# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 6, 2021

Lyle W. Cayce
Clerk

No. 18-11479

Chad Everet Brackeen; Jennifer Kay Brackeen; State of Texas; Altagracia Socorro Hernandez; State of Indiana; Jason Clifford; Frank Nicholas Libretti; State of Louisiana; Heather Lynn Libretti; Danielle Clifford,

*Plaintiffs—Appellees,*

*versus*

Deb Haaland, *Secretary, United States Department of the Interior;* Darryl LaCounte, *Acting Assistant Secretary for Indian Affairs;* Bureau of Indian Affairs; United States Department of the Interior; United States of America; Xavier Becerra, *Secretary, United States Department of Health and Human Services;* United States Department of Health and Human Services,

*Defendants—Appellants,*

Cherokee Nation; Oneida Nation; Quinault Indian Nation; Morongo Band of Mission Indians,

*Intervenor Defendants—Appellants.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:17-CV-868

No. 18-11479

Before Owen, *Chief Judge*, and Jones, Smith, Wiener, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Duncan, Engelhardt, and Oldham, *Circuit Judges.**

Per Curiam:

This en banc matter considers the constitutionality of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 *et seq.*, and the validity of implementing regulations promulgated by the Bureau of Indian Affairs (BIA) in its 2016 Final Rule (Final Rule). Plaintiffs are several couples who seek to adopt or foster Indian children, a woman who wishes for her Indian biological child to be adopted by non-Indians, and the States of Texas, Louisiana, and Indiana. Defendants are the United States, federal agencies and officials charged with administering ICWA and the Final Rule, as well as several Indian tribes that intervened in support of ICWA. The district court granted Plaintiffs summary judgment in part, declaring that ICWA and the Final Rule contravene multiple constitutional provisions and the Administrative Procedure Act (APA). Defendants appealed. A panel of this court reversed and rendered judgment for the Defendants. *See Brackeen v. Bernhardt*, 937 F.3d 406, 414 (5th Cir. 2019). One panel member partially dissented, concluding that several provisions of ICWA violated the Tenth Amendment's anticommandeering doctrine. *See id.* at 441–46 (Owen, J., concurring in part and dissenting in part). This case was then reconsidered en banc.

Neither Judge Dennis's nor Judge Duncan's principal opinion nor any of the other writings in this complex case garnered an en banc majority on all issues. We therefore provide the following issue-by-issue summary of the en banc court's holdings, which does not override or amend the en banc opinions themselves.

---

* Judge Ho was recused and did not participate. Judge Wilson joined the court after the case was submitted and did not participate.

No. 18-11479

First is the issue of standing. The en banc court unanimously holds that at least one Plaintiff has standing to challenge Congress's authority under Article I of the Constitution to enact ICWA and to press anticommandeering and nondelegation challenges to specific ICWA provisions. The en banc court also unanimously holds that Plaintiffs have standing to challenge the Final Rule as unlawful under the APA. The en banc court is equally divided as to whether Plaintiffs have standing to challenge two provisions of ICWA, 25 U.S.C. §§ 1913 and 1914, on equal protection grounds, and the district court's conclusion that Plaintiffs can assert this claim is therefore affirmed without a precedential opinion.[1] An en banc majority also holds that Plaintiffs have standing to assert their equal protection challenges to other provisions of ICWA.

On the merits, an en banc majority agrees that, as a general proposition, Congress had the authority to enact ICWA under Article I of the Constitution.[2] An en banc majority also holds that ICWA's "Indian child" classification does not violate equal protection.[3] The district court's ruling to the contrary on those two issues is therefore reversed. The en banc court is equally divided, however, as to whether Plaintiffs prevail on their equal protection challenge to ICWA's adoptive placement preference for "other

---

[1] *See United States v. Garcia*, 604 F.3d 186, 190 n.2 (5th Cir. 2010) ("Decisions by an equally divided en banc court are not binding precedent but only affirm the judgment by operation of law.").

[2] *See* Part II(A)(1) of Judge Dennis's opinion *and* Part II of Judge Costa's opinion.

[3] Part II(B) of Judge Dennis's opinion is the en banc majority opinion on this issue, except as to the constitutionality of "other Indian families" in § 1915(a)(3) and "Indian foster home" in § 1915(b)(iii).

No. 18-11479

Indian families," 25 U.S.C. § 1915(a)(3), and its foster care placement preference for a licensed "Indian foster home," § 1915(b)(iii).[4] The district court's ruling that provisions of ICWA and the Final Rule are unconstitutional because they incorporate the "Indian child" classification is therefore reversed, but its ruling that § 1915(a)(3) and (b)(iii) violate equal protection is affirmed without a precedential opinion.

The court's holdings on Plaintiffs' various anticommandeering claims are more intricate. An en banc majority holds that ICWA's "active efforts," § 1912(d), expert witness, § 1912(e) and (f), and recordkeeping requirements, § 1915(e), unconstitutionally commandeer state actors.[5] The district court's judgment declaring those sections unconstitutional under the anticommandeering doctrine is therefore affirmed. However, the en banc court is equally divided on whether the placement preferences, § 1915(a)–(b), violate anticommandeering to the extent they direct action by state agencies and officials[6]; on whether the notice provision, § 1912(a), unconstitutionally commandeers state agencies[7]; and on whether the placement record provision, § 1951(a), unconstitutionally commandeers

---

[4] *Compare* Part II(B) of JUDGE DENNIS's opinion *with* Part III(A)(3) of JUDGE DUNCAN's opinion.

[5] Parts III(B)(1)(a)(i), (ii), (iv); III(B)(1)(b); and III(B)(2)(b) (insofar as it addresses §§ 1912(d)–(f) and 1915(e)) of JUDGE DUNCAN's opinion are the en banc majority opinion on these issues.

[6] *Compare* Part II(A)(2)(a)(i) of JUDGE DENNIS's opinion *with* Part III(B)(1)(a)(iii) of JUDGE DUNCAN's opinion.

[7] *Compare* Part II(A)(2)(b) of JUDGE DENNIS's opinion *with* Part III(B)(1)(a)(v) of JUDGE DUNCAN's opinion.

No. 18-11479

state courts.[8] To that extent, the district court's judgment declaring those sections unconstitutional under the anticommandeering doctrine is affirmed without precedential opinion.

Furthermore, an en banc majority holds that several challenged ICWA provisions validly preempt state law and so do not commandeer states. Those are provisions granting certain private rights in state child custody proceedings—namely, the right to intervene, § 1911(c), to appointed counsel, § 1912(b), to examine documents, § 1912(c), to explanation of consent, § 1913(a), to withdraw consent, § 1913(b), (c), and (d), to seek invalidation, § 1914, to seek return of custody, § 1916(a), and to obtain tribal information, § 1917.[9] In addition, an en banc majority holds that the following provisions validly preempt contrary state law to the extent they apply to state courts (as opposed to state agencies): the placement preferences, § 1915(a) and (b), and the placement and termination standards, § 1912(e) and (f).[10] The district court's rulings to the contrary are therefore reversed.

Next, an en banc majority holds that § 1915(c), which permits Indian tribes to establish an order of adoptive and foster preferences that is different from the order set forth in § 1915(a) and (b), does not violate the non-

---

[8] *Compare* Parts II(A)(2)(a)(ii) of JUDGE DENNIS's opinion *with* Part III(B)(2)(c) of JUDGE DUNCAN's opinion.

[9] Part III(B)(2)(a) of JUDGE DUNCAN's opinion is the en banc majority opinion on this issue, except as to the appointed counsel provision in § 1912(b).

[10] Part III(B)(2)(c) of JUDGE DUNCAN's opinion is the en banc majority opinion on this issue, except as to the placement record requirement in § 1951(a).

No. 18-11479

delegation doctrine.[11] The district court's ruling to the contrary is therefore reversed.

Last are Plaintiffs' claims that the Final Rule violates the APA. An en banc majority holds that the BIA did not violate the APA by concluding in the Final Rule that it may issue regulations binding on state courts.[12] But an en banc majority also holds that—consistently with the en banc court's holding that §§ 1912(d), 1912(e), and 1915(e) commandeer states—the Final Rule violated the APA to the extent it implemented these unconstitutional provisions.[13] Finally, an en banc majority determines that 25 C.F.R. § 23.132(b)—the part of the Final Rule interpreting § 1915's "good cause" standard to require proof by clear and convincing evidence—violated the APA.[14] An en banc majority holds that the Final Rule did not violate the APA in any other respect. The district court's grant of relief under the APA is affirmed to the extent it is consistent with these holdings and reversed to the extent it is inconsistent with these holdings.

The judgment of the district court is therefore AFFIRMED in part and REVERSED in part, and judgment is accordingly RENDERED.

---

[11] Part II(C) of JUDGE DENNIS's opinion is the en banc majority opinion on this issue.

[12] Part II(D)(2) of JUDGE DENNIS's opinion is the en banc majority opinion on this issue.

[13] Part III(D)(1) of JUDGE DUNCAN's opinion is the en banc majority opinion on this issue, insofar as it applies to §§ 1912(d)–(e) and 1915(e).

[14] Part III(D)(3) of JUDGE DUNCAN's opinion is the en banc majority opinion on this issue.

No. 18-11479

Dennis, J., delivered the opinion of the en banc court with respect to Parts II(B), II(C), and II(D)(2) of his opinion (except as otherwise noted in the Per Curiam opinion, *supra*).

Duncan, J., delivered the opinion of the en banc court with respect to Parts III(B)(1)(a)(i)–(ii), III(B)(1)(a)(iv), III(B)(2)(a)–(c), III(D)(1), and III(D)(3) of his opinion (except as otherwise noted in the Per Curiam opinion, *supra*).

JAMES L. DENNIS, *Circuit Judge*: [†]

The Indian Child Welfare Act (ICWA) of 1978 is a federal law that regulates the removal and out-of-home placement of American Indian children. The Act establishes minimum federal standards that must be met in any legal proceeding to place an Indian child in a foster or adoptive home, and it ensures that Indian tribes and families are allowed to participate in such Indian child welfare cases. *See* 25 U.S.C. § 1901 *et seq.* Congress enacted ICWA after finding "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions"; "that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families"; and "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children

---

[†] JUDGES STEWART and GRAVES join this opinion in full. JUDGES WIENER, HIGGINSON, AND COSTA join all except Discussion Part I.A.2 (standing to bring equal protection claims other than the challenges to 25 U.S.C. §§ 1913-14).

CHIEF JUDGE OWEN joins Discussion Parts I.A.1 (standing to challenge §§ 1913-14), I.C (standing to bring anticommandeering claims), II.A.2.a.1 (anticommandeering challenge to §§ 1912(e)-(f) and 1915(a)-(b) as they pertain to state courts), and II.C (nondelegation). She further joins Discussion Part I.D (standing to bring nondelegation claim) except as to the final sentence. *See infra* OWEN, CHIEF JUDGE, OP.

JUDGE SOUTHWICK joins Discussion Parts I.A.1 (standing to challenge §§ 1913-14), II.A.1 (Congress's Article I authority), II.B (equal protection), and II.C (nondelegation). He further joinss in-part Discussion Parts II.A.2 (anticommandeering) and II.D (APA challenge to the Final Rule), disagreeing to the extent the analyses pertains to § 1912(d)-(f) and the regulations that implement those provisions.

JUDGE HAYNES has expressed her partial concurrence in her separate opinion. *See infra* HAYNES, CIRCUIT JUDGE, OP.

and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." *Id.*

Plaintiffs, consisting of the States of Texas, Louisiana, and Indiana, and seven individuals, challenge the facial constitutionality of ICWA as well as the statutory and constitutional validity of the Department of Interior's 2016 administrative rule implementing ICWA (the "Final Rule"). Combined, Texas, Louisiana, Indiana, and Ohio (which filed an amicus brief in support of Plaintiffs) are home to only about 1% of the total number of federally recognized Indian tribes and less than 4% of the national American Indian and Alaska Native population. *See* NAT'L CONF. OF STATE LEGIS., FEDERAL AND STATE RECOGNIZED TRIBES (March 2020), https://www.ncsl.org/research/state-tribal-institute/list-of-federal-and-state-recognized-tribes.aspx; CENTERS FOR DISEASE CONTROL AND PREVENTION, *Tribal Population* https://www.cdc.gov/tribal/tribes-organizations-health/tribes/state-population.html (last viewed Mar. 29, 2021). On the other hand, twenty-six other states and the District of Columbia have filed amicus briefs asking us to uphold ICWA and the Final Rule. Those states are California, Alaska, Arizona, Colorado, Connecticut, Idaho, Illinois, Iowa, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, Oklahoma, Oregon, Pennsylvania, Rhode Island, Utah, Virginia, Washington, and Wisconsin, which are collectively home to 94% of federally recognized Indian tribes and 69% of the national American Indian and Alaska Native population.

We do not decide cases by a show of hands of states' votes, of course, but we cannot ignore the irony of the situation with which we are faced. Twenty-six states and the District of Columbia, which are home to a large majority of federally recognized tribes and the nation's overall indigenous population, do not view ICWA as any sort of burden on their child welfare

systems. They strongly contend that ICWA is constitutional and have no problem applying it in their state court systems; indeed, they view ICWA as the "gold standard" for child welfare practices and a "critical tool" in managing their relationships with the Indian tribes within their borders. Conversely, only four states with relatively few tribes and Indians regard ICWA as offensive to their sovereignty and seek to have the law struck down completely because it intrudes upon their otherwise unimpeded discretion to manage child custody proceedings involving Indian children. Further, these State Plaintiffs and their amicus wrongly assert repeatedly that ICWA regulates *all* of their child custody and adoption proceedings. This is simply not true. Congress drew ICWA narrowly to provide minimum protections only to qualified Indian children—safeguards that Congress found necessary and proper to stop the abusive practices that had removed nearly a generation of Indian children from their families and tribes and that threatened the very existence of the Indian nations. *See generally* Margaret Jacobs, A Generation Removed: The Fostering and Adoption of Indigenous Children in the Postwar World (2014) [hereinafter Jacobs, A Generation Removed]. The vast majority of child custody proceedings in Texas, Louisiana, and Indiana do not involve Indian children; therefore, ICWA does not apply in the vast majority of such proceedings in those states or, for that matter, in any other state.

Defendants are the United States of America, several federal agencies and officials in their official capacities, and five intervening Indian tribes. Defendants moved to dismiss the complaint for lack of subject matter jurisdiction, but the district court denied the motion, concluding, as relevant to this appeal, that Plaintiffs had Article III standing. The district court then granted summary judgment in favor of Plaintiffs, ruling that provisions of ICWA and the Final Rule violated equal protection, the anticommandeering doctrine, the nondelegation doctrine, and the Administrative Procedure Act (the "APA"). Defendants appealed.

Although we would affirm most aspects of the district court's ruling that Plaintiffs have standing, we would conclude that Plaintiffs' challenges to ICWA lack merit and uphold the statute in its entirety. We would therefore reverse the district court's grant of summary judgment to Plaintiffs and render judgment in favor of Defendants.

## BACKGROUND

Before the establishment of the United States, the North American landmass was "owned and governed by hundreds of Indian tribes." Cohen's Handbook of Federal Indian Law § 1.01 (Nell Jessup Newton ed., 2012.) [hereinafter Cohen's]. These tribes, sovereigns under international law, came under the jurisdiction of the United States "through a colonial process that was partly negotiated and partly imposed." *Id.* The Constitution recognizes the existence of Indian tribes and, in many respects, treats them as sovereigns in the same manner as the states and foreign nations. *See* U.S. Const. art. I, § 8, cl. 3 (empowering Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"); *Holden v. Joy*, 84 U.S. 211, 242 (1872) (holding that the President's Article II, Section 2 power to make treaties with the Indian tribes is coextensive with the power to make treaties with foreign nations). But a long line of judicial opinions confirms that, under U.S. law, Indian tribes occupy a unique position: they are "domestic, dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). That is, tribes reside within the United States and are subject to federal power, but they retain sovereign authority over a range of matters relevant to their self-government. Cohen's, *supra* § 1.01.

Three key principles underpin the field of federal Indian law. First, Indian tribes possess "inherent powers of a limited sovereignty that has never been extinguished." *Id.* Because of tribes' retained sovereignty, they have a government-to-government relationship with the United States. *Id.* Second, the federal government has expansive and exclusive powers in Indian affairs,

and, relatedly, an ongoing obligation to use those powers to promote the well-being of the tribes in what is commonly referred to as a trust relationship. *Id.* Third, as a corollary to the federal government's broad power in Indian affairs, the supremacy of federal law, and the need for the nation to speak with one voice in its government-to-government relations, state authority in this field is very limited. *Id.*

In addition to these precepts, we are mindful of the uniquely crucial importance of historical perspective in federal Indian law. *See, e.g.,* CHARLES A. MILLER, THE SUPREME COURT AND THE USES OF HISTORY 24 (1969) ("[I]n disputes concerning American Indian tribes the courts have also considered and often decided cases principally on the basis of historical materials[.]"). As Justice Holmes said about a different issue: "Upon this point a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921); *see also N.L.R.B. v. Noel Canning,* 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions[.]" (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). Particularly significant to our analysis is the contemporary understanding of the Constitution's treatment of Indian Affairs at the time of its adoption. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 605-10 (2008) (canvassing Founding-era historical sources to synthesize the original understanding of the Constitution). We therefore survey the interrelated history of Indian affairs and the adoption of the Constitution.

## I. A Brief History of the American Indians and the United States Constitution

In holding key provisions of ICWA unconstitutional, the district court disregarded two centuries of precedent and omitted any discussion of the history of the federal constitutional power to enter treaties or legislate with respect to the Indian tribes. Seeking to make up for the district court's errors and omissions, the Plaintiffs now cite to several historical texts. The

authorities they cite, however, mainly support a broad understanding of the federal government's exclusive power over Indian affairs, which includes the authority to prevent states from exercising their sovereignty in ways that interfere with federal policy toward the Indians. Careful study of their references and other scholarly resources reveals the lack of foundation for the district court's more limited conception of federal authority.

Following the American Revolution, the new United States government supplanted the British Crown as the self-appointed ruler of most of North America, thereby inviting expansive white settlement of the continent. *See* COHEN'S, *supra* § 1.02. Americans, then, were optimistic in 1783; their victory over the British had rendered the nation, as George Washington put it, "the sole Lord[] and Proprietor[] of a vast tract of continent." Gregory Ablavsky, *The Savage Constitution*, 63 DUKE L.J. 999, 1009 (2014) [hereinafter Ablavsky, *Savage Constitution*] (quoting George Washington, THE LAST OFFICIAL ADDRESS, OF HIS EXCELLENCY GENERAL WASHINGTON, TO THE LEGISLATURES OF THE UNITED STATES 4 (1783)). But only four years later, that optimism "turned to despondence, as the Continental Congress, with an empty treasury and a barely extant military, confronted looming wars against powerful Indian confederacies on the northern and southern borderlands." *Id.* Unrest between the tribes, the states, squatters, and settlers was largely to blame for this dramatic shift in national mood—hallmarks of the failure of the central government's Indian policy under the Articles of Confederation. *Id.* at 1006.

The insolvent Continental Congress desperately desired both peace with the Indians and annexation of the western land they inhabited in order to repay the debt it had incurred during the Revolutionary War. *Id.* To accomplish these goals, the new nation followed the practice of the British, who had treated Indian tribes as "quasi-foreign nations" and used negotiation, treaties, and war-making as the primary tools for managing relations. Br. of Prof. Ablavsky at 5. In other words, the United States

structured its relations with tribes akin to its regulation of foreign affairs. *See id.* The Articles of Confederation accordingly provided that the national government was to have authority over "managing all affairs with the Indians." ARTICLES OF CONFEDERATION OF 1781, art. IX. As the Continental Congress's Committee on Southern Indians explained, this authority comprehended a number of interrelated powers: "making war and peace, purchasing certain tracts of [tribal] lands, fixing the boundaries between [Indians] and our people, and preventing the latter settling on lands left in possession of the former." 33 *Journals of the Continental Congress, 1774-1789*, 457 (Roscoe R. Hill ed., 1936). These interconnected powers were, in the Southern Indians Committee's view, "indivisible." *Id.* This is to say that, under the Articles of Confederation, the Continental Congress was intended to possess Indian affairs powers like those that any sovereign would hold in conducting affairs with other sovereigns. *See id.* (noting that "before the revolution" these powers "were possessed by the King"). In practice, however, it was not clear whether, under the Articles, the states also retained the sovereign power to deal with the Indian tribes in their own right. *See* THE FEDERALIST NO. 42 at 217 (James Madison) (describing the delineation of authority as "ambiguous").

Exercising its federal authority, the Continental Congress appointed commissioners to secure peace treaties with tribes throughout the nation. COHEN'S, *supra* at 1.02[3]. These treaties serve as some of the earliest documentary bases for the nation's continuing trust relationship with the tribes. For example, in return for peace and other guarantees, the United States promised the Cherokees that the tribe would be "received" into "the favour and protection of the United States of America." Treaty with the Cherokees, preamble, 1785, 7 Stat. 18. Similar language was included in a treaty with the Six Nations tribes at Fort Stanwix in New York. TREATY WITH THE SIX NATIONS, 1784, 7 Stat. 15 (Treaty at Fort Stanwix).

While the national government worked to secure treaties with the tribes, some states resisted—or outright defied—these efforts, viewing them as infringements on their sovereignty. COHEN'S, *supra* at 1.02[3]. New York, for instance, protested the asserted national "incursion" into its powers posed by the Treaty of Fort Stanwix. Robert N. Clinton, *The Dormant Indian Commerce Clause*, 27 CONN. L. REV. 1055, 1147 (1995). Other states went further. Georgia and North Carolina seized on ambiguous clauses in the Articles concerning the scope of federal power over Indian affairs, construing them in a manner that "le[ft] the federal powers . . . a mere nullity." 33 *Journals of the Continental Congress* at 457. Indeed, Georgia outright ignored federal treaties and attempted to form its own compacts with the Creek Indians, *see id.*, "reportedly resort[ing] to death threats to compel agreement" and expropriate tribal lands. Ablavsky, *The Savage Constitution*, *supra* at 1028; *see also* Report of the Secretary of War on the Southern Indians (July 18, 1787), in 18 EARLY AMERICAN INDIAN DOCUMENTS: TREATIES AND LAWS, 1607-1789: REVOLUTION AND CONFEDERATION 449, 450 (Alden T. Vaughan et al. eds., 1994) [hereinafter EARLY AMERICAN INDIAN DOCUMENTS].

In a memorandum drafted on the eve of the Constitutional Convention, James Madison described Georgia's "wars and Treaties . . . with the Indians," as emblematic of the "vices" inherent in the division of federal and state power under the Articles. JAMES MADISON, VICES OF THE POLITICAL SYSTEM OF THE UNITED STATES, in 9 THE PAPERS OF JAMES MADISON 345, 348 (Robert A. Rutland et al. eds., 1975). And in a letter sent to Congress in the midst of the Convention, Secretary at War Henry Knox worried that the United States could not "effectual[y] interfere[]" in the many skirmishes that pitted states and settlers against

Indians and, he predicted that a "general [I]ndian war may be expected."[1] H. Knox, Report of the Secretary at War on the Southern Indians (July 18, 1787), in 18 EARLY AMERICAN INDIAN DOCUMENTS 450. Thus, nationalists like Madison and Alexander Hamilton "agreed on the problem": the new nation was "too weak to exercise the authority it enjoyed on paper" under the Articles of Confederation, and a stronger federal government was needed. Ablavsky, *Savage Constitution*, *supra* at 999. "Indian affairs thus propelled the creation of a more powerful national state—one that, in Madison's words, would possess the "ability to effect what it is proper [it] should do.'" *Id.* (alterations in original) (quoting Letter from James Madison to George Nicholas (May 17, 1788), in 18 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION: COMMENTARIES ON THE CONSTITUTION PUBLIC AND PRIVATE 24, 28 (John P. Kaminski et al. eds., 1995)). The supporters of a stronger national authority envisioned a central government that could "govern not merely in principle but 'in reality,'" as Secretary Knox wrote about Indian affairs. *Id.* (quoting Report of the Secretary at War on the Southern Indians (July 18, 1787), in 18 EARLY AMERICAN INDIAN DOCUMENTS 449, 450).

At the Constitutional Convention, Madison attributed the failings of Indian policy to state interference with the Confederation's authority, especially its treatymaking power. *Id.* at 1006. His solution to Indian affairs was to revise "federalism to ensure federal supremacy—partly through the Indian Commerce Clause, but more significantly through the Treaty,

---

[1] Knox's position was labeled "Secretary at War" under the Articles. *See* 19 Journals of the Continental Congress, 1774-1789, at 126 (Worthington Chauncey Ford ed., 1912) (establishing under the Articles of Confederation the position of "Secretary at War"). He was appointed to the new position of "Secretary of War" in September 1789. *See* Harry M. Ward, The Department of War, 1781-1795, at 101-02 (1962); *see also* Act of Aug. 7, 1789, ch. 7, 1 Stat. 49, 50 (establishing the Department of War and the office of Secretary of War, a position invested with "such duties as shall be enjoined on, or entrusted to him by the President of the United States . . . relative to Indian Affairs").

Compact, Supremacy, and Property Clauses." Ablavsky, *Savage Constitution*, *supra* at 1006-07. At its heart, Madison's solution to Indian affairs "envisioned a strengthened federal government that would protect and restrain Indians and states alike." *Id.* at 1007.

Hamilton and other Federalists took a different but complementary view; their "concern over external threats dovetailed with the views of many on the frontier, who blamed the Articles' failure on national military weakness against Native power."[2]    *Id.*   The approach of Hamilton and

---

[2] Though the writings and speeches of Madison have traditionally been regarded as the authoritative encapsulation of the Federalist case for the Constitution, contemporary research has upset the assumption that Madison's views were representative of the Federalist camp generally. In particular, historians have harnessed *The Documentary History of the Ratification*, a rich source of primary material concerning the Constitutional Convention and the ratification debates that includes documents such as letters, petitions, and records of convention debates. *See* Max M. Edling, A Revolution in Favor of Government: Origins of the U.S. Constitution and the Making of the American State 18-21 (2003) at 29 [hereinafter Edling, A Revolution in Favor of Government] (citing The Documentary History of the Ratification of the Constitution: Commentaries on the Constitution Public and Private 24, 28 (John P. Kaminski et al. eds., 1995)). In addition to the obvious import of the proceedings during the Constitutional Convention at which the charter was framed, documentation from the subsequent ratification debates offers significant insight into how the Constitution should be interpreted. The Constitution rooted its legitimacy in the consent of those whom it would come to govern, declaring that the system it outlined was "ordained and established" by "We the people," U.S. Const. Preamble. To turn the promise of self-rule into a reality, ratification was conducted through a series of state conventions with delegates chosen by the voters of each state. Ratification thus was itself an act of popular sovereignty and representative democracy that required the public and its chosen delegates to be educated and deliberate on the meaning of the Constitution. *See id.* at 29-31. These ratification debates provided the "first widely shared" exposition of important constitutional provisions, and the discussions that took place therein were the starting point for constitutional interpretation during the early republic. *Id.* Thus, the contemporaneous writings that circulated among the public and within the state ratification conventions are as important as the records of the Constitutional Convention itself in determining the charter's original public meaning. *See* id.

Mining this trove, historians have concluded that the issues that motivated Madison were not emphasized by all Federalists. Many Federalists did not echo Madison's

likeminded Federalists to Indian affairs, then, was to create a muscular "fiscal-military state that would possess the means to dominate the borderlands at Indians' expense." *Id.* (citing Max M. Edling, A REVOLUTION IN FAVOR OF GOVERNMENT: ORIGINS OF THE U.S. CONSTITUTION AND THE MAKING OF THE AMERICAN STATE 47-49 (2003)). The Indians thus served as "both impetus and justification for the creation of a federal standing army" supportable through direct taxation. *Id.*

Ultimately, these arguments in favor of restraining states and centralizing authority over Indian affairs resulted in a significant enhancement of the federal government's power. *Id.* at 999. New constitutional provisions were added declaring the federal constitution, laws, and treaties the supreme law of the land; barring state treatymaking; and providing "exclusive federal power over western territories." *Id.* Added, too, was the Indian Commerce Clause, but the foregoing more general

---

prototypical liberal "call for minority rights and limited government," but rather argued for the formation of a strong national state. *Id.* at 14-15. While Madison was concerned primarily with creating a constitutional structure that would protect liberty by restraining concentrations of power and safeguarding the rights of minorities, Hamilton and others sought to establish a robust "national government with the ability to act." *Id.*

This latter group of Federalists, having witnessed the failings of the weak and insolvent nation under the Articles of Confederation, were fierce advocates for the Constitution's grant of unlimited fiscal and military power to the central government, arguing that centralizing such authority was necessary to defend against foreign and domestic aggressors and competitors. *Id.* Chief among the adversaries they sought to protect against were the Indian tribes. Indians presented immediate dangers in the borderlands, and these Federalists feared the tribes would form confederations with each other, the British to the north, or the Spanish to the south, creating strong rival powers for control of the continent. *Id.* These Federalists also perceived a need to remove the tribes, by force or by treaties, as obstacles to the new nation's capitalization of the interior lands and their resources. *See* Ablavsky, *Savage Constitution* at 1037-38, 1063-67. Countering the tribes, they believed, would require a strong central government with unlimited taxing, borrowing, and military powers. In sum, the need for a strong national government with robust powers to manage relations with the Indians played a crucial role in the Federalist case for the Constitution, and recognizing this motivation is key to understanding the wide breadth of the Indian affairs power the Constitution confers on the federal government. *See id.* at 1058-67.

provisions ensuring supreme federal power over the states with respect to foreign affairs and the western territories were of much greater importance, as they collectively authorized the "fiscal-military state committed to western expansion" that the Federalists had envisioned. *Id.*

During the ratification of the Constitution, the constant potential for Indian alliances with other tribes or European nations also influenced the public understanding of the Constitution. *See id.* at 1058-67. Indeed, "many Federalists repeatedly invoked the specter of threats posed by the 'savages' to justify" states' ratifying a stronger federal government and a standing army. *Id.* at 1000, 1069. This unifying strategy worked well: Georgia, for example, ratified the new Constitution after only three days of debate so that it could secure federal aid in its ongoing war with the Creek Indians. *Id.*

Proponents of the new charter also expressly contended that its consolidation of power over Indian affairs in the national government would rectify the problems that had resulted from the split authority between the states and Congress under the Articles of Confederation. Writing in the Federalist Papers, Madison described the Indian Commerce Clause as "very properly unfettered" by the ambiguous limits Article XI of the Articles of Confederation had placed on state power. THE FEDERALIST NO. 42 at 217 (James Madison); *see also* Ablavsky, *The Savage Constitution*, *supra* at 1053-54. The Constitution's opponents recognized, too, the import of this redistribution of power in Indian affairs; Abraham Yates, a leading Anti-Federalist, warned that "adopting the new government[] will enervate" states' "legislative rights, and totally surrender into the hands of Congress the management and regulation of the Indian affairs." Abraham Yates, *Documentary History of the Ratification of the Constitution*, Vol. XX, p. 1158; *see also* Ablavsky, *The Savage Constitution*, *supra* at 1053-54. Yet the Constitution was ratified despite these concerns, indicating that early Americans viewed the benefits of centralizing power over Indian affairs to be worth the surrender of state authority.

The post-ratification history further confirms that the Constitution created a fiscal-military government possessing broad, exclusive federal powers over Indian affairs. The Washington Administration likened federal authority over Indian affairs to its foreign affairs power. For instance, Secretary Knox wrote to President George Washington that "[t]he independent nations and tribes of Indians ought to be considered as foreign nations, not as the subjects of any particular state." Letter from Henry Knox to George Washington (July 7, 1789), in 3 PAPERS OF GEORGE WASHINGTON: PRESIDENTIAL SERIES 134, 138 (Dorothy Twohig ed., 1989). Accordingly, as Knox explained in another letter, the federal government had supreme authority to regulate in this field: "[T]he United States have, under the constitution, the sole regulation of Indian affairs, in all matters whatsoever." Letter from Henry Knox to Israel Chapin (Apr. 28, 1792), in 1 AMERICAN STATE PAPERS: INDIAN AFFAIRS 231-32 (Walter Lowrie et al. eds., 1832).

State officials also acknowledged the federal government's plenary authority over Indian affairs under the new constitution. Soon after ratification, for example, South Carolina Governor Charles Pinckney wrote to President Washington requesting aid from "the general Government, to whom with great propriety the sole management of India[n] affairs is now committed." Letter from Charles Pinckney to George Washington (Dec. 14, 1789), in 4 PAPERS OF GEORGE WASHINGTON: PRESIDENTIAL SERIES 401, 404 (Dorothy Twohig ed., 1993); *see also* Gregory Ablavsky, *Beyond the Indian Commerce Clause*, 124 YALE L.J. 1012, 1043 (2015) [hereinafter Ablavsky, *Beyond the Indian Commerce Clause*] (citing similar acknowledgments of federal supremacy in Indian affairs by the legislatures of Georgia and Virginia).

Early congressional enactments demonstrate the Founding-era view that the federal government was supreme in regulating Indian affairs. Ablavsky, *Savage Constitution*, *supra* at 999. Particularly significant is the

13

First Congress's passage of the Indian Intercourse Act (also referred to as the "Non-Intercourse Act" or "Trade and Intercourse Act"). Act of July 22, 1790, 1 Cong. ch. 33, 1 Stat. 137. The statute limited trade with Indians to persons licensed by the federal government and criminalized offenses by U.S. citizens against Indians in Indian country, including within states' borders. Successor versions were enacted throughout the 18th and 19th centuries, further expanding the scope of the law by, for instance, "authorizing federal military force to arrest violators of the Act found within Indian country anywhere in the United States." *See* Br. of Prof. Ablavsky at 11.[3]

That the Constitution was intended to confer on the federal government unimpeded authority vis-à-vis Indian relations is evidenced further in how the government deployed its new fiscal-military power against the tribes in service of the nation's westward expansion.[4] The military's initial western expeditions in the early 1790s resulted in gross failure, as an Indian confederacy handed the American forces the U.S. Army's worst defeat by Indians in its entire history. Ablavsky, *Savage Constitution*, *supra* at 1077-78. The Indians' routing of American troops underscored their martial strength and the threat that they posed to the nation's ambitions to conquer the western lands. In response, the government ramped up spending on the Army over the next few years, swelling its size severalfold. In subsequent battles with the Indians, the newly strengthened Army "prevailed, seizing most of present-day Ohio." *Id.* at 1078. The government's bellicose stance toward the tribes persisted, and, over the next century, wars between the Indians and the United States "remained a near constant" as the government

---

[3] *See also* Act of May 19, 1796, 4 Cong. ch. 30, § 3, 1 Stat. 469, 470; Act of June 30, 1834, ch. 161, 4 Stat. 729; Act of Mar. 30, 1802, ch. 13, 2 Stat. 139; Act of Mar. 3, 1799, ch. 46, 1 Stat. 743; Act of Mar. 1, 1793, ch. 19, 1 Stat. 329.

[4] "The army had been brought into existence to deal with western expansion and to coerce the Indians." EDLING, A REVOLUTION IN FAVOR OF GOVERNMENT, *supra* at 140. Indeed, in the Antebellum era alone, the U.S. Army fought at least ten wars against the Indians. Ablavsky, *Savage Constitution*, *supra* at 1080 & n.483.

continued to facilitate westward expansion.[5] *Id.* at 1078. In this way, the Constitution operated as the Federalists had predicted: the nation developed a strong military able to quell any threat posed by Indians and, consequently, to open up the west to Anglo settlement. *Id.* at 1077-78.

Finally, early Supreme Court decisions confirm that the Constitution was understood to place the reins of authority over Indian affairs squarely and solely in the hands of the federal government. In *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832), Chief Justice John Marshall explained that the Constitution

> confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and *with the Indian tribes*. These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions. The shackles imposed on this power, in the confederation, are discarded.

---

[5] The history of the dispossession of the Indians continued apace throughout the nineteenth and well into the twentieth centuries. In the early years of the nineteenth century, for example, the United States negotiated treaties that resulted in the nation acquiring millions of acres, "often paying pennies on the acre for lands worth many times more." COHEN'S, *supra* § 1.03. Later, during the "allotment" era of 1887 until 1934, Indians' land holdings plunged from 138 million acres to only 48 million acres of land due to the federal government's policy of splitting tribal members' undivided interests in reservation lands into individually-owned lots and then selling off "surplus" reservation land to non-Indians. *Id.* § 1.04. By the measure of some scholars of the Indian history, "the United States seized some 1.5 billion acres from North America's native peoples" in total since the nation's founding. Claudio Saunt, *The Invasion of America*, AEON (Jan. 7, 2015), https://aeon.co/essays/how-were-1-5-billion-acres-of-land-so-rapidly-stolen. Professor Saunt has authored several books documenting the lengthy history of injustices that befell the Indians as their lands were taken by non-Indians throughout the eighteenth and nineteenth centuries, often by the federal government or with its backing. *See, e.g.*, CLAUDIO SAUNT, WEST OF THE REVOLUTION: AN UNCOMMON HISTORY OF 1776 (2014); CLAUDIO SAUNT, UNWORTHY REPUBLIC: THE DISPOSSESSION OF NATIVE AMERICANS AND THE ROAD TO INDIAN TERRITORY (2020).

The Court's holistic reading of the Constitution exemplifies how the Founding Generation understood federal Indian authority: as a bundle of interrelated powers that functioned synergistically to give the federal government supreme authority over Indian affairs. *See id.* at 519 ("The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the union."); *see also* Ablavsky, *Beyond the Indian Commerce Clause*, *supra* at 1040; *cf. McGirt v. Oklahoma*, 140 S. Ct. 2452, 2463 (2020) ("The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." (internal quotation marks omitted)).

In sum, the historical evidence powerfully demonstrates that the Framers intended the Constitution, through an array of provisions, to entrust to the federal government exclusive and supreme authority in Indian affairs, including the power to prevent states from interfering with federal policy toward the Indians. It also reveals that the Founding Generation, both at the federal and state levels, held this same understanding regarding the Constitution's consolidation of authority in Indian affairs. Wielding its interconnected, symbiotic powers in this area, the early federal government at times regulated to encourage national expansion at the expense of the Indians' sovereignty and thereby to entrench tribes' dependency on the federal government of the United States.

## II. The Special Federal-Tribal Trust Relationship

As a result of the federal government's forcible annexation of the western lands and envelopment of the Indian nations, the United States developed a special obligation with respect to the Indian tribes, with the two sharing what modern courts generally describe as a unique "trust relationship." Matthew L.M. Fletcher, PRINCIPLES OF FEDERAL INDIAN LAW § 5.2 (1st ed. 2017) [hereinafter Fletcher, FEDERAL INDIAN LAW]. In essence, the trust relationship obligates the federal government to

preserve tribal self-governance, promote tribal welfare, and uphold its fiduciary duty in managing tribal assets.  *See id.*

The contemporary understanding of the trust relationship has roots in the centuries-old "doctrine of the law of nations."  *Worcester*, 31 U.S. at 520. That doctrine holds that "when a stronger sovereign assumes authority over a weaker sovereign, the stronger one assumes a duty of protection for the weaker one, which does not surrender its right to self-government." Fletcher, Federal Indian Law, *supra* § 5.2; *see Worcester*, 31 U.S. at 552, 555 ("Th[e] relation [between the United States and the tribes] was that of a nation claiming and receiving the protection of one more powerful: not that of individuals abandoning their national character, and submitting as subjects to the laws of a master . . . Protection does not imply the destruction of the protected.").  Of course, the Indian Nations were originally self-governing sovereigns and independent from any outside rulers.  *See McClanahan v. State Tax Comm'n of Az.*, 411 U.S. 164, 172 (1973).  But vested with plenary authority over Indian affairs, the federal government from its founding asserted a degree of ultimate sovereignty over the tribes.  *See* Ablavsky, *Beyond the Indian Commerce Clause*, *supra* at 1012.  In particular, the United States insisted that it had the authority under the law of nations to control the tribes' external relations with other sovereigns.  *See* Fletcher, Federal Indian Law, *supra* § 5.2.  Under the same law of nations, then, the United States naturally assumed a duty of protection to the tribes.  *See id.*  And as the nation expanded westward, an increasing number of Indian nations, whether through treaty or military conquest, fell under the authority of the United States and therefore under its duty of protection.  Cohen's, *supra* § 1.03.

In addition to demonstrating the early federal government's view that it held exclusive plenary power over Indian affairs, the First Congress's enactment of the Indian Intercourse Act reveals that the young nation understood itself to owe a special duty of protection to the Indian tribes within its borders.  Act of July 22, 1790, 1 Cong. ch. 33, 1 Stat. 137.  The

legislation sought to prevent abuses against Indians by non-Indians and states. Specifically, it permitted only federal agents to purchase Indian lands and provided for criminal sanctions for offenses by non-Indians against Indians. *See* COHEN'S, *supra* § 1.03. Federal legislation protective of Indians was crucial because, as the Court later explained, the tribes "owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies." *United States v. Kagama*, 118 U.S. 375, 384 (1886).

The government's acknowledgement and assumption of a special duty of protection is further reflected in countless treaties between the United States and the tribes. *See, e.g.*, *Worcester*, 31 U.S. at 519 (noting that the United States "assum[ed] the duty of protection" toward the Cherokee Nation under the Treaty of Holston, July 2, 1791, 7 Stat. 39, 40). Like the Indian Intercourse Act, these treaties committed the government to protecting the tribes from a sometimes-hostile non-Indian populace. *See, e.g.*, Treaty with the Northern Cheyenne and Northern Arapahoe, art. I, May 10, 1868, 15 Stat. 655, 655 ("If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will . . . cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained."); *see also* Mary Christina Wood, *Indian Land and the Promise of Native Sovereignty: The Trust Doctrine Revisited*, 1994 UTAH L. REV. 1471, 1496-97 (1994). The Supreme Court itself has repeatedly recognized the duty of protection the treaties memorialized. *See, e.g.*, *Kagama*, 118 U.S. at 384 ("From the[ tribes'] very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power."); *Worcester*, 31 U.S. at 519.

Regrettably, the federal government's involvement in Indian affairs has also often been far from benign.  During the late nineteenth to early twentieth centuries, Congress interfered in internal tribal affairs and property interests extensively.  Fletcher, FEDERAL INDIAN LAW, *supra* § 5.2; *see also McGirt*, 140 S. Ct. at 2463 (discussing Congress's policy in the late 1800's of "pressur[ing] many tribes to abandon their communal lifestyles and parcel their land into smaller lots owned by individual tribe members," in order to assimilate Native Americans and give white settlers "more space of their own" (citing General Allotment Act of 1887, ch. 119, 24 Stat. 388-90)).  The Court, however, held that such congressional enactments—even when they resulted in takings of tribal property—were immune from judicial review as long as Congress acted in "good faith." *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565-66 (1903)).  In taking a hands-off, deferential approach to Congress's management of Indian affairs, the Court analogized the federal-tribal relationship as akin to that of a guardian to its ward. *See, e.g.*, *id.* at 565 (stating that "Congress possess[es] paramount power over the property of the Indians, by reason of its exercise of guardianship over their interests"); *Kagama*, 118 U.S. at 384 ("These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States[.]").  Though intended to suggest that the government played a salutary role in tribal affairs, the guardianship metaphor instead underscores a prevailing view of Indians—both wrongheaded and deeply repugnant—as primitive people, "untutored and improvident, and still requiring the protection and supervision of the general government." *Heckman v. United States*, 224 U.S. 413, 417 (1912); *see also, e.g.*, *Beecher v. Wetherby*, 95 U.S. (5 Otto) 517, 525 (1877) (describing the Indians as "an ignorant and dependent race" subject to the "control [of] a Christian people").

In 1934, Congress began a "slow retreat" from this problematic guardianship model when it enacted the Indian Reorganization Act. Fletcher, FEDERAL INDIAN LAW, *supra* § 5.2 (citing Act of June 18, 1934, 48 Stat. 984, codified as amended at 25 U.S.C. §§ 5101 *et seq.*).  The Act, for

19

the first time in the history of the government's intervention in Indian affairs, required tribal consent to the statute's operative provisions. 25 U.S.C. § 5123(a)(1). This trend continued into the latter half of the twentieth century, and the guardianship metaphor has now given way completely, with Congress and the modern Court both explicitly acknowledging that the government's relationship with and obligations to the tribes is instead that of a trustee to a beneficiary. *See, e.g.*, 25 U.S.C. §§ 5601–02 (recognizing and reaffirming the federal trust responsibility); 25 U.S.C. § 3101 (finding that "the United States has a trust responsibility toward Indian forest lands"); *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (affirming the "undisputed existence of a general trust relationship between the United States and the Indian people"); *see also* Fletcher, FEDERAL INDIAN LAW, *supra* § 5.2. Rather than reflecting and justifying a paternalistic approach that subordinated tribal sovereignty—as the guardianship model did—the trust relationship commits the federal government to preserving tribal self-governance.[6] It also obligates and authorizes Congress to enact statutes that promote the general well-being of tribes by providing them with governmental services, including education, health care, housing, and public safety. Fletcher, FEDERAL INDIAN LAW, *supra* § 5.3; *see also Seminole*

---

[6] This duty to maintain tribal self-governance is embodied in the congressional statement of policy in the Indian Self-Determination and Education Assistance Act of 1975:

> The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy that will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 5301.

*Nation v. United States*, 316 U.S. 286 (1942) (imposing "the most exacting fiduciary standards" on the government in administering tribal assets). In fact, "[n]early every piece of modern legislation dealing with Indian tribes contains a statement reaffirming the trust relationship between tribes and the federal government."[7] COHEN'S, *supra* § 5.04.

In short, the present-day trust relationship between the United States and Indian nations is an outgrowth of a complex, centuries-old nation-to-nation political relationship between the two, and it expresses both the enduring obligations the federal government owes to the Indians and its power to discharge this duty.

## III.    Federal Regulation of Indian Children Before ICWA

Even before the dawn of the American nation, Congress had concerned itself with the rearing of Indian youths. As JUDGE COSTA relates, in 1775 the Continental Congress appropriated funds ostensibly to educate Indians at Dartmouth College but with the ulterior aim of using the Indian pupils as shields to ward off potential attacks by the British or their Indian allies. *See* COSTA, CIRCUIT JUDGE, OP. at 15. In the earliest years

---

[7] *See, e.g.*, Indian Trust Asset Reform Act, 25 U.S.C. §§ 5601–5602 (recognizing and reaffirming the federal trust responsibility); National Indian Forest Resources Management Act, 25 U.S.C. § 3101 (finding that "the United States has a trust responsibility toward forest lands"); American Indian Agricultural Resources Management Act, 25 U.S.C. § 3701 (finding that "the United States has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes"); American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. § 4043 (Special Trustee for American Indians must prepare comprehensive strategic plan to "ensure proper and efficient discharge of the Secretary's trust responsibilities to Indian tribes and individual Indians"); Native American Housing Assistance and Self-Determination Act, 25 U.S.C. § 4101(2)–(4) ("[T]here exists a unique relationship between the Government of the United States and the governments of Indian tribes and a unique Federal responsibility to Indian people[.]"); 20 U.S.C. § 7401 ("It is the policy of the United States to fulfill the Federal Government's unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children.").

of the Constitutional era, the federal government took a number of actions to regulate Indian children.  For example, starting in 1794, the federal government entered into over one hundred treaties with Indian tribes that obligated the federal government to provide for Indian education.  And stemming from a misguided paternalistic stance toward the tribes, President Washington directed American treaty commissioners dealing with Indian tribes to "endeavor to obtain a stipulation for certain missionaries . . . to reside in the nation" in order to "civilize" the population.  Matthew L.M. Fletcher & Wenona T. Singel, *Indian Children and the Federal-Tribal Trust Relationship*, 95 Neb. L. Rev. 885, 912 (2017) (quoting Letter from George Washington, President of the United States, to Benjamin Lincoln, Cyrus Griffin, and David Humphreys, (August 29, 1789), reprinted in 4 American State Papers 65, 66 (Walter Lowrie & Matthew St. Clair Clarke eds., 1832)).

During the late eighteen century the federal government even expressly involved itself in the transfer of American Indian children from their families and tribal communities to non-native homes.  Fletcher, Federal Indian Law, *supra* § 3.6.  Under the Washington Administration, for instance, federal monies financed the rearing of Indian children in Quaker homes.  Br. of Prof. Ablavsky at 20.  Though springing from an intention to do good, like much of the government's past Indian policy, the Indian removal efforts wrought monumental and lasting damage on the lives of individual Indians and tribes.  *See* Fletcher, Federal Indian Law, *supra* § 3.6.

The campaign to "Christianize" the supposedly heathen Native peoples greatly expanded in the late nineteenth century, with the removal of Indian children constituting the single most important aspect of the government's "civilization" policy.  *See* Fletcher, Federal Indian Law, *supra* § 3.6.  Government officials took Indian children from their homes and tribal lands, at times by force, and enrolled them at coercive, off-

reservation Indian boarding schools. *Id.* These federally run or financed schools sought to stamp out all vestiges of Indian culture. As the Commissioner of Indian Affairs wrote in 1896, the purportedly humanitarian course was "for the strong arm of the nation to reach out, take [Indian children] in their infancy and place them in its fostering schools, surrounding them with an atmosphere of civilization, . . . instead of allowing them to grow up as barbarians and savages." T.J. Morgan, *A Plea for the Papoose*, 18 Baptist Home Mission Monthly 402, 404 (1896). The headmaster of the notorious Carlisle School explained the policy even more bluntly in his infamous credo, stating that the schools were meant to take an Indian child and "Kill the Indian in him, to save the man." Fletcher, Federal Indian Law, *supra* § 3.6 (quoting Richard H. Pratt, The Advantages of Mingling Indians with Whites (1892), reprinted in Americanizing the American Indians: Writings by the "Friends of the Indian" 1880–1900 260–61 (Francis Paul Prucha ed. 1973)).

Although the total number of children enrolled in the boarding schools is unknown, in 1895 alone 157 boarding schools housed more than 15,000 Indian children. Andrea C. Curcio, *Civil Claims for Uncivilized Acts: Filing Suit Against the Government for American Indian Boarding School Abuses*, 4 Hastings Race & Poverty L.J. 45, 57 (2006). Many were run directly by the Bureau of Indian Affairs ("BIA"). Others were operated by Christian groups that received federal funds. Schooling was left to Christian groups because Christianity, and particularly Protestantism, was seen, at the time, as essential to a "civilized" life. *See* Fletcher, Federal Indian Law, *supra* § 3.6. The government thus hoped to eradicate the American Indians' native religions by converting young Indians to Christianity.

The use of government-backed force was central to the creation of these boarding schools. "Indian parents who opposed the taking of their children to these schools faced criminal prosecution and possible incarceration." *Id.* Children were "literally kidnap[ped]" so they could be

shipped off to the Indian schools. For example, one federal agent described hunting down Hopi "Indian children who had escaped to caves or cellars, sometimes defended by their parents, who would have to be restrained by force to prevent the kidnapping of their children." *Id.*

Life at the schools themselves was pervaded by a strict regimen of military-style discipline meant to reform Indian children and assimilate them into Anglo society. *Id.* Children were forbidden to speak their native languages and were punished, including through beatings, if they lapsed into their native tongues. COHEN'S, *supra* § 1.04. And the goal of permanently severing Indian children's connections with tribal life did not stop at the end of the school year. Under an "outing system," Indian children were placed in non-Indian homes far from their reservations during the summer, ensuring that they never returned to their communities during their tenure at the boarding schools. Fletcher, FEDERAL INDIAN LAW, *supra* § 3.6.

In 1928, a devastating federally commissioned report produced by the Brookings Institution laid bare the problems in Indian boarding schools, concluding that they were "grossly inadequate." *See* Lewis Meriam, THE PROBLEM OF INDIAN ADMINISTRATION 11 (1928). The report detailed life at the schools, citing "deplorable health conditions," including fire risks, "serious malnutrition, and high-rates of communicable diseases." *Id.* at 192, 318-19. More generally, the report observed that the "official government attitude" toward Indian education had been premised "on the theory that it is necessary to remove the Indian child[ren] as far as possible from [their] environment" so as to prepare them for "life among the whites." *Id.* at 346, 618. This way of thinking, the report explained, was fundamentally flawed and at odds with the "modern point of view in education," which favored rearing the child "in the natural setting of home and family life." *Id.* at 346. The result of the government's boarding school policy had been to "largely disintegrate[] the [Indian] family." *Id.* at 15.

By the time of the report, Indian boarding schools had begun to decline as the BIA charged state public schools with assuming more responsibility for Indian education. COHEN'S, *supra* § 1.04. But the boarding schools did not vanish; as late as the 1970s, thousands of Indian children were still being educated at federal boarding schools. *See Indian Child Welfare Act of 1977: Hearing on S. 1214 Before the Select Comm. on Indian Affairs*, 95th Cong. 603 (1977).

In establishing Indian schools, "the intent of American policymakers and educators may not have been to harm Indian people," but the "end result was the near-destruction of tribal culture and religion across the United States." Fletcher, FEDERAL INDIAN LAW, *supra* § 3.6. The federal government itself has acknowledged its tragic role in decimating Indian tribes and families by separating them from their children. In 2000, the Assistant Secretary of the BIA offered a formal apology to the Indian tribes:

> [The BIA] set out to destroy all things Indian. This agency forbade the speaking of Indian languages, prohibited the conduct of traditional religious activities, outlawed traditional government, and made Indian people ashamed of who they were. Worst of all, the [BIA] committed these acts against the children entrusted to its boarding schools, brutalizing them emotionally, psychologically, physically, and spiritually . . . Never again will we seize your children, nor teach them to be ashamed of who they are. Never again.

146 CONG. REC. E1453 (Sept. 12, 2000) (quoting apology of Assistant Secretary for Indian Affairs, Department of the Interior remarks on Sept. 8, 2000).

## IV.  State Abuses Leading to ICWA

Though federal Indian boarding schools eventually declined, massive numbers of Indian children continued to be permanently removed from their families, tribes, and cultures through the 1970s. Replacing off-reservation boarding schools, state courts and child welfare agencies became the primary

vehicle for severing Indian youth—the lifeblood of tribes—from their communities. *See* Cohen's, *supra* § 11.02. Surveys of states with large Indian populations during the 1960s and 1970s showed that between twenty-five to thirty-five percent of all Indian children were removed from their families. *See Indian Child Welfare Program: Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs*, 93rd Cong. Rec. 3 (April 8–9, 1974) (statement of William Byler, Executive Director, Association of American Indian Affairs); H.R. Rep. No. 95-1386, at 9 (1978). "In 16 states surveyed in 1969, approximately 85% percent of all Indian children in foster care were living in non-Indian homes," while in Minnesota in the early 1970s "90 percent of the adopted Indian children [were] in non-Indian homes." H.R. Rep. No. 95-1386, at 9 (1978); *see also Indian Child Welfare Program: Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs*, 93rd Cong. Rec. 5 (April 8–9, 1974) (statement of William Byler, Executive Director, Association of American Indian Affairs); *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989); Cohen's, *supra* § 11.01. And in jurisdictions with significant Indian populations, Indian children were uprooted by states' child welfare machinery at rates far exceeding those for non-Indians. *See Indian Child Welfare Act of 1977: Hearing on S. 1214 Before the Select Comm. on Indian Affairs*, 95th Cong. 539-40 (1977). For example, in North Dakota and South Dakota, Indian children were over twenty times as likely to be placed in foster care than non-Indians. *Id.* at 540. In Minnesota, Maine, and Utah, the relative foster care rate for Indian children was, respectively, nineteen, sixteen, and fifteen times greater than that for non-Indians. *Id.* at 540. And in Washington, the combined rate of foster care and adoptive placements for Indian children in 1973 was nearly fourteen times greater than that of non-Indians. *Id.* at 599.

This nationwide crisis aroused the attention and indignation of Congress in the mid-1970s. Over the course of four years, Congress held hearings on, deliberated on, and debated how to remedy the problem.

Fletcher, Federal Indian Law, *supra* § 8.8. Congress heard "testimony taken from Indian Country . . . that many state and county social service agencies and workers, with the approval and backing of many state courts and some federal B[IA] officials, had engaged in the systematic, automatic, and across-the-board removal of Indian children from Indian families and into non-Indian families and communities." *Id.*

State officials attempted to justify these large-scale removals by invoking Anglo norms that favored rearing children within a nuclear family structure. *See Holyfield*, 490 U.S. at 35-36 (quoting 25 U.S.C. § 1901). This approach often reflected the officials' profound ignorance of or hostility to tribes' traditional values and community-oriented approach to child raising. In Indian communities, for example, it is common for extended family to play key roles in raising Indian children. *See* Jacobs, A Generation Removed, *supra* at 24-25; *see also* Supreme Court Br. of Indian Law Professors in *Adoptive Couple v. Baby Girl*, No. 12–399, at 5. Non-Indian child welfare agents, however, interpreted this practice of extended family care as parental neglect and cited it as a reason for removing Indian children from their parents and putting them up for adoption. *See* Supreme Court Br. of Indian Law Professors in *Adoptive Couple v. Baby Girl*, No. 12–399. In total, this and similar uninformed and abusive practices resulted in the removal, as noted, of over a quarter of all Indian children from their homes in states with large Indian populations. *See* H.R. Rep. No. 95-1386, at 9 (1978). Thus, even though the widespread transfer of Indian children to non-Indians may not have been specifically intended as an assimilation project, it nonetheless had that effect.

The mass removal of Indian children had profoundly adverse effects on the children themselves, who suffered trauma from being separated from their families and "problems of adjusting to a social and cultural environment much different than their own." *Id.*; *see also Indian Child Welfare Act of 1977: Hearing Before the S. Select Committee on Indian Affs.*, 95th Cong. 114 (1977)

(statement of Carl E. Mindell, M.D., & Alan Gurwitt, M.D., American Academy of Child Psychiatry) (stating that "[t]here is much clinical evidence to suggest that these Native American children placed in off-reservation non-Indian homes are at risk in their later development" and that "they are subject to ethnic confusion and a pervasive sense of abandonment"). Indian parents suffered greatly, too, of course. The evil of mass removal, however, was systemic, threatening not only children and families but the tribes themselves. As Calvin Isaac, the Chief of the Mississippi Band of Choctaw Indians, explained to Congress, the aggregate effect of the removal of Indian children threatened the tribes' existence:

> Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People. Furthermore, these practices seriously undercut the tribes' ability to continue as self-governing communities. Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships.

*Holyfield*, 490 U.S. at 34.[8]

## V. Congress's Findings and Aims in Enacting ICWA

In view of the alarming abuses perpetrated through state Indian child custody proceedings, Congress enacted ICWA in 1978. Recognizing that a "special relationship" exists between the United States and Indian tribes, Congress made the following findings:

---

[8] As the Supreme Court noted in *Holyfield*, 490 U.S. 34 n.3 , "[t]hese sentiments were shared by the ICWA's principal sponsor in the House, Rep. Morris Udall, *see* 124 CONG. REC. 38102 (1978) ("Indian tribes and Indian people are being drained of their children and, as a result, their future as a tribe and a people is being placed in jeopardy"), and its minority sponsor, Rep. Robert Lagomarsino, *id.* ("This bill is directed at conditions which . . . threaten . . . the future of American Indian tribes [.]" (cleaned up)).

Congress has plenary power over Indian affairs.  25 U.S.C. § 1901(1) (citing U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall have Power . . . To regulate Commerce . . . with the Indian Tribes.")).

"[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children." *Id.* § 1901(3).

"[A]n alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and . . . an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." *Id.* § 1901(4).

"States exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." *Id.* § 1901(5).

Based on its findings, Congress declared that it was the policy of the United States

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

*Id.* § 1902.

## VI.   ICWA's Provisions

ICWA's substantive and procedural safeguards apply in any child custody proceeding involving an "Indian child," defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe

or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4). In proceedings for the foster care placement or termination of parental rights, ICWA gives "the Indian custodian of the child and the Indian child's tribe . . . a right to intervene at any point in the proceeding." *Id.* § 1911(c). "In any involuntary proceeding . . . where the court knows or has reason to know that an Indian child is involved," ICWA requires that the parent, the Indian custodian, the child's tribe, or the Secretary of the United States Department of the Interior ("Secretary" or "Secretary of the Interior") be notified of pending proceedings and of their right to intervene. *Id.* § 1912(a). In voluntary proceedings for the termination of parental rights or adoptive placement of an Indian child, ICWA ensures that the parent can withdraw consent for any reason prior to entry of a final decree of adoption or termination, at which point the child must be returned to the parent. *Id.* § 1913(c). If consent was obtained through fraud or duress, a parent may petition to withdraw consent within two years after the final decree of adoption and, upon a showing of fraud or duress, the court must vacate the decree and return the child to the parent. *Id.* § 1913(d). An Indian child, a parent or Indian custodian from whose custody the child was removed, or the child's tribe may file a petition in any court of competent jurisdiction to invalidate an action in state court for foster care placement or termination of parental rights if the action violated any provision of §§ 1911 to 1913. *Id.* § 1914.

ICWA further sets forth placement preferences for foster care, preadoptive, and adoptive proceedings involving Indian children. Section 1915 requires:

> In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

*Id.* § 1915(a).  Similar requirements are set for foster care or preadoptive placements.  *Id.* § 1915(b).  If a tribe establishes by resolution a different order of preferences, the state court or agency effecting the placement "shall follow [the tribe's] order so long as the placement is the least restrictive setting appropriate to the particular needs of the child."  *Id.* § 1915(c).

The state in which an Indian child's placement was made shall maintain records of the placement, which shall be made available at any time upon request by the Secretary or the child's tribe.  *Id.* § 1915(e).  An Indian adoptee who attains the age of majority may request that the court which entered the adoption order provide her with information "as may be necessary to protect any rights flowing from the . . . tribal relationship."  *Id.* § 1917.  And a state court entering a final decree in an adoptive placement "shall provide the Secretary with a copy of such decree or order" and information as necessary regarding "(1) the name and tribal affiliation of the child; (2) the names and addresses of the biological parents; (3) the names and addresses of the adoptive parents; and (4) the identity of any agency having files or information relating to such adoptive placement."  *Id.* § 1951(a).  ICWA's severability clause provides that "[i]f any provision of this chapter or the applicability thereof is held invalid, the remaining provisions of this chapter shall not be affected thereby."  *Id.* § 1963.

## VII.    The Final Rule

ICWA provides that "the Secretary [of the Interior] shall promulgate such rules and regulations as may be necessary to carry out [its] provisions." 25 U.S.C. § 1952.  In 1979, the BIA promulgated guidelines (the "1979 Guidelines") intended to assist state courts in implementing ICWA but that lacked "binding legislative effect."  Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979).  The 1979 Guidelines left the "[p]rimary responsibility" of interpreting certain language in ICWA "with the [state] courts that decide Indian child custody cases."  *Id.*  However, in June 2016, the BIA promulgated the Final Rule to

"clarify the minimum Federal standards governing implementation of [ICWA]" and to ensure that it "is applied in all States consistent with the Act's express language, Congress's intent in enacting the statute, and to promote the stability and security of Indian tribes and families." 25 C.F.R. § 23.101; Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,868 (June 14, 2016). The Final Rule explained that while the BIA "initially hoped that binding regulations would not be necessary to carry out [ICWA], a third of a century of experience has confirmed the need for more uniformity in the interpretation and application of this important Federal law." 81 Fed. Reg. at 38,782 (internal citation and quotation marks omitted).

The Final Rule provides that state courts have the responsibility of determining whether a child is an "Indian child" subject to ICWA's requirements. 25 C.F.R. §§ 23.107; 81 Fed. Reg. at 38,778, 38,869-73. The Final Rule also sets forth notice and recordkeeping requirements for states, *see* 25 C.F.R. §§ 23.140-41; 81 Fed. Reg. at 38,778, 38,875-76, and requirements for states and individuals regarding voluntary proceedings and parental withdrawal of consent, *see* 25 C.F.R. §§ 23.124-28; 81 Fed. Reg. at 38,778, 38,873-74. The Final Rule also restates ICWA's placement preferences and clarifies when they apply and when states may depart from them. *See* 25 C.F.R. §§ 23.129-32; 81 Fed. Reg. at 38,778, 38,874-75.

## VIII. The Instant Action

### A. Parties

#### 1. Plaintiffs

Plaintiffs in this action are the states of Texas, Louisiana, and Indiana,[9] (collectively, "State Plaintiffs"), and seven individual Plaintiffs—

---

[9] There are three federally recognized tribes in Texas: the Yselta del Sur Pueblo, the Kickapoo Tribe, and the Alabama-Coushatta Tribe. There are four federally recognized tribes in Louisiana: the Chitimacha Tribe, the Coushatta Tribe, the Tunica-

Chad and Jennifer Brackeen ("the Brackeens"), Nick and Heather Libretti ("the Librettis"), Altagracia Socorro Hernandez ("Hernandez"), and Jason and Danielle Clifford ("the Cliffords") (collectively, "Individual Plaintiffs") (together with State Plaintiffs, "Plaintiffs").

### a. The Brackeens & A.L.M.

At the time their initial complaint was filed in the district court, the Brackeens sought to adopt A.L.M., who falls within ICWA's definition of an "Indian Child." His biological mother is an enrolled member of the Navajo Nation and his biological father is an enrolled member of the Cherokee Nation. When A.L.M. was ten months old, Texas's Child Protective Services ("CPS") removed him from his paternal grandmother's custody and placed him in foster care with the Brackeens. Both the Navajo Nation and the Cherokee Nation were notified pursuant to ICWA and the Final Rule. A.L.M. lived with the Brackeens for more than sixteen months before they sought to adopt him with the support of his biological parents and paternal grandmother. In May 2017, a Texas court, in voluntary proceedings, terminated the parental rights of A.L.M.'s biological parents, making him eligible for adoption under Texas law. Shortly thereafter, the Navajo Nation notified the state court that it had located a potential alternative placement for A.L.M. with non-relatives in New Mexico, though this placement ultimately failed to materialize. In July 2017, the Brackeens filed an original petition for adoption, and the Cherokee Nation and Navajo Nation were notified. The Navajo Nation and the Cherokee Nation reached an agreement whereby the Navajo Nation was designated as A.L.M.'s tribe for purposes of ICWA's application in the state proceedings. No one intervened in the Texas adoption proceeding or otherwise formally sought to adopt A.L.M. The Brackeens entered into a settlement with the Texas state agency and

---

Biloxi Tribe, and the Jena Band of Choctaw Indians. There is one federally recognized tribe in Indiana: the Pokagon Band of Potawatomi Indians.

A.L.M.'s guardian ad litem specifying that, because no one else sought to adopt A.L.M., ICWA's placement preferences did not apply.  In January 2018, the Brackeens successfully petitioned to adopt A.L.M.  The Brackeens initially alleged in their complaint that they would like to continue to provide foster care for and possibly adopt additional children in need, but their experience adopting A.L.M. made them reluctant to provide foster care for other Indian children in the future.  Since their complaint was filed, the Brackeens have sought to adopt A.L.M.'s sister, Y.R.J. in Texas state court.  Y.R.J., like her brother, is an Indian Child for purposes of ICWA.  The Navajo Nation contests the adoption.  On February 2, 2019, the Texas court granted the Brackeens' motion to declare ICWA inapplicable as a violation of the Texas constitution, but "conscientiously refrain[ed]" from ruling on the Brackeens' claims under the United States Constitution pending our resolution of the instant appeal.

### b.  The Librettis & Baby O.

The Librettis live in Nevada and sought to adopt Baby O. when she was born in March 2016.  Baby O.'s biological mother, Hernandez, wished to place Baby O. for adoption at her birth, though Hernandez has continued to be a part of Baby O.'s life and she and the Librettis visit each other regularly.  Baby O.'s biological father, E.R.G., descends from members of the Ysleta del sur Pueblo Tribe (the "Pueblo Tribe"), located in El Paso, Texas, and was a registered member of that tribe at the time Baby O. was born.  The Pueblo Tribe intervened in the Nevada custody proceedings seeking to remove Baby O. from the Librettis.  Once the Librettis joined the challenge to the constitutionality of ICWA and the Final Rule, the Pueblo Tribe indicated that it was willing to settle.  The Librettis agreed to a settlement with the Pueblo Tribe that would permit them to petition for adoption of Baby O.  The Pueblo Tribe agreed not to contest the Librettis' adoption of Baby O., and on December 19, 2018, the Nevada state court issued a decree of adoption, declaring that the Librettis were Baby O.'s lawful parents.  Like the

Brackeens, the Librettis alleged that they intend to provide foster care for and possibly adopt additional children in need but are reluctant to foster Indian children after this experience.

### c.  The Cliffords & Child P.

The Cliffords live in Minnesota and seek to adopt Child P., whose maternal grandmother is a registered member of the White Earth Band of Ojibwe Tribe (the "White Earth Band"). Child P. is a member of the White Earth Band for purposes of ICWA's application in the Minnesota state court proceedings.  Pursuant to § 1915's placement preferences, county officials removed Child P. from the Cliffords' custody and, in January 2018, placed her in the care of her maternal grandmother, whose foster license had been revoked.  Child P.'s guardian ad litem supports the Cliffords' efforts to adopt her and agrees that the adoption is in Child P.'s best interest.  The Cliffords and Child P. remain separated, and the Cliffords face heightened legal barriers to adopting her.  On January 17, 2019, the Minnesota court denied the Cliffords' motion for adoptive placement.

### 2.  Defendants

Defendants are the United States of America; the United States Department of the Interior and its Secretary Deb Haaland, in her official capacity; the BIA and its Director Darryl La Counte, in his official capacity; and the Department of Health and Human Services and its Secretary Xavier Becerra, in his official capacity (collectively, the "Federal Defendants"). Shortly after this case was filed in the district court, the Cherokee Nation, Oneida Nation, Quinalt Indian Nation, and Morengo Band of Mission Indians (collectively, the "Tribal Defendants") moved to intervene, and the district court granted the motion.  On appeal, we granted the Navajo

Nation's motion to intervene as a defendant[10] (together with Federal and Tribal Defendants, "Defendants").

## B. Procedural History

Plaintiffs filed the instant action against the Federal Defendants in October 2017, alleging that the Final Rule and certain provisions of ICWA are unconstitutional and seeking injunctive and declaratory relief. Plaintiffs argued that ICWA and the Final Rule violate equal protection and substantive due process under the Fifth Amendment and the anticommandeering doctrine that arises from the Tenth Amendment. Plaintiffs additionally sought a declaration that provisions of ICWA and the Final Rule violate the nondelegation doctrine and the APA. Defendants moved to dismiss, alleging that Plaintiffs lacked standing. The district court denied the motion. All parties filed cross-motions for summary judgment. The district court granted Plaintiffs' motion for summary judgment in part, declaring that ICWA and the Final Rule violated equal protection, the Tenth Amendment, and the nondelegation doctrine, and that the challenged portions of the Final Rule were invalid under the APA.[11] Defendants appealed. A panel of this court affirmed in part the district court's rulings on standing but reversed and rendered judgment on the merits, with one judge concurring in part and dissenting in part. The court then granted en banc review. In total, fourteen amicus briefs have been filed in this case.

---

[10] The Navajo Nation had previously moved to intervene twice in the district court. The first motion was for the limited purpose of seeking dismissal pursuant to Rule 19, which the district court denied. The Navajo Nation filed a second motion to intervene for purposes of appeal after the district court's summary judgment order. The district court deferred decision on the motion pending further action by this court, at which time the Navajo Nation filed the motion directly with this court.

[11] The district court denied Plaintiffs' substantive due process claim, which Plaintiffs do not appeal.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *See Texas v. United States*, 497 F.3d 491, 495 (5th Cir. 2007). Summary judgment is appropriate when the movant has demonstrated "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

### I.  Article III Standing

Defendants first contend that Plaintiffs lack standing to challenge ICWA and the Final Rule. The district court denied Defendants' motion to dismiss on this basis, concluding that Individual Plaintiffs have standing to bring an equal protection claim; State Plaintiffs have standing to challenge provisions of ICWA and the Final Rule on the ground that they violate the Tenth Amendment and the nondelegation doctrine; and all Plaintiffs have standing to bring an APA claim challenging the validity of the Final Rule.

Article III limits the power of federal courts to "Cases" and "Controversies." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing U.S. CONST. art. III, § 2). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Id.* To meet the Article III standing requirement, plaintiffs must demonstrate (1) "an injury in fact" that is (2) "fairly traceable to the challenged action of the defendant," and that is (3) likely to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks, citations, and alterations omitted). A plaintiff seeking equitable relief must demonstrate a likelihood of future injury in addition to past harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). This injury must be "concrete and particularized" and "actual or imminent, not conjectural or

hypothetical." *See Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

"[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Nevertheless, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," and we therefore need conclude only that one plaintiff in the present case satisfies standing with respect to each claim. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). "This court reviews questions of standing *de novo*." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013).

## A. Standing to Bring Equal Protection Claim

Plaintiffs challenged 25 U.S.C. §§ 1913(d), 1914, 1915(a), and 1915(b), and Final Rule § 23.129 to 23.132 on equal protection grounds, alleging that these provisions impose regulatory burdens on non-Indian families seeking to adopt Indian children that are not similarly imposed on Indian families who seek to adopt Indian children. The district court concluded that Individual Plaintiffs suffered and continue to suffer injuries when their efforts to adopt Indian children are burdened by ICWA and the Final Rule; that their injuries are fairly traceable to the actions of Defendants because ICWA and the Final Rule mandate state compliance; and that these injuries are redressable because if ICWA and the Final Rule were invalidated, then state courts would no longer be required to follow them. Defendants disagree, arguing that the Individual Plaintiffs cannot demonstrate an injury in fact or redressability and thus lack standing to bring an equal protection claim. We will consider Plaintiffs' standing to assert challenges to each of the provisions at issue in turn.

### 1. The Challenge to §§ 1913 and 1914

We first conclude that none of the Plaintiffs have standing to assert an equal protection challenge to §§ 1913 and 1914.  The district court concluded that § 1913(d), which allows a parent to petition the court to vacate a final decree of adoption on the ground that consent was obtained through fraud or duress, left the Brackeens' adoption of A.L.M. vulnerable to collateral attack for two years following the final judgment.  Defendants argue that § 1914,[12] and not § 1913(d), applies to the Brackeens' state court proceedings and that, in any event, any injury premised on potential future collateral attack under either provision is too speculative.

We need not decide which provision applies here, as none of the Individual Plaintiffs have suffered an injury under either provision.[13] Plaintiffs do not assert that the biological parents of any Indian child, any tribe, or any other party are currently seeking or intend in the future to invalidate the adoption of any of their adopted children under either provision.  Plaintiffs' proffered injury under § 1913(d) or § 1914 is therefore too speculative to support standing.  *See Lujan*, 504 U.S. at 560; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n. 5 (2013) ("[T]hreatened injury must be certainly impending to constitute injury in fact, and . . . allegations of possible future injury are not sufficient. . . . . Plaintiffs cannot rely on speculation about the unfettered choices made by

---

[12] "Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title."  25 U.S.C. § 1914.

[13] State Plaintiffs argue that they have standing to bring an equal protection challenge in *parens patriae* on behalf of citizens other than the Individual Plaintiffs.  We disagree. *See South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) ("[A] State [does not] have standing as the parent of its citizens to invoke [the Fifth Amendment Due Process Clause] against the Federal Government, the ultimate parens patriae of every American citizen.").

independent actors not before the court." (internal quotation marks, citations, and alterations omitted)).

Plaintiffs and JUDGE DUNCAN cite *Time Warner Cable, Inc. v. Hudson* for the proposition that "unequal positioning" before the law is sufficient to constitute an injury. 667 F.3d 630 (5th Cir. 2012) (internal quotation marks and citation omitted); *see* DUNCAN, CIRCUIT JUDGE, OP. at 19-20 & n.30. But that case is inapposite.

In *Time Warner*, this court considered whether standing was satisfied when incumbent Texas cable operators that had franchise agreements to provide services to municipalities across the state brought an equal protection challenge to a Texas law that excluded them from a benefit afforded to other similarly situated cable operators. 667 F.3d at 633-34. The Texas legislature had concluded that the cost of negotiating separate municipal franchise agreements posed a barrier for new companies seeking to enter the cable services market. *Id.* The Texas legislature responded by passing a law that permitted new entrants to the market and "overbuilders"—companies that build their own cable systems in areas already served by a cable operator—to obtain statewide franchises immediately. *Id.* Incumbent cable providers, however, were ineligible for statewide franchises until after the expiration of their existing municipal licenses. *Id.* at 634.

This court concluded that the incumbent operators had alleged a sufficiently actual or imminent injury because the statute was presently preventing incumbent cable providers from competing for the statewide franchises on equal footing with other market participants. *Id.* at 636. The incumbent cable providers would have been denied statewide licenses under the law if they had applied for them prior to the expiration of their existing municipal licenses, and submitting an application for a state-issued franchise license was wholly within the incumbent providers' power. In this way, the incumbent providers' claim satisfied Article III requirements, as the law

erected an actual barrier to companies already providing cable services that otherwise would be immediately free to seek a statewide franchise. *Id.*; *see also Northeastern Florida Chapter of Assoc. Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (in challenging a governmental program setting aside a certain percentage of contracts for minority-owned businesses, plaintiff must "demonstrate that it is *able and ready* to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis" (emphasis added)).

By contrast, Plaintiffs' challenges here to §§ 1913(d) and 1914 rest on the purely theoretical actions of potential third parties who may (or may not) invoke these provisions. *Cf. Clapper*, 568 U.S. at 414 n. 5.  This case is not like *Time Warner*, but rather *Barber v. Bryant,* in which a group of LGBT individuals and advocacy organizations brought an equal protection challenge to a Mississippi statute that permitted parties accused of LGBT discrimination to assert their sincerely held religious opposition as a defense. 860 F.3d 345, 351 (5th Cir. 2017).  This court found that, like in the present case, the *Barber* plaintiffs lacked standing to bring their equal protection challenge because any hypothetical future injury they would suffer under the statute was entirely dependent on unknown third-parties choosing to undertake a course of conduct purportedly authorized by the statute—there, discrimination against the plaintiffs. *Id.* at 357. JUDGE DUNCAN selectively quotes from *Barber* to argue that the court based its decision only on the fact that the plaintiffs had not alleged that *they* intended to engage in the activities in relation to which the Mississippi statute provided a discrimination defense. DUNCAN, CIRCUIT JUDGE, OP. at 19 n.30. But the *Barber* court plainly stated that, "[a]t a minimum, the challengers would have to allege plans to engage in [the] conduct in Mississippi *for which they would be subject to a denial of service* and would be stripped of a preexisting remedy for that denial."  *Barber*, 860 F.3d at 358 (emphasis added).  In the absence of allegations that a third party would take advantage of the statute to act in a way that would harm the plaintiffs, the plaintiffs failed to assert the type of

imminent injury necessary to support standing on their equal protection claim.[14]

In much the same way, the Plaintiffs here allege only that a third party *could* come along and challenge their adoptions under the statute, but they make no allegations that any party has in fact done so or intends to do so in the future. In other words, these provisions have yet to place any Plaintiff on unequal footing. No harm under the statute has materialized and no certain injury is imminent, as is required for standing to challenge the provision. *Clapper*, 568 U.S. at 409. And, to the extent Plaintiffs argue that an injury arises from their attempts to avoid collateral attack under § 1914 by complying with §§ 1911 to 1913, costs incurred to avoid injury are "insufficient to create standing" where the injury is not certainly impending. *See id.* at 416-17. Accordingly, Plaintiffs lack standing to challenge §§ 1913(d) and 1914.

### 2. The Remaining Equal Protection Claims

Turning to the Plaintiffs' remaining claims, we conclude that the Brackeens have standing to assert an equal protection claim as to 25 U.S.C. § 1915(a) and Final Rule §§ 23.129, 23.130, and 23.132, and that the Cliffords have standing to press this claim as to § 1915(b) and Final Rule § 23.131. Because at least one Plaintiff has standing to assert each of these remaining claims, the "case-or-controversy requirement" is satisfied, and we do not analyze whether any other Individual Plaintiff has standing to raise it. *See Rumsfeld*, 547 U.S. at 52 n.2.

First, the Brackeens have standing to challenge § 1915(a), ICWA's adoption placement preferences provision. As Plaintiffs argue, § 1915's

---

[14] The *Barber* plaintiffs also raised an Establishment Clause challenge to the statute, a separate issue not presented here and about which we express no opinion. *See Barber*, 860 F.3d at 356 ("The Equal Protection and Establishment Clause cases call for different injury-in-fact analyses because the injuries protected against under the Clauses are different." (internal quotations and citations omitted)).

placement preferences impose on them the ongoing injury of increased regulatory burdens in their proceedings to adopt A.L.M.'s sister, Y.R.J., which the Navajo Nation currently opposes in Texas state court. "An increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). However, we must also consider whether causation and redressability are met here. *See Lujan*, 504 U.S. at 560-61. The Brackeens' alleged injury is fairly traceable to the actions of at least some of the Federal Defendants, who bear some responsibility for the regulatory burdens imposed by ICWA and the Final Rule. *See Contender Farms, L.L.P.*, 779 F.3d at 266 (noting that causation "flow[s] naturally from" a regulatory injury). Additionally, the Brackeens have demonstrated a likelihood that their injury will be redressed by a favorable ruling of this court. In the Brackeens' ongoing proceedings to adopt Y.R.J., the Texas trial court has indicated that it will refrain from ruling on the Brackeens' federal constitutional claims pending a ruling from this court.[15]

---

[15] We also conclude that the Brackeens have maintained standing throughout the course of the litigation. The Brackeen's initial complaint, filed in October 2017, alleged that they intended to adopt A.L.M. In January 2018, the Brackeens completed their adoption of A.L.M. in state court. In March 2018, they filed a second amended complaint wherein they alleged that they "intend[ed] to provide foster care for, and possibly adopt, additional children in need." Several months later, in September 2018, the Brackeens undertook efforts to adopt Y.R.J, and they supplemented the district court record in October 2018 with exhibits evidencing these efforts. The injury alleged in the Brackeens' second amended complaint was sufficiently imminent to support standing, in part, because the regulatory burdens they claimed ICWA imposed on their first adoption constitute "evidence bearing on whether" they faced "a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983) (internal quotation marks omitted). That the Brackeens' asserted injury was not too conjectural to support standing is confirmed by their later attempted adoption of Y.R.J. *See Hargrave v. Vermont*, 340 F.3d 27, 33034 (2d Cir. 2003) (plaintiff's claims that she would be subject to a state law even though a state court had refused to enforce the law were not speculative in light of state Supreme Court's ruling following the filing of plaintiff's federal complaint that the law could go into effect). Further, in this case, promoting judicial economy counsels in favor of construing the Brackeens' supplemental filing as correcting any defect in the pleading,

Our esteemed colleague JUDGE COSTA disagrees that the likelihood that the Texas trial court will follow our interpretation of ICWA is sufficient to satisfy Article III's redressability requirements and asserts that we are rendering an advisory opinion on this issue. COSTA, CIRCUIT JUDGE, OP. at 2-4. But "Article III does not demand a demonstration that victory in court will without doubt cure the identified injury." *Teton Historic Aviation Found. v. DOD*, 785 F.3d 719, 727 (D.C. Cir. 2015). The plaintiff must show only that its injury is "likely to be redressed by a favorable decision." *Vill. of Arlington Heights, v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977). By stating that it will defer to our ruling, the Texas court has removed any need "to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." *Id.* at 261-62. Instead, the Texas court's statement has made it all but certain that a decision in the Brackeens' favor will redress their purported injuries. *See Evans v. Michigan*, 568 U.S. 313, 325-26 (2013) ("We presume here, as in other contexts, that courts exercise their duties in good faith."). Article III's redressability requirements are met with respect to the Brackeens' claim, meaning at least one Plaintiff has standing to bring an equal protection claim challenging § 1915(a) and Final Rule §§ 23.129 to 23.132. *See Lujan*, 504 U.S. at 560-61; *Rumsfeld*, 547 U.S. at 52 n.2.

---

permitting both the court and the parties to "circumvent 'the needless formality and expense of instituting a new action when events occurring after the original filing indicate[] a right to relief.'" *Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1044 (9th Cir. 2015) (quoting WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1505)). Therefore, even if the Brackeens had lacked standing at some point during the district court litigation, their supplementation of the record with information related to their attempted adoption of Y.R.J. cured any defect. *See Mathews v. Diaz*, 426 U.S. 67, 75 (1976).

Similarly, the Cliffords have standing to challenge § 1915(b), ICWA's foster care and preadoptive placement preferences, and Final Rule § 23.131.[16] The Cliffords have clearly alleged an injury due to this provision; they fostered Child P., but, pursuant to § 1915(b)'s placement preferences, Child. P. was removed from their custody and placed with her maternal grandmother, a member of the White Earth Band. Like the Brackeens' alleged injury, the Cliffords' injury is fairly traceable to some of the Federal Defendants given their responsibility for the burdens imposed by § 1915(b). Finally, a declaration by the district court that § 1915(b) violates equal protection would redress the Cliffords' injury. Since Child P. has not yet been adopted, the Cliffords may still petition for custody. Though no state court—whether within this circuit or in the Cliffords' home state of Minnesota—is bound by a decree of this court, we conclude that it is "substantially likely that [a state court] would abide by an authoritative interpretation" of ICWA by this court, "even though [it] would not be directly bound by such a determination." *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992). Thus, a favorable ruling "would at least make it easier for" the Cliffords to regain custody of Child P. *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 521 (5th Cir. 2014). In sum, Plaintiffs have standing to challenge § 1915(a) and (b) and Final Rule §§ 23.129 to 23.132.

---

[16] The Cliffords also challenged § 1915(a). We need not address this challenge, however, as we have already concluded that the Brackeens—and thus all Plaintiffs—have standing to challenge this provision. *See Rumsfeld*, 547 U.S. at 52 n.2 ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."). In addition, the parties contest whether the Cliffords' claim is subject to issue preclusion. Because issue preclusion is an affirmative defense, it does not implicate our standing analysis. *See, e.g.*, *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1003 (8th Cir. 2007) ("Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions, to be addressed on their own terms." (quoting *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 346 (3d Cir. 2001))); WRIGHT & MILLER, 13A FED. PRAC. & PROC. JURIS. § 3531 (3d ed.) ("Affirmative defenses against the claims of others are not likely to raise 'standing' concerns.").

## B. Standing to Bring Administrative Procedure Act Claim

Plaintiffs also bring APA challenges to the Final Rule promulgated by the BIA. They assert that the Final Rule violates the APA because ICWA does not authorize the Secretary of the Interior to promulgate binding rules and regulations and also contend that the Final Rule's construction of § 1915 is invalid. The district court ruled that State Plaintiffs had standing to bring APA claims, determining that the Final Rule injured State Plaintiffs by intruding upon their interests as quasi-sovereigns to control the domestic affairs within their states.[17] A state may be entitled to "special solicitude" in our standing analysis if the state is vested by statute with a procedural right to file suit to protect an interest and the state has suffered an injury to its "quasi-sovereign interests." *Massachusetts v. EPA*, 549 U.S. 497, 518-20 (2007) (holding that the Clean Air Act provided Massachusetts a procedural right to challenge the EPA's rulemaking and that Massachusetts suffered an injury in its capacity as a quasi-sovereign landowner due to rising sea levels associated with climate change). Applying *Massachusetts*, this court in *Texas v. United States* held that Texas had standing to challenge the Department of Homeland Security's ("DHS") implementation and expansion of the Deferred Action for Childhood Arrivals program under the APA. *See* 809 F.3d 134, 152 (5th Cir. 2015). This court reasoned that Texas was entitled to special solicitude on the grounds that the APA created a procedural right to challenge the DHS's actions, and DHS's actions affected states' sovereign interest in creating and enforcing a legal code. *See id.* at 152-53.

Likewise, here, the APA provides State Plaintiffs a procedural right to challenge the Final Rule. *See id.*; 5 U.S.C. § 702. Moreover, State Plaintiffs allege that the Final Rule affects their sovereign interest in controlling child

---

[17] The district court also found an injury based on the Social Security Act's conditioning of funding on states' compliance with ICWA. However, because we find that Plaintiffs have standing on other grounds, we decline to decide whether they have demonstrated standing based on an alleged injury caused by the Social Security Act.

custody proceedings in state courts. *See Texas*, 809 F.3d at 153 (recognizing that, pursuant to a sovereign interest in creating and enforcing a legal code, states may have standing based on, *inter alia*, federal preemption of state law). Thus, State Plaintiffs are entitled to special solicitude in our standing inquiry. With this in mind, we find that the elements of standing are satisfied. If, as State Plaintiffs alleged, the Secretary promulgated a rule binding on states without the authority to do so, then State Plaintiffs have suffered a concrete injury to their sovereign interest in controlling child custody proceedings that was caused by the Final Rule. Additionally, though state courts and agencies are not bound by this court's precedent, a favorable ruling from this court would remedy the alleged injury to states by making their compliance with ICWA and the Final Rule optional rather than compulsory. *See Massachusetts*, 549 U.S. at 521 (finding redressability where the requested relief would prompt the agency to "reduce th[e] risk" of harm to the state).

## C. Standing to Bring Tenth Amendment Claims

For similar reasons, the district court found, and we agree, that State Plaintiffs have standing to challenge provisions of ICWA and the Final Rule under the Tenth Amendment. The imposition of regulatory burdens on State Plaintiffs is sufficient to demonstrate an injury to their sovereign interest in creating and enforcing a legal code to govern child custody proceedings in state courts. *See Texas*, 809 F.3d at 153. Additionally, the causation and redressability requirements are satisfied here, as a favorable ruling would likely redress State Plaintiffs' asserted injuries by lifting the mandatory burdens ICWA and the Final Rule impose on states. *See Lujan*, 504 U.S. at 560-61.

## D. Standing to Bring Nondelegation Claim

Plaintiffs also contend that § 1915(c), which allows a tribe to establish a different order of placement preferences than the defaults contained in § 1915(a) and (b), is an impermissible delegation of legislative power that binds State Plaintiffs. Defendants argue that State Plaintiffs cannot

demonstrate an injury, given the lack of evidence that a tribe's reordering of § 1915(a) and (b)'s placement preferences has affected any children in Texas, Indiana, or Louisiana or that such impact is "real and immediate." State Plaintiffs respond that tribes can change ICWA's placement preferences at any time and that at least one tribe, the Alabama-Coushatta Tribe of Texas, has already done so. We conclude that State Plaintiffs have demonstrated injury and causation with respect to this claim, as State Plaintiffs' injury from the Alabama-Coushatta Tribe's decision to depart from § 1915's default placement preferences is concrete and particularized and not speculative. *See Lujan*, 504 U.S. at 560. And given that the Alabama-Coushatta Tribe has already filed their reordered placement preferences with Texas's Department of Family and Protective Services, Texas faces a "substantial risk" that its claimed injury will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" (internal quotation marks omitted) (quoting *Clapper*, 568 U.S. at 409, 414 n.5)). Moreover, a favorable ruling from this court would redress State Plaintiffs' injury by making a state's compliance with a tribe's alternative order of preferences under § 1915(c) optional rather than mandatory. *See id.*

## II. Facial Constitutional Challenges to ICWA

Having determined that State Plaintiffs have standing on the aforementioned claims, we proceed to the merits of these claims. We note at the outset that ICWA is entitled to a "presumption of constitutionality" and "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000) (citing *United States v. Harris*, 106 U.S. 629, 635 (1883)).

## A. Preemption and Anticommandeering

The district court ruled, and Plaintiffs argue on appeal, that 25 U.S.C. §§ 1901-23[18] and 1951-52[19] exceed Congress's constitutional powers by violating the anticommandeering doctrine and accordingly do not preempt any conflicting state law. We review *de novo* the constitutionality of a federal statute. *See United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

We start our discussion by explaining the principles underpinning two intertwined areas of constitutional law: preemption and anticommandeering. First, preemption. This concept is derived from the Supremacy Clause of the Constitution, which provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof[] . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("A fundamental principle of the Constitution is that Congress has the power to preempt state law."). Therefore, when "Congress enacts a law that imposes restrictions or confers rights on private actors" and a "state law confers rights or imposes restrictions that conflict with the federal law," under the Supremacy Clause, "the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018). "Even without an express provision for preemption . . . state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby*, 530 U.S. at 372.

---

[18] Title 25 U.S.C. §§ 1901-03 sets forth Congress's findings, declaration of policy, and definitions. Sections 1911-23 govern child custody proceedings, including tribal court jurisdiction, notice requirements in involuntary and voluntary state proceedings, termination of parental rights, invalidation of state proceedings, placement preferences, and agreements between states and tribes.

[19] Section 1951 sets forth information-sharing requirements for state courts. Section 1952 authorizes the Secretary of the Interior to promulgate rules and regulations that are necessary for ICWA's implementation.

The anticommandeering doctrine, by contrast, is rooted in the Tenth Amendment, which states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. Congress's legislative powers are limited to those enumerated under the Constitution, and "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy*, 138 S. Ct. at 1476. "Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Id.* at 1477 (quoting *New York v. U.S.*, 505 U.S. 144, 178 (1992)).

In the present context, these two doctrines—preemption and anticommandeering—represent opposite sides of the same coin. *See New York*, 505 U.S. at 156 (explaining that in cases "involving the division of authority between federal and state governments," the dual inquiries as to whether a congressional enactment is authorized under Article I or violates the Tenth Amendment "are mirror images of each other"). This is because for a federal law to preempt conflicting state law, two conditions must be satisfied. First, the federal law "must represent the exercise of a power conferred on Congress by the Constitution." *Murphy*, 138 S. Ct. at 1479. Second, since the Constitution "confers upon Congress the power to regulate individuals, not States," *New York*, 505 U.S. at 166, the provision at issue must be a regulation of private actors. *Murphy*, 138 S. Ct. at 1479. As discussed in more detail *infra*, a law does not fail this second inquiry simply because it *also* regulates states that participate in an activity in which private parties engage. *Id.* at 1478. Rather, the key question is whether the law establishes rights enforceable by or against private parties. *See id.* at 1480 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 391 (1992)). When a federal law fails this second step by directly commanding the executive or legislative branch of a state government to act or refrain from acting without commanding    private    parties    to    do    the    same,    it    violates    the

anticommandeering doctrine.[20] *See, e.g.*, *New York*, 505 U.S. at 188 (stating that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program"); *Printz v. United States*, 521 U.S. 898, 932 (1997). On the other hand, if Congress enacts a statute pursuant to an enumerated power and the statute does not violate the anticommandeering doctrine or another constitutional provision, then the federal law necessarily has preemptive force.[21]

---

[20] Though Congress is prohibited from commandeering states' legislatures and executive officers, it can "encourage a State to regulate in a particular way, or . . . hold out incentives to the States as a method of influencing a State's policy choices." *New York*, 505 U.S. at 166. For example, Congress may condition the receipt of federal funds under its spending power. *See id.* at 167. Some of the Defendants contend that ICWA is authorized under Congress's Spending Clause powers because Congress conditioned federal funding in Title IV-B and E of the Social Security Act on states' compliance with ICWA. However, because we conclude that ICWA is constitutionally permissible even if its provisions are construed as mandatory, we need not reach the question of whether it is justified as an optional incentive program in which states voluntarily participate.

[21] Of course, like any other unconstitutional law, a federal statute that violates the anticommandeering doctrine exceeds Congress's legislative authority. *See New York*, 505 U.S. at 155-56. The Court has stated, however, that a statute is beyond Congress's Article I power for purposes of the premption analysis either when the statute does not "represent the exercise of a power conferred on Congress by the Constitution,"—that is, when it addresses a subject matter that is not included in the powers that the Constitution grants the federal government—or when the statute breaches the anticommandeering doctrine, regardless of the subject matter addressed by the legislation. *See Murphy*, 138 S. Ct. at 1479. These are two distinct inquires. Otherwise, Congress could never violate the anticommandeering doctrine when regulating in a field over which it holds plenary authority. But the Supreme Court has held that this is not how the Constitution works. *See Reno v. Condon*, 528 U.S. 141, 142 (2000) (stating that, "in *New York* [*v. United States*, 505 U.S. 144 (1992)] and *Printz* [*v. United States*, 521 U.S. 898 (1997)], the Court held that federal statutes were invalid, not because Congress lacked legislative authority over the subject matter, but because those statutes violated" the anticommandeering doctrine); *cf., e.g.*, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) (explaining that "[e]ven when the Constitution vests in Congress complete law-making authority over a particular area," that authority is subject to other constitutional constraints); *Williams v. Rhodes*, 393 U.S. 23, 29 (1968) ("[T]he Constitution is filled with provisions that grant Congress . . . specific power[s] to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of

### 1. Article I Authority

We first address whether ICWA represents a valid exercise of Congress's Article I power. "Proper respect for a co-ordinate branch of the government requires the courts of the United States to give effect to the presumption that congress will pass no act not within its constitutional power. This presumption should prevail unless the lack of constitutional authority to pass an act in question is clearly demonstrated." *Harris*, 106 U.S. at 635.

The district court concluded that Congress overstepped its powers in enacting ICWA by breaching the anticommandeering doctrine, but it never addressed whether the Act fell within Congress's Article I power separate and apart from any supposed anticommandeering violation. On appeal, Plaintiffs squarely argue that Congress exceeded its authority—without respect to any anticommandeering violation—in enacting ICWA.[22] For the reasons that follow, we disagree.

The historical development of the federal Indian affairs power is essential to understanding its sources and scope. *See Heller*, 554 U.S. at 581. Earlier, we reviewed the Framers' dissatisfaction with the untenable division of authority over Indian affairs between the states and the national Government under the Articles of Confederation. We explained how this led

---

the Constitution."). We therefore address separately whether ICWA is within the range of subject matter on which Article I authorizes Congress to legislate and whether the law violates the anticommandeering inquiry.

[22] "[A] court of appeals sits as a court of review, not of first view." *Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017). Notwithstanding this general rule, "there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where injustice might otherwise result." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (cleaned up). Given the extensive litigation and the substantial and exceptional briefing from both the parties and *amici*, we conclude that it would work an injustice at this juncture not to resolve the question of Congress's authority to enact ICWA. *See id.* Moreover, we ultimately conclude that the proper resolution of the question is beyond any doubt.

the Framers to endow the national government with exclusive, plenary power in regulating Indian affairs under the new Constitution. *See supra* Background Part I. This intent, we observed, is revealed through a holistic reading of the Constitution; the combination of the charter's Treaty, Property, Supremacy, Indian Commerce, and Necessary and Proper Clauses, among other provisions, operate to bestow upon the federal government supreme power to deal with the Indian tribes. *See* Ablavsky, *Beyond the Indian Commerce Clause*, *supra* at 1043-44. Understandably, then, the Supreme Court has consistently characterized the federal government's Indian affairs power in the broadest possible terms. *See, e.g.*, *United States v. Lara*, 541 U.S. 193, 200 (2000) (noting that the Indian Commerce and Treaty Clauses are sources of Congress's "plenary and exclusive" "powers to legislate in respect to Indian tribes"); *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 837 (1982) (discussing Congress's "broad power . . . to regulate tribal affairs under the Indian Commerce Clause"); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (same); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 (1978) ("As we have repeatedly emphasized, Congress' authority over Indian matters is extraordinarily broad . . . ."); *Mancari*, 417 U.S. at 551-52 (noting that "[t]he plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself").

Conversely, the Constitution totally displaced the states from having any role in these affairs and "divested [them] of virtually all authority over Indian commerce and Indian tribes." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 62 (1996); *see also* Ablavsky, *Beyond the Indian Commerce Clause*, *supra* at 1043-44 (noting that the federal government's Indian affairs powers collectively amounted to what present-day doctrine terms field preemption). Responding to the problem under the Articles of Confederation of states openly flouting the federal strategy with respect to the Indians, the Framers specifically intended that the Constitution would prevent the states from exercising their sovereignty in a way that interfered with federal Indian

policy. *See* William C. Canby, § 2.1 AMERICAN INDIAN LAW IN A NUTSHELL, (7th Ed.) [hereinafter CANBY, AMERICAN INDIAN LAW]. As in its dealings with foreign nations, it was important that the United States speak with one voice in making peace with or deploying military force against the Indians without being undercut by the various contrary policies individual states might adopt if left to their own devices.

The writings and actions of both the Washington Administration and the First Congress amply demonstrate this early conception of the national Government as having primacy over Indian affairs. President George Washington himself explained in a letter to the Governor of Pennsylvania that the federal Government, under the new Constitution, "possess[ed] the only authority of regulating an intercourse with [the Indians], and redressing their grievances." Letter from George Washington to Thomas Mifflin (Sept. 4, 1790), in 6 THE PAPERS OF GEORGE WASHINGTON: PRESIDENTIAL SERIES 188, 189 (Mark A. Mastromarino ed., 1996). And the First Congress reinforced this exceptionally broad understanding of federal authority through the adoption of the Indian Intercourse Act of 1790, Act of July 22, 1790, §§ 1-3, 1 Stat. 137-38. *See, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) ("An act 'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, is contemporaneous and weighty evidence of its true meaning.'" (alteration omitted) (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888)). The legislation provided exclusively for federal management of essential aspects of Indian affairs: the regulation of trade with Indians, prohibition on purchases of Indian land except by federal agents, and the federalization of crimes committed by non-Indians against Indians. *See* COHEN'S, *supra*, § 1.03[2]. And early Congresses repeatedly reaffirmed this expansive understanding of federal power by reenacting the statute in various forms throughout the late eighteenth and early nineteenth century. *See* Act of June 30, 1834, ch. 161, 4 Stat. 729; Act of Mar. 30, 1802, ch. 13, 2

Stat. 139; Act of Mar. 3, 1799, ch. 46, 1 Stat. 743; Act of May 19, 1796, ch. 30, 1 Stat. 469; Act of Mar. 1, 1793, ch. 19, 1 Stat. 329.

These acts further evince that, from its earliest days, Congress viewed itself as having an obligation to sustain the Indians and tribes as a separate people belonging to separate nations and to protect them from harm by the states and their inhabitants. *See Lummi Indian Tribe v. Whatcom Cnty.*, 5 F.3d 1355, 1358 (9th Cir. 1993) (internal citations omitted) ("Courts considering the [Indian Intercourse] Act's purpose have agreed that Congress intended to protect Indians from the 'greed of other races,' and from 'being victimized by artful scoundrels inclined to make a sharp bargain.'" (first quoting *United States v. Candelaria*, 271 U.S. 432, 442 (1926); then quoting *Tuscarora Nation of Indians v. Power Auth.*, 257 F.2d 885, 888 (2d Cir. 1958), *vacated as moot sub nom.*, *McMorran v. Tuscarora Nation of Indians*, 362 U.S. 608 (1960))); Stephen L. Pevar, The Rights of Indians and Tribes 96 (4th ed. 2012). This duty has deep historical roots. As related above, the federal Government engaged with the Indians in the decades following ratification as part of its westward expansion project, utilizing not only diplomatic tools like treaties, but also military might. *See supra* Background Part I. By virtue of its manifold and dominant powers over Indian affairs, the national Government gradually subjugated the western lands, eventually enveloping the Indian tribes and extinguishing many aspects of their external sovereignty, including their ability to deal with other countries as independent nations.

As a consequence of the Indians' partial surrender of sovereign power, the federal Government naturally took on an attendant duty to protect and provide for the well-being of the "domestic dependent [Indian] nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 13 (1831) (stating that Indian tribes "look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants"); *see also Mancari*, 417 U.S. at 552 ("In the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force,

leaving them . . . [a] dependent people, needing protection . . . ." (quoting *Bd. of Cnty. Comm'rs v. Seber*, 318 U.S. 705, 715 (1943)); *supra* Background Part II. That is, owing to the federal Government's expansive Indian affairs powers and the way in which it has wielded those powers to divest Indians of their ancestral lands, the Government bears a responsibility to protect the tribes from external threats. Similarly, the Government has an overarching duty to provide for the welfare of tribes. *See* CANBY, AMERICAN INDIAN LAW, *supra* § 3.1; COHEN'S, *supra*, § 5.04.[23] Numerous pieces of Indian federal legislation have been passed pursuant to this federal duty.[24] Indeed, we know of no court that has found Congress's power wanting when Congress has invoked its duty to the tribes and enacted legislation clearly aimed at keeping its enduring covenant. *See*, *e.g.*, *Mancari*, 417 U.S. 551-52 ("Of necessity the United States assumed the duty of furnishing . . . protection [to the Indians], and with it the authority to do all that was required to perform that obligation . . . ." (quoting *Seber*, 318 U.S. at 715));

---

[23] As discussed, this obligation has been characterized as akin to a guardian-ward relationship, or, in more contemporary parlance, a trust relationship. *See supra* Background Part II; *compare Cherokee*, 30 U.S. at 13 (referring to the tribes as "domestic dependent nations" and explaining "[t]heir relation to the United States resembles that of a ward to his guardian"), *with Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 757 (2016) (noting the "general trust relationship between the United States and the Indian tribes") (internal quotation marks omitted).

[24] *See, e.g.*, Indian Health Care Improvement Act, 25 U.S.C. § 1602 (explaining that the legislation was passed "in fulfillment of [the Government's] special trust responsibilities and legal obligations to Indians"); Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450a(a) ("The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities."); Elementary and Secondary Education Act, 20 U.S.C. § 7401 ("It is the policy of the United States to fulfill the Federal Government's unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children."); American Indian Agricultural Resource Management Act, 25 U.S.C. § 1307 ("[T]he United States has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes.").

*Kagama,* 118 U.S. at 383-84 ("Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States . . . From their very weakness and helplessness . . . there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen."); *Perrin v. United States*, 232 U.S. 478, 486 (1914) ("It must also be conceded that, in determining what is reasonably essential to the protection of the Indians, Congress is invested with a wide discretion, and its action, unless purely arbitrary, must be accepted and given full effect by the courts."); *Worcester*, 31 U.S. at 556-57 (explaining that the Constitution vests Congress with broad Indian affairs powers and that Congress has "[f]rom the commencement of our government . . . passed acts to regulate trade and intercourse with the Indians; which treat the[ tribes] as nations, respect their rights, and manifest a firm purpose to afford that protection which treaties stipulate"); *Cherokee Nation*, 30 U.S. at 13.[25]

Chief among the external threats to the Indian tribes were the states and their inhabitants. *See Kagama,* 118 U.S. at 384 (The Indian tribes "owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies."); CANBY, AMERICAN INDIAN LAW, *supra* § 3.1. And the Supreme Court has long recognized and repeatedly reaffirmed the federal Government's ongoing duty to protect tribes from the states and vice versa—as well as its power to do so. *See Kagama,* 118 U.S. at 384*; Cherokee Nation*, 30 U.S. at 13; *Worcester*, 31 U.S. at 556-57; *Mancari*, 417 U.S. 551-52.

---

[25] Though some of the cited cases are permeated with paternalistic overtones and objectionable descriptions of Indians, it is no less true today than it was centuries ago that the national Government owes an obligation to provide for the welfare of the Indians—and that it is armed with the power to do so. *See, e.g.*, *Mancari*, 417 U.S. 551-52.

In light of the foregoing, ICWA represents the convergence of key aspects of federal Indian law. First, as Congress expressly noted in its congressional findings, ICWA was enacted pursuant to the "plenary power over Indian affairs" that the Constitution places in the federal government. [26] 25 U.S.C. § 1901(1). This authority is exclusive to the federal government, and the Framers specifically intended to prevent the states from interfering with its exercise, either by taking their own disparate stances in dealing with tribal governments or by otherwise exercising their sovereignty in a manner contrary to federal Indian policy. *See Seminole Tribe of Fla.*, 517 U.S. at 62; Ablavsky, *Beyond the Indian Commerce Clause*, *supra* at 1043-44. Just as the Constitution was meant to preclude the states from undertaking their own wars or making their own treaties with the Indian tribes, *see* James Madison, Vices of the Political System of the United States, in 9 THE PAPERS OF JAMES MADISON 345, 348 (Robert A. Rutland et al. eds., 1975), so too does it empower the federal government to ensure states do not spoil relations with the Indian tribes through the unwarranted taking and placement of Indian children in non-Indian foster and adoptive homes. [27] As with the

---

[26] We find it notable that, in enacting ICWA, Congress explicitly contemplated whether it was constitutionally authorized to do so. *See* H.R. REP. NO. 95-1386, at 13-15 (discussing the constitutionality of ICWA, including that ICWA falls within Congress's plenary power over Indian affairs); *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) ("The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality."). Though this judgment is not dispositive, we grant it due deference. *See Perrin*, 232 U.S. at 486 ("[I]n determining what is reasonably essential to the protection of the Indians, Congress is invested with a wide discretion[.]").

[27] JUDGE DUNCAN contends that the principle that the federal government may prevent states from interfering with federal policy toward the tribes does not apply here because ICWA does not totally exclude states from Indian child custody proceedings. He contends that ICWA instead "does the opposite of 'excluding'" by "leav[ing] many adoptions under state jurisdiction . . . while imposing 'Federal standards' on those state proceedings." DUNCAN, CIRCUIT JUDGE, OP. at 48 (citing §§ 1911(b) & 1902). But JUDGE DUNCAN's suggestion that ICWA "co-opts" the machinery of state courts in service to the federal government is highly misleading. DUNCAN, CIRCUIT JUDGE,

federal government's dealings with any other nation, the Constitution dictates that the government address relations with the Indian tribes on behalf of the nation as a whole without state interference, be it with respect to war making, peace treaties, or child custody practices.

Second, ICWA falls within the federal government's continuing trust relationship with the tribes, which includes a specific obligation to protect the tribes from the states. We earlier recounted the arbitrary and abusive child removal and assimilation practices that led Congress to conclude that it was necessary and proper for it to enact ICWA. *See supra* Background Part IV-V; *see also Antoine*, 420 U.S. at 203. Briefly stated, throughout the late nineteenth and well into the twentieth century, the federal government was intimately involved in programs ostensibly to "educate" Indian children at off-reservation schools that sought to imbue them with white Christian values and permanently shed them of and sever them from their tribal heritage. Although the federal Government eventually discontinued this assimilationist policy, Congress found that abusive Indian child custody practices continued at the state level, often leading to the "wholesale" and unwarranted removal of Indian children from their homes by state child welfare agencies and adjudicatory bodies, *see* H.R. REP. NO. 95-1386, at 9;

---

OP. at 49. Far from pressing the states into federal service, ICWA minimizes any intrusion on state sovereignty by *permitting* states to exercise some jurisdiction over Indian Child custody proceedings so long as the state courts respect the federal rights of Indian children, families, and tribes. Section "1911(a) establishes exclusive jurisdiction in the *tribal* courts for proceedings concerning an Indian child who resides or is domiciled within the reservation." *Holyfield*, 490 U.S. at 36 (internal quotation marks omitted) (emphasis added). And while Section 1911(b) allows states to exercise some concurrent jurisdiction over cases involving "children not domiciled on the reservation," it establishes that jurisdiction over such proceedings still "*presumptively*" lies with the tribal courts. *Id.* at 36 (internal quotation marks omitted) (emphasis added). This means that, except in limited circumstances, the case may remain in state court only with the consent of the Indian child's parents, custodian, and tribe. *See* § 1911(b). This is all to say, that the statute allows states to participate in an activity that is presumptively and could wholly be reserved to the tribes or the federal government is an indulgence of state interests, not an invasion thereof.

*see also Indian Child Welfare Act of 1977: Hearing Before the S. Select Committee on Indian Affs.*, 95th Cong. 320 (1977) (statement of James Abourezk, Chairman, S. Select Comm. on Indian Affs.) (describing the massive removal as resulting in "cultural genocide"). Congress heard and received extensive evidence on this plundering of tribal communities' children, including testimony that the vast removal of Indian children from their homes and communities constituted an existential threat to tribes. *See* 124 Cong. Rec. 38,103 (1978) (statement of Minority sponsor Rep. Robert Lagomarsino) ("For Indians generally and tribes in particular, the continued wholesale removal of their children by nontribal government and private agencies constitutes a serious threat to their existence as on-going, self-governing communities."); *see also* H.R. REP. NO. 95-1386, at 9-10 (declaring that the removal of Indian children was a "crisis of massive proportions," representing "perhaps the most tragic and destructive aspect of Indian life").

After reviewing this testimony and evidence concerning the massive removal of Indian children from their tribal communities by the states, Congress found that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"; "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies"; and "that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(3)-(4). And Congress directly attributed this threat to the states "exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies," observing that they had "often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." *Id.* § 1901(5).

Thus, ICWA also falls within Congress's "plenary powers to legislate on the problems of Indians" in order to fulfill its enduring trust obligations

to the tribes. *Antoine*, 420 U.S. at 203.  Indeed, the congressional findings in the statute expressly invoke this "responsibility for the protection and preservation of Indian tribes and their resources" and state "that the United States has a direct interest, as trustee, in protecting Indian children."  25 U.S.C. § 1901(2)-(3).  The law was intended to combat an evil threatening the very existence of tribal communities, and it would be difficult to conceive of federal legislation that is more clearly aimed at the Government's enduring trust obligations to the tribes.  Moreover, it fulfills the government's duty to protect the tribes from the states by regulating relations between the two—a power that the Framers specifically intended that the Constitution bestow on the federal government.[28]  *See* CANBY, AMERICAN INDIAN LAW § 2.1

---

[28] The opposing opinion misapprehends the significance to our analysis of the federal government's history of removing Indian children from their families and tribes to place them at off-reservation boarding schools. *See* DUNCAN, CIRCUIT JUDGE, OP. at 50-51.  In the view of the opposing opinion, that the boarding school policy began in the latter half of the nineteenth century, and not the Founding era, means that the federal government's assimilation policy is irrelevant in determining whether Congress was authorized to enact ICWA.  This is squarely contrary to the Supreme Court's explicit direction that historical "practice [is] an important interpretive factor even when the nature or longevity of that practice is subject to dispute, *and even when that practice began after the founding era.*"  *Noel Canning,* 573 U.S. at 525 (emphasis added).  But more importantly, JUDGE DUNCAN's observation about the start of the boarding school policy misses the point: Since the Nation's founding, the federal government has viewed itself as owing an affirmative duty to promote tribal welfare generally and to provide for Indian children specifically, as well as having the power to do so—obligations that arise under what is now described as a trust relationship between the tribes and the government. *See* Br. of Prof. Ablavsky at 20 (describing federal financing of placement of Indian children in Quaker homes during the Washington administration); *see also* Fletcher, FEDERAL INDIAN LAW § 5.2.  This relationship, at one time, led the federal government to pursue misguided policies that harmed the tribes, including its efforts at assimilating Indian children through the use of boarding schools during the nineteenth and twentieth centuries.  And decades after the height of the federal government's ill-founded promotion of Indian boarding schools, the states continued to perpetuate the destruction of tribal culture by removing massive numbers of Indian children from the custody of their parents.  *See supra* Background Part IV-V.  In the face of these abusive child welfare practices and pursuant to the government's trust duty to the tribes—which, again, is rooted in the Nation's Founding era—Congress enacted ICWA to protect the tribes.  Stated differently,

("The central policy . . . was one of separating Indians and non-Indians and subjecting nearly all interaction between the two groups to federal control.").

Plaintiffs raise several arguments in favor of cabining Congress's authority to redress the evils attending state child welfare proceedings involving Indian children. We review their contentions and find them wanting.

First, seeking to surmount the mountain of case law sustaining Congress's plenary authority to regulate with respect to Indians, Plaintiffs point out that the Court remarked that this power is "not absolute" in *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73, 84 (1977). A cursory review of the cited authority reveals that it affords no support to Plaintiffs' position. The above-quoted statement was made with regard to the justiciability of a challenge to Congress's "exercise of control over tribal property." *Id.* at 83. In other words, the Court was addressing only whether it in fact had authority to adjudicate the dispute—not the extent of Congress's authority to regulate Indian tribes. In any event, the Court concluded that the controversy was justiciable and upheld the challenged enactment. *Id.* at 90. *Delaware Tribal Business Committee* in no way shackles Congress's authority to regulate Indian tribes.

Plaintiffs next contend that the meaning of commerce in the Indian and Interstate Commerce Clauses is equivalent. Plaintiffs thus seek to import Interstate Commerce Clause jurisprudence into the Indian Commerce Clause in order to limit Congress's power under the latter; they argue that

---

Founding-era history confirms Congress's "plenary power[]" and responsibility "to legislate on the problems of Indians," *Antoine*, 420 U.S. at 203, and the history of Indian child removal demonstrates that the unwarranted breakup of Indian families was such a problem. Congress was effectuating its trust obligations to the tribes when it acted to halt the wrongful Indian child custody practices that had once been carried out by the federal government and were continuing to be practiced by states at the time of ICWA's enactment, and this is exactly what the Constitution empowers the federal government to do.

the latter clause does not authorize ICWA because children are not "persons . . . in commerce" and child custody cases do not substantially affect commerce with Indian tribes. We find Plaintiffs' construction of the Indian Commerce Clause unduly cramped, at odds with both the original understanding of the clause and the Supreme Court's more recent instructions. *See Printz*, 521 U.S. at 905 (looking to "historical understanding and practice" as well as "the jurisprudence of this Court" to determine whether a federal enactment was constitutional). More fundamentally, the history, text, and structure of the Constitution demonstrate that the federal Government, including Congress, has plenary authority over all Indian affairs and that this power is in no way limited to the regulation of economic activity. And, as stated, Congress does not derive its plenary power solely from the Indian Commerce Clause, but rather from the holistic interplay of the constitutional powers granted to Congress to deal with the Indian tribes as separate nations. *See* Ablavsky, *Beyond the Indian Commerce Clause*, *supra* at 1026.

The history refutes Plaintiffs' attempt to equate the Interstate and Indian Commerce Clauses. Indeed, since the framing of the Constitution, "Indian 'commerce' [has] mean[t] something different" than "interstate commerce." *Id.* The Framers debated and approved the Indian Commerce Clause separately from the Interstate Commerce Clause, and, during ratification, the clauses were viewed as so distinct in content that "no one during ratification interpreted the Indian Commerce Clause to shed light on the Interstate . . . Commerce Clause[], or vice versa." *Id.* at 1027*; see also* Matthew L.M. Fletcher, *ICWA and the Commerce Clause*, in The Indian Child Welfare Act at 30: Facing the Future 32 (Fletcher et al. eds., 2009) [hereinafter Fletcher, *ICWA and the Commerce Clause*]. Though both provisions use the term "commerce," the historical evidence from the time of the Constitution's framing indicates that interpreting "commerce" identically in the Interstate and Indian Commerce Clauses is a "trap" that "would tend to obliterate the original meaning and intent of the Indian

Commerce Clause." Fletcher, *ICWA and the Commerce Clause*, *supra*, at 31. Put simply, "[c]ommerce with Indian tribes must be interpreted on its own terms rather than in the shadow of . . . the Interstate Commerce Clause." Ablavsky, *Beyond the Indian Commerce Clause*, *supra*, at 1028, 1029 (noting that eighteenth century references to "commerce" with Indians included the exchange of religious ideas with tribes and sexual intercourse with Indians); *see also* Fletcher, *ICWA and the Commerce Clause*, *supra* at 8-9.

Legislation from the beginning of the Constitutional era further demonstrates that the Constitution confers synergistic and comprehensive powers on the federal Government to manage relations with Indian tribes, regardless of whether the regulated activity is economic in nature. As noted above, the Indian Intercourse Act of 1790 embraced many noneconomic subjects, including the regulation of criminal conduct by non-Indians against Indians. In enacting the law, the First Congress plainly conceived of its power to extend into regulation of noneconomic activity relating to Indian tribes. *See* Jack M. Balkin, *Commerce*, 109 MICH. L. REV. 1, 24-26 (2010) (discussing the Act and its successors and stating that "Congress clearly believed that it could reach both economic and noneconomic activity under the Indian Commerce Clause," given that the Act reaches noneconomic criminal conduct, such as murder); *see also* Akhil Reed Amar, *America's Constitution and the Yale School of Constitutional Interpretation*, 115 YALE L.J. 1997, 2004 n.25 (2006). Since then, Congress has repeatedly exercised its Indian affairs authority for matters far beyond mere economic exchange. *See, e.g.*, Indian Health Care Improvement Act, 25 U.S.C. §§ 1601 *et seq.*; Tribally Controlled Community College Assistance Act, 25 U.S.C. § 1801(7)(B).

Furthermore, "[t]he scope of federal power under the Indian commerce clause has developed under Supreme Court decisions differently than the powers over foreign and interstate commerce." COHEN'S, *supra*, § 4.01[1][a]. The Court has explicitly underscored the distinction between

the clauses, explaining that "the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause." *Seminole Tribe*, 517 U.S. at 62 (observing that, though "the States still exercise some authority over interstate trade[, they] have been divested of virtually all authority over Indian commerce and Indian tribes"). In short, it is "well established that the Interstate Commerce and Indian Commerce Clauses have very different applications"; unlike the former clause, which "is concerned with maintaining free trade among the States," "the central function of the Indian Commerce Clause is to provide Congress with *plenary* power to legislate in the field of Indian affairs." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989) (emphasis added); *see also United States v. Lomayaoma*, 86 F.3d 142, 145 (9th Cir. 1996) (noting that the Indian Commerce clause "confers more extensive power on Congress than does the Interstate Commerce Clause"). And the Supreme Court has continually made clear that Congress's Indian affairs power is not limited to regulating economic activity. *See Lara*, 541 U.S. at 200 (affirming power of tribes to criminally prosecute nonmembers); *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 410-11, 416-17 (1865) (upholding under the Indian Commerce Clause a federal statute that criminally sanctioned the sale of liquor to Indians, reasoning that the law "regulates the intercourse between the citizens of the United States and [Indian] tribes, which is another branch of commerce, and a very important one"); *Worcester*, 31 U.S. at 559 (explaining that the array of Indian affairs powers conferred on Congress by the Constitution "comprehend all that is required for the regulation of our intercourse with the Indians"). Any contention that ICWA is beyond Congress's authority to legislate with regard to Indian affairs is unfounded.

Alternatively, Plaintiffs argue that, even if the Constitution grants Congress plenary power with respect to Indian affairs, ICWA nonetheless exceeds Congress's legislative authority because it reaches Indian children who are not yet enrolled tribal members. We find no merit in this argument.

Pursuant to its Indian affairs power, Congress has long regulated persons without any tribal connection when their conduct affects Indians. *See, e.g.*, Indian Intercourse Act, § 1, 1 Stat. 137 (requiring any person who seeks "to carry on any trade or intercourse with the Indian tribes" to obtain a license from the federal government); *United States v. Mazurie*, 419 U.S. 544, 556-58 (1975) (upholding federal criminal statute, passed pursuant to the Indian Commerce Clause and applied to non-Indians for conduct on private, non-Indian land within a reservation). Indeed, "Congress' plenary powers to legislate on the problems of Indians" often results in statutes that impact— and are directly aimed at—non-Indians. *Antoine*, 420 U.S. at 203; *see also Dick v. United States*, 208 U.S. 340, 357 (1908) ("As long as these Indians remain a distinct people, with an existing tribal organization, recognized by the political department of the government, Congress has the power to say with whom, and on what terms, they shall deal . . . ."). This type of regulation has been upheld repeatedly, even when it extends outside the bounds of the reservation or Indian country. *See, e.g.*, *United States v. Nice*, 241 U.S. 591, 597 (1916) ("The power of Congress to regulate or prohibit traffic in intoxicating liquor with tribal Indians within a state, *whether upon or off an Indian reservation*, is well settled. It has long been exercised, and has repeatedly been sustained by this court.") (emphasis added); *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. (3 Otto) 188, 195 (1876) (sustaining Congress's power to require forfeiture of liquor sold outside of Indian country by a non-Indian to a tribal member); *Holliday*, 70 U.S. (3 Wall.) at 416-17 (upholding statute that criminally sanctioned sale of liquor by a non-Indian to an Indian outside of Indian country); Cohen's, *supra*, § 5.01[3] (explaining that the Indian Commerce Clause comprehends "transactions outside of Indian country."). Simply put, Congress's Indian affairs power does not hinge on whether an entity affected by a regulation is a member of an Indian tribe, and there is no authority in the case law for the novel constraint on congressional power that Plaintiffs proffer.

JUDGE DUNCAN's objections to Congress's power to enact ICWA center on concerns that the statute impermissibly interferes with state sovereignty by legislating federal protections applicable to Indian children in state child welfare proceedings. He raises similar contentions when arguing that ICWA contravenes the anticommandeering principle, which we address below in our anticommandeering discussion. *See infra* Discussion Part II.A.2. But that issue is distinct from the question of whether Congress under Article I may legislate on the particular subject matter at issue: providing minimum protections for Indian children and families in child custody proceedings in order to prevent and rectify the massive removal of Indian children from their communities.[29] *See supra* note 21. To the extent the opposing opinion alleges a Tenth Amendment violation independent of any anticommandeering problem, centuries of Supreme Court precedent declaring Congress's duty to protect tribes from the states and Congress's corresponding "plenary power[] to legislate on the problems of Indians" compel us to reject JUDGE DUNCAN's arguments for imposing new restraints on this authority. *Antoine*, 420 U.S. at 203; *see also, e.g.*, *Mancari*, 417 U.S. 551-52; *Kagama*, 118 U.S. at 383-84. Indeed, preventing the states from exercising their sovereign power in a manner that interferes with federal policy toward the Indian tribes is precisely what the Constitution was intended to do. *See Worcester*, 31 U.S. at 559 ("[The Constitution] confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations,

---

[29] The opposing opinion misreads us as somehow suggesting that the "Tenth Amendment vanishes" when Congress has plenary power to legislate in a certain field. SEE DUNCAN, CIRCUIT JUDGE, OP. at 28. To the contrary, we have explained that the question of Congress's Article I authority to legislate on a given subject matter is separate from the anticommandeering inquiry and other federalism concerns—as well as other constitutional constraints on Congress's legislative authority. *See supra* note 21. And our analysis therefore tracks this basic understanding about the distinct constitutional inquiries presented: first, we address whether ICWA is within the range of Congress's Indian affairs authority, and second, we consider whether ICWA contravenes the anticommandeering doctrine. *Compare* Discussion Part II.A.1 *with* Discussion Part.II.A.2.

and among the several states, and *with the Indian tribes*. These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions. The shackles imposed on this power, in the confederation, are discarded."). It was exactly this concern that led the Framers to confer on the federal government exclusive, plenary power over Indian affairs through myriad interrelated constitutional provisions. *See* Ablavsky, *Beyond the Indian Commerce Clause* at 1043-44.

JUDGE DUNCAN's argument suffers from another fundamental defect. His overarching premise is that ICWA violates the Tenth Amendment—and thus exceeds Congress's Article I authority—because it "encroaches" on an area of "traditional" state regulation, the field of domestic relations. DUNCAN, CIRCUIT JUDGE, OP. at 15, 40 n. 58,. Yet, as JUDGE HIGGINSON cogently explains, this assertion is squarely at odds with the Supreme Court's decision in *Garcia v. San Antonio Metropolitan Transit Authority*, where the Court emphatically rejected as unprincipled and unadministrable a conception of Tenth Amendment protections that turns on whether a regulated activity is one that is traditionally within a state's purview. HIGGINSON, CIRCUIT JUDGE, OP. at 1-2; *see Garcia,* 469 U.S. 528, 546-47 (1985) ("We therefore now reject, as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.'")

First, "[t]here is no 'general doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other.'" *Maryland v. Wirtz*, 392 U.S. 183, 195 (1968) (quoting *Case v. Bowles*, 327 U.S. 92, 101 (1946)). Rather, pursuant to the Supremacy Clause, "the Federal Government, when acting within a delegated power, may override countervailing state interests," whether those interests are

labeled traditional, fundamental, or otherwise. *Id.* In ratifying the Constitution, the states consented to the subordination of their interests— even those interests that are traditional state prerogatives—to those of the federal government when it acts pursuant to its constitutional powers. *See Garcia*, 469 U.S. at 549. "In the words of James Madison to the Members of the First Congress: 'Interference with the power of the States was no constitutional criterion of the power of Congress. If the power was not given, Congress could not exercise it; if given, they might exercise it, although it should interfere with the laws, or even the Constitution of the States.'" *Id.* (quoting 2 Annals of Cong. 1897 (1791)).

Moreover, on a more practical level, requiring courts to attempt to ascertain whether a given area of regulation is sufficiently within the historical province of states to qualify for protection would "result in line-drawing of the most-arbitrary sort." *Id.* at 545. "[T]he genesis of state governmental functions stretches over a historical continuum from before the Revolution to the present, and courts would have to decide by fiat precisely how longstanding a pattern of state involvement had to be for federal regulatory authority to be defeated." *Id.* And, as the *Garcia* Court observed, aside from longevity, there is a total lack "of objective criteria" by which to identify unenumerated "fundamental' elements of state sovereignty." *Id.* at 549.

The *Garcia* Court therefore held that the entirety of the constitutional protections for states' retained sovereignty in the federalist system are found in the limitations inherent in Congress's enumerated Article I powers[30] and

---

[30] The modern anticommandeering doctrine was developed post-*Garcia*, and it is also rooted in the Tenth Amendment's reservation of state sovereignty. *See, e.g.*, *New York*, 505 U.S. at 188; *Printz*, 521 U.S. at 932. And the Court has of course long recognized that states retain sovereign immunity from most private suits, including in post-*Garcia* decisions. *See, e.g., Seminole Tribe*, 517 U.S. at 47. *Garcia*, nevertheless, remains good law, as evidenced by citations to it in the Court's leading anticommandeering cases, *see New*

"in the structure of the Federal government itself," which assigns the states a role in, among other things, selecting the executive and legislative branches of the federal government. *Id.* at 550-51. This structure reflects the Framers' desire "to protect the States from overreaching by Congress" through their participation in the democratic system and the political process, and not by judicial assessment of whether a federal practice intrudes on some inviolable area of state sovereignty that went unmentioned in the Constitution despite its supposed importance. *Id.* In short, *Garcia* made clear that any "attempt to draw the boundaries of state regulatory immunity in terms of 'traditional governmental function' is not only unworkable but is also inconsistent with established principles of federalism." *Id.* at 554.

As JUDGE HIGGINSON points out, this is precisely the type of disfavored line drawing in which JUDGE DUNCAN's opinion engages: it erroneously attempts to shield states from ICWA's minimum protections on the ground that the law touches on domestic relations, a sphere of regulation "traditionally" within the purview of states. HIGGINSON, CIRCUIT JUDGE, OP. at 1-2. The opposing opinion thus "risks resuscitating a misunderstanding of state sovereignty that entangles judges with the problematic policy task of deciding what issues are so inherent in the concept and history of state sovereignty that they fall beyond the reach of Congress." HIGGINSON, CIRCUIT JUDGE, OP. at 2.

Recognizing that *Garcia*'s reasoning dooms its argument, the opposing opinion attempts to distinguish that decision based on the fact that the statute at issue in *Garcia* was enacted pursuant to Congress's Interstate Commerce Clause authority, whereas ICWA stems from Congress's power over Indian affairs. *See* DUNCAN, CIRCUIT JUDGE, OP. at 40 n.58. However, the *Garcia* Court's reasoning for expressly rejecting a Tenth

---

*York*, 505 U.S. at 155; *Printz*, 521 U.S. at 932, meaning the type of unenumerated spheres of state sovereignty JUDGE DUNCAN relies upon simply do not exist.

Amendment test that looks to whether a federal regulation encroaches on a 'traditional governmental function' applies with equal force regardless of the enumerated power pursuant to which Congress acts. Moreover, it would be nonsensical for the Tenth Amendment to impose more stringent federalism limitations on Congress when it regulates under its Indian affairs authority than under its Interstate Commerce power. It is well settled that states retain sovereign authority under the Tenth Amendment "only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government," *id.* at 549, and "the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause." *Seminole Tribe*, 517 U.S. at 62. In other words, if any distinction exists between the limitations federalism places on Congress's Indian affairs power and its Interstate Commerce power, it would be that Congress has *more* freedom to regulate with respect to Indian affairs, not less. *See id.*; *Cotton Petroleum Corp.*, 490 U.S. at 192; *see also Lomayaoma*, 86 F.3d 145; Ablavsky, *Beyond the Indian Commerce Clause*, *supra* at 1043-44.

The opposing opinion further contends that *Garcia* is inapposite because that case "concerned whether 'incidental application' of general federal laws 'excessively interfered with the functioning of state governments.'" DUNCAN, CIRCUIT JUDGE, OP. at 40 n.58 (quoting *Printz*, 521 U.S. at 932). But the same is true with ICWA. Like the provision of the Fair Labor Standards Act at issue in *Garcia* that applied to both public and private employers, ICWA is a generally applicable law. Under the statute, as explained *infra* Discussion Part II.A.2.b, any burdens faced by states are "nothing more than the same . . . obligations" that "private [actors] have to meet." *Garcia*, 469 U.S. at 554. Because ICWA's mandates may be borne either by private actors or state actors, any burdens on states are "merely incidental applications" of the statute. *Printz*, 521 U.S. at 932. JUDGE DUNCAN thus fails to persuasively distinguish *Garcia*, confirming that the opposing opinion's argument for limiting Congress's Indian affairs

authority under the Tenth Amendment is "unsound in principle and unworkable in practice." *Garcia*, 469 U.S. at 546.

The opposing opinion also posits, in essence, that Congress's authority to enact ICWA turns on whether there is either a Supreme Court decision blessing a statute that operates just like ICWA or a Founding-era federal law that regulates Indian children and applies within state child welfare proceedings. *See* DUNCAN, CIRCUIT JUDGE, OP. at 29-56. Because neither exist, ICWA must fall, according to the opposing opinion. Such reasoning is misguided.

First, it is unsurprising that there is no Founding-era federal Indian statute conferring rights that apply in state proceedings. As JUDGE COSTA notes, it would have been anachronistic and bizarre for the early Congresses to have passed a law specifically pertaining to child custody proceedings because it was not until the middle of the nineteenth century that state adoption law shifted to allow for the adjudication of child placements in judicial proceedings. *See* COSTA, CIRCUIT JUDGE, OP. at 16-17; *see also* Naomi Cahn, *Perfect Substitutes or the Real Thing?*, 52 DUKE L.J. 1077, 1112-17 (2003). And there was no need during the Founding era for legislation that operated like ICWA as there was no massive removal of Indian children from their families at the hands of state administrative or judicial bodies. It was only during the 1970s that the scale of the ongoing, state-driven problem of Indian child removal was brought to Congress's attention. *See supra* Background Part IV. Over a four-year span, Congress considered voluminous evidence of the systematic removal of Indian children from their families and tribes through state proceedings. Fletcher, FEDERAL INDIAN LAW, *supra* § 8.8. Faced with the unique and alarming nature of this evil, Congress determined it was necessary to enact ICWA in order to protect Indian children, families, and tribes within those state proceedings. Thus, deciding ICWA's constitutionality by looking to whether the Founders enacted a federal law conferring rights to Indian families and tribes within

child custody proceedings is as nonsensical as deciding that federal regulation of the internet is unconstitutional because the early Congresses lacked the prescience to regulate a non-existent technology.

Second, the absence of a Supreme Court decision squarely addressing a federal Indian statute that creates rights applicable in state proceedings does not lend credence to the opposing opinion's position. As discussed *infra* Discussion Part II.A.2.a.i, the Supreme Court has repeatedly held that state courts are bound by the Supremacy Clause to apply validly preemptive federal law, and there is thus ample Supreme Court precedent supporting Congress's authority to enact laws applicable in state proceedings. *See, e.g., McCarty v. McCarty*, 453 U.S. 210, 235-36 (1981) (federal military benefits statute guaranteeing "retired pay" to a retired servicemember preempted state's community property law that otherwise would have provided upon divorce for dividing the retirement pay between the former spouses); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 590 (1979) (federal Railroad Retirement Act's scheme for pension benefits, which excluded a spouse of a railroad employee from entitlement to such benefits upon divorce, preempted state law's definition of community property subject to division). That there may be no case affirming a federal statute that creates rights *related to Indians* that apply in state courts evidences only the history just discussed and the fact that few questioned Congress's ability to legislate in this manner given the wealth of Supreme Court precedents upholding the preemptive force of federal law. Indeed, ICWA itself has been a part of the United State Code for over forty years without a significant Tenth Amendment challenge to the law reaching the Supreme Court or the courts of our sister circuits, which would surely be puzzling if the statute were truly the radical, unprecedented federal overreach that the opposing opinion contends. Thus, the lack of a Supreme Court case directly addressing an Indian law like ICWA that creates rights applicable in state court proceedings speaks not to the absence of federal authority to enact such a statute, but

instead to historical circumstance and federal authority that is so well established as to be unquestionable.

To summarize, ICWA's constitutionality does not hinge on JUDGE DUNCAN's exceptionally pinched framing that would have the statute rise or fall based on the historical sanctioning of an exact analogue that Congress would have had no occasion to enact. Rather, the salient question is whether the history and text of the Constitution and congressional practice suggest that ICWA is within Congress's plenary Indian affairs authority. *See Noel Canning,* 573 U.S. at 533 ("The Founders knew they were writing a document designed to apply to ever-changing circumstances over centuries. After all, a Constitution is 'intended to endure for ages to come,' and must adapt itself to a future that can only be 'seen dimly,' if at all." (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 415 (1819))); *Heller*, 554 U.S. at 528. Given the extensive history of federal government efforts to provide for the welfare of Indian children and tribes, including legislation specifically designed to protect Indians from mistreatment by the states and their citizens, this question can only be answered in the affirmative.

Searching in vain for case law to support its unorthodox position, the opposing opinion improvidently relies on two inapposite Supreme Court decisions, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), and *United States v. Lara*, 541 U.S. 193 (2004). In *Seminole Tribe*, the Court considered an issue wholly absent from the present case: Congress's power to abrogate states' sovereign immunity. 517 U.S. at 47. That case concerned the Indian Gaming Regulatory Act, which was passed pursuant to the Indian Commerce Clause. *Id.* One provision in the law authorized tribes to sue states in federal court to compel them to negotiate in good faith to establish a tribal-state compact governing gaming activities. *Id.* The Court nullified that provision; it reasoned that, although the Constitution vests Congress with "complete law-making authority" with respect to Indian affairs, "the Eleventh

Amendment [generally] prevents congressional authorization of suits by private parties against unconsenting states." *Id.* at 72.

Judge Duncan emphasizes this uncontroversial statement, but it does not advance his argument. Duncan, Circuit Judge, Op. at 35-36. In holding that Congress could not abrogate a state's sovereign immunity pursuant to its Indian affairs power, *Seminole Tribe* simply recognized that, even when Congress holds plenary authority over a field of legislation, that power is still subject to limitations imposed by other constitutional provisions. *See id.*; *Williams*, 393 U.S. at 29; *Condon*, 528 U.S. at 149. It is for this reason that, as explained *supra* note 21, we first address Congress's Article I authority to legislate over ICWA's subject matter and then separately consider whether ICWA is consistent with the anticommandeering doctrine and other constitutional guarantees.

To the extent Judge Duncan asserts that *Seminole Tribe* prohibits Congress from regulating in state "sovereign matters like adoption proceedings," Duncan, Circuit Judge, Op. at 36, we disagree. *Seminole Tribe* addressed only limitations on Congress's power to override states' sovereign immunity from suit by private parties. *See id.* at 47. It has no bearing on the scope of Congress's Article I authority when, as here, private suits against a state are not at issue. Indeed, the Court carefully noted that its opinion in no way touched upon other aspects of the Tenth Amendment. *See id.* at 61 n.10 (expressly declining to opine on whether the statute contravened the anticommandeering doctrine because this argument "was not considered below . . . and is not fairly within the question presented"); *see also id.* at 183 n.65 (Souter, J., dissenting) (cautioning that the views expressed in his dissenting opinion on the issue of state sovereign immunity "should not be understood [as] tak[ing] a position on" the "scope of the Tenth Amendment" in other respects). Furthermore, the Supreme Court has expressly held that even in fields like domestic relations that are generally the exclusive territory of state regulation, Congress can enact

legislation that preempts contrary state law. *See, e.g.*, *McCarty*, 453 U.S. at 235-36. In sum, any reliance on *Seminole Tribe* as imposing a limit on Congress's ability to exercise its Indian affairs authority to create federal rights that apply within child custody proceedings is misplaced.[31]

The Supreme Court's decision and reasoning in *Lara*, 541 U.S. at 196, also does not apply to the present case. There, the Court considered the constitutionality of a statute enacted in response to an earlier Court ruling in *Duro v. Reina*, 495 U.S. 676 (1990). In *Duro*, the Court held that tribes had been dispossessed of their inherent authority to prosecute nonmember Indians by virtue of their status as dependent sovereigns subject to the authority of the United States. *Id.* at 679. Congress promptly passed a law seeking to avoid the Court's ruling in *Duro* by "recogniz[ing] and reaffirm[ing]" that tribes' inherent sovereignty includes the power to exercise criminal jurisdiction over nonmember Indians. *Lara,* 541 U.S. at 196; *see also United States v. Enas*, 255 F.3d 662, 669 (9th Cir. 2001) (citing 25 U.S.C. § 1301(2)). That statute was challenged in *Lara* as exceeding Congress's authority. *See* 541 U.S. at 200. The case thus presented the specific question of whether Congress could statutorily alter limits that had been placed on tribes' inherent sovereign powers as a result of their dependent status.

The Court answered this question in the affirmative, reasoning that Congress was in effect "relax[ing] restrictions that the political branches" had previously placed on the exercise of inherent tribal authority. *Id.* at 196. In recognizing Congress's power to remove such restrictions, the Court

---

[31] We note that JUDGE DUNCAN mischaracterizes the Defendants as supposedly making the "core" argument that simply because Congress has plenary authority over Indian affairs it "can *ipso facto*" regulate sovereign state affairs. DUNCAN, CIRCUIT JUDGE, OP. at 33-34, 36 n.52. This contention is not raised in the Defendants' briefing nor was it advanced at oral argument. Defendants' actual argument is that, as an initial matter, Congress has authority to enact ICWA and second that ICWA does not violate the anticommandeering doctrine.

discussed several relevant considerations. For example, one consideration was that Congress, with the Court's approval, had a long-established practice of adjusting the limits on the sovereign authority of tribes and other "dependent entities" such as Hawai'i and Puerto Rico. *Id.* 203-04. This history of congressional action was germane to deciding whether Congress could continue to adjust the scope of tribal autonomy. However, the *Lara* Court's considerations are of no relevance where, as with ICWA, Congress is not altering the scope of tribes' retained sovereign power.

Instead, in enacting ICWA, Congress simply employed *its* power to set policy with respect to the Indian tribes by conferring minimum federal protections on Indian children, parents, and tribes in state child custody proceeding. Stated differently, the considerations in *Lara* are inapplicable because, unlike the statute at issue in *Lara*, ICWA affirmatively grants new rights, protections, and safeguards to individual Indians and tribes in state proceedings and does not restore or remove any inherent sovereign authority the tribes possessed prior to their becoming dependents of the United States. Take, for instance, § 1911(b), which permits tribes to intervene in an off-reservation child custody case and invoke ICWA's placement preferences. That this provision cannot be read to restore sovereign authority to a tribe is clear from the fact that it grants the very same right to an Indian child's parents or relatives; a power cannot be sovereign in nature if it can just as easily be exercised by individual tribal members as by tribes themselves. *Cf. Lara,* 541 U.S. at 200 (upholding *tribes'* inherent sovereign power to prosecute nonmember Indians). Similarly, § 1912(b) provides indigent Indian parents or custodians a right to appointed counsel in state child custody proceedings—a right not conferred on the sovereign tribes at all. These provisions grant rights to Indian tribes, parents, and relatives pursuant to *Congress's* power to regulate relations between states, the federal

government, and the tribes, and they simply do not implicate the Indian tribes' inherent sovereign power.[32]

In sum, *Lara's* unique analytical approach cannot be applied wholesale to assess an enactment like ICWA that does not restore tribal sovereignty but instead affirmatively regulates Indian affairs by establishing a range of federal protections that apply when an Indian child is involved in a state child custody proceeding. *Lara*'s reasoning is therefore far removed from the Article I issue presented in this case.

Based on the Framers' intent to confer on the federal Government exclusive responsibility for Indian affairs, the centuries-long history of the Government's exercise of this power, and the extensive body of binding Supreme Court decisions affirming and reaffirming this authority, we conclude that ICWA "represent[s] the exercise of [] power[s] conferred on Congress by the Constitution." *Murphy*, 138 S. Ct. at 1479. At a bare minimum, ICWA is "necessary and proper," U.S. CONST. art. I, sec. 8— that is, "plainly adapted," *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 421 (1819)—to solving "the problems of Indians," *Antoine*, 420 U.S. at 203, and thus fulfilling the federal government's trust duty to the tribes as it is squarely targeted at rectifying "perhaps the most tragic and destructive aspect of Indian life." H.R. REP. NO. 95-1386, at 9-10.[33] A contrary holding would render Congress impotent to remedy and prevent repetition of the depredations visited upon Indian children, tribes, and families, an injustice to which the federal Government itself has contributed and apologized. *See*

---

[32] JUDGE DUNCAN is correct that in *Lara* the Court noted that it was not confronted "with a question dealing with potential constitutional limitations on efforts to legislate far more radical changes in tribal status." *Lara*, 541 U.S. at 205; DUNCAN, CIRCUIT JUDGE, OP. at 33-34 n.33. But as explained above, ICWA does not effect any change whatsoever in tribal sovereignty. JUDGE DUNCAN is therefore incorrect that the instant challenge to ICWA presents the question *Lara* left undecided.

[33] Notably, Plaintiffs do not expressly contend that ICWA exceeds the auxiliary powers granted to Congress under the Necessary and Proper Clause.

146 CONG. REC. E1453 (Sept. 12, 2000) (quoting apology of Assistant Secretary for Indian Affairs, Department of the Interior remarks on Sept. 8, 2000). Such a result would be not only a sad irony, but a grievous judicial straitjacketing of a coordinate branch of government. We decline to vitiate Congress's authority in a field in which the Supreme Court has held that it wields plenary power. *See Lara*, 541 U.S. at 200 (2000); *Ramah Navajo Sch. Bd., Inc.*, 458 U.S. at 837; *White Mountain Apache Tribe*, 448 U.S. at 142. Instead, we follow the Court's sustained admonitions that Congress is empowered fully to make good on its trust obligations to Indian tribes. *See, e.g.*, *Mancari*, 417 U.S. 551-52; *Antoine*, 420 U.S. at 203; *Kagama*, 118 U.S. at 383-84.

### 2.  ICWA Does Not Violate the Anticommandeering Principle.

We turn to the second prong of the preemption analysis and consider whether ICWA runs afoul of the anticommandeering doctrine. Under the Articles of Confederation, the federal government largely lacked the power to govern the people directly and instead was restricted to giving commands to the states that it was often powerless to enforce. *New York*, 505 U.S. at 161-62 (citing *Lane Cnty. v. Oregon*, 74 U.S. (Wall.) 71, 76 (1868)). To rectify this impotency, the Framers inverted this relationship in the Constitution, empowering Congress to "exercise its legislative authority directly over individuals rather than over States." *Id.* at 164. Citing this history, Justice O'Connor inaugurated the modern anticommandeering doctrine, in *New York v. United States*, stating that it represents the Framers' structural decision to withhold from Congress the power to directly command state executives and state legislatures to do its bidding. *See id.*

The Constitution's Supremacy Clause, provides, however, that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Thus, a distinction exists between a law that unconstitutionally

"conscript[s] state governments as [the federal government's] agents," *New York*, 505 U.S. at 178, and a law that establishes federal rights or obligations that the states must honor despite any conflict with state law. We consider, then, whether ICWA falls into the former camp or the latter.

### a. In Requiring State Courts to Apply Preemptive Federal Law, ICWA Does Not Violate the Anticommandeering Doctrine.

The district court determined that ICWA unconstitutionally commandeers the states by requiring state courts to apply its minimum protections in their child custody proceedings. However, when considering whether a federal law violates the anticommandeering doctrine, the Supreme Court has consistently drawn a distinction between a state's courts and its political branches.

Because the Supremacy Clause obligates state courts to apply federal law as the "supreme Law of the Land" and provides that "the Judges in every State shall be bound thereby," the anticommandeering principle that Justice O'Connor formulated in *New York* does not apply to properly enacted federal laws that state courts are bound to enforce. As Justice Scalia made clear in *Printz*, "the Constitution was originally understood to permit imposition of an obligation on state *judges* to enforce federal prescriptions, insofar as those prescriptions related to matters appropriate for the judicial power." *Printz*, 521 U.S. at 907. State courts were viewed as distinctive because, "unlike [state] legislatures and executives, they applied the law of other sovereigns all the time," including federal law as mandated by the Supremacy Clause. *Id.* Thus, it is well-established that Congress has the power to pass laws enforceable in state courts. *See Palmore v. United States*, 411 U.S. 389, 402 (1973); *Testa v. Katt*, 330 U.S. 386, 394 (1947); *see also Second Employers' Liability Cases, N.H. & H.R. Co.,* 223 U.S. 1, 57 (1912); *Claflin v. Houseman*, 93 U.S. 130, 136-37 (1876). Although these "[f]ederal statutes enforceable in state courts do, in a sense, direct state judges to

enforce them, . . . this sort of federal 'direction' of state judges is mandated by the text of the Supremacy Clause." *New York*, 505 U.S. at 178-79.  In other words, it is inherent in the Supremacy Clause's provision that federal law "shall be the supreme Law of the Land" that state courts must enforce federal law.  U.S. CONST. art. VI, cl. 2.

In the district court's erroneous view, ICWA's standards do not bind states courts because ICWA itself does not supply a federal cause of action. Although the district court noted the settled principle that state courts must apply federal law to a federal cause of action, it did not recognize the equally settled obligation on state courts to honor federal rights when they are implicated in a case arising out of a state-law cause of action.  Failing to appreciate this duty, the court below thought that ICWA cannot bind state courts because it "modif[ies]" the substantive standards applicable to child custody cases, which arise from state law.  Thus, the district court believed that ICWA improperly commandeers state courts and therefore cannot preempt conflicting state law.

There is no support in the Supreme Court's precedents for this novel limit on federal preemption.  *See, e.g.*, *Haywood v. Drown*, 556 U.S. 729, 736 (2009) ("[A]lthough States retain substantial leeway to establish the contours of their judicial systems, they lack authority to nullify a *federal right* or cause of action they believe is inconsistent with their local policies." (emphasis added)).  The Supreme Court has long made clear that, even in areas of traditional state prerogative, such as domestic relations, a federal right may preempt state causes of action "to the extent of any conflict" between the two.  *Hillman v. Maretta*, 569 U.S. 483, 490-91 (2013) (quoting *Crosby*, 530 U.S. at 372).  In other words, when the standard application of substantive state family law "clearly conflict[s]" with "federal enactments" in an area in which Congress may validly exercise its Article I authority, state law "must give way."  *Id.* (quoting *Ridgway v. Ridgway*, 454 U.S. 46, 55 (1981)) (federal statute requiring that life insurance benefits be paid

81

according to a specific "order of precedence" preempted state law directing that proceeds be paid to a different beneficiary).

More to the point, the Supreme Court has expressly held that federal law *can* "modify" the substance of state law claims. Take, for example, *McCarty v. McCarty*, 453 U.S. 210 (1981). There, a federal military benefits statute provided for a different division of retirement benefits upon divorce than a state's community property law. *Id.* at 235-36. The Court held that the federal law preempted state law, thereby altering the substantive law applicable to a state-law cause of action. *Id.*; *see also Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 131, 143 (2001) (holding that ERISA preempted state law regarding allocation of certain assets upon divorce during state probate proceeding); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 590 (1979) (holding that federal law preempted state law's definition of community property subject to division with respect to federal pension benefits). And in *Jinks v. Richland County*, the Court affirmed that federal law cannot only "modify" the substance of a state law claim, but indeed can keep alive a state law cause of action that would otherwise be time-barred.[34]   538 U.S. 456, 459 (2003) (upholding the federal supplemental jurisdiction statute's provision tolling state law claims while they are pending in federal court, thus permitting such claims, if they are dismissed from federal court, to proceed in state court, though they otherwise may be barred by the running of a state's limitations period).

As amici point out, these laws are not unique: a host of federal statutes change the standards applicable to state causes of action, including in family

---

[34] While it is unquestionable that federal law may alter the "'substance' of state-law rights of action," the Supreme Court has left unresolved the validity of "federal laws that regulate state-court 'procedure.'" *See Jinks*, 538 U.S. at 464. We need not weigh in on this unsettled question because ICWA's challenged provisions grant rights and protections to Indian tribes and families that are substantive in nature. *Cf. id.* at 464-65 (tolling of state law limitations period is substantive).

law proceedings.   *See, e.g.*, Servicemembers Civil Relief Act, 50 U.S.C. § 3911, *et seq.*; Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A; Full Faith and Credit for Child Support Orders Act, 28 U.S.C. § 1738B; Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, *et seq.*; Intercountry Adoption Act of 2000, 42 U.S.C. § 14954.  And state courts have long applied these requirements without ever questioning Congress's authority to impose them.

For example, in *In re Larson*, a California appeals court held that the federal Soldiers' and Sailors' Civil Relief Act (SSCRA), which affords rights to servicemembers who are "prejudiced" in state court proceedings "by reason of [their] military service," overrode otherwise applicable state law. 183 P.2d 688, 690 (Cal. Dist. Ct. App. 1st 1947), *disapproved of on other grounds by In re Marriage of Schiffman*, 620 P.2d 579 (Cal. 1980) (citing Pub. L. No. 86-721, 54. Stat. 1180, now titled Servicemembers Civil Relief Act, 50 U.S.C. § 391).  In that case, the state trial court had granted a mother's petition to have her child's last name changed to hers from that of her former spouse. *Id.* at 690-91.  The father appealed, averring that, because he was in the armed forces and detained as a prisoner of war in Germany at the of time of the mother's petition, he was entitled to relief under the SSCRA.  *Id.* at 690. Acknowledging that the mother had "proceeded in accordance with the applicable statutes of this state," the appeals court nonetheless recognized that the federal statute superseded state law and vacated the lower court's order to permit the father to challenge the petition. *Id.* at 690-91.  At no point did the state court suggest that the SSCRA impinged on state sovereignty. *See also, e.g.*, *In re China Oil & Gas Pipeline Bureau*, 94 S.W.3d 50, 59 (Tex. App. 2002) (applying Foreign Sovereign Immunities Act burden of proof to determine whether foreign state had waived immunity from state law breach of contract, breach of fiduciary duty, and fraud claims); *State ex rel. Valles v. Brown*, 639 P.2d 1181, 1186 (N.M. 1981) (applying Parental Kidnapping Prevention Act to determine whether the state court could modify a child custody decree).

In light of the Supreme Court's express decisions upholding federal law's ability to alter substantive aspects of state claims and the robust history of federal statutes that do just that, there can be little doubt that the district court erred by determining that ICWA's provisions preempting state law were instead a violation of the anticommandeering doctrine. Thus, to the extent that the rights created by ICWA conflict with states' child custody laws, the Supremacy Clause requires state judges to honor ICWA's substantive provisions. *See New York*, 505 U.S. at 178-79 (explaining that state judges are required under the Supremacy Clause to enforce federal law).

### i.   Sections 1912(e)-(f), 1915(a)-(b)

Applying these principles to the case at bar, we conclude that "to the extent of any conflict" between the rights created by ICWA and state law, *Hillman v. Maretta*, 569 U.S. at 490, state courts are obliged to honor those rights by applying ICWA's substantive evidentiary standards for foster care placement and parental termination orders, 25 U.S.C. § 1912(e)-(f), as well as the federal law's child placement preferences, *id.* § 1915(a)-(b). Each of these provisions creates federal rights in favor of Indian children, families, and tribes that potentially alter the substantive standards applicable in child custody proceedings. We note that these provisions do in fact conflict with the otherwise applicable law of the State Plaintiffs. For example, in furthering its goal of protecting "the best interests of Indian children," *id.* § 1902, ICWA prohibits terminating the parental rights of an Indian child's biological parents absent a determination "beyond a reasonable doubt . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." *Id.* § 1912(f). The State Plaintiffs, on the other hand, generally use the far less stringent "best interests of the child" analysis and "clear and convincing" evidentiary

standard.[35] Consequently, as between these differing standards, state courts are compelled to employ ICWA's heightened protections in proceedings involving Indian children. Indeed, state courts have not hesitated do so.[36] *See, e.g.*, *In re W.D.H.*, 43 S.W.3d 30, 37 (Tex. App. 2001) ("We conclude that it is not possible to comply with both the two-prong test of the Family Code, which requires a determination of the best interest of the child under the 'Anglo' standard, and the ICWA, which views the best interest of the Indian child in the context of maintaining the child's relationship with the Indian Tribe, culture, and family."); *Yavapai–Apache Tribe v. Mejia,* 906 S.W.2d 152, 170 (Tex. App. 1995) (stating that ICWA "was specifically directed at preventing the infiltration of Anglo standards" in custody proceedings involving Indian children); *In re Adoption of M.T.S.*, 489 N.W.2d 285, 288 (Minn. Ct. App. 1992) (concluding that ICWA's preference for placing an Indian child with an Indian family member provides a "higher standard of protection" for an Indian guardian than the state's best interests standard, which would otherwise apply in determining a child's custodial

---

[35] *See* IND. CODE §§ 31-35-2-4(b)(2) and 31-37-14-2 (2019) (setting forth a four-element test to terminate parental rights, including that termination is "in the best interests of the child," and requiring proof of each element by "clear and convincing" evidence); LA. CHILD. CODE art. 1015, 1035, 1037 (2019) (stating that in order to terminate parental rights a court must find by "clear and convincing evidence" that a parent has committed one of an enumerated list of offenses and that it is in the "best interests of the child" to terminate the rights); TEX. FAM. CODE § 161.001 (2019) (requiring a showing by "clear and convincing evidence" "that termination is in the best interest of the child" and that the parent committed one of an enumerated list of offenses).

[36] Some state courts have determined that certain of ICWA's provisions do not conflict with—and therefore do not preempt—state law but rather mandate additional protections that state courts must implement. *See, e.g.*, *K.E. v. State*, 912 P.2d 1002, 1004 (Utah Ct. App. 1996) (holding that ICWA does not preempt the state's "statutory grounds for termination of parental rights" but instead "requires a specific finding for termination proceedings" that continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child "in addition to those [findings] required by state law and imposes a separate burden of proof for that finding." (citing 25 U.S.C. § 1912(f)).

placement (citing 25 U.S.C. §§ 1915(a), 1921)).  This is "no more than an application of the Supremacy Clause." *New York*, 505 U.S. at 178.

In sum, § 1912(e) and (f)'s evidentiary standards and § 1915(a) and (b)'s placement's preferences simply supply substantive rules enforceable in state court and do not violate the Tenth Amendment.

### ii.  Sections 1915(e), 1917, and 1951(a)

We likewise find no constitutional infirmity in ICWA's provisions that require state courts to maintain and make available certain records pertaining to custody proceedings involving Indian children.  *See* 25 U.S.C. §§ 1915(e), 1917, and 1951(a).  Section 1915(e) requires state courts to retain a record "evidencing the efforts to comply" with ICWA's placement preferences and "ma[k]e available" this record, upon request, to the Secretary or an Indian child's tribe.  *Id.* § 1915(e).  Under § 1917, once an adopted Indian child attains majority, the state court that "entered the final decree" of adoption "shall," upon the Indian adoptee's application, "inform" her of her biological parents' tribal affiliation and provide other information that "may be necessary to protect any rights from the individual's tribal relationship."  *Id.* § 1917.  And § 1951(a) requires state courts to provide the federal government with a copy of the adoption decree in any proceeding involving an Indian child.  *Id.* § 1951(a).

Though these recordkeeping provisions arguably do not supply rules of decision like those in §§ 1912(e)-(f) and 1915(a)-(b), the original understanding of the Supremacy Clause nonetheless compels state courts to effectuate their mandate.  As explained in *Printz v. United States*, "the first Congresses required state courts to record applications for citizenship . . . [and] to transmit abstracts of citizenship applications and other naturalization records to the Secretary of State."  521 U.S. at 905-06 (citing Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103; Act of June 18, 906 1798, ch. 54, § 2, 1 Stat. 567).  From the dawn of the constitutional era, then, federal law placed specific recordkeeping and sharing requirements on state courts, and

86

these duties were viewed as congruent with the state courts' obligations under the Supremacy Clause.  The history thus makes clear that this sort of requirement cannot be considered commandeering in violation of the Tenth Amendment.  *See Marsh*, 463 U.S. at 790.  Plaintiffs have provided no authority for deviating from this original understanding, and so we hew to it.

State Plaintiffs contend that, rather than applying to state courts, §§ 1915(e) and 1951(a) instead impose obligations on state agencies and thereby violate the anticommandeering doctrine.  We address these provisions in turn and disagree with the States' conclusion as to each.

Though § 1915(e) applies to the "State," it does not specify whether that term refers to state courts or agencies.  The regulation implementing § 1915(e), however, expressly permits states to designate either their courts or agencies as "the repository for th[e] information" required to be maintained by § 1915(e)."  25 C.F.R. § 23.141 ("The State court or agency should notify the BIA whether these records are maintained within the court system or by a State agency.").  Substantively, the regulation requires only that "court records" be maintained.  81 Fed. Reg. at 38,849-50.  This imposes no direct burden on states.

State Plaintiffs do not challenge the BIA's construction of § 1915(e).[37] Thus, their complaint that § 1915(e) and its implementing regulation impermissibly burdens their agencies rings hollow, given that Plaintiffs themselves have elected to designate their agencies, rather than courts, as the entities charged with complying with these provisions.  States are not

---

[37] Such a challenge would be unavailing in any event.  Because the BIA's determination that state courts may maintain the records contemplated by § 1915(e) is at minimum a reasonable interpretation of an ambiguous statute that the BIA administers, *see Miss. Band Choctaw Indians v. Holyfield*, 490 U.S. at 40 n.13 ("Section 1915(e) . . . requires *the court* to maintain records 'evidencing the efforts to comply with the order of preference specified in this section.'" (emphasis added)), it is entitled to *Chevron* deference.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *infra* Discussion Part II.D.

"pressed into federal service" when they affirmatively choose to obligate their executive, rather than judicial, officers to implement an otherwise valid federal obligation. *See Printz*, 521 U.S. at 905. In other words, § 1915(e) and its implementing regulation are not "direct orders to the governments of the States" but rather let states exercise their discretion to require either their courts or child welfare agencies to maintain and make available the required records. *Murphy*, 138 S. Ct. at 1478. The constitutionality of these provisions does not rise or fall based on a state's preference.

For similar reasons, we disagree with Judge Duncan's contention that § 1951(a), which requires state courts to furnish adoption records to the federal government, invalidly commandeers state agencies. Duncan, Circuit Judge, Op. at 104-06 . Notably, no party takes this position. This is likely because on its face the provision applies only to state courts. *See* 25 U.S.C. § 1951(a) (requiring "[a]ny State court entering a final decree or order in any Indian child adoptive placement" to provide certain records). And the records that must be furnished by a state court pursuant to this provision are not the type of records commonly held by state agencies; instead, the records are naturally produced as part of *state court* proceedings, and state courts are therefore in the best position to maintain and provide the records to the federal government.[38] *Id.* That the regulations implementing § 1951(a) purport to provide states the flexibility to instead designate an agency to fulfill the duties it imposes does not change that the law is by default aimed at state courts. *See* 25 C.F.R. § 23.140 (specifying that designating an agency relieves state courts of their obligations under § 1951(a)). And a state's wholly voluntary choice to utilize its political branches in place of its

---

[38] Section 1951(a) specifically requires that the following information be supplied to the Secretary: (1) the names and tribal affiliation of the Indian child; (2) the names and addresses of the child's biological parents; (3) the names and addresses of the adoptive parents; and (4) the identity of an agency that has information relating to the child's adoptive placement. 25 U.S.C. § 1951(a).

courts cannot, as we have explained, constitute commandeering of those political branches.

We therefore conclude that state courts are bound by the Supremacy Clause to apply §§ 1915(e), 1917, and 1951(a).[39]

### b. The Challenged Provisions Do Not Commandeer Other State Actors.

We next consider whether ICWA commandeers state actors other than state courts. Our determination that the preemption and commandeering analyses are mirror images of one another leads us to the conclusion that if ICWA regulates private actors—and therefore preempts conflicting state law—it does not contravene the anticommandeering doctrine. A survey of the Supreme Court's precedents in this area makes clear that a law meets this requirement so long as it establishes rights that are legally enforceable by or against private parties. This test is necessarily satisfied when Congress enacts a general regulation applicable to any party who engages in an activity, regardless of whether that party is a State or private actor. The Supreme Court has thus stressed in its Tenth Amendment decisions that "the anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Murphy*, 138 S. Ct. at 1478. It is unsurprising, then, that in

---

[39] We also disagree with JUDGE DUNCAN's asserted distinction between § 1917 and the other recordkeeping provisions. DUNCAN, CIRCUIT JUDGE, OP. at 97-98 &- 98 n.138. JUDGE DUNCAN maintains that § 1917, which confers upon adult Indian adoptees the right to obtain from courts information pertaining to their tribal relationship, is a valid preemption provision because it is "best read" as regulating private actors, not states. But the same could be said for § 1915(e), which confers rights upon Indian tribes to obtain records. And both provisions require state courts to retain records so that an Indian individual or tribe may later obtain them. Thus, if § 1917 is best read as applying to private actors, so too is § 1915(e). We find it unnecessary to resolve this question, however, because like §§ 1915(e) and 1951(a), § 1917 places duties on state courts to maintain records—a special type of obligation that was understood from the nation's very beginning to validly bind state courts under the Supremacy Clause. *See Printz*, 521 U.S. at 905-06.

each case in which the Court has found an anticommandeering violation, the statute at issue directly and exclusively commanded a state's legislature or executive officers to undertake an action or refrain from acting without mandating that private actors do the same.

For example, in the first modern anticommandeering case, *New York v. United States*, the Supreme Court held that a federal law impermissibly commandeered state actors to implement federal legislation when it gave states "[a] choice between two unconstitutionally coercive" alternatives: to either dispose of radioactive waste within their boundaries according to Congress's instructions or "take title" to, and assume liabilities for, the waste. 505 U.S. at 175-76. The Court was clear: Congress cannot compel "*the States* to enact or enforce a federal regulatory program." *Id.* at 176 (emphasis added). Notably, the statute did not place any legally enforceable rights or restrictions on private parties, instead operating only upon the states.

Similarly, in *Printz v. United States*, the Court held that a provision of the Brady Handgun Violence Prevention Act requiring state chief law enforcement officers to conduct background checks on handgun purchasers "conscript[ed] the State's officers directly" and was therefore invalid. 521 U.S. at 935. The Court explained that the statute violated the anticommandeering principle because it was aimed solely at state executive officers, requiring them "to conduct investigation in their official capacity, by examining databases and records that only state officials have access to. In other words, the suggestion that extension of this statute to private citizens would eliminate the constitutional problem posits the impossible." *Id.* at 932 n.17 (*N.B.* that "the burden on police officers [imposed by the Brady Act] would be permissible [under the Tenth Amendment] *if a similar burden were also imposed on private parties* with access to the relevant data" (first alteration in original) (emphasis added) (internal quotation marks and citation omitted)). Accordingly, the Court rejected as irrelevant the Government's

90

argument that the Act imposed only a minimal burden on state executive officers, stating that it was not "evaluating whether the incidental application to the States of a federal law of general applicability excessively interfered with the functioning of state governments," but rather a law whose "whole *object* . . . [was] to direct the functioning of the state executive." *Id.* at 931-32. Again, the law did nothing to alter the rights or obligations of private parties, but served only to bind the States.

Recently, in *Murphy v. NCAA*, the Court concluded that a federal law that prohibited states from authorizing sports gambling ran afoul of the anticommandeering doctrine. 138 S. Ct. at 1478. The statute violated state sovereignty, the Court explained, by "unequivocally dictat[ing] what a state legislature may and may not do." *Id.* In reaching this conclusion, the Court reviewed its Tenth Amendment jurisprudence and clarified the distinction between statutes that impermissibly commandeer state actors and those that may incidentally burden the states but, nevertheless, do not offend the Tenth Amendment. The mediating principle, the Court announced, is that a regulation is valid so long as it "evenhandedly regulates an activity in which both States and private actors engage." *Id.* at 1478. This occurs when a statute confers either legal rights or restrictions on private parties that participate in the activity, and thus the law is "best read" as regulating private parties.

A review of two cases cited by *Murphy* in which the Court upheld statutes imposing incidental burdens or obligations on states is instructive as to what permissible, evenhanded regulation entails. First, in *Reno v. Condon*, the Court unanimously upheld the Driver's Privacy Protection Act (DPPA), a federal regulatory scheme that restricted the ability of states and private parties to disclose a driver's personal information without consent. 528 U.S. 141, 151 (2000). In determining that the anticommandeering doctrine did not apply, the Court distinguished the law from those invalidated in *New York* and *Printz*:

> [T]he DPPA does not require the States in their sovereign capacity to regulate their own citizens; rather it regulates the States as the owners of [Department of Motor Vehicle] data bases. It does not require the [state] Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals . . . .

*Id.* The statute, moreover, "applied equally to state[s] and private" resellers of motor vehicle information. *Murphy*, 138 S. Ct. at 1479; *see Condon*, 528 U.S. at 151 (explaining that the statute was "generally applicable"). That compliance with the DPPA's provisions would "require time and effort on the part of state employees" posed no constitutional problem, then, because private actors engaged in the regulated enterprise were also subject to the statute's requirements. *Condon*, 528 U.S. at 150. In short, because the law created restrictions enforceable against private resellers, it satisfied the "best read" test as articulated in *Murphy*.

Second, in *Baker v. South Carolina*, the Court also rejected a Tenth Amendment challenge to a federal enactment. 485 U.S. 505, 513-15 (1988). At issue in that case was a statute that eliminated the federal income tax exemption for interest earned on certain bonds issued by state and local governments unless the bonds were registered. *Id.* at 507-08. The Court treated the provision "as if it directly regulated States by prohibiting outright the issuance of [unregistered] bearer bonds." *Id.* at 511. But critically, the provision applied not only to states but to any entity issuing the bonds, including "local governments, the Federal Government, [and] private corporations." *Id.* at 526-27. In upholding the provision, the Court reasoned that it merely "regulat[ed] a state activity" and did not "seek to control or influence the manner in which States regulate private parties." *Id.* at 514. "That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *Id.* at 514-15 (requiring "state officials . . . to devote substantial effort" to comply

with the statute is "an inevitable consequence" of Congress validly regulating the state's activity). Such a federal law thus does not commandeer state actors, but merely establishes standards applicable to any actor who chooses to engage in an activity that Congress may validly regulate through legislation. *See id.* It creates legally enforceable obligations—in *Baker*, a prohibition—that affect private parties.

As both a textual and practical matter, the provisions Plaintiffs challenge apply "evenhandedly" to "an activity in which both States and private actors engage." *Murphy*, 138 S. Ct. at 1478. Sections 1912(a) and (d), for example, impose notice and "active efforts" requirements, respectively, on the "party" seeking the foster care placement of, or termination of parental rights to, an Indian child.[40] Because plaintiffs bring a facial challenge, there is no need to look beyond the language of these provisions— which plainly is facially neutral, *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."); *see also United States v. Raines,* 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.").[41] The statute applies to

---

[40] Section 1912(a) requires "*the party* seeking the foster care placement of, or termination of parental rights to, an Indian child" to "notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right to intervention." 25 U.S.C. § 1912(a) (emphasis added).

Section 1912(d) states that "[*a*]*ny party* seeking to effect a foster care placement of, or termination of parental rights to, an Indian child" to "satisfy the court that active efforts have been made to provide remedial services . . . to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." *Id.* § 1912(d) (emphasis added).

[41] Our court recently reaffirmed this principle. In *Freedom Path, Inc. v. Internal Revenue Service*, we examined a facial challenge to an IRS Revenue Ruling by an organization that had received a proposed denial from the IRS of its application for tax-exempt status. *See* 913 F.3d 503, 506 (5th Cir. 2019). We explained that "[t]o find the

any party seeking a foster care placement or the termination of parental rights, regardless of whether that party is a state agent or private individual. *Id.*

Furthermore, even were we to consider how these provisions are actually applied in child custody proceedings, it is clear that they do in fact apply to private parties. ICWA defines "foster care placement" to embrace "*any action* removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator." 25 U.S.C. § 1903(1)(i) (emphasis added). As Defendants observe, actions to appoint guardians or conservators are often private actions that do not involve the state as a party. *See, e.g.*, *J.W. v. R.J.*, 951 P.2d 1206, 1212-13 (Alaska 1998) (determining that a custody dispute between a father and stepfather constituted a "foster care placement" under ICWA); *In re Guardianship of J.C.D.*, 686 N.W.2d 647, 649 (S.D. 2004); *In re Custody of C.C.M.*, 202 P.3d 971, 977 (Wash. C.t App. 2009) (holding that grandparents' petition for nonparental custody of their Indian grandchild "qualifies as an action for foster care placement under ICWA"). Similarly, private parties may bring proceedings to terminate parental rights. *See, e.g.*, Tex. Fam. Code. Ann. § 102.003 (permitting, among others, a "parent," "the child through a court-appointed representative," or "a guardian" to bring such an action); 33 Tex. Prac. Handbook of Tex.

---

unconstitutionality [the organization] claims requires that we go beyond the language of the Revenue Ruling and analyze the way in which the IRS applies it beyond the text. *On a facial challenge, however, we do not look beyond the text* . . . [A] facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." *Id.* at 508 (internal quotation marks and citations omitted) (emphasis added) (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006)). And, even if we were to construe Plaintiffs' complaint as an as-applied challenge, the proper remedy would not be the wholesale invalidation of the statutory provisions that the district court's order effected and for which Plaintiffs and Judge Duncan argue. Rather, demonstrating that the statute may be applied unconstitutionally warrants only an injunction against the statute being applied in that unconstitutional manner. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).

FAMILY LAW § 19:2 (2018); *see also Matter of Adoption of T.A.W.*, 383 P.3d 492, 496 (Wash. 2016) (holding that ICWA's "active efforts provision . . . appl[ies] to privately initiated terminations" and remanding for trial court to determine whether "active efforts ha[d] been" made to prevent the breakup of the Indian family); *D.J. v. P.C.*, 36 P.3d 663, 673 (Alaska 2001) ("[W]e hold that ICWA applies to termination proceedings when a party other than the state seeks the termination."); *S.S. v. Stephanie H.*, 388 P.3d 569, 573–74 (Ariz. Ct. App. 2017) ("[W]e conclude that ICWA applies to a private termination proceeding just as it applies to a proceeding commenced by a state-licensed private agency or public agency."); *In re N.B.*, 199 P.3d 16, 19 (Colo. App. 2007) ("ICWA's plain language is not limited to action by a social services department."). Thus, from both a textual and practical standpoint, it cannot seriously be disputed that these provisions apply to private parties. *See* 25 U.S.C. § 1903(1)(i); *J.W.*, 951 P.2d at 1212-13.

Similarly, § 1912(e) and (f)—which require qualified expert witness testimony before, respectively, either the foster care placement of, or termination of parental rights to, an Indian child—are also evenhanded regulations that do not effect an invalid commandeering.[42] Neither provision expressly refers to state agencies. And when read in conjunction with § 1912(d)'s language placing burdens on "[a]ny party" involved in foster care or parental termination proceedings relating to Indian children, § 1912(e) and (f) must also reasonably be understood to apply to "any party"

---

[42] Section 1912(e) provides that no foster care placement may be ordered in involuntary proceedings in state court absent "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e).

Section 1912(f) requires that no termination of parental rights may be ordered in involuntary proceedings in state court absent "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *Id.* § 1912(f).

engaged in these proceedings. This understanding, moreover, comports with how state courts have read and applied these provisions. *See, e.g.*, *In re Mahaney*, 51 P.3d 776, 786 (Wash. 2002) (holding that § 1912(e)'s expert witness requirement applied to an action exclusively between private parties—an Indian mother and her children's paternal grandmother— regarding a foster care placement); *D.J.*, 36 P.3d at 673 (holding that § 1912(f) applied to an action between an Indian child's maternal grandmother and his biological father regarding the termination of the father's parental rights); *Matter of Baby Boy Doe*, 902 P.2d 477, 484 (Idaho 1995) (holding that prospective adoptive parents satisfied "their burden of proof" under § 1912(f) "with testimony of [a] qualified expert witness[]"). Thus, § 1912(e) and (f), like § 1912 (a) and (d), are generally applicable provisions. *See Murphy*, 138 S. Ct. at 1478; *see also Condon*, 528 U.S. at 151.

State Plaintiffs' contention that the aforementioned provisions commandeer state executive officers is reminiscent of the argument made by South Carolina—and rejected by the Court—in *Condon*. There, South Carolina claimed that the DPPA "thrusts upon the States all of the day-to-day responsibility for administering its complex provisions . . . and thereby makes state officials the unwilling implementors of federal policy." 528 U.S. at 149-50 (internal quotation marks omitted). But ICWA, like the DPPA, does not require states "to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Id.* at 151. Unlike the statutes in *New York*, *Printz*, and *Murphy*, § 1912 does not create obligations or restrictions enforceable solely against states. *See Murphy*, 138 S. Ct. at 1481 (determining that a provision of the gambling regulation at issue did not constitute a valid "preemption provision because there is *no way* in which [it] c[ould] be understood as a regulation of private actors") (emphasis added); *Printz*, 521 U.S. at 932 n.17 (explaining that extending "to private citizens" the federal statute's directives "posits the impossible"); *New York*, 505 U.S. at 160 ("[T]his is not a case in which Congress has subjected a State to the same

legislation applicable to private parties."). Instead, its provisions simply impose the same, generally applicable burden on any party engaged in a custody proceeding involving an Indian child. *Cf. Condon*, 528 U.S. at 151 (noting that the regulation of data bases applied to "private resellers" of motor vehicle information along with states); *Baker*, 485 U.S. at 526-27 (stating that the requirement that bearer bonds be registered in order to be eligible for a federal income tax exemption applied to "local governments, the Federal Government, [and] private corporations"). Thus, § 1912 (a), (d), (e), and (f) "evenhandedly regulate[] an activity in which both States and private actors engage," and the anticommandeering doctrine does not apply. *See Murphy*, 138 S. Ct. at 1478.

JUDGE DUNCAN posits two reasons why the evenhandedness principle ought not apply to the challenged provisions. First, he asserts that ICWA compels states to regulate private individuals. DUNCAN, CIRCUIT JUDGE, OP. at 89-91. Not so. As discussed, ICWA is a comprehensive federal regulatory scheme that regulates private individuals by creating rights and restrictions in favor of Indian individuals and tribes in child custody proceedings involving Indian children. In so doing, ICWA places legal obligations on parties to these proceedings, whether individuals or state actors. *See Condon*, 528 U.S. at 150 (finding no anticommandeering problem in the fact that compliance with the DPPA would "require time and effort on the part of state employees"). Just as the DPPA "regulate[d] the States as the owners of data bases," *id.* at 151, ICWA regulates the states as participants in Indian child custody proceedings—placing the same requirements on states as it does on any private party. This fits the bill of an evenhanded regulation.[43]

---

[43] JUDGE DUNCAN's assertion that ICWA imposes "critical duties" on state actors is irrelevant to determining whether the statute is consistent with the anticommandeering doctrine. DUNCAN, CIRCUIT JUDGE, OP. at 91. Nowhere in the

Second, JUDGE DUNCAN asserts that ICWA regulates states in their sovereign capacity. DUNCAN, CIRCUIT JUDGE, OP. at 91-92. Whereas Congress regulated states as participants in the market for bonds in *Baker* and the market for driver's information in *Condon*, JUDGE DUNCAN contends that ICWA does not regulate states as market participants but rather as sovereigns carrying out their duty to protect children. But in *Condon*, the statute at issue "regulate[d] the disclosure of personal information contained in the records of state motor vehicle departments." 528 U.S. at 143. The regulation of motor vehicles, of course, is a quintessential state function. As explained above, the provision was nevertheless upheld because it "regulate[d] the States as the owners of data bases;" that is, as participants in the market for drivers' personal information. *Id.* at 151. The situation is the same here. Though family law is as a general matter committed to the states, *but see, e.g.*, *McCarty*, 453 U.S. at 235-36, the activity at issue here—child custody proceedings—involves private parties as litigants.[44] ICWA,

---

Court's commandeering cases has it made mention of, or found dispositive, whether the obligations imposed on states by a regulation were important to the statutory scheme's success. In *Condon*, for example, that the DPPA's restrictions applied to states was surely "crucial" to the law's efficacy. *See* 528 U.S. at 143-44 (noting that "Congress found that many States . . . sell driver's personal information" and that the statute "establishes a regulatory scheme" that expressly "restricts the States' ability to disclose a driver's personal information"); *id.* at 143 (citing 139 CONG. REC. 9468 (Nov. 16, 1993) (explaining that a purpose of "this legislation is to protect a wide range of individuals, [to] protect them from the State agencies [that,] often for a price, a profit to the State, [] release lists") (statement of Sen. Warner)); *see also Baker*, 485 U.S. at 510-11 (noting that the challenged provision "completes th[e] statutory scheme" setup by Congress). The evenhandedness inquiry does not turn on whether the statute imposes "critical" duties— or even "trivial" duties, for that matter—on states, but rather whether those duties apply equally to both states and private actors. *See Murphy*, 138 S. Ct. at 1478.

[44] Citing *Printz*, JUDGE DUNCAN also asserts that the "salient question" in determining whether the evenhandedness exception applies is "whether a federal law requires states officials to act 'in their official capacity' to implement a federal program." DUNCAN, CIRCUIT JUDGE, OP. at 93 (quoting *Printz*, 521 U.S. at 932 n.17). This test cannot be squared with the Court's cases. In *Condon*, for example, compliance with the DPPA required action by state officials acting in their official capacity. *See* 528 U.S. at 150

then, "regulates the States as" participants in these proceedings, and the reasoning of *Baker* and *Condon* applies equally here.

Because § 1912 (a), (d), (e), and (f) are "evenhanded," we conclude they are necessarily "best read" as pertaining to private actors within that phrase's meaning in *Murphy*. *Id.* at 1478, 1479. This follows from our earlier conclusion that a law is "best read" as regulating private actors—and therefore can be given preemptive effect—when it creates legal rights and obligations enforceable by or against private actors. Because an evenhanded regulation genuinely applies to private parties (as well as states), it necessarily establishes legal rights and obligations applicable to private parties (as well as states).

This is demonstrated by even a cursory review of § 1912 (a), (d), (e), and (f). The obligations the provisions impose are enforceable against any private party seeking a foster placement for, or the termination of parental rights to, an Indian child. And, viewed inversely, these obligations are an array of rights in favor of and enforceable by private parties. Section 1912(a) grants Indian parents and tribes the right to notice of pending child custody proceedings. *Id.* § 1912(a). Further, § 1912(d) grants to Indian children, tribes, and families the right to maintain their tribal and family unit "subject

---

("We agree with South Carolina's assertion that the DPPA's provisions will require time and effort on the part of state employees . . . ."); *see also Baker*, 485 U.S. at 514-15 ("That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect."). The salient question, rather, is whether the statute applies equally to both states and private actors. This is clear from the portion of *Printz* Judge Duncan purports to rely on. As the Court in *Printz* explained, the background check requirement at issue "*undoubtedly*" would have been consistent with the anticommandeering doctrine if its burdens could have been extended equally to both state actors and private actors. 521 U.S. at 932 n.17 (emphasis added). The problem, however, was that the burden the statute placed on state law enforcement officers by its very nature could not possibly be borne by private persons. *Id.* ("[T]he suggestion that extension of this statute to private persons would eliminate the constitutional problem posits the impossible.").

only to certain (federal) constraints." *Id.* § 1912(d); *Murphy*, 138 S. Ct. at 1480. Specifically, the provision confers upon private actors an enforceable right to demand in custody proceedings that "active efforts" be made to keep an Indian family intact before the foster care placement of, or termination of parental rights to, an Indian child. *See D.J.*, 36 P.3d at 674 (reversing the termination of parental rights to an Indian child because, *inter alia*, the trial court failed to make findings as to whether active efforts had been made to prevent the breakup of the Indian family). Sections 1912(e) and (f) similarly provide enforceable federal rights to Indian parents to maintain their families absent testimony from qualified expert witnesses regarding detriment to the child from the parents' continued custody. 25 U.S.C. § 1912(e), (f).

Plaintiffs' argument that ICWA is not evenhanded—and thus is not best read as applying to private parties—because state actors are more frequently bound by its provisions is also misplaced. As an initial matter, a "best read" inquiry that turns on the factual question of whom is most likely to engage in the regulated conduct would demand record evidence that is absent here, and there is no indication that the Supreme Court has ever performed such a fact-bound evaluation as part of its commandeering analyses. More importantly, an "evenhanded" law is "best read" as regulating private parties not because its burdens may happen to fall upon states more or less frequently than private actors as a factual matter, but instead, as we have explained, because such a law *necessarily* establishes rights or obligations that are legally enforceable by or against private parties.

The *Murphy* Court's discussion of *Morales v. Trans World Airlines, Inc.*, in which the Court considered whether the federal Airline Deregulation Act of 1978 (ADA) preempted States from passing their own laws prohibiting allegedly deceptive airline fare advertisements, confirms this conclusion. *Id.* at 1480 (citing *Morales*, 504 U.S.at 391). At issue in *Morales* was a provision of the ADA that removed earlier federal airline regulations. 504 U.S. at 378. "To ensure that the States would not undo federal deregulation with

regulation of their own," the ADA provided that "no State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier." *Murphy*, 138 S. Ct. at 1480 (alteration in original) (quoting 49 U.S.C. § 1305; *Morales*, 504 U.S. at 378). The Court held that the provisions validly preempted state law. *Id.* at 391. As the Court in *Murphy* explained:

> [t]his language [in the ADA] might appear to operate directly on the States [and thus constitute an invalid attempt at preemption], but it is a mistake to be confused by the way in which a preemption provision is phrased . . . [I]f we look beyond the phrasing employed in the Airline Deregulation Act's preemption provision, it is clear that this provision operates just like any other federal law with preemptive effect. It confers on private entities (*i.e.,* covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints.

*Id.* at 1480. The Court's analysis did not turn on the frequency with which state and private actors engaged in the regulated conduct; indeed, it is axiomatic that private actors could not regulate airlines. Rather, as the *Murphy* Court made clear, what was dispositive in determining that the statute was "best read" as regulating private actors—and thus preempted state law —was that it created legally enforceable private rights. *Id.* at 1480. Accordingly, Plaintiffs' argument is of no moment. Sections 1912 (a), (d), (e), and (f) are evenhanded regulations, and they therefore do not violate the anticommandeering doctrine and may validly preempt conflicting state law.

Although Plaintiffs limit their arguments on appeal primarily to the aforementioned portions of § 1912, the district court's ruling that ICWA violates the anticommandeering doctrine was far more sweeping, invalidating all portions of the statute that alter the substantive law applicable in cases arising out of state causes of action. As discussed, the district court's theory that ICWA commandeers state courts in this manner is based on a flawed

premise. *See supra* Discussion Part II.A.2.i. ICWA's provisions beyond those already discussed in § 1912 also validly preempt conflicting state law because they are part of a comprehensive statute, the "whole *object* of" which, *Printz*, 521 U.S. at 900, is to "confer[] on private entities"—namely Indian children, families, and tribes—"a federal right." *Murphy*, 138 S. Ct. at 1480; *see* 25 U.S.C. § 1902 (declaring Congress's policy in enacting ICWA of "protect[ing] the best interests of Indian children and promot[ing] the stability and security of Indian families and tribes"). An inquiry into ICWA's individual provisions, moreover, reveals that they operate to confer rights on private actors. For instance, § 1911, grants the Indian custodian of an Indian child and that child's tribe the right to intervene in child custody proceedings.[45] Section 1912(b) confers upon indigent Indian parents "the right to court-appointed counsel in any removal, placement, or termination proceeding." *Id.* § 1912(b). And § 1913(b) affords Indian parents the right to withdraw their consent to a foster care placement at any time. *Id.* § 1913(b).[46]

---

[45] Several jurisdictions have recognized that § 1911(c) creates federal rights in favor of tribes and therefore have concluded that the provision preempts otherwise applicable state law permitting only licensed attorneys to represent parties. *See, e.g.*, *In re Elias L.*, 767 N.W.2d 98, 104 (Neb. 2009). These courts have explained that the tribal right to intervene is unfettered and that otherwise applicable state law would "not only burden the right of tribal intervention, it will essentially deny that right in many cases." *State ex rel. Juvenile Dep't of Lane Cnty. v. Shuey*, 850 P.2d 378, 381 (Or. Ct. App. 1993); *see also In re N.N.E.*, 752 N.W.2d 1, 12 (Iowa 2008); *J.P.H. v. Fla. Dep't of Children & Families*, 39 So. 3d 560 (Fla. Dist. Ct. App. 2010) (per curiam). In essence, these state courts have understood that they are bound to permit tribes to intervene without being represented by licensed counsel because to require otherwise would "frustrate[] the deliberate purpose of Congress" in enacting this measure. *Hillman*, 569 U.S. at 494 (internal quotation marks and citation omitted).

[46] ICWA's placement preference provisions, § 1915(a) & (b), likewise create federal rights for Indian children, tribes, and families that apply in Indian child custody proceedings. Because the placement preferences are valid premptive federal laws, state adjudicators are bound under the Supremacy Clause to apply these provisions. *See supra* Discussion Part II.A.2.a(i).

Given that the entire purpose and effect of the provisions the district court erroneously invalidated is to confer rights and protections upon private actors, *viz.*, Indian tribes, families, and children, we conclude that they are "best read" as regulating private parties. *Murphy*, 138 S. Ct. at 1479, 1480 ("In sum, regardless of the language used by Congress . . . , every form of preemption is based on a federal law that regulates the conduct of private actors, not the States."). That the Supremacy Clause prevents states from interfering with these federal rights does not transform ICWA into an unconstitutional command to state actors. *See Murphy,* 138 S. Ct. at 1480. Rather, such a restriction on states is inherent to preemption. *See id.* at 1479.

---

Indeed, JUDGE DUNCAN acknowledges that the placement preferences apply in state court and preempt contrary state law. He broadly suggests, however, that the placement preferences also separately "direct action by state agencies and officials." DUNCAN, CIRCUIT JUDGE, OP. at 83-84. But reading the placement-preference provisions to require state agencies to perform executive or legislative tasks is contrary to the statute's plain text. The provisions merely require the body adjudicating an Indian child custody proceeding to apply the preferences contained therein in deciding contested claims unless there is good cause not to. *See* 25 U.S.C. § 1915(a) ("In any adoptive placement of an Indian child . . ., a preference shall be given, in the absence of good cause to the contrary . . . ."); *id.* § 1915(b) ("In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary . . . .").

As JUDGE DUNCAN concedes, this straight-forward interpretation does not present an anticommandeering problem. *See New York*, 505 U.S. at 178-79 ("Federal statutes enforceable in state courts do, in a sense, direct state judges to enforce them, but this sort of federal 'direction' of state judges is mandated by the text of the Supremacy Clause."); *cf. Murphy*, 138 S. Ct. at 1480-81 (observing that "every form of preemption is based on a federal law that regulates the conduct of private actors" and invalidating a federal statute that barred states from authorizing sports gambling because the statute did "not confer any federal rights on private actors" and instead could be understood only as "a direct command to the States"). JUDGE DUNCAN's interpretation of § 1915(a) & (b) as separately directing state administrative action—which he argues is unconstitutional—is thus not only plainly unreasonable given the text of the statute, but also contrary to settled canons of statutory construction. *See United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) (stating that a statute must be interpreted to avoid constitutional doubt if reasonably possible).

It would thus be error on multiple levels to conclude that ICWA unconstitutionally commandeers state actors, and we decline to do so.[47]

---

[47] The opposing opinion again makes much of the unremarkable fact, already discussed above, *see supra* note 21, that though Congress may hold plenary authority over a given field of legislation, any laws passed pursuant to that plenary power must still be consistent with the anticommandeering doctrine and other constitutional principles. *See* DUNCAN, CIRCUIT JUDGE, OP. at 27-29. In a misguided attempt to illustrate this point, the opposing opinion conjures up various hypothetical federal laws concerning subjects on which Congress exercises exclusive legislative authority that would alter the rules applicable to various state causes of actions in state proceedings. For example, the opposing opinion imagines a federal law "mandating different comparative fault rules in state court suits involving Swedish visa holders," and appears to postulate that, notwithstanding Congress's plenary power in regulating commerce with foreign nations, *see* U.S. CONST. art. I, § 8, cl. 3, such a law would be beyond Congress's legislative authority. DUNCAN, CIRCUIT JUDGE, OP. at 29.

First, these are far-fetched, counterfactual, law-school exam hypotheticals that are wholly detached from the kind of real and pressing human problems that ICWA addresses; rational legislators would neither see the need for such legislation nor enact such unfair and unworkable laws. As Justice Frankfurter observed, "[t]he process of Constitutional adjudication does not thrive on conjuring up horrible possibilities that never happen in the real world and devising doctrines sufficiently comprehensive in detail to cover the remotest contingency. Nor do we need go beyond what is required for a reasoned disposition of the kind of controversy now before the Court." *Garcia*, 469 U.S. 528 (quoting *New York v. United States*, 326 U.S. 572, 583 (1946) (Frankfurter, J.)). Though a ridiculous law can be imagined, it is unnecessary to fence off an inviolable area of sovereignty reserved to the states in order to prevent it. And it bears emphasizing that we nowhere contend, as JUDGE DUNCAN pretends, that Tenth Amendment principles like the anticommandeering doctrine "vanish" in the face of Congress's plenary authority over Indian affairs. DUNCAN, CIRCUIT JUDGE, OP. at 69. This is a strawman, as evidenced by the fact that we specifically address Plaintiffs' anticommandeering contentions after concluding that ICWA is within the subject matter upon which Congress is authorized to legislate.

Moreover, it is unclear precisely what point JUDGE DUNCAN is attempting to make with his parade of supposed horribles. He appears to consider it obvious that his imagined laws would "of course" exceed Congress's power solely because they set standards applicable to state causes of action in state court proceedings. DUNCAN, CIRCUIT JUDGE, OP. at 35. But, as JUDGE DUNCAN himself fully acknowledges elsewhere in his opinion, it is well established that Congress *can* validly set substantive standards in state court proceedings when acting pursuant to its Article I powers, including by "altering" the substance of state causes of action. DUNCAN, CIRCUIT JUDGE, OP. at 102-03 ("The Supreme Court has ruled that federal standards may supersede state

To summarize, ICWA is a law of the United States made in pursuance of the Congress's constitutional authority.  Further, ICWA does not violate the anticommandeering doctrine because it does not directly command state legislatures or executive officials to enact or administer a federal program.  Rather, any burden it places on state actors is incidental and falls evenhandedly on private parties participating in the same regulated activity.  Under the Supremacy Clause, then, ICWA is the supreme law of the land, and judges in every state shall be bound thereby.  ICWA and the Final Rule therefore preempt conflicting state law, and the district court erred by concluding otherwise.

## B.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. 14, § 1.  This clause is implicitly incorporated into the Fifth Amendment's guarantee of due process.  *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  We apply the same analysis with respect to equal protection claims under the Fifth and Fourteenth Amendments.  *See Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir.

---

standards even in realms of traditional state authority such as family and community property law. . . . [W]henever a federal standard supersedes a state standard, the federal standard can be said to 'modify a state created cause of action.'"); *see also Jinks*, 538 U.S. at 464-65 (holding that federal laws that "change the 'substance' of state-law rights of action" do not violate state sovereignty).  And, while JUDGE DUNCAN expresses some doubt as to Congress's authority to regulate the procedure by which state courts' handle state-created causes of action, he wholly concedes that ICWA creates substantive standards, not procedural ones.  DUNCAN, CIRCUIT JUDGE, OP. at 102 ("ICWA enacts substantive child-custody standards applicable in state child custody proceedings . . . To the extent those substantive standards compel state courts . . . we conclude they are valid preemption provisions.").  Thus, if JUDGE DUNCAN is arguing that his hypothetical laws would outstrip Congress's power because they would regulate state court procedure rather than substance, he has already conceded that ICWA is not like those laws.  And if he is arguing that the laws would be unconstitutional merely because they apply to state causes of actions in state court proceedings, his position is squarely contradicted by on-point Supreme Court precedent and his own words in this very case.

1995). In evaluating an equal protection claim, strict scrutiny applies to laws that rely on classifications of persons based on race. *See id.* But where the classification is political, rational basis review applies. *See Mancari*, 417 U.S. at 555. This means that the law is strongly presumed to be constitutional, and we will invalidate it only when the classification bears no rational connection to any legitimate government purpose. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993).

The district court granted summary judgment to the Plaintiffs, concluding that § 1903(4)—setting forth ICWA's definition of "Indian child" for purposes of determining when ICWA applies in state Indian child custody proceedings—is a racial classification that cannot withstand strict scrutiny.[48] Because ICWA's provisions are based on classifications of Indians, such as "Indian child," "Indian family," and "Indian foster home," we must first examine whether these are political or race-based classifications and thus which level of scrutiny applies. "We review the constitutionality of federal statutes de novo." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012).

### 1. Level of Scrutiny

Congress has exercised plenary power "over the tribal relations of the Indians . . . from the beginning." *Lone Wolf*, 187 U.S. at 565. The Supreme Court's decisions "leave no doubt that federal legislation with respect to Indian tribes . . . is not based upon impermissible racial classifications." *United States v. Antelope*, 430 U.S. 641, 645 (1977). "Literally every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for

---

[48] As described above, we conclude that Plaintiffs have standing to challenge 25 U.S.C. § 1915(a) to (b) and Final Rule §§ 23.129 to 23.132 on equal protection grounds. The district court's analysis of whether the ICWA classification was political or race-based focused on § 1903(4), presumably because § 1903(4) provides a threshold definition of "Indian child" that must be met for any provision of ICWA to apply in child custody proceedings in state court.

special treatment a constituency of tribal Indians living on or near reservations." *Mancari*, 417 U.S. at 552. "If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized." *Id.*

In the foundational case of *Morton v. Mancari*, the Supreme Court rejected an equal-protection challenge to a BIA employment preference for Indians over non-Indians that applied regardless of whether the Indian beneficiary lived or worked on or near a reservation. *Id.* at 539 n.4, 555. The Court began by noting that Congress has repeatedly enacted preferences for Indians like the one at issue and that these preferences have several overarching purposes: "to give Indians a greater participation in their own self-government; to further the Government's trust obligation toward the Indian tribes; and to reduce the negative effect of having non-Indians administer matters that affect Indian tribal life." *Id.* at 541-42 (footnotes omitted). The Court then stated that central to the resolution of whether the preference constituted a political or racial classification was "the unique legal status of Indian tribes under federal law and . . . the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes." *Id.* at 551.

In view of this "historical and legal context," the Court upheld the preference, determining that it served a "legitimate, nonracially based goal." *Id.* at 553-54. Specifically, the preference was "reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups." *Id.* at 554. Significantly, the Court observed that because the preference was limited to members of federally recognized tribes, it thus was "not directed towards a 'racial' group consisting of 'Indians' . . . In this sense, the preference is political rather than

107

racial in nature." *Id.* at 553 n.24. This was true even though individuals were also required to possess "one-fourth or more degree Indian blood" to be eligible for the preference. *Id.* The ruling, moreover, was consistent with "numerous' Court decisions upholding legislation that singled out Indians for special treatment. *Id.* at 554-55. The Court concluded its opinion by broadly holding that "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555.

The district court erroneously construed *Mancari* narrowly and sought to distinguish it from ICWA for two primary reasons. First, the district court read *Mancari*'s blessing of special treatment for Indian to be limited to laws "directed at Indian self-government and affairs on or near Indian lands." The district court apparently concluded that ICWA did not meet either of these requirements, and reasoned that strict scrutiny therefore applied. Second, the district court observed that ICWA's definition of Indian child—which includes children under eighteen years of age who are *eligible* for membership in a federally recognized tribe and have a biological parent who is a member of a tribe, 25 U.S.C. § 1903(4)(b)—extends beyond members of federally recognized tribes, whereas the preference in *Mancari* was restricted to current tribal members and thus "operated to exclude many individuals who are racially to be classified as Indians." Citing tribal membership laws that include a requirement of lineal descent, *see, e.g.*, Navajo Nation Code § 701, the district court concluded that, since ICWA covers Indian children who are eligible for membership in a tribe, "[t]his means one is an Indian child [within the meaning of ICWA] if the child is related to a tribal ancestor by blood." In the view of the district court, ICWA therefore "uses ancestry as a proxy for race," and the law is therefore subject to strict scrutiny.

We disagree with the district court's reasoning and conclude that *Mancari* stands for the broader proposition that as long as "legislation that

singles out Indians for . . . special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians," the statute "will not be disturbed." *Mancari*, 417 U.S. at 554-55. In other words, if a statute is reasonably related to the special government-to-government political relationship between the United States and the Indian tribes, it does not violate equal protection principles. *Mancari*—and its progeny—confirm that classifications relating to Indians need not be specifically directed at Indian self-government to be considered political classifications for which rational basis scrutiny applies. *Id.* at 555 ("As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed."); *see also, e.g.*, *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500-01 (1979) ("It is settled that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive." (quoting *Mancari*, 417 U.S. at 551-52)).

In *United States v. Antelope*, for instance, the Court expressly recognized that, although some of its earlier decisions relating to Indians "involved preferences or disabilities directly promoting Indian interests in self-government," its precedent "point[s] more broadly to the conclusion that federal regulation of Indian affairs is not based upon impermissible classifications." 430 U.S. 641, 646-47 (1977) (first citing *Mancari*, 417 U.S. at 553 n.24; then citing *Fisher v. District Court*, 424 U.S. 382 (1976) (per curiam)) (holding that a federal statute subjecting individual Indians to federal criminal jurisdiction due to their status as tribal members did not violate equal protection); *see also, e.g.*, *Washington v. Wash. State Comm. Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 673 n.20 (1979) (determining that a treaty granting Indians certain preferential fishing rights did not violate equal protection because the Court "has repeatedly held that the peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf when rationally related to the Government's

109

'unique obligation toward the Indians' " (quoting *Mancari*, 417 U.S. at 555));
*Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 479-80 (1976)
(sustaining tribal members' immunity from state sales tax for cigarettes sold
on the reservation and explaining that "[a]s long as the special treatment can
be tied rationally to the fulfillment of Congress' unique obligation toward the
Indians, such legislative judgments will not be disturbed." (quoting *Mancari*,
417 U.S. at 555)).

Moreover, even if preferences for Indians were limited to those
directly furthering tribal self-government—a proposition that, as
demonstrated, is unsupportable—it is clear that ICWA is aimed squarely at
this legislative purpose. As discussed, prior to enacting ICWA, Congress
considered testimony about the devastating impacts of removing Indian
children from tribes and placing them for adoption and foster care in non-
Indian homes. *See supra* Background Part IV. The Tribal Chief of the
Mississippi Band of Choctaw Indians, we noted, testified that "the chances
of Indian survival are significantly reduced" by removing Indian children
from their homes and raising them in non-Indian households where they are
"denied exposure to the ways of their People . . . [T]hese practices seriously
undercut the tribes' ability to continue as self-governing communities.
Probably in no area is it more important that tribal sovereignty be respected
than in an area as socially and culturally determinative as family
relationships." *Hearing on S. 1214 before the S. Select. Comm. on Indian
Affairs*, 95th Cong. 157 (1977).

This testimony undoubtedly informed Congress's finding that
children are the most vital resource "to the continued existence and integrity
of Indian tribes," which itself reflects Congress's intent to further tribal self-
government. 25 U.S.C. § 1901(3). Moreover, the Supreme Court has
recognized that in enacting ICWA, "Congress was concerned not solely
about the interests of Indian children and families, but also about the impact
on the tribes themselves of the large numbers of Indian children adopted by

non-Indians.    The numerous prerogatives accorded the tribes through ICWA's substantive provisions must, accordingly, be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves." *Holyfield*, 490 U.S. at 50 (internal citations omitted)); *see also id.* (noting evidence before Congress at the time ICWA was considered that the "[r]emoval of Indian children from their cultural setting seriously impacts . . . long-term tribal survival" (quoting S. Rep. No. 597, 95th Cong., 2d Sess. 52 (1977)).    Thus, it is clear that Congress intended ICWA to further both tribal self-government and the survival of tribes. *See* 25 U.S.C. § 1901(3)*; see also* Cohen's, *supra* § 11.01[2] ("ICWA's objective of promoting the stability and security of Indian tribes and families encompasses the interest of Indian nations in their survival as peoples and self-governing communities . . . .").

We also are unpersuaded by the district court's reasoning that differential treatment for Indians is only subject to rational basis review when it applies to Indians living on or near reservations.    The Supreme Court has long recognized Congress's broad power to regulate Indians and Indian tribes on and off the reservation. *See, e.g., United States v. McGowan*, 302 U.S. 535, 539 (1938) ("Congress possesses the broad power of legislating for the protection of the Indians wherever they may be within the territory of the United States." (quoting *United States v. Ramsey*, 271 U.S. 467, 471 (1926)); *Perrin*, 232 U.S. at 482 (acknowledging Congress's power to regulate Indians "whether upon or off a reservation and whether within or without the limits of a state").    And courts have repeatedly upheld government preferences for Indians, regardless as to whether the Indians receiving "special treatment" were located on or near a reservation. *See, e.g.*, *Am. Fed'n of Gov't Emps. v. United States*, 330 F.3d 513, 516, 521 (D.C. Cir. 2003) (rejecting an equal protection challenge to a federal defense spending measure that provided a contracting preference for firms with less than "51 percent Native American ownership" even though the preference was "not restricted to Indian activities on or near reservations or Indian land").    Indeed, the preference in

*Mancari* itself did not require that the Indians benefiting from the employment preference live on or near a reservation, and the non-Indian employees who challenged the preference averred that "none of them [were] employed on or near an Indian reservation." *Mancari*, 417 U.S. at 539 n.4.

The district court's additional rationale for finding an equal protection violation here—that unlike the statute in *Mancari*, ICWA's definition of Indian child extends to children who are only eligible for membership but not-yet enrolled in a tribe—is also flawed. Though the district court made much of the fact that a child's tribal eligibility generally turns on having a blood relationship with a tribal ancestor, this does not equate to a proxy for race, as the district court believed.

Originally, Indian tribes "were self-governing sovereign political communities." *Wheeler*, 435 U.S. at 322-23; *see also* Sarah Krakoff, *Inextricably Political: Race, Membership, and Tribal Sovereignty*, 87 WASH. L. REV. 1041 (2012) [hereinafter Krakoff]. The Constitution, moreover, recognizes tribes' political status both explicitly and implicitly. *See, e.g.*, U.S. CONST. art. I, § 8 (empowering Congress "to regulate commerce with foreign Nations, among the several States, and with the Indian Tribes"). And as explained, the history of the post-ratification period demonstrates that the federal government treated tribes as quasi-sovereigns from the very start.[49] *See* Ablavsky, *Beyond the Indian Commerce Clause*, *supra* at 1061-67. Though the relationship between the government and the tribes has evolved since then, it has always been considered a relationship between political

---

[49] To be sure, this course of dealing was not between powers on equal footing; the Court, as noted, has described the tribes as "wards of the nation" and "dependent on the United States," which, in turn, owes a "duty of protection" to Indian tribes. *Kagama*, 118 U.S. at 383-84 (emphasis omitted); *see also Mancari*, 417 U.S. at 551 (characterizing the relationship between the tribes and federal government as that of "guardian-ward"). But this dependent, quasi-sovereign status does not change that tribes are fundamentally political bodies with whom the federal government must manage relations as with any other nation.

entities.  *See Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 16 (1831) (Marshall, C.J.) (describing Indian tribes as "domestic dependent nations"); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1278 (9th Cir. 2004) ("Historically, the formal relationship between the United States and American Indian tribes has been political, rather than race-based."); Cohen's, *supra* § 4.01[1][a]; *see generally* Krakoff, *supra*, at 1060-78.

Beginning in 1934 with passage of the Indian Reorganization Act, the federal government entered into a new chapter wherein it officially acknowledged Indian tribes' rights of self-governance by authorizing tribes to apply for federally-recognized status.  *See* Indian Reorganization Act, 25 U.S.C. §§ 5101 *et seq.*  Official federal recognition of Indian tribes is "a formal political act" that "institutionaliz[es] the government-to-government relationship between the tribe and the federal government."  *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C. Cir. 2008) (quoting Cohen's, *supra* § 3.02[3] (2005 ed.)); *see also* Krakoff, *supra*, at 1075. Though inevitably tied in part to ancestry, tribal recognition and tribal sovereignty center on a group's status as a continuation of a historical political entity.  *See* 25 C.F.R. § 83.11(c), (e) (criteria for a tribe to receive federal recognition include that the tribe has "maintained political influence or authority over its members as an autonomous entity from 1900 until the present" and that its members "descend from a historical Indian tribe"); Sarah Krakoff, *They Were Here First: American Indian Tribes, Race, and the Constitutional Minimum*, 69 Stan. L. Rev. 491, 538 (2017) (explaining that the descent criterion for federal recognition is "a proxy for connection[] to a political entity, specifically a *tribe*, which existed historically"); Federal Acknowledgment of American Indian Tribes, 80 Fed. Reg. 37862, 37,867 (2015).  In this way, federally recognized tribal status is an inherently political classification.  *See Mancari*, 417 U.S. at 553 n.24.

In view of this history, we cannot say that simply because ICWA's definition of "Indian child" includes minors eligible for tribal membership

(who have a biological parent who is a tribal member), the classification is drawn along racial lines. Tribal eligibility does not inherently turn on race, but rather on the criteria set by the tribes, which are present-day political entities.[50] Just as the United States or any other sovereign may choose to whom it extends citizenship, so too may the Indian tribes.[51] That tribes may

---

[50] As the Tribes explain, under some tribal membership laws, eligibility extends to children without Indian blood, such as the descendants of persons formerly enslaved by tribes who became members after they were freed or the descendants of persons of any ethnicity who have been adopted into a tribe. *See*, *e.g.*, Treaty with the Cherokees, 1866, U.S.—Cherokee Nation of Indians, art. 9, July 19, 1866, 14 Stat. 799 (providing that the Cherokee Nation "further agree that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees"); *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86, 132, 140-41 (D.D.C. 2017) (holding that Cherokee Freedmen enjoy full citizenship rights as members of the Cherokee Nation because Congress has never abrogated or amended the relevant treaty terms). Accordingly, a child may fall under ICWA's membership eligibility standard because his or her biological parent became a member of a tribe, despite not being racially Indian. Additionally, many racially Indian children, such as those affiliated with non-federally recognized tribes, do not fall within ICWA's definition of "Indian child." When it comes to ICWA's definition of Indian child, race is thus both underinclusive—because it does not capture these descendants of freed enslaved persons or other adoptive members who are not "racially" Indians—and overinclusive—because it embraces "racially" Indian children who are not enrolled in or eligible for membership in a recognized tribe or who lack a biological parent who is a member of a recognized tribe.

[51] For illustrative purposes, we note that *jus sanguinis*, or citizenship based on descent, is a common feature of the citizenship laws of foreign nations. *See, e.g.*, Irish Nationality and Citizenship Act, 2001 (Act. No. 15/2001) (Ir.) (individuals with any direct ancestor who was an Irish citizen are eligible for Irish ancestry, provided that the applicant's parent was recorded in Ireland's foreign births register); Kodikas Ellenikes Ithageneias [KEI] [Code of Greek Citizenship] A:1,10 (Gr.) (establishing that children of Greek parents are Greek by birth, and providing that aliens of Greek ethnic origin are eligible to obtain citizenship by naturalization); The Law of the Republic of Armenia on the Citizenship of the Republic of Armenia (Nov. 6, 1995), as amended through Feb. 26, 2017, by RA Law No. 75-N (Arm.) (providing that a person may be granted Armenian citizenship without residing in Armenia or speaking Armenian if he or she is of Armenian ancestry); Law of Return, 5710-1950, SH No. 51 p. 159 (1950) (Isr.) (extending the right of citizenship to any "Jew" wishing to immigrate to Israel); Law of Return (Amendment No. 2), 5730-1970, SH No. 586 p. 34 (1970) (Isr.) (clarifying that "Jew" means any person born of a

use ancestry as part of their criteria for determining membership eligibility does not change that ICWA does not classify in this way; instead, ICWA's Indian child designation classifies on the basis of a child's connection to a political entity based on whatever criteria that political entity may prescribe.[52] *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978) ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community.").

---

Jewish mother or who converted to Judaism, and vesting the right of citizenship in any child, grandchild, or spouse of a Jew, as well as any spouse of a child of a Jew or any spouse of a grandchild of a Jew); Legge 5 febbraio 1992, no. 91, G.U. Feb. 15, 1992, n.38 (It.) (guaranteeing citizenship to any person whose father or mother are citizens, and providing that Italian citizenship may be granted to aliens whose father or mother or whose direct ancestors to the second degree were citizens by birth); Law of 2 April 2009 on Polish Citizenship, Dz. U. z. 2012 r. poz. 161 (Feb. 14, 2012) (Pol.) (stating that individuals within two degrees of Polish ancestry may be eligible for Polish citizenship). That one may be eligible for citizenship based on their ancestry does not, of course, alter the fact that citizenship and eligibility therefor—like actual and potential membership in a federally recognized tribe—are political matters concerning the rights and obligations that come from membership in a polity.

[52] Moreover, even if ICWA did classify on the basis of blood quantum as do some other laws respecting Indian affairs, it does not necessarily follow that strict scrutiny would apply. *See generally* Matthew L.M. Fletcher, *Politics, Indian Law, and the Constitution*, 108 Cal. L. Rev. 495, 532-46 (2020) (arguing that, based on the historical understanding of the Indian affairs power, Congress has complete authority to determine who is an Indian and it is never a suspect classification); *Mancari*, 417 U.S. at 552 (applying rational basis review to law that classified on the basis of blood quantum). Because ICWA simply looks to tribal eligibility and the tribal membership of a child's birth parents, we need not decide what level of scrutiny applies when Congress classifies on the basis of more remote Indian ancestry. We note, however, that some scholars have explained that "the appearance of 'Indian' within the [text of the] U.S. Constitution likely dooms [any] equal protection challenge to Indian classifications." Gregory Ablavsky, *Race, Citizenship, and Original Constitutional Meanings* 70 Stan. L. Rev. 1025, 1074 (2018). Either the use of "'Indian' in the Constitutional is a political classification" and thus "the use of Indian in ICWA and similar statutes must also be read as a political classification," or the references to Indians in the Constitution must be understood as "bound up with historical conceptions of race" and "the Constitution itself" therefore acknowledges and "authorizes distinctions based on Native ancestry." *Id.*

The district court determined, and Plaintiffs now argue, that ICWA's definition of "Indian child" "mirrors the impermissible racial classification in *Rice* [*v. Cayetano*, 528 U.S. 495 (2000)], and is legally and factually distinguishable from the political classification in *Mancari*." We disagree.

In *Rice*, the Court held that a provision of the Hawaiian Constitution that permitted only "Hawaiian" people to vote in the statewide election for the trustees of the Office of Hawaiian Affairs (OHA) violated the Fifteenth Amendment. *Id.* at 515. "Hawaiian" was defined by statute as "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawai[']i." *Id.* at 509. (citation and internal quotation marks omitted). The Court emphasized that the statute classified citizens "solely because of their ancestry," determining that the legislature's purpose in doing so was to use ancestry as a proxy for race. *Id.* at 514-17. In reaching its ruling, the *Rice* Court expressly reaffirmed *Mancari*'s central holding that, because classifications based on Indian tribal membership are "not directed towards a 'racial' group consisting of 'Indians,'" but instead apply "only to members of 'federally recognized' tribes," they are "political rather than racial in nature." *Rice*, 528 U.S. at 519-20 (quoting *Mancari*, 417 U.S. at 553 n.24).

The facts and legal issues in *Rice* are clearly distinguishable from the present case. As a threshold matter, *Rice* specifically involved voter eligibility in a state-wide election for a state agency, and the Court found only that the law at issue violated the Fifteenth Amendment. As should be obvious, the Fifteenth Amendment, which deals exclusively with voting rights, is not implicated in this case. But even assuming *Rice*'s holding would apply to an equal protection challenge, ICWA's definition of "Indian child" is a fundamentally different sort of classification than the challenged law in *Rice*.

The Court in *Rice* specifically noted that native Hawaiians did not enjoy the same status as members of federally recognized tribes, who are

116

constituents of quasi-sovereign political communities. *Id.* at 522. Instead, ancestry was the sole, directly controlling criteria for whether or not an individual could vote in the OHA election. But unlike the ancestral requirement in *Rice*, ICWA's eligibility standard simply recognizes that some Indian children have an imperfect or inchoate tribal membership. That is, the standard embraces Indian children who possess a potential but not-yet-formalized affiliation with a current political entity—a federally recognized tribe. *See Mancari*, 417 U.S. at 553 n.24.

An appreciation for how tribal membership works makes this manifest. As Congress understood in enacting ICWA, tribal membership "typically requires an affirmative act by the enrollee or her parent," 81 Fed. Reg. at 38,782, and a "minor, perhaps infant, Indian does not have the capacity to initiate the formal, mechanical procedure necessary to become enrolled in his tribe," H.R. REP. NO. 95-1386, at 17 (1978). Thus, Congress was not drawing a racial classification by including the eligibility requirement but instead recognizing the realities of tribal membership and classifying based on a child's status as a member or potential member of a quasi-sovereign political entity, regardless of his or her ethnicity. And because ICWA does not single out children "solely because of their ancestry or ethnic characteristics," *Rice*, 528 U.S. at 515, *Rice* is inapposite.

In short, we find *Rice* wholly inapplicable except insofar as it reaffirmed the holdings of *Mancari* and its progeny that laws that classify on the basis of Indian tribal membership are political classifications. It therefore does not alter our conclusion that ICWA's definition of "Indian child" is a political classification subject to rational basis review. *See Mancari*, 417 U.S. at 555.

Plaintiffs also separately contend that ICWA's lowest-tiered adoptive placement preference for "other Indian families" constitutes a racial

classification.[53]  *See* 25 U.S.C. § 1915(a)(3).  This preference, they argue, treats Indian tribes as "fungible" and does not account for the array of differences between tribes, which, in turn, evinces a desire to keep Indian children within a larger Indian "race."  We disagree for reasons similar to our holding regarding ICWA's Indian child designation.  Like the hiring preference in *Mancari*, this adoption placement preference—like all of ICWA's placement preferences—"applies only to members of federally recognized tribes."  *Mancari*, 417 U.S. at 554 n.24 (internal quotation marks omitted); *see also* 25 U.S.C. § 1903(3) (defining "Indian" as encompassing only members of federally recognized tribes).  Because on its face the provision is limited to "members of federally recognized tribes," "the preference is political rather than racial in nature."  *Mancari*, 417 U.S. at 554 n.24 (internal quotation marks omitted).  Accordingly, it, too, is subject only to rational basis review.[54]

## 2. Rational Basis Review

Having determined that ICWA's Indian child and family designations are political classifications, we need look no further than *Rice* to determine their constitutionality.  Even in setting aside the Hawai'i election law at issue, the Court stated in no uncertain terms that statutes that fulfill "Congress' unique obligation toward the Indians" are constitutional.  *Id.* at 520 (quoting *Mancari*, 417 U.S. at 555).  "Of course," the *Rice* Court elaborated, "as we

---

[53] 25 U.S.C. § 1915(a) provides:

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with

   (1) a member of the child's extended family;

   (2) other members of the Indian child's tribe; or

   (3) other Indian families.

[54] For the same reasons, ICWA's foster care placement preferences based on tribal membership trigger only rational basis review.  *See* 25 U.S.C. § 1915(b).

have established in a series of [post-*Mancari*] cases, Congress may fulfill its obligations and responsibilities to the Indian tribes by enacting legislation dedicated to their circumstances and needs." *Id.* at 519 (citing *Wash. State Comm. Passenger Fishing Vessel Ass'n,* 443 U.S. at 673 n.20; *Antelope*, 430 U.S. at 645-47; *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84-85 (1977); *Moe*, 425 U.S. at 479-80; *Fisher*, 424 U.S. at 390-91).

This is precisely what ICWA does. We have already described at length the "circumstances and needs" that gave rise to ICWA. *Id.*; *see supra* Background Part IV-V. Suffice it to say that, in enacting the statute, Congress explicitly found that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(4). It further concluded "that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." *Id.* § 1901(5). It therefore enacted ICWA "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." *Id.* U.S.C. § 1902. By systematically favoring the placement of Indian children with Indian tribes and families in child custody proceedings, Congress sought to ensure that children who are eligible for tribal membership are raised in environments that engender respect for the traditions and values of Indian tribes, thereby increasing the likelihood that the child will eventually join a tribe and contribute to "the continued existence and integrity of Indian tribes." *Id.* § 1901(3). It cannot be reasonably gainsaid that these measures have *some* rational connection to Congress's goal of fulfilling its broad and enduring trust obligations to the

Indian tribes.[55] *See Mancari*, 417 U.S. at 555.  Indeed, JUDGE DUNCAN does not truly argue to the contrary.  Instead, he raises what amount to two arguments that ICWA uses *impermissible means* to further Congress's obligations to the Indian tribes.

First, JUDGE DUNCAN argues that ICWA is irrational because it extends beyond internal tribal affairs and intrudes into state proceedings. DUNCAN, CIRCUIT JUDGE, OP. at 65.  As we discuss at length when addressing Plaintiffs' federalism-based arguments, ICWA's creation of federal rights that state courts must honor is not a violation of state sovereignty.  More fundamentally, however, the degree to which a law intrudes on state proceedings has no bearing on whether that law is rationally linked to protecting Indian tribes.  One can imagine any number of overbearing measures that would advantage Indians at the expense of the states or other members of society that would nonetheless promote Indian welfare.  A federal law could simply effectuate a direct transfer of wealth from state coffers to the Indian tribes, for example, which would almost certainly run afoul of various constitutional provisions.  But there would be no debate that the law rationally furthered the well-being of tribes, which is sufficient to overcome *an equal protection challenge* when rational basis review applies. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate [government] interest.").

Though JUDGE DUNCAN couches this objection as an aspect of rational basis review, he appears to apply a far more searching standard of

---

[55] In addition to the reasons stated above, that ICWA furthers Congress's legislative aim of discharging its duties to tribes is strongly suggested by the fact that 486 federally recognized tribes—over 80% of all such tribes in this nation—have joined as amici in support of upholding ICWA's constitutionality.

scrutiny.[56] For example, he relies on the *Rice* Court's statement that, because the OHA elections in that case affected the state as a whole, extending "*Mancari* to th[at] context would [] permit a State, by racial classification, to fence out whole classes of its citizens from decisionmaking in critical state affairs." DUNCAN, CIRCUIT JUDGE, OP. at 61-62 (quoting 528 U.S. at 522). As we have stated, though, *Rice* centered on the Fifteenth Amendment, and even if the law were instead examined under the Fourteenth Amendment, it would be subject to strict scrutiny because it classified on the basis of race and discriminated with respect to a fundamental constitutional right. *See Nordlinger*, 505 U.S. at 10. ICWA does neither. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973) (limiting "fundamental rights" for purposes of equal protection analysis to those rights protected by

---

[56] JUDGE DUNCAN contends that he is "faithfully following the tailoring analysis for Indian classifications laid out by *Mancari*, *Rice*, and *Adoptive Couple*." DUNCAN, CIRCUIT JUDGE, OP. at 64 n.93. But the Supreme Court has expressly stated that "classifications based on tribal status" are not "suspect," *Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. at 501, and, again, the Court has repeatedly reaffirmed that laws that neither infringe on a fundamental right nor involve a suspect classification warrant only rational basis review, which does not include the type of "tailoring analysis" JUDGE DUNCAN employs. *See, e.g.*, *Beach Commc'ns, Inc.*, 508 U.S., at 313 ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). If JUDGE DUNCAN reads the cases he cites to *sub silentio* overrule Supreme Court precedent to establish that Indian classifications are inherently suspect or otherwise subject to a stricter tailoring requirement than any other non-suspect classification, his conclusion runs counter to virtually every federal appeals court to have explicitly considered the issue. *See, e.g.*, *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 330 F.3d 513, 520 (D.C. Cir. 2003) ("[O]rdinary rational basis scrutiny applies to Indian classifications just as it does to other non-suspect classifications under equal protection analysis." (citation omitted)); *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 732 (9th Cir. 2003) ("The [*Mancari*] Court held that legislative classifications furthering that same purpose were political and, thus, did not warrant strict scrutiny instead of ordinary, rational-basis scrutiny[.]"). In other words, it is firmly established that *ordinary* rational basis scrutiny applies in an equal protection challenge to an Indian classification, and under standard rational basis review, factors like the degree of intrusion on state sovereignty are simply not relevant to whether one can imagine a legitimate government interest furthered by the classification.

121

the constitution).  Thus, whether ICWA incidentally disadvantages some groups in state court proceedings is of no moment.  *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (stating that "a law will be sustained" on rational basis review "if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous" (citing *New Orleans v. Dukes*, 427 U.S. 297 (1976))).

Moreover, even if such a factor were relevant to ICWA's validity, we would disagree that the law's purpose or effect is analogous to the Hawai'i law at issue in *Rice*.  Unlike the OHA election qualifications, ICWA regulates relations between states, the federal government, and the Indian tribes.  The law is an example of congressional control over federal-tribal affairs—an interest completely absent in *Rice*.  *See Rice*, 528 U.S. at 518 (noting that to sustain Hawai'i's restriction under *Mancari*, it would have to "accept some beginning premises not yet established in [its] case law," such as that Congress "has determined that native Hawaiians have a status like that of Indians in organized tribes"); *see also Kahawaiolaa*, 386 F.3d at 1279 (rejecting an equal protection challenge brought by Native Hawaiians, who were excluded from the U.S. Department of the Interior's formal tribal acknowledgement process, and concluding that the recognition of Indian tribes was political).  Thus, there is no concern that ICWA excludes a class of citizens from participation in their own self-government; even when ICWA reaches into state court adoption proceedings, those proceedings are simultaneously affairs of states, tribes, and Congress.  *See* 25 U.S.C. § 1901(3) ("[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children.").  The *Rice* Court's caution against fencing off a class of citizens from participation in state affairs thus does not apply to ICWA for multiple reasons.

What remains of JUDGE DUNCAN's contentions amount to objections that ICWA's Indian child and family designations are under- and

over-inclusive. ICWA applies to Indian children who are only eligible for tribal membership and may never join a tribe, he points out, as well as when an Indian child's biological parents do not oppose placement of an Indian child with a non-Indian family. Based on this, JUDGE DUNCAN argues that the law could be applied in scenarios where it does not further Congress's goals of ensuring the continued survival of Indian tribes and preventing the unwilling breakup of Indian families. DUNCAN, CIRCUIT JUDGE, OP. at 67-71. Similarly, because ICWA in some instances favors placement of an Indian child with an Indian family of a different tribe over placement with a non-Indian family, JUDGE DUNCAN contends that the statute treats the tribes as fungible and does not always promote Congress's goal of linking Indian children with their particular tribes. DUNCAN, CIRCUIT JUDGE, OP. at 71-73. But the Supreme Court has clearly stated that these are not grounds for invalidating a law on rational basis review.

"Rational-basis review tolerates overinclusive classifications, underinclusive ones, and other imperfect means-ends fits." *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1010 (7th Cir. 2019) (collecting Supreme Court cases). "[L]egislation 'does not violate the Equal Protection Clause merely because the classifications [it makes] are imperfect.'" *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 592 n.39 (1979) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). "Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required.'" *Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 108 (1979)). On rational-basis review, a statutory classification "comes to us bearing a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative *every conceivable basis which might support it*." *Beach Commc'ns, Inc.*, 508 U.S. at 314-15 (emphasis added) (cleaned up). All of this is to say that it is immaterial whether one can imagine scenarios in which ICWA's classifications do not further ICWA's goals; that

the classifications could further legitimate goals in some instances is wholly sufficient to sustain the law's constitutionality.[57]

_____

[57] JUDGE DUNCAN contends that his arguments are somehow different from contentions that ICWA is overinclusive because "[e]ligibility—one of only two ways to trigger ICWA—makes the law cover children (like the ones here) with no actual connection to a tribe" and "allowing ICWA to override birth parents' wishes to place their children with non-Indians . . . makes nonsense of ICWA's key goal of preventing the *break-up* of Indian families." DUNCAN, CIRCUIT JUDGE, OP. at 68-69 n.95. But a law that employs a classification that applies to some individuals or in some situations in which it does not further the legislature's objectives is the precise definition of an overinclusive law, and the Supreme Court has repeatedly reaffirmed that such a statute survives rational basis review. *See, e.g.*, *Burlington N. R. Co. v. Ford*, 504 U.S. 648, 653–54 (1992) (upholding against equal protection challenge state's differing venue rules for domestically incorporated corporations because legislature could have rationally concluded that many corporations are headquartered in their state of incorporation and venue rule would promote convenient litigation, despite many corporations not having their principal place of business in their state of incorporation); *Vance v. Bradley*, 440 U.S. 93, 106 (1979) (upholding Foreign Service's mandatory 60-year retirement age because Congress could rationally believe that it promoted the maintenance of "a vigorous and competent" Service, notwithstanding many people over 60 being more "vigorous and competent" than many people under 60); *Dandridge v. Williams*, 397 U.S. 471, 486 (1970) (upholding state's cap on welfare awarded to families with dependent children because it was rational to believe it would encourage families to seek employment, despite the fact that many such families contain "no person who is employable"). Thus, even if JUDGE DUNCAN is correct that some Indian children as classified by ICWA never ultimately join an Indian tribe and that some Indian birth parents do not object to the placement of their children with non-Indian families, this does not mean that ICWA does not pass constitutional muster. It is enough that Congress could have rationally believed that some Indian children *would* join a tribe and some Indian birth parents *would* object to a non-Indian family placement.

Perhaps seeking to overcome this clear infirmity in its reasoning, the opposing opinion makes much of the Supreme Court's statement in *Adoptive Couple v. Baby Girl* that it would "raise equal protection concerns" to apply ICWA in a manner that "put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian." DUNCAN, CIRCUIT JUDGE, OP. at 62, 70 (quoting 570 U.S. at 655). He contends that ICWA violates equal protection principles because it allegedly disadvantages Indian children by making it more difficult for non-Indians to adopt them. But the Court was merely cautioning in dictum that ICWA may be vulnerable to an as-applied challenge in the rare situation in which applying its classification to a specific set of facts is wholly irrational. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (holding that applying city ordinance to particular plaintiffs violated equal

Further, ICWA is irrational in the scenarios that JUDGE DUNCAN proposes only if we artificially cabin the interests that ICWA may serve. But "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* And "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* In other words, JUDGE DUNCAN errs by limiting his analysis to ICWA's goals as he narrowly defines them; any conceivable legitimate goal may be grounds to sustain ICWA's constitutionality so long as one can rationally articulate a way in which the law's Indian child and family classifications would theoretically further it.

In this light, it is clear that ICWA's classifications are not irrational even in the situations JUDGE DUNCAN suggests. It is rational to think that ensuring that an Indian child is raised in a household that respects Indian values and traditions makes it more likely that the child will eventually join an Indian tribe—thus "promot[ing] the stability and security of Indian tribes," 25 U.S.C. § 1902—even when the child's parents would rather the child be placed with a non-Indian family. And we reject the notion that ICWA's preference for Indian families treats tribes as fungible. As Defendants point out, many contemporary tribes descended from larger historical bands and continue to share close relationships and linguistic,

---

protection because classification was irrational in that specific instance). This is a different matter than Plaintiffs' facial challenge to the statute, which requires that the "challenger . . . establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The fact that [ICWA] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid[.]" *Id.* Lastly, we reject JUDGE DUNCAN's supposition that the Indian children whom Plaintiffs seek to adopt would be put at "great disadvantage" by being placed in the care of an Indian relative or family pursuant to ICWA's preferences. DUNCAN, CIRCUIT JUDGE, OP. at 68-70. That is a value-laden policy determination that courts are ill-equipped to make, especially without the type of detailed fact-finding as to specific home placements that is largely absent from the record before us.

cultural, and religious traditions, so placing a child with another Indian family could conceivably further the interest in maintaining the child's ties with his or her tribe or culture. *See*, *e.g.*, Greg O'Brien, *Chickasaws: The Unconquerable People*, Mississippi History Now (September 23, 2020, 9:20 AM), https://mshistorynow.mdah.state.ms.us/articles/8/chickasaws-the-unconquerable-people (noting that, "[c]ulturally, the Chickasaws were (and are) similar to the Choctaws; both groups spoke a nearly identical language, their societies were organized matrilineally (meaning that ancestry was traced only through the mother's line), political power was decentralized so that each of their seven or so villages had their own chiefs and other leaders, and they viewed the sun as the ultimate expression of spiritual power for its ability to create and sustain life"). By providing a preference for placing Indian children with a family that is part of a formally recognized Indian political community that is interconnected to the child's own tribe, ICWA enables that child to avail herself of the numerous benefits—both tangible and intangible—that come from being raised within this context. And even if this were not the case, Congress could rationally conclude that placing an Indian child with a different tribe would fortify the ranks of that other tribe, contributing to the continued existence of the Indian tribes as a whole. *See* 25 U.S.C. §§ 1901(3), 1902; *Holyfield*, 490 U.S. at 49.

In sum, § 1903(4)'s definition of an "Indian child" and § 1915(a)(3)'s Indian family preference can be rationally linked to the trust relationship between the tribes and the federal government, as well as to furthering tribal sovereignty and self-government. They therefore do not violate constitutional equal protection principles, and the district court erred by concluding otherwise.[58] *See Mancari*, 417 U.S. at 555.

---

[58] We similarly conclude that ICWA's foster care preferences survive rational basis review and thus do not violate equal protection.

### C. Nondelegation Doctrine

We next review Plaintiffs' challenge to 25 U.S.C. § 1915(c) under the nondelegation doctrine.  Article I of the Constitution vests "[a]ll legislative Powers" in Congress.  U.S. CONST. art. 1, § 1, cl. 1.  "In a delegation challenge, the constitutional question is whether the statute has" impermissibly "delegated legislative power."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  Section 1915(c) allows Indian tribes to establish through tribal resolution a different order of preferred placement than that set forth in § 1915(a) and (b).[59]  Section 23.130 of the Final Rule provides that a tribe's established placement preferences apply over those initially specified in ICWA.[60]  The district court determined that these provisions violated the nondelegation doctrine, reasoning that § 1915(c) grants Indian tribes the power to change legislative preferences with binding effect on the states and that Indian tribes are not part of the federal government of the United States and therefore cannot exercise federal legislative or executive regulatory power over non-Indians on non-tribal lands.

As an initial matter, Defendants argue that the district court's analysis of the constitutionality of these provisions ignores the inherent sovereign authority of tribes.  They contend that § 1915(c) merely recognizes and incorporates a tribe's exercise of its inherent sovereignty over Indian children and therefore is not a delegation of authority from Congress.  Ultimately, however, we need not decide whether the Indian tribes' inherent sovereign

---

[59] The provision states: "In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section."  25 U.S.C. § 1915(c).

[60] "If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply."  25 C.F.R. § 23.130.

authority extends to establishing rights that can be conferred on its potential members in state court proceedings because Congress can extend tribal jurisdiction by delegating *its* power through an "express authorization [in a] federal statute." *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997); *see also United States v. Enas*, 255 F.3d 662, 666-67 (9th Cir. 2001) (en banc) (explaining the "dichotomy between inherent and delegated power" and that "[w]hen Congress bestows additional power upon a tribe—augments its sovereignty, one might say—this additional grant of power is referred to as 'delegation'"); *cf. Mazurie*, 419 U.S. at 557 ("We need not decide whether this independent authority is itself sufficient for the tribes to impose Ordinance No. 26. It is necessary only to state that the independent tribal authority is quite sufficient to protect Congress' decision to vest in tribal councils this portion of its own authority to 'regulate Commerce . . . with the Indian tribes.'") (alterations in original).

As we have stated, Congress possesses the authority to enact ICWA pursuant to its constitutional legislative power. *See supra* Discussion Part II.A. And the limitations on Congress's ability to delegate its legislative power are "less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." *Mazurie*, 419 U.S. at 556-57.

Such a rule may arguably be justified by the fact that the Supreme Court has long recognized that Congress may incorporate the laws of another sovereign into federal law without violating the nondelegation doctrine. In *United States v. Sharpnack*, 355 U.S. 286, 293-94 (1958), for instance, the Supreme Court upheld a federal statute that prospectively incorporated states' criminal law and made it applicable in federal enclaves within each state, though the states, of course, lacked the power to legislate in these enclaves. Rather than an impermissible delegation of Congress's legislative power, the Court reasoned that the law was a "deliberate continuing adoption by Congress" of state law as binding federal law. *Id.*; *see also Gibbons*

*v. Ogden*, 22 U.S. (9 Wheat.) 1, 80 (1824) ("Although Congress cannot enable a State to legislate, Congress may adopt the provisions of a State on any subject."); *United States v. Palmer*, 465 F.2d 697, 699-700 (6th Cir. 1972) (holding that the incorporation of state law into 18 U.S.C. § 1955, which prohibits operating an illegal gambling business and defines such an illicit business as one that violates state or local law, does not violate the nondelegation doctrine). This same reasoning applies to laws enacted by Indian tribes, for "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory." *Mazurie*, 419 U.S. at 557; *see also S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 556 (9th Cir. 1983) (determining that the Secretary of the Interior did not improperly subdelegate administrative authority by requiring tribal consent as a condition precedent to granting a right-of-way across tribal lands to a railroad because the Secretary simply "incorporate[d] into the decision-making process the wishes of a body with independent authority over the affected lands").

Section 1915(c) provides that a tribe may pass, by its own legislative authority, a resolution reordering the placement preferences set forth by Congress in § 1915(a) or (b). Pursuant to this section, a tribe may assess, for example, whether the most appropriate placement for an Indian child is with members of the child's extended family, the child's tribe, or other Indian families. It is beyond debate that it would be within Indian tribes' authority to set these same standards in *tribal* child custody proceedings. *See, e.g.*, *Fisher*, 424 U.S. 390 (upholding exclusive tribal jurisdiction over adoption proceedings among tribal members located in Indian country); *Montana*, 450 U.S. at 564 (noting tribes' "inherent power to determine tribal membership [and] regulate domestic relations among members"). And just as the law at issue in *Sharpnack* incorporated the laws of a state on a matter with respect to which the state was authorized to legislate and applied it in an area in which the state was not authorized to legislate, so § 1915(c) incorporates the law of Indian tribes on a matter within the tribes' jurisdiction and makes it

applicable in an area that might otherwise be beyond the tribes' power to regulate. Thus, § 1915(c) can be characterized as a valid "deliberate continuing adoption by Congress" of tribal law as binding federal law. *Sharpnack*, 355 U.S. at 293-94; 25 U.S.C. § 1915(c); 81 Fed. Reg. at 38,784 (statement by the BIA noting that "through numerous statutory provisions, ICWA helps ensure that State courts incorporate Indian social and cultural standards into decision-making that affects Indian children").

But § 1915(c)'s validity is not dependent solely on this framing. Courts have frequently upheld delegations of congressional authority to Indian tribes without reference to federal incorporation of their law. In *United States v. Mazurie*, for example, the Supreme Court considered a federal law that allowed the tribal council of the Wind River Tribes, with the approval of the Secretary of the Interior, to adopt ordinances to control the introduction of alcoholic beverages by non-Indians on privately owned land within the boundaries of the reservation. *See* 419 U.S. at 547, 557. As the Court later explained, Congress indicated its intent to delegate authority to tribes in the statute's requirement that liquor transactions conform "'with an ordinance duly adopted' by the governing tribe." *Rice v. Rehner*, 463 U.S. 713, 730-31 (1983) (quoting 18 U.S.C. § 1161) (examining the same statute challenged in *Mazurie*). The Court ruled that such a delegation of congressional power did not violate the nondelegation doctrine. *Mazurie,* 419 U.S. at 546, 557. Tribes possess "a certain degree of independent authority over matters" relating to their "internal and social relations," the Court reasoned, including the "distribution and use of intoxicants" within the reservation's bounds. *Id.* And this independent tribal authority provided Congress with a sufficient basis for vesting in tribes Congress's own power to regulate Indian affairs. *Id.*

Similarly, in *Bugenig v. Hoopa Valley Tribe*, the Ninth Circuit, sitting en banc, determined that Congress had expressly delegated authority to the Hoopa Valley Tribe to regulate conduct by nonmembers. *See* 266 F.3d 1201,

1223 (9th Cir. 2001) (en banc). In that case, the Hoopa Tribe had ratified a constitution in 1972 stating that the Tribe's jurisdiction "extend[s] to all lands within the confines of the" reservation and that the Tribe could regulate "the use and disposition of property upon the reservation," including by non-members. *Id.* at 1212. Later, Congress passed a statute stating that "existing gove[r]ning documents of the Hoopa Valley Tribe and the governing body established and elected thereunder . . . are hereby ratified and confirmed." *Id.* at 1207-08 (quoting 25 U.S.C. § 1300i-7). The Tribe then passed a resolution prohibiting harvesting timber within a certain zone on the reservation. *Id.* at 1208. Shortly after the resolution's adoption, a non-member purchased property in this zone and began clearing its timber. *Id.* The Tribe attempted to enjoin her timber removal, arguing that Congress had vested in it the authority to regulate within the reservation, regardless of ownership. *Id.* at 1209. The Ninth Circuit agreed. Reading together the tribal constitution and the congressional enactment that "ratified and confirmed" the Tribe's governing documents, the court found that Congress had "delegated authority to regulate all the lands within the" reservation, including those owned by non-Indians. *Id.* at 1216. The court also determined that the delegation was valid because "Congress can delegate to Indian tribes those powers that are within the sphere of the Indian Commerce Clause." *Id.* at 1223 n.12.

Like the statutes in *Mazurie* and *Bugenig*, § 1915(c) contains an express delegation to tribes. *See* 25 U.S.C. § 1915(c) (permitting "the Indian child's tribe" to alter the order of placement preferences). And because the authority to alter placement preferences with respect to specific tribes is within Congress's power, Congress can validly delegate this authority to Indian tribes. *See Buenig*, 266 F.3d at 1223 n.12. Thus, Congress has validly "augment[ed]" tribal power by delegating additional authority via § 1915(c). *Enas*, 255 F.3d at 667.

JUDGE DUNCAN presents two arguments as to why § 1915(c) violates nondelegation principles.  First, he contends that the provision delegates Congress's core legislative power and thereby violates the bicameralism and presentment requirements that Congress must adhere to when enacting law.  DUNCAN, CIRCUIT JUDGE, OP. at 110-11.  Second, he argues that, even if § 1915(c) is construed as a delegation of regulatory authority, it violates nondelegation principles because it entrusts the authority to a party outside the federal government.  DUNCAN, CIRCUIT JUDGE, OP. at 112.  Neither contention is ultimately persuasive. .  At the threshold, we note that JUDGE DUNCAN takes up the contention that § 1915(c) specifically violates bicameralism and presentment wholly *sua sponte*; no party or amicus raised it in the district court, before the panel, or in en banc briefing.[61]  This is likely because the nondelegation doctrine already provides that Congress may not delegate to other actors the core legislative power that would be subject to the bicameralism and presentment requirements, *see Loving v. United States*, 517 U.S. 748, 758 (1996), and thus the nondelegation inquiry, already accounts for bicameralism and presentment.  *See* John F. Manning, *The Nondelegation Doctrine as a Canon of Avoidance*, 2000 SUP. CT. REV. 223, 240 (2000) ("The nondelegation doctrine protects [important] interests by forcing specific policies through the process of bicameralism and presentment[.]"); *see also Jackson v.*

---

[61] The district court also did not raise or pass on this issue.  We ordinarily do not consider issues in this posture.  *See Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 140 (5th Cir. 2016) ("To preserve an argument, it must be raised to such a degree that the district court has an opportunity to rule on it." (cleaned up)); *Firefighters' Ret. Sys. v. EisnerAmper, L.L.P.*, 898 F.3d 553, 561 (5th Cir. 2018) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." (internal quotation marks omitted)).  Moreover, "[i]n our adversarial system of adjudication, we follow the principle of party presentation . . . '[I]n the first instance and on appeal . . ., we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'"  *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (third set of alterations in original) (quoting *Greenlaw v. United States*, 554 U.S. 237 (2008)).

*Stinnett*, 102 F.3d 132, 135 n.3 (5th Cir. 1996) (rejecting a reading of a statute that would "approach[] a violation of the Presentment Clause *and* the nondelegation doctrine" (emphasis added)).  In a nondelegation challenge, the nondelegation question both subsumes and precedes the presentment and bicameralism questions, rending those latter inquiries superfluous.

Bicameralism and presentment are only *separately* implicated—to the exclusion of nondelegation—when Congress devises a scheme by which it (or its legislative agent) purports to enact law through a process other than that prescribed by Article I, Section 7 of the Constitution.  "Absent retained congressional veto power or other such retained authority . . . which is 'legislative in its character and effect,' the presentment clauses are not [separately] implicated and the only question is one involving the delegation doctrine."  *United States v. Scampini*, 911 F.2d 350, 352 (9th Cir. 1990) (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)) (internal citation omitted); *see also Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 276 (1991) ("*Congress* cannot exercise its legislative power to enact laws without following the bicameral and presentment procedures specified in Article I." (emphasis added)).  An arrangement in which specifically Congress or its agents attempt to enact legislation through an unconstitutional process is the only situation that can give rise to a procedural violation of bicameralism or presentment without also implicating nondelegation; it is still Congress that is purporting to enact law but doing so without complying with constitutionally mandated procedures.  In light of this framing, it makes sense that the Supreme Court has consistently performed only a nondelegation analysis when examining challenges to the vesting of power in parties other than Congress or its agents. *See, e.g.*, *Mazurie*, 419 U.S. at 556-58; *Loving*, 517 U.S. at 758; *Am. Trucking Ass'ns*, 531 U.S. at 472-76; *Mistretta v. United States*, 488 U.S. 361, 371-79 (1989).  Neither Congress nor its agents are involved in the tribal resolution contemplated by § 1915(c).  The cases JUDGE DUNCAN relies upon addressing the procedures Congress must use when enacting legislation are

133

therefore of little relevance to the present case. *E.g.*, *Chadha*, 462 U.S. at 959, *Clinton v. City of New York*, 524 U.S. 417, 447–48 (1998); *Metro. Washington Airports Auth.* 501 U.S. at 276.

Evaluated under the proper rubric, § 1915(c) does not represent an invalid delegation. As to JUDGE DUNCAN's first contention, he appears to argue that § 1915(c) implicates the core legislative power because Congress, in setting a default rule that tribes may alter under congressionally-defined circumstances, has effectively permitted the tribes to "change specifically enacted Congressional priorities." DUNCAN, CIRCUIT JUDGE, OP. at 109. We note the counterintuitive nature of the opposing opinion's proposed holding that Congress delegates too much discretion when it provides some guidance and exercises some control over an issue by setting a default standard rather than leaving the implementation of a statute entirely to the delegee's discretion. Moreover, countless other federal statutes set a default standard that applies unless another party chooses to act, and these laws often grant the delegee far more power to negate the normal functioning of federal law than does § 1915(c). *See, e.g.*, 16 U.S.C. § 1536 (permitting an Endangered Species Committee made up of high-ranking executive branch officials to suspend the otherwise applicable requirements of the Endangered Species Act for particular projects); 7 U.S.C. § 136p (allowing the Environmental Protection Agency (EPA) to exempt state and federal agencies from the Federal Insecticide, Fungicide and Rodenticide Act); 43 U.S.C. § 1652 (permitting the Secretary of the Interior and other federal officials to "waive any procedural requirements of law or regulation which they deem desirable to waive in order to" construct the Trans-Alaska Pipeline); 42 U.S.C. § 1315 (permitting states, with approval from the Department of Health and Human Services, to customize their Medicaid programs in ways that would otherwise violate the Social Security Act). Indeed, many federal statutes specifically delegate to another, *separate sovereign* the authority to alter the federal standard in matters related to the sovereign's jurisdiction. *See, e.g.*, 20 U.S.C. § 1415(b)(6)(B) (providing that

134

the statute of limitation for bringing an administrative claim under the Individuals with Disabilities Education Act is two-years "or, if the State has an explicit time limitation for presenting such a complaint under this subchapter, in such time as the State law allows"); 11 U.S.C. § 522 (permitting state law to alter the default property exemptible from a bankruptcy estate); 12 U.S.C. § 2279aa-12(b)(2) (permitting states to enact law overriding exemption from state registration and qualification laws for securities guaranteed by the Federal Agricultural Mortgage Corporation); 42 U.S.C. § 14503(a), (e) (exempting nonprofit and governmental entities from liability for the acts of volunteers but allowing state law to override exemption in several specific ways).[62]  Courts have repeatedly affirmed Congress's authority to allow another party to override the federal default for specific applications of a law without violating nondelegation principles. *See, e.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 578 (D.C. Cir. 2019), *cert. denied sub nom. Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020) (mem.) (upholding against nondelegation challenge law permitting the EPA to alter otherwise statutorily mandated renewable fuel quotas); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 124 (D.D.C. 2007) (noting that permitting executive officials to waive environmental laws for limited purposes does not violate nondelegation where it did not "alter the text of

---

[62] JUDGE DUNCAN attempts to distinguish between laws that permit another party to waive statutory requirements and those that permit a party to "re-write enacted statutes." DUNCAN, CIRCUIT JUDGE, OP. at 111. n.149. But the opposing opinion offers no reasoned analysis as to why a waiver, which effectively deletes text from a statute for specific applications of the law or adds text establishing specific exceptions to a statutory regime, is less of a "rewrit[ing of] enacted statutes" than the reordering of the placement preferences for limited applications of ICWA that the statute authorizes Indian tribes to bring about. This failing is particularly apparent in JUDGE DUNCAN's handling of the cited federal laws that permit another sovereign to override a statutory default, just as ICWA does here. DUNCAN, CIRCUIT JUDGE, OP. at 113 n.150. Simply repeating the phrase "alter the text" is no substitute for meaningfully distinguishing these laws, and the opposing opinion does nothing to explain how § 1915(c) authorizes "alter[ing] the text" of a statute any more than the myriad other federal laws cited here that permit a party other than Congress to change a statute's functioning for certain limited applications.

any statute, repeal any law, or cancel any statutory provision" because the statute itself "retains the same legal force and effect as it had when it was passed by both houses of Congress and [was] presented to the President"); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1140 (S.D. Cal. 2018), *aff'd*, 915 F.3d 1213 (9th Cir. 2019), *cert. denied sub nom. Animal Legal Def. Fund v. Dep't of Homeland Sec.*, 139 S. Ct. 594 (2018) (same).

JUDGE DUNCAN's second contention—that Congress may not delegate authority of any sort to a party outside the federal government—is also easily disposed of. Whether framed as a prospective incorporation of another sovereign's law or a delegation of regulatory authority, the Supreme Court has long approved of federal statutes that permit another sovereign to supply key aspects of the law, including an explicit delegation of authority to the Indian tribes. *See Mazurie*, 419 U.S. at 556-57; *Gibbons*, 22 U.S. (9 Wheat.) at 80, *Wilkerson v. Rahrer*, 140 U.S. 545, 562 (1891) ("[W]hile the legislature cannot delegate its power to make a law, it can make a law which leaves it to municipalities or the people to determine some fact or state of things, upon which the action of the law may depend."). *But see Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 164 (1920) (holding that Congress may not delegate to the states its exclusive authority over admiralty and maritime law because the Constitution specifically entrusts that power to Congress to maintain nationwide uniformity). Indeed, the Supreme Court itself routinely looks to the law of other sovereigns to fill in important aspects of federal statutes. In the context of a § 1983 claim, for instance, analogous state personal injury torts supply, *inter alia*, the statute of limitations in which the federal claim may be brought. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) ("Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose."). The inescapable message of these long-standing statutes and Supreme Court precedents is clear: Congress does not invalidly delegate regulatory power simply because it prospectively incorporates into federal law the decision-making of another sovereign on a matter within that

sovereign's jurisdiction.[63]  *Cf. Kentucky Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1417 (6th Cir. 1994) ("[T]he separation of powers principle and, *a fortiori*, the nondelegation doctrine, simply are not implicated by Congress' 'delegation' of power to the States.").

It is thus unsurprising that JUDGE DUNCAN offers no binding precedent to support a rule that regulatory power cannot be delegated outside the federal government, relying entirely on concurrences and secondary sources for his novel approach. *See* DUNCAN, CIRCUIT JUDGE, OP. at 112.  And, because he offers no explanation or limiting principle to differentiate the present case from those cited above, one is struck by the sheer breadth of the opposing proposed opinion's holding, which would likely render myriad federal laws invalid and conflict with binding Supreme Court precedents. *See, e.g.*, *Mazurie*, 419 U.S. at 556-57.

In sum, § 1915(c) validly integrates tribal sovereigns' decision-making into federal law, regardless of whether it is characterized as a prospective incorporation of tribal law or an express delegation by Congress under its Indian affairs authority.  Accordingly, § 1915(c) does not violate the nondelegation doctrine.[64]

---

[63] Even if the Indian tribes were not sovereigns in their own right, it does not necessarily follow that incorporating their decision-making into federal law would violate the nondelegation doctrine, as the Supreme Court has historically upheld even delegations of authority to private entities against such challenges. *See Currin v. Wallace*, 306 U.S. 1, 1 (1939); *United States. v. Rock Royal Co-op.,* 307 U.S. 533, 577–78 (1939).

[64] Because we would not hold that any provision of ICWA is unconstitutional, a severability analysis is unnecessary.  However, even if we were to conclude that certain portions of ICWA violate the Constitution, we would hold that ICWA's severability clause, 25 U.S.C. § 1963, is fully enforceable, meaning that only those specific provisions of the law that are unconstitutional are invalid and the remainder of the statute remains in full effect. *See Seila Law LLC v. Consumer Fin. Protect. Bureau*, 140 S. Ct. 2183, 2209 (2020) ("When Congress has expressly provided a severability clause, our task is simplified.  We will presume that Congress did not intend the validity of the statute in question to depend

### D. The Final Rule

The district court held that, to the extent §§ 23.106 to 23.122, 23.124 to 23.132, and 23.140 to 23.141 of the Final Rule were binding on State Plaintiffs, they violated the APA for three reasons: the provisions (1) purported to implement an unconstitutional statute; (2) exceeded the scope of the Interior Department's statutory authority to implement ICWA; and (3) reflected an impermissible construction of § 1915. Reviewing the district court's legal conclusions *de novo*, we conclude that the Final Rule does not contravene the APA. *Fath v. Texas Dep't of Transp.*, 924 F.3d 132, 136 (5th Cir. 2018).

### 1. The Constitutionality of ICWA

Because we conclude, for reasons discussed earlier in this opinion, that the challenged provisions of ICWA are constitutional, we also determine that the district court erred by concluding that the Final Rule was invalid because it implemented an unconstitutional statute. Thus, the statutory basis for the Final Rule is constitutionally valid.

### 2. The Scope of the BIA's Authority

Congress authorized the Secretary of the Interior to promulgate "rules and regulations as may be necessary to carry out the provisions" of ICWA. 25 U.S.C. § 1952. Pursuant to this provision, the BIA, acting under authority delegated by the Interior Department, issued guidelines in 1979 for state courts in Indian child custody proceedings that were "not intended to have binding legislative effect." 44 Fed. Reg. at 67,584. The BIA explained that, generally, "when the Department writes rules needed to carry out responsibilities Congress has explicitly imposed on the Department, those rules are binding." *Id.* However, when "the Department writes rules or

---

on the validity of the constitutionally offensive provision unless there is strong evidence that Congress intended otherwise." (internal quotation and ellipses omitted)).

guidelines advising some other agency how it should carry out responsibilities explicitly assigned to it by Congress, those rules or guidelines are not, by themselves, binding." *Id.* With respect to ICWA, the 1979 BIA did not interpret the language and legislative history of 25 U.S.C. § 1952 to indicate that Congress intended the BIA to supervise state judiciaries, and it noted that enacting federal regulations that were primarily applicable in state court proceedings would raise federalism concerns. *Id.* The agency concluded that such binding regulations were "not necessary" in any event because the BIA then believed that state courts were "fully capable" of honoring the rights created by ICWA. *Id.*

In 2016, however, the BIA changed course and issued the Final Rule, which, in an effort to bring about greater uniformity in Indian child custody cases, sets binding standards governing the rights of Indian children, families, and tribes in such proceedings. *See* 25 C.F.R. §§ 23 *et seq.*; 81 Fed. Reg. at 38,779, 38,785. The BIA explained that its earlier, nonbinding guidelines were "insufficient to fully implement Congress's goal of nationwide protections for Indian children, parents, and Tribes." 81 Fed. Reg. at 38,782. Without the Final Rule, the BIA stated, state-by-state determinations about how to implement ICWA would continue to result in widely differing standards of protection "with potentially devastating consequences" for the Indian populations that ICWA was intended to benefit. *See id.*

Echoing the district court's reasoning, Plaintiffs argue that the BIA did not provide a sufficient explanation for its change in position regarding its authority to issue binding regulations. It is not clear, however, whether they also contend that, regardless of the adequacy of the explanation for the new position, the BIA simply lacks authority under § 1952 to promulgate binding regulations. In any event, we assume Plaintiffs properly present both challenges. As to the latter argument that the BIA lacks authority under ICWA to issue binding regulations, we employ the familiar framework set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837,

842-43 (1984).  Under *Chevron*, we review "an agency's construction of the statute which it administers," by asking "two questions."  *Id.* at 842.  First, we must examine whether the statute is ambiguous.  *Id.*  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  We must uphold an agency's reasonable interpretation of an ambiguous statute.  *Id.* at 844.

Under *Chevron* step one, the question is whether Congress unambiguously intended to grant the Department authority to promulgate rules and regulations that implement private rights that state courts must honor.  In stating that "the Secretary shall promulgate such rules and regulations as may be necessary to carry out the provisions of this chapter," the text of § 1952 confers broad authority on the Department to promulgate rules and regulations it deems necessary to carry out ICWA.  This language clearly grants the BIA the authority to promulgate standards that are binding upon all parties; this is inherent in the statute's use of the term "rules," for a rule is not a rule if it can be disregarded at will.  Still, the Final Rule does place a duty on state courts to respect the rights it implements, which we will grant is somewhat unusual in the world of administrative law.  *See* 81 Fed. Reg. 38,778.  Because it may be arguable that "Congress has not directly addressed the precise question at issue"—that is, whether the BIA is authorized to promulgate rules and regulations that effectively bind state courts—we will assume *arguendo* that § 1952 is ambiguous on the subject.  *See Chevron*, 467 U.S. at 843.

The BIA's interpretation of § 1952 is valid under the second *Chevron* step because it is a reasonable construction of the statute.  *See* 467 U.S. at 843-44.  As Defendants point out, § 1952's language is substantively identical

to other statutes conferring broad delegations of rulemaking authority. Indeed, the Supreme Court has held that "[w]here the empowering provision of a statute states simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act' . . . the validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973) (quoting 42 U.S.C. § 1408) (cleaned up); *see also City of Arlington v. F.C.C.*, 569 U.S. 290, 306 (2013) (noting a lack of "case[s] in which a general conferral of rulemaking or adjudicative authority has been held insufficient to support *Chevron* deference for an exercise of that authority within the agency's substantive field"); *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377-78 (1999) (determining that the Federal Communications Commission had authority to issue regulations based on statutory language permitting the agency to "prescribe such rules and regulations as may be necessary in the public interest to carry out" the statute). Here, § 1952's text is nearly identical to the statutory language at issue in *Mourning*, and the Final Rule's binding standards for Indian child custody proceedings are obviously related to ICWA's purpose of establishing minimum federal standards in child custody proceedings involving Indian children. *See* 25 U.S.C. § 1902. Thus, the BIA was reasonable in interpreting § 1952 to confer on it the authority to promulgate the Final Rule.

Neither Plaintiffs nor Judge Duncan argues that setting binding standards for child custody proceedings is unrelated to ICWA's purpose, for clearly it is not. Instead, Plaintiffs and Judge Duncan primarily contend that the BIA reversed its position without providing an adequate explanation.[65]

---

[65] Like with Plaintiffs, it is not clear whether Judge Duncan separately argues that, regardless of the adequacy of the explanation given for the change, it is unreasonable

We must note the conceptual difference between the *Chevron* inquiry, which asks whether an agency's substantive interpretation of a statute is a reasonable one, and the procedural question of whether an agency provided an adequate explanation for its decision to switch from one statutory interpretation to another. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001 n.4 (2005) (noting that any inconsistency in an agency's explanation for changing course "bears on whether the [agency] has given a reasoned explanation for its current position, not on whether its interpretation is consistent with the statute"). To be sure, there are situations where the procedures by which an agency adopts a new statutory interpretation—including whether the agency provided a reasoned explanation for changing its position—may be relevant to whether a court should defer to an agency's interpretation of a statute. More specifically, when it is necessary for a court to interpret a statute committed to an agency's implementation, *Chevron* deference may be withheld if the agency failed to adequately explain why it shifted to its current interpretation. *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). But the *Chevron* framework is inapposite where a plaintiff directly challenges an agency rulemaking as violating *the APA*—as opposed to the statute that is being interpreted—because the agency arbitrarily departed from a prior statutory interpretation. When a plaintiff merely argues that an agency

in the first instance for the BIA to interpret § 1952 to authorize the Final Rule because Congress could not have intended to allow the agency to set standards applicable in state courts. But any such argument would simply be inconsistent with the Supreme Court's holdings in *Mourning* and related cases regarding the breadth of authority delegated by broadly worded rules-enabling statutes. Under these precedents, so long as a rule is reasonably related to the statute's purpose, it is not unreasonable to interpret the BIA's delegated authority to encompass it. *See Mourning*, 411 U.S. at 369. Moreover, Congress clearly considered it to be within *its* power to set standards applicable in child custody proceedings, as there is no dispute that many provisions of ICWA do precisely that. There is thus no reason to presume that Congress would implicitly exclude such authority from its broad authorization to the BIA to promulgate rules it deems necessary to ICWA's implementation.

violated the APA by not providing sufficient reasons for its change of position, it is unnecessary for a court to actually decide whether the new statutory interpretation is correct to resolve the question; indeed, an agency can violate the APA by switching to a statutory interpretation that is wholly *reasonable* under *Chevron* if it does so without providing an adequate explanation for the change. *See Brand X*, 545 U.S. at 1001 (stating that an agency "is free within the limits of reasoned interpretation to change course *if it adequately justifies the change*" (emphasis added)); 5 U.S.C. § 706(2)(A), (C) (calling for courts to *separately* evaluate whether an agency action is arbitrary and capricious and whether an agency action is in excess of statutory authority). And because there is no need to interpret the statute when the challenge is only to the adequacy of an agency's explanation for its changed position, there is no need to determine whether to defer to the agency's new interpretation under *Chevron*. JUDGE DUNCAN therefore errs by characterizing the question of whether the BIA provided an adequate explanation for its changed position as a component of *Chevron* step two.

Moreover, we disagree that the BIA failed to provide an adequate explanation for its change of course. "The mere fact that an agency interpretation contradicts a prior agency position is not fatal. Sudden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion. But if these pitfalls are avoided, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (internal citations and quotation marks omitted). The agency must provide a "reasoned explanation" for its new policy, but "it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "[I]t suffices that the new policy is permissible under the statute, that there are good reasons

for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

In the preamble to the Final Rule, the BIA directly addressed its reasons for departing from its earlier interpretation that it had no authority to promulgate binding regulations applicable in child custody proceedings. The agency explained that, contrary to its previous position that nothing in the text of the statute indicated a congressional intent to authorize such binding regulations, Supreme Court precedent established that the text of § 1952 conferred "a broad and general grant of rulemaking authority" and "presumptively authorize[s the] agenc[y] to issue rules and regulations addressing matters covered by the statute."    81 Fed. Reg. at 38,785 (collecting Supreme Court cases).  The BIA also justified its determination that ICWA granted it the authority to promulgate binding regulations based on having "carefully considered public comments on the issue" and, in light of this commentary, having reconsidered and rejected its statements in 1979 that it lacked such authority. *See id.* at 38,785-86.  And the BIA directly responded to the federalism concerns raised in 1979 and by present-day commentators. It explained that such concerns were misplaced because the Constitution conferred upon Congress plenary power over Indian affairs and that, when "a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *Id.* at 38,789 (internal quotation marks omitted) (quoting *New York*, 505 U.S. at 156).  Because Congress's plenary power authorized it to enact ICWA and because Congress had validly delegated authority to the BIA in § 1952 to implement ICWA, the agency determined that the Final Rule did not unconstitutionally encroach on state authority. *See id.*

Further, the BIA discussed why it now considered binding regulations necessary to implement ICWA: In 1979, the BIA "had neither the benefit of the *Holyfield* Court's carefully reasoned decision nor the opportunity to observe how a lack of uniformity in the interpretation of ICWA by State

courts could undermine the statute's underlying purposes." 81 Fed. Reg. at 38,787. In *Miss. Band of Choctaw Indians v. Holyfield*, the Supreme Court considered the meaning of the term "domicile" in 25 U.S.C. § 1911, which ICWA left undefined and the BIA left open to state interpretation under its 1979 Guidelines. 490 U.S. at 43, 51. "Section 1911 lays out a dual jurisdictional scheme" in which tribal courts have exclusive jurisdiction over custody proceedings concerning an Indian child "who resides or is domiciled within the reservation of" her tribe, whereas state courts have concurrent jurisdiction with tribal courts "in the case of children not domiciled on the reservation." *Id.* at 36. The Court held that "it is most improbable that Congress would have intended to leave the scope of the statute's key jurisdictional provision subject to definition by state courts as a matter of state law," given that "Congress was concerned with the rights of Indian families vis-à-vis state authorities" and considered "States and their courts as partly responsible for the problem it intended to correct" through ICWA. *Id.* at 45. Because Congress intended for ICWA to address a nationwide problem, the Court determined that the lack of nationwide uniformity resulting from varied state-law definitions of this term frustrated Congress's intent. *Id.*

The Court's reasoning in *Holyfield* applies with equal force here. Congress's concern with safeguarding the rights of Indian families and communities was not limited to § 1911 but rather extended to all provisions of ICWA. Thus, as the BIA explained, the provisions of ICWA that the statute left open to state interpretation in 1979, including many that Plaintiffs now challenge, were subject to the same lack of uniformity the Supreme Court identified as contrary to Congress's intent in *Holyfield*. 81 Fed. Reg. at 38,779, 38,782 (explaining that the result of "conflicting State-level" interpretations of ICWA "is that many of the problems Congress intended to address by enacting ICWA persist today"). In view of *Holyfield* and "37 years of real-world ICWA application," *id.* at 38,786, the BIA concluded that issuing binding rules for child custody proceedings was "necessary to carry

out the provisions" of ICWA, an authority that was included in Congress's broad grant of rulemaking authority under § 1952. The BIA thus supplied a "reasoned explanation" for reversing its earlier position on its need and authority to issue binding regulations, *Fox Television Stations*, 556 U.S. at 515.

JUDGE DUNCAN's belief that ICWA is inconsistent with principles of federalism suffuses his critique of the BIA's explanation for its change of interpretation. Because the BIA's prior interpretation was constitutionally permissible and its new interpretation is not, he appears to argue, Congress could not have intended the new interpretation, and whatever explanation the BIA provided for the change was therefore inadequate. *See* DUNCAN, CIRCUIT JUDGE, OP. at 120-22. For the reasons discussed above with respect to ICWA's statutory provisions, we disagree that the BIA's new interpretation of its § 1952 authority violates the Constitution. But more importantly, in judging the adequacy of the BIA's explanation, it does not necessarily matter whether the BIA's new interpretation is actually constitutional, nor even whether Congress in fact intended § 1952 to confer authority to promulgate rules that would be binding in state court proceedings. These questions are relevant only to whether the BIA's new interpretation of § 1952 is a substantively reasonable interpretation and a constitutional application of the statute, which, again, are separate questions from the procedural matter of whether the agency gave a sufficient explanation for its decision to change course.

When specifically examining whether an agency met the procedural requirement that it provide an adequate explanation, all that is necessary is a "minimal level of analysis" from which the agency's reasoning may be discerned, *Encino Motorcars*, 136 S. Ct. at 2125—regardless of whether the court finds the reasoning fully persuasive. In other words, the agency decision must simply be non-arbitrary. When an agency "display[s] awareness that it is changing position" and provides coherent reasons for doing so, the test is satisfied. *Id.* at 2126. Here, it is enough that the BIA

"*believe*[*d*]" its prior interpretation of § 1952 to be an incorrect reflection of Congressional intent and set forth its reasons for thinking so. *Fox Television Stations*, 556 U.S. at 515. The same is true for the BIA's reasoned determination that its issuance of binding regulations does not pose federalism problems. It does not matter to this inquiry whether a court thinks the agency's interpretation or legal analysis is incorrect, nor that a court disagrees with the agency's decision as a policy matter. *See id.*; *cf.* DUNCAN, CIRCUIT JUDGE, OP. at 123 (arguing that conflicting state court decisions were not numerous and long-standing enough to justify issuing regulations to enforce uniformity).

Contrary to Plaintiffs' contentions, the BIA explained why it changed its interpretation of § 1952 and why it believed the Final Rule was needed based on its years of study and public outreach. *See* 81 Fed. Reg. 38,778-79, 38,784-85. In promulgating the rule, the BIA relied on Supreme Court precedent, its own expertise in Indian affairs, its specific experience in administering ICWA and other Indian child-welfare programs, state interpretations and best practices,[66] public hearings, and tribal consultations. *See id.* Thus, the BIA's change of course was not "arbitrary, capricious, [or] an abuse of discretion" because it was not sudden and unexplained. *See Smiley*, 517 U.S. at 742; 5 U.S.C. § 706(a)(2). The district court's contrary conclusion was error.

### 3. The BIA's Construction of § 1915

Title 25 U.S.C. § 1915 sets forth preferences for the placement of Indian children unless good cause can be shown to depart from them. 25 U.S.C. § 1915(a)-(b). The 1979 Guidelines advised that the term "good cause" in § 1915 "was designed to provide state courts with flexibility in

---

[66] Since ICWA's enactment in 1978, several states have incorporated the statute's requirements into their own laws or have enacted detailed procedures for their state agencies to collaborate with tribes in child custody proceedings.

determining the disposition of a placement proceeding involving an Indian child." 44 Fed. Reg. at 67,584. However, § 23.132(b) of the 2016 Final Rule, now specifies that "[t]he party seeking departure from [§ 1915's] placement preferences should bear the burden of proving by clear and convincing evidence that there is 'good cause' to depart from the placement preferences." 25 C.F.R. § 23.132(b). The district court determined that Congress unambiguously intended the ordinary preponderance-of-the-evidence standard to apply and that the BIA's imposition of a higher standard was therefore not entitled to *Chevron* deference.

Defendants contend that the Final Rule's clarification of the meaning of "good cause" and imposition of a clear-and-convincing-evidence standard are entitled to *Chevron* deference. Plaintiffs respond that the Final Rule's fixed definition of "good cause" is contrary to ICWA's intent to provide state courts with flexibility.

We conclude that the BIA's interpretation of § 1915 is entitled to *Chevron* deference. For purposes of *Chevron* step one, the statute is silent with respect to which evidentiary standard applies. *See* 25 U.S.C. § 1915; *Chevron*, 467 U.S. at 842. The district court relied on the canon of *expressio unius est exclusio alterius* ("the expression of one is the exclusion of others") in deciding that Congress unambiguously intended that a preponderance-of-the-evidence standard was necessary to show good cause under § 1915. The court reasoned that, because Congress specified a heightened evidentiary standard in other provisions of ICWA but did not do so with respect to § 1915, Congress did not intend for the heightened clear-and-convincing-evidence standard to apply. This was error.

"When interpreting statutes that govern agency action, . . . a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion." *Catawba Cty. v. E.P.A.*, 571 F.3d 20, 36 (D.C. Cir. 2009) (internal quotation marks

omitted) (quoting *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990)); *accord In Defense of Animals v. United States Dep't of the Interior*, 751 F.3d 1054, 1066 n.20 (9th Cir. 2014) (same); *see also Texas Office Pub. Util. Counsel v. F.C.C.*, 183 F.3d 393, 443 (5th Cir. 1999) (noting that the *expressio unius* canon is of "limited usefulness . . . in the administrative context"). "[T]hat Congress spoke in one place but remained silent in another, as it did here, rarely if ever suffices for the direct answer that *Chevron* step one requires." *Catawba Cty. v. E.P.A.*, 571 F.3d at 36 (internal quotation marks and citation omitted); *see also Adriondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014) ("The *expressio unius* canon is a 'feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved.' " (quoting *Cheney R.R. Co.*, 902 F.2d at 68-69)); *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) ("Under *Chevron,* we normally withhold deference from an agency's interpretation of a statute only when Congress has directly spoken to the precise question at issue, and the *expressio* canon is simply too thin a reed to support the conclusion that Congress has clearly resolved this issue." (internal quotation marks and citations omitted)).

JUDGE DUNCAN argues that there is no indication that Congress intended to require a heightened standard of proof for § 1915. DUNCAN, CIRCUIT JUDGE, OP. at 125-26. But this misses the point. The question is not whether Congress intended to require a heightened standard, but rather whether it intended to *prohibit* one. The statute is silent as to the matter, and when "the statute is silent . . . with respect to the specific issue," we assume that Congress delegated the matter to agency discretion and proceed to *Chevron* step two.[67] *Chevron*, 467 U.S. at 842.

---

[67] This is why Plaintiffs' and Judged Duncan's references to *Grogan v. Garner*, 498 U.S. 279, 286 (1991), are inapposite. *Grogan* addressed the standard of proof that applied to exceptions from dischargability of debt in the Bankruptcy Code, *see id.,* a set of laws that

Under *Chevron* step two, the BIA's determination as to the applicable evidentiary standard is reasonable. *See Chevron*, 467 U.S. at 844. As stated, the broad grant of rule-making authority in § 1952 permits the BIA to enact rules that are not foreclosed by statute "so long as [they are] reasonably related to the purposes of the enabling legislation." *Mourning*, 411 U.S. at 36. The BIA's suggestion that the clear-and-convincing standard should apply was derived from the best practices of state courts. 81 Fed. Reg. at 38,843. The preamble to the Final Rule explains that, since ICWA's passage, "courts that have grappled with the issue have almost universally concluded that application of the clear and convincing evidence standard is required as it is most consistent with Congress's intent in ICWA to maintain Indian families and Tribes intact." *Id.* (citing, *inter alia*, *In re MKT*, 368 P.3d 771, 786 (Okla. 2016); *Gila River Indian Cmty. v. Dep't. of Child Safety*, 363 P.3d 148, 152-53 (Ariz. Ct. App. 2015); *In re Alexandria P.*, 228 Cal. App. 4th 1322, 1340 (Cal. Ct. App. 2014)). Because the BIA's interpretation of § 1915 as not prohibiting a heightened standard of proof is not inconsistent with the statutory provision, and because § 23.132(b) was based on the persuasive reasoning in state court decisions and is designed to further congressional intent, we conclude it is reasonable and entitled to *Chevron* deference.

In considering *Chevron* step two, JUDGE DUNCAN again blends the question of whether the BIA fulfilled the APA's procedural requirement that it provide an adequate explanation for changing the way it interprets a statute it administers—a claim the Plaintiffs have not raised with respect to § 23.132(b)—with the substantive question of whether it is reasonable to

---

courts are tasked with interpreting in the first instance. Congress had not delegated to an agency the authority to issue rules interpreting the Bankruptcy Code, and the *Grogan* court was therefore tasked with determining the best interpretation of the statutory provision, not simply whether a particular agency interpretation was reasonable. Thus, the *Grogan* Court's ruling that, under those circumstances, statutory silence suggested that the preponderance-of-the-evidence standard applied does not indicate that statutory silence prohibits an agency from applying a heightened evidentiary standard to the issue.

interpret the BIA's rulemaking authority to authorize the provision. DUNCAN, CIRCUIT JUDGE, OP. at 128. Though we disagree that the BIA failed to provide a reasoned explanation for its changed position, this is neither here nor there. Our precedents at most establish that, in a direct challenge to an agency rulemaking as beyond statutory authority, the agency's departure from longstanding practice justifies a more searching review at *Chevron* step two to determine whether the new position is reasonable. *See Chamber of Com. of United States of Am. v. United States Dep't of Labor*, 885 F.3d 360, 380 (5th Cir. 2018) (stating that we greet sudden claims that a long-standing statute grants sweeping new powers with "a measure of skepticism" (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014))). This is a different question from whether the agency provided an adequate explanation for shifting away from a longstanding interpretation.[68] And even if the BIA's explanation for changing course were insufficient, our caselaw does not indicate that such a deficiency inherently renders the agency's new interpretation an unreasonable construction of the statute. Plaintiffs have alleged only that § 23.132(b) is prohibited by § 1915. Thus, the sole issue is whether the regulation is permissible under ICWA. *See Chevron*, 467 U.S. at 842-43. The adequacy of the explanation for the BIA's new position is separate from, and immaterial to, this question.

JUDGE DUNCAN offers no argument as to why it is unreasonable to interpret § 1915 to permit the BIA to require the clear-and-convincing evidence standard beyond his reference to the *expressio unius* canon, which we have already found insufficient to foreclose the BIA's application of that standard. And because the BIA was reasonable in interpreting § 1915 not to

---

[68] To be sure, how long an agency adhered to a prior statutory interpretation may be a relevant consideration when a plaintiff does allege a procedural APA violation because an agency's explanation for a change of course must account for reliance interests engendered by its prior policy. *See Fox Television Stations, Inc.*, 556 U.S. at 515 (citing *Smiley*, 517 U.S. at 742). But Plaintiffs have not raised such a challenge to § 23.132(b).

prohibit a heightened standard of proof, we conclude that § 23.132(b) did not exceed the BIA's statutory authority. *See* 5 U.S.C. § 706(a)(2).

\* \* \*

For these reasons, we conclude as follows: First, Plaintiffs have standing to press their claims except as to §§ 1913(d) and 1914. Next, the en banc court holds that Congress was authorized to enact ICWA. We conclude that this authority derives from Congress's enduring obligations to Indian tribes and its plenary authority to discharge this duty. And, although the en banc majority decides otherwise as to some provisions and the en banc court is equally divided as to others, we would hold that none of ICWA's provisions violate the Tenth Amendment's anticommandeering doctrine. Thus, we would hold that ICWA validly preempts any conflicting state law, and we dissent from the en banc majority's decision to the extent it differs from this conclusion.

In addition, for the en banc court, we hold that ICWA's "Indian Child" designation and the portions of the Final Rule that implement it do not offend equal protection principles because they are based on a political classification and are rationally related to the fulfillment of Congress's unique obligation toward Indians, and we REVERSE the district court's determination to the contrary. And, though the en banc court is equally divided on the matter, we would likewise determine that ICWA's adoptive placement preference for "other Indian families," and its foster care placement preference for a licensed "Indian foster home," and the regulations implementing these preferences are consistent with equal protection.

We also hold for the en banc court that § 1915(c) does not contravene the nondelegation doctrine because the provision is either a valid prospective incorporation by Congress of another sovereign's law or a delegation of regulatory authority. We therefore REVERSE this aspect of the district court's ruling.

152

Further, we hold for the en banc court that the BIA acted within its statutory authority in issuing binding regulations, and we hold for the en banc court that the agency did not violate the APA when it changed its position on the scope of its authority because the agency provided a reasonable explanation for its new stance.  And we hold for the en banc court that the portions of the Final Rule that implement all parts of ICWA other than §§ 1912(d)-(f) and 1915(e) do not violate the APA. We thus REVERSE the district court's contrary conclusions.

Although a majority of the en banc court disagrees, we would also conclude that the portions of the Final Rule implementing §§ 1912(d)-(f) and 1915(e) are valid because these statutory provisions are constitutional, and we would hold that the provision of the Final Rule implementing § 1915's "good cause" standard is reasonable.  We thus dissent from the en banc majority's decision that these portions of the Final Rule are invalid.

Because we conclude that that the challenged provisions of ICWA are constitutional in all respects and that the Final Rule validly implements the statute, we would reverse the district court in full and render judgment in favor of Defendants on all claims.  We dissent from those portions of the en banc majority's decision that fail to do so.

STUART KYLE DUNCAN, *Circuit Judge*:[†]

We consider challenges to the Indian Child Welfare Act of 1978 ("ICWA"), 92 Stat. 3069, 25 U.S.C. §§ 1901–1963, and its implementing regulations, 81 Fed. Reg. 38,778 (June 14, 2016) ("The Final Rule").

ICWA is a federal law that regulates state foster-care and adoption proceedings involving Indian children. The law is challenged by three states, which claim it abridges their sovereignty, and by several couples seeking to adopt Indian children, who claim it unfairly blocks them from doing so. The case is one of first impression and raises many intricate issues. That should come as no surprise, given that "[t]he condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence . . . . marked by peculiar and cardinal distinctions which exist no where else." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16 (1831) (Marshall, C.J.); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.01 (2019) [hereinafter "COHEN'S"] ("The field of Indian law and policy is

---

[†] JUDGES SMITH, ELROD, WILLETT, ENGELHARDT, and OLDHAM join JUDGE DUNCAN's opinion in full. JUDGE JONES joins all except Parts III(A)(2) (equal protection as to "Indian child") and that portion of Part III(B)(2)(a) concerning preemption by the appointed counsel provision in 25 U.S.C. § 1912(d).

CHIEF JUDGE OWEN joins Part III(B) (anti-commandeering/preemption) and Part III(D)(3) ("good cause" standard in 25 C.F.R. § 23.132(b) violates APA). *See infra* OWEN, C.J., concurring in part and dissenting in part.

JUDGE SOUTHWICK joins Parts III(B)(1)(a)(i)–(ii) (anti-commandeering as to § 1912(d)–(f)); Part III(B)(2)(a) (preemption); Part III(B)(2)(b) (in part) (no preemption, only as to § 1912(d)–(f)); Part III(B)(2)(c) (in part) (preemption, except as to the discussion of § 1951(a)); and Part III(D)(1) (in part) (Final Rule violates APA to extent it implements § 1912(d)–(f)).

JUDGE HAYNES joins Part I (standing); Part III(A)(3) (equal protection as to "other Indian families"); Parts III(B)(1)(a)(i), III(B)(1)(a)(iv), III(B)(1)(a)(ii) (in part), III(B)(1)(b) (in part), and III(B)(2)(b) (in part) (anti-commandeering/preemption as to §§ 1912(d)–(e) and 1915(e)); Part III(D)(1) (in part) (Final Rule violates APA to extent it implements provisions found unconstitutional in those portions of Parts III(A) and (B) that JUDGE HAYNES joins); and Part III(D)(3) ("good cause" standard in 25 C.F.R. § 23.132(b) fails at *Chevron* step one). *See infra* HAYNES, J., concurring.

extraordinarily complex, rich, controversial, and diverse."). To guide the reader through our lengthy decision, we provide this summary.

First, we conclude ICWA exceeds Congress's power to the extent it governs state proceedings. Congress, to be sure, has "plenary" authority to legislate on Indian affairs. *United States v. Lara*, 541 U.S. 193, 200 (2004) (quoting *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989)). But ICWA does something that, to our knowledge, no federal Indian law has ever tried: it governs states' own administrative and judicial proceedings. That is an unheard-of exercise of the Indian affairs power, and neither Supreme Court precedent nor founding-era practice justifies it. And ICWA is all the more jarring because of its subject matter: domestic relations. That subject "belongs to the laws of the states, and not to the laws of the United States," and is "one in regard to which neither the congress of the United States, nor any authority of the United States, has any special jurisdiction." *Ex parte Burrus*, 136 U.S. 586, 594 (1890). And yet ICWA co-opts the states to create, in essence, a federal adoption system for Indian children. The Constitution does not empower Congress to do that. To say otherwise would mock "our federal system, [in which] the National Government possesses only limited powers [and] the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854 (2014).

Second, in the alternative, we conclude many parts of ICWA are unconstitutional or unlawful. ICWA's unequal standards for "Indian children" and "Indian families" violate the Fifth Amendment's equal protection guarantee by failing to rationally link children to tribes. Many provisions commandeer states by conscripting their agencies, officials, and courts into a federal regulatory program. Another provision delegates to Indian tribes the power to change enacted federal law setting child placement preferences. Declaratory relief is proper as to those provisions. Finally, a 2016 rule implementing ICWA violates the Administrative Procedure Act by

exceeding the agency's authority over state courts. To that extent, the rule must be declared unlawful.

Our decision does not affect all of ICWA. Some provisions do not govern state proceedings—such as those giving tribes exclusive jurisdiction over on-reservation children, those permitting states and tribes to adjust their jurisdictions, and those granting funds for tribal programs. These provisions are not challenged here and do not fall within our decision. With that qualification, we affirm the district court's judgment declaring parts of ICWA and the Final Rule unconstitutional and unlawful.

### TABLE OF CONTENTS

BACKGROUND ................................................................................... 4

  I.    Indian Child Welfare Act ..................................................... 4

  II.   Final Rule .............................................................................. 7

  III.  Parties ................................................................................... 9

  IV.  District Court Proceedings.................................................11

STANDARD OF REVIEW .................................................................13

DISCUSSION ....................................................................................13

  I.    Article III Standing.............................................................13

  II.   Challenge to Congress's Power to Enact ICWA............. 21

  III.  Challenges to Specific ICWA Provisions ........................52

    A.   Fifth Amendment Equal Protection ..............................53

    B.   Commandeering and Preemption...................................69

       1.    Commandeering.......................................................73

       2.    Preemption...............................................................88

C.    Nondelegation ............................................................... 100

D.    Administrative Procedure Act...................................... 109

E.    Remedy ........................................................................... 121

## Background

## I. Indian Child Welfare Act

In 1978, Congress enacted ICWA out of concern that too many Indian children were being unjustifiably removed from their families and adopted by non-Indians. Specifically, Congress found that "an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children [were being] placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(4). Congress also found that "the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, ha[d] often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." § 1901(5). ICWA therefore set "minimum Federal standards" for removing Indian children and placing them in foster and adoptive homes "which will reflect the unique values of Indian culture." § 1902. These standards sought "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." *Id.* As authority for the law, Congress invoked its "plenary power over Indian affairs," grounded in the Indian Commerce Clause and "other constitutional authority." § 1901(1); *see* U.S. Const. art. I, § 8, cl. 3 (vesting Congress with "Power . . . [t]o regulate Commerce . . . with the Indian Tribes").

4

ICWA applies to a "child custody proceeding" involving an "Indian child." § 1903(1), (4).[1] Such proceedings include foster care placements, terminations of parental rights, and preadoptive and adoptive placements. § 1903(1)(i)–(iv). If a proceeding involves an Indian child living on a tribe's reservation, the tribe has exclusive jurisdiction. § 1911(a). For off-reservation Indian children, state courts exercise concurrent jurisdiction with tribal courts, but must transfer a proceeding to tribal jurisdiction upon request of either parent or the child's tribe, absent good cause or a parent's objection. § 1911(b); *see also Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 162 (Tex. App.—Houston [14th Dist.], Aug. 24, 1995, pet. denied) (explaining "state courts may exercise jurisdiction concurrently with the tribal courts" in proceedings involving off-reservation children).

For proceedings remaining under state jurisdiction, ICWA imposes numerous requirements. For instance, a party seeking foster placement, or termination of parental rights, must notify the Indian child's parent and tribe of that party's "right to intervene." §§ 1911(c), 1912(a).[2] Indigent parents have the "right to court-appointed counsel." § 1912(b). Any party has "the right to examine all reports or other documents filed with the court[.]" § 1912(c). To prevail, the party seeking placement or termination must prove that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" and "have proved unsuccessful." § 1912(d). The party must also offer evidence, "including testimony of qualified expert witnesses," that the

---

[1] An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." § 1903(4).

[2] The Secretary of the Interior must be notified if the parent or custodian cannot be found. § 1912(a).

parent's continued custody will likely cause the child "serious emotional or physical damage." § 1912(e)–(f). Proof must be by "clear and convincing evidence" for foster placement, § 1912(e), and "beyond a reasonable doubt" for termination, § 1912(f).

If parents voluntarily consent to a placement or to termination of rights, they can withdraw consent "at any time" before the process ends. § 1913(b)–(c). Following an adoption, the birth parents may withdraw consent based on fraud or duress for up to two years. § 1913(d). A child, parent, or tribe may also sue to invalidate the placement or termination for any violation of §§ 1911, 1912, or 1913. § 1914.

ICWA also dictates where Indian children may be placed. In adoptions governed by state law, an Indian child must be placed, absent "good cause," with "(1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." § 1915(a). Similarly, in foster or pre-adoptive placements, an Indian child must be placed (again, absent good cause) with: (1) extended family; (2) a foster home "licensed, approved, or specified" by the tribe; (3) a licensed "Indian foster home"; or (4) an "institution for children" either tribe-approved or operated by a suitable Indian organization. § 1915(b)(i)–(iv). In any case, the child's tribe may "establish a different order of preference by resolution," which the "agency or court effecting the placement shall follow," provided "the placement is the least restrictive setting appropriate to the particular needs of the child." § 1915(c). The "State" must maintain a record of an Indian child's placement that "evidenc[es] the efforts to comply with the order of preference specified in [§ 1915]" and that "shall be made available at any time upon request of the Secretary or the Indian child's tribe." § 1915(e).

ICWA also requires state courts to maintain and transmit various records. For instance, upon request of an adopted Indian eighteen or older, a

court must provide "the tribal affiliation, if any, of the individual's biological parents and . . . such other information as may be necessary to protect any rights flowing from the individual's tribal relationship." § 1917. Additionally, a state court must provide the Secretary with a copy of a final adoption decree "together with such other information as may be necessary to show" various matters. § 1951(a).[3]

Finally, ICWA contains a severability clause providing that, "[i]f any provision . . . or the applicability thereof is held invalid, the remaining provisions . . . shall not be affected thereby." § 1963.[4]

## II. Final Rule

In 1979, the Bureau of Indian Affairs ("BIA") promulgated guidelines (the "1979 Guidelines") to assist state courts in applying ICWA. *See* 44 Fed. Reg. 67,584 (Nov. 26, 1979); *see also* 25 U.S.C. § 1952 (authorizing Secretary of Interior to "promulgate such rules and regulations . . . necessary" to implement ICWA). The 1979 Guidelines were "not intended to have binding legislative effect." 44 Fed. Reg. at 67,584. BIA found nothing in ICWA or its legislative history to suggest that Congress intended the Department to exercise "supervisory authority" over courts deciding Indian child-custody matters. *Id.* Such authority would be "so at odds with concepts of both

---

[3] Those matters are: (1) the child's name and tribal affiliation, (2) the names and addresses of biological parents, (3) the names and addresses of adoptive parents, and (4) "the identity of any agency having files or information relating to such adoptive placement." § 1951(a)(1)–(4); *see also* 25 C.F.R. §§ 23.140–141 (additional recordkeeping requirements applicable to both courts and agencies).

[4] ICWA contains other provisions unrelated to state child-custody proceedings, such as provisions permitting jurisdictional agreements between states and Indian tribes (§ 1919); provisions addressing the Secretary's approval of tribal re-assumption of jurisdiction (§ 1918); and provisions concerning grants and funding for tribal child and family programs (§§ 1931–1933). As explained *infra* III(E), our decision does not affect these provisions.

federalism and separation of powers that it should not be imputed to Congress in the absence of an express declaration of Congressional intent to that effect." *Id.* Rather, "[p]rimary responsibility" for interpreting ICWA "rests with the courts that decide Indian child custody cases." *Id.* In particular, the Guidelines mentioned the "good cause" standard, which was "designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.*; *see* § 1915(a)–(b).

In 2016, BIA changed course and promulgated new regulations (the "Final Rule") that "set binding standards for Indian child-custody proceedings in State courts." 81 Fed. Reg. 38,778, 38,785 (June 14, 2016). BIA stated it "no longer agrees with statements it made in 1979 suggesting that it lacks the authority to issue binding regulations." *Id.* at 38,786. It now found binding standards "necessary," *see* § 1952, given "divergent interpretations of ICWA provisions by State courts and uneven implementation by State agencies." 81 Fed. Reg. at 38,787. In particular, the new regulations restrict what constitutes "good cause" to depart from ICWA's placement preferences. *See id.* at 38,843–47. The "good cause" standard, the new regulations assert, is not determined by the "best interests of the child" but is instead "a limited exception" to the preferences. *Id.* at 38,847. Accordingly, the new regulations limit "good cause" to five factors. *See* 25 C.F.R. § 23.132(c). Moreover, the party seeking departure "should" bear the burden of proving good cause "by clear and convincing evidence." *Id.* § 23.132(b). BIA acknowledged that the clear-and-convincing standard "is not articulated in section 1915," but asserted courts have "almost universally concluded" it is the right standard. 81 Fed. Reg. at 38,843. Finally, BIA explained the Final Rule only "advises" that the standard "'should' be followed," but "does not categorically require that outcome" and "declines to establish a uniform standard of proof on this issue." *Id.*

8

### III. Parties

### A. Plaintiffs

Plaintiffs are the states of Texas, Louisiana, and Indiana (collectively, the "State Plaintiffs"), and seven individual plaintiffs—Chad and Jennifer Brackeen (the "Brackeens"), Nick and Heather Libretti (the "Librettis"), Altagracia Socorro Hernandez ("Hernandez"), and Jason and Danielle Clifford (the "Cliffords") (collectively, "Individual Plaintiffs").[5]

#### 1. *A.L.M., Y.R.J., and the Brackeens*

In 2015, A.L.M. was born in New Mexico to unmarried parents. His biological mother is a member of the Navajo Nation and his biological father is a member of the Cherokee Nation. Soon after birth, his mother brought A.L.M. to live in Texas with his paternal grandmother. The Child Protective Services Division ("CPS") of the Texas Department of Family and Protective Services ("DFPS") removed A.L.M. when he was 10 months old and placed him in foster care with the Brackeens. In 2017, his biological parents voluntarily terminated their rights to A.L.M. and, along with his guardian *ad litem*, supported the Brackeens' adoption petition. At the adoption hearing, representatives of the Navajo and Cherokee Nations agreed to designate Navajo as A.L.M.'s tribe because the Navajo had located an alternate placement with non-family tribal members in New Mexico. The Texas family court denied the Brackeens' petition, concluding they failed to prove by clear and convincing evidence good cause to depart from ICWA's placement preferences. The DFPS announced its intention to remove A.L.M. from their care and transfer him to the Navajo family. The Brackeens

---

[5] References to "Plaintiffs" include both State Plaintiffs and Individual Plaintiffs.

9

obtained an emergency stay and filed this lawsuit. The proposed Navajo placement then withdrew, and the Brackeens finalized A.L.M.'s adoption.

The Brackeens are now engaged in Texas state court proceedings to adopt A.L.M.'s half-sister, Y.R.J., who was born in June 2018 to A.L.M.'s biological mother. The Navajo Nation again opposes the Brackeens' petition to adopt Y.R.J. based on ICWA's placement preferences. The proceedings are ongoing. *See In re Y.J.*, No. 02-19-235-CV, 2019 WL 6904728, at *1 (Tex. App.—Fort Worth, Dec. 19, 2019, pet. filed) (remanding for further proceedings).

### 2. *Baby O., Hernandez, and the Librettis*

In 2016, Baby O. was born in Nevada to plaintiff Hernandez, a non-Indian. Her biological father, E.R.G., is descended from members of the Ysleta del sur Pueblo Tribe ("Pueblo") but was not an enrolled member when Baby O. was born. With E.R.G.'s support, Hernandez decided to have the Librettis adopt Baby O., who accompanied the Librettis home three days after her birth. The Pueblo Tribe intervened in the Nevada custody proceedings and identified numerous alternative Indian-family placements for Baby O. under ICWA. After the Librettis joined this lawsuit, however, the tribe withdrew its objections and the Librettis finalized Baby O.'s adoption in late 2018.

### 3. *Child P. and the Cliffords*

Born in 2011 in Minnesota, Child P. was placed in foster care in 2014 when her biological parents were arrested and charged with various drug-related offenses. For two years Child P. moved from placement to placement until Minnesota terminated her mother's rights and placed her with the Cliffords in 2016, who have since sought to adopt her. Child P.'s maternal grandmother, R.B., is a member of the White Earth Band of the Ojibwe Tribe (the "White Earth Band"). After Child P. initially entered foster care in

2014, the White Earth Band notified the court that she was ineligible for membership. After Child P. was placed with the Cliffords, however, the tribe changed its position, notified the court that Child P. was eligible for membership, and has since announced that Child P. is a member. As a result, Minnesota removed Child P. from the Cliffords and placed her with R.B. in 2018. The state trial court concluded that the Cliffords had not established "good cause" to deviate from ICWA's preferences by "clear and convincing evidence," a decision since affirmed on appeal. *See In re S.B.*, No. A19-225, 2019 WL 6698079, at *6 (Minn. Ct. App. Dec. 9, 2019). Child P.'s adoption, however, has not been finally approved; until it is, the Cliffords remain eligible to adopt her.

### B. Defendants

Defendants are the United States of America and various federal agencies and officials, referred to collectively as the "Federal Defendants."[6] Shortly after this suit was filed, the Cherokee Nation, Oneida Nation, Quinault Indian Nation, and Morongo Band of Mission Indians (collectively, the "Tribal Defendants") were allowed to intervene as defendants. On appeal, we granted the Navajo Nation's motion to intervene as a defendant.[7]

### IV. District Court Proceedings

Plaintiffs sued in federal district court seeking injunctive relief and a declaration that ICWA and the Final Rule violate various provisions of the

---

[6] Specifically, they are the United States Department of the Interior and its Secretary Deb Haaland, in her official capacity; the BIA and its Acting Assistant Secretary for Indian Affairs Darryl LaCounte, in his official capacity; and the United States Department of Health and Human Services and its Secretary Xavier Becerra, in his official capacity.

[7] References to "Defendants" include both Federal Defendants and Tribal Defendants.

Constitution and the APA. Defendants moved to dismiss for lack of standing. The district court denied the motion, finding that at least one Plaintiff had standing to bring each claim. Plaintiffs then moved for summary judgment on all their claims, which the district court granted in part and denied in part. *See Brackeen v. Zinke*, 338 F. Supp. 3d 514 (N.D. Tex. 2018).

First, the district court ruled that ICWA discriminates on the basis of a racial classification that fails to satisfy strict scrutiny and therefore violates the Fifth Amendment's equal protection component. Second, the court ruled that ICWA's provision empowering Indian tribes to re-order placement preferences improperly delegates federal legislative power. Third, the court ruled that various provisions of ICWA "commandeer" state agencies, officials, and courts in violation of Article I and the Tenth Amendment and do not validly preempt conflicting state laws. Fourth, the court ruled that various provisions of the Final Rule violate the APA. Finally, the court ruled that ICWA as a whole exceeds Congress's power under the Indian Commerce Clause.[8] The court's final judgment therefore declared certain provisions of ICWA and the Final Rule unconstitutional.[9]

On appeal, a panel of our court reversed the district court on all grounds. *Brackeen v. Bernhardt*, 937 F.3d 406 (5th Cir. 2019). JUDGE OWEN dissented in part. *Id.* at 441–46 (OWEN, J., dissenting in part). We granted *en banc* rehearing. *Brackeen v. Bernhardt*, 942 F.3d 287 (2019).

---

[8] The court denied summary judgment on Plaintiffs' Fifth Amendment claim based on parents' fundamental rights to "make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57 (2000). The court reasoned those rights had never been extended to foster families, prospective adoptive parents, or "adoptive parents whose adoption is open to collateral attack." *Brackeen*, 338 F. Supp. 3d at 546. Plaintiffs have not appealed that ruling.

[9] Specifically, it declared unconstitutional 25 U.S.C. §§ 1901–23 and 1951–52, as well as 25 C.F.R. §§ 23.106–22, 23.124–32, and 23.140–41.

## STANDARD OF REVIEW

"We review a grant of summary judgment *de novo*, applying the same standard as the district court." *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 504 (5th Cir. 2018) (citation omitted). "We review *de novo* the constitutionality of federal statutes." *United States v. McGinnis*, 956 F.3d 747, 752 (5th Cir. 2020) (citation omitted). We must set aside final agency action under the APA if "such action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting 5 U.S.C. § 706(2)(A)).

## DISCUSSION

We proceed as follows. First, we address whether Plaintiffs have Article III standing to assert their claims, and conclude they do (*infra* I). Next, we address whether ICWA exceeds Congress's constitutional power over Indian affairs (*infra* II). Agreeing with the district court in part, we conclude that ICWA exceeds Congress's power to the extent it governs state child-custody proceedings. Alternatively (*infra* III), we address the court's holdings that parts of ICWA and the Final Rule violate the Fifth Amendment equal protection guarantee (III(A)); the anti-commandeering and preemption doctrines (III(B)); the nondelegation doctrine (III(C)); and the APA (III(D)). Concluding that parts of ICWA and the Final Rule are unconstitutional or unlawful on those grounds, we then address the appropriate remedy (III(E)).

### I. Article III Standing

We first address whether Plaintiffs have Article III standing. The district court ruled they did, concluding that the State Plaintiffs had standing to assert claims that ICWA exceeds Congress's power, commandeers states, and violates the nondelegation doctrine; that the Individual Plaintiffs had

13

standing to assert equal protection claims; and that all Plaintiffs had standing to challenge the Final Rule under the APA.

We review standing *de novo*. *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). Article III standing requires plaintiffs to show an injury traceable to defendants' conduct that a judicial decision would likely redress. *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Texas v. United States*, 945 F.3d 355, 374 (5th Cir. 2019) (standing requires "injury, causation, and redressability") (citation omitted). At least one plaintiff must have standing "for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

## A.

The claims that ICWA exceeds Congress's power, commandeers states, and improperly delegates legislative power are, in essence, claims that ICWA encroaches on states' prerogatives to administer child-custody proceedings. State Plaintiffs have standing to bring these claims, which assert injuries unique to states, caused by the Federal Defendants' administration of ICWA, and redressable by a favorable decision.

We have found that states "may have standing based on (1) federal assertions of authority to regulate matters [states] believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (citations omitted), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016)

14

(Mem.).[10] Those principles easily encompass State Plaintiffs' claims that ICWA hijacks their child-custody machinery and improperly supplants their child-custody standards, either directly or by delegation to tribes. They also explain why State Plaintiffs have standing to assert under the APA that the Final Rule improperly issued regulations purporting to bind state administration of child-custody proceedings. *See id.* at 151–54 (holding federal statute may afford states standing to vindicate injury to their "quasi-sovereign" interests) (citing *Massachusetts v. EPA*, 549 U.S. 497, 518–20 (2007)); *Texas*, 945 F.3d at 384 (states have standing to challenge statute infringing sovereign interest in "applying their own laws and policies"); *see also* 5 U.S.C. § 702 (affording right of judicial review to persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action").[11]

## B.

The equal protection claims assert ICWA and the Final Rule wrongly discriminate against Indian children and non-Indian families. The Individual Plaintiffs claim this unequal treatment permeates the law and regulations, beginning with the threshold definition of "Indian child." *See* 25 U.S.C.

---

[10] *See also Tex. Office of Pub. Util. Council v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) ("States have a sovereign interest in 'the power to create and enforce a legal code.'") (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)).

[11] Defendants contest State Plaintiffs' standing to bring a nondelegation challenge to § 1915(c), which allows tribes to vary ICWA's placement preferences. Defendants say any injury is speculative because no evidence shows that a tribally-reordered preference has affected proceedings in the plaintiff states. *See Lujan*, 504 U.S. at 560 (injury must be "actual or imminent, not conjectural or hypothetical" (internal quotation marks omitted)). We disagree. As State Plaintiffs note, one Texas tribe, the Alabama-Coushatta, has filed its reordered preferences with the Texas DFPS. The claimed injury from § 1915(c) is thus sufficient to support standing. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'") (cleaned up).

§ 1903(4). They claim the placement preferences for Indian children, § 1915(a)–(b), "impose a naked preference for 'Indian families' over families of any other race," and make non-Indians show "good cause" to depart from them, *id.* They claim the collateral attack provisions, §§ 1913(d) and 1914, make their adoptions of Indian children more vulnerable to being overturned. Finally, they claim the Final Rule implementing these provisions adds to their injuries.[12] The State Plaintiffs assert similar claims on behalf of "children in their care," alleging ICWA and the Final Rule "require [their] agencies and courts" to "carry out the racially discriminatory policy objectives of [ICWA]" and to expend "resources and money" in doing so. All Plaintiffs seek a declaration that §§ 1913(d), 1914, and 1915 are unconstitutional and an injunction prohibiting the Federal Defendants from implementing those sections "by regulations, guidelines, or otherwise." They also seek declaratory relief and an injunction prohibiting the Federal Defendants from enforcing funding mechanisms tied to states' compliance with ICWA. *See* 42 U.S.C. §§ 622(b)(9), 677(b)(3)(G).

We agree with the district court that the Individual Plaintiffs have standing to challenge ICWA and the Final Rule.[13] As persons seeking to adopt Indian children, the Individual Plaintiffs are "objects" of the contested provisions, and the "ordinary rule" is that they have standing to challenge them. *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264–266 (5th Cir. 2015) (quoting *Lujan*, 504 U.S. at 561). Their adoptions have been burdened, in various ways, by ICWA's unequal treatment of non-Indians.

---

[12] *See, e.g.*, 25 C.F.R. §§ 23.129–32 (implementing preferences); *id.* § 23.132(b) (party seeking departure from preferences must prove "good cause" by "clear and convincing evidence"); *id.* §§ 23.136–37 (implementing collateral attack provisions).

[13] We therefore need not consider whether the State Plaintiffs have standing to bring equal protection claims on behalf of Indian children in their care.

For instance, the Brackeens' adoption of A.L.M. was hampered and delayed by the preferences,[14] burdens they are again suffering in trying to adopt A.L.M.'s half-sister, Y.R.J. *See Y.J.*, 2019 WL 6904728, at *5 (noting the Navajo seek "a judgment that Y.J. be placed in accordance with ICWA preferences"). Moreover, the Brackeens' adoption of A.L.M. (and Y.R.J. too, if successful) will be open to collateral attack under ICWA.[15] Similarly, the Cliffords' attempt to foster Child P. has been thwarted by the pre-adoptive preferences—they failed to show good cause to depart by "clear and convincing evidence"—and they will be hampered by the adoptive

---

[14] Defendants argue that, because the Brackeens' adoption of A.L.M. was completed in January 2018, their claims regarding A.L.M. are moot. We disagree. The situation falls within the "capable of repetition, yet evading review" exception to mootness because (1) A.L.M.'s adoption was "in its duration too short to be fully litigated prior to [its being settled]"; and (2) given the Brackeens' announced intent to adopt other Indian children, "there was a reasonable expectation that [they] would be subjected to the same action again." *Kucinich v. Tex. Democratic Party*, 563 F.3d 161, 164 (5th Cir. 2009) (citation omitted). JUDGE WIENER's partial dissent argues neither prong applies. As to prong one, he contends the Brackeens "could have litigated their ICWA challenges in state court during A.L.M.'s July 2017 adoption proceedings, long before" the district court's October 2018 judgment. WIENER OP. at 5 n.18. We disagree. The Brackeens *were* contesting the preferences during the state proceedings, but those proceedings were settled in December 2017 due to the fortuity that the Navajo placement "was no longer available" and no others materialized. As to the second prong, JUDGE WIENER contends the Brackeens' "stated reluctance to adopt other Indian children was too vague." *Id.* We disagree. The Brackeens needed to show only a "reasonable expectation" they would again face ICWA's burdens. *Kucinich*, 563 F.3d at 164. They did so by alleging they "intend[ed]" to foster and adopt other Indian children, and then by supplementing the record to document their effort to adopt Y.R.J., beginning with their letter to the state agency in September 2018. *See, e.g.*, *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 463 (2007) (second prong satisfied when plaintiff "credibly claimed that it planned" to engage in similar activity subject to prior regulation).

[15] Specifically, the Brackeens' adoption of A.L.M. remains open to attack under § 1914, and their prospective adoption of Y.R.J. would be open to attack under both §§ 1913(d) and 1914. Unlike § 1913(d), which allows a collateral attack based on fraud or duress only for two years after the adoption, § 1914 specifies no time frame for a collateral attack based on a claimed violation of any provision of §§ 1911–1913.

preferences in their planned adoption of Child P. If the Brackeens and the Cliffords were Indians, or if the children they sought to adopt were non-Indians, none of these obstacles would exist.

Those unequal burdens are injuries-in-fact for equal protection purposes. An equal protection injury consists in "[d]iscriminatory treatment at the hands of the government." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012) (alteration in original).[16] If plaintiffs show such disparate treatment, then "no further showing of suffering based on that unequal positioning is required for purposes of standing." *Time Warner*, 667 F.3d at 636; *see also Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."). The Individual Plaintiffs have made that showing here.[17] And their injuries

---

[16] *See also Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017) (explaining "the gravamen of an equal protection claim is differential governmental treatment"); *Contender Farms*, 779 F.3d at 266 ("An increased regulatory burden typically satisfies the injury in fact requirement.") (citation omitted).

[17] The Federal Defendants argue no Plaintiff has standing to challenge the collateral attack provisions because it is "speculative" whether any such attack will occur. We disagree. The injury arises from those provisions' unequal treatment of the adoptions, not from any collateral attack itself. That injury is concrete, "irrespective of whether the plaintiff[s] will sustain an actual or more palpable injury as a result of the unequal treatment." *Time Warner*, 667 F.3d at 636 (citation omitted). We disagree with JUDGE DENNIS that this injury is not imminent under *Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017). DENNIS OP. at 41–42. There, plaintiffs brought equal protection claims against a Mississippi law that protected persons holding traditional beliefs about marriage, sexual relations, and sex from discriminatory state action in specified areas, such as licensing or celebrating marriages. *Barber*, 860 F.3d at 351. We held plaintiffs lacked a "certainly impending" injury because they had not alleged they "plan[ned] to engage" in any conduct covered by the statute. *Id.* at 357. Although one plaintiff did "stat[e] his intention to marry," he did not allege that he was seeking marriage-related services from someone who might refuse or "even that he intended to get married in Mississippi." *Id.* The Brackeens

are traceable, in part, to the Federal Defendants' implementing ICWA through the Final Rule and to their inducing state officials to apply ICWA through the leverage of child welfare funds. *See K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (traceability requires only that defendants "significantly contributed" to injury); *see also Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (causation "doesn't require a showing . . . that the defendant's actions are the very last step in the chain of causation" and "isn't precluded where the defendant's actions produce a determinative or coercive effect upon the action of someone else") (quoting *Bennett v. Spear*, 520 U.S. 154, 167, 169 (1997)) (internal quotation marks omitted).

Finally, our decision would redress the Individual Plaintiffs' injuries. Redressability means a decision's "practical consequences" would "significant[ly] increase . . . the likelihood" of relief. *Utah v. Evans*, 536 U.S. 452, 464 (2002). "The relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Cmtys. Project*, 946 F.3d at 655 (citation omitted); *see also Dep't of Tex., Veterans of the Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 432 (5th Cir. 2014) (en banc) (a decision need only relieve "a [plaintiff's] discrete injury," not his "*every* injury") (citation omitted). Here, the requested relief would redress the Individual Plaintiffs' injuries in numerous ways. For instance, it would make overcoming ICWA's preferences easier, because the Individual Plaintiffs would no longer have to justify departure "by clear and convincing

---

are in a different position. Unlike the *Barber* plaintiffs, the Brackeens *have* engaged in conduct covered by §§ 1913 and 1914—adopting Indian children—and their adoptions are *now* vulnerable to collateral attack, unlike adoptions of non-Indian children. That "[d]iscriminatory treatment at the hands of the government" is a present injury-in-fact, regardless of whether "an actual or more palpable injury" will later materialize in the form of a collateral attack. *Time Warner*, 667 F.3d at 636.

evidence." 25 C.F.R. § 23.132(b) (implementing § 1915(a)–(b)). It would also remove state child welfare officials' obligations to implement the preferences, efforts "critical to the success of the . . . preferences." 81 Fed. Reg. at 38,839; *see also infra* III(B)(1)(a)(iii) (discussing state officials' required assistance with finding preferred placements). Additionally, Federal Defendants would be barred from inducing state officials to implement ICWA, including the preferences, by withholding funding.[18] Finally, the requested relief would make the adoptions less vulnerable to being overturned: it would declare unenforceable the collateral attack provisions themselves (§§ 1913(d), 1914), the underlying grounds for invalidity (§§ 1911–1913), as well as the implementing regulations (25 C.F.R. §§ 23.136–137). So, while a favorable decision would not guarantee the success of the Individual Plaintiffs' adoptions, its "practical consequences" would "lessen" their "discrete injur[ies]" caused by ICWA's unequal treatment of Indian children and non-Indian families. *Evans*, 536 U.S. at 464; *Inclusive Cmtys. Project*, 946 F.3d at 655; *Dep't of Tex., Veterans of Foreign Wars of the U.S.*, 760 F.3d at 432.[19] That is enough to satisfy redressability.

---

[18] *See* 42 U.S.C. § 622(b)(9) (to qualify for Title IV-B funds, a state's child welfare plan must describe "the specific measures taken by the State to comply with the Indian Child Welfare Act"); *id.* § 624(a) (authorizing HHS Secretary to pay child welfare funds to a state "that has a plan developed in accordance with section 622"); *see also* 45 C.F.R. §§ 1355.34(b)(2)(ii)(E), 1355.36 (HHS regulations authorizing withholding of Title IV-B and Title IV-E funds based on, *inter alia*, failure to comply with ICWA).

[19] Redressability does not turn on whether our decision would determine the outcome of the Brackeens' adoption of Y.R.J. So, we need not address JUDGE COSTA's view that redressability may never depend on the impact of a federal decision on a state court. *See* COSTA OP. at 3–11. We note that JUDGE COSTA concedes the Brackeens have standing to bring APA claims because "a declaratory judgment against the Interior Secretary would bind her when it comes to enforcing the department's challenged regulations." *Id.* at 9 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992)). We agree. Consider, though, that one ground for the Brackeens' APA claims is that the Final Rule implements ICWA provisions that violate their equal protection rights. Thus, to decide

## II. Challenge to Congress's Power to Enact ICWA

We first consider whether ICWA is unconstitutional because Congress lacks power to regulate state child-custody proceedings involving Indian children. The district court held ICWA exceeds Congress's power. The panel reversed, reasoning that "the Indian Commerce Clause grants Congress plenary power over Indian affairs." *Brackeen*, 937 F.3d at 434 (citing *Lara*, 541 U.S. at 200). On *en banc* rehearing, Defendants continue to defend ICWA as a valid exercise of Congress's "plenary and exclusive authority over Indian affairs," derived from the Indian Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, and the Treaty Clause, art. II, § 2, cl. 2, as well as "preconstitutional powers."

We agree with Defendants that Congress has ample power to legislate respecting Indians, and also that the Supreme Court has described that power in broad terms that go beyond trade. We cannot agree, however, that Congress's authority is broad enough to justify ICWA's intrusion on state child-custody proceedings. To the contrary, the Supreme Court has warned that an exercise of Congress's Indian power that "interfere[s] with the power or authority of any State" would mark a "radical change[] in tribal status." *Lara*, 541 U.S. at 205. ICWA presents precisely such an interference with state authority. We therefore hold that, to the extent ICWA governs child-custody proceedings under state jurisdiction, it exceeds Congress's power.[20]

---

that APA claim, we would in any event have to address whether the relevant parts of ICWA violate equal protection. *See* 5 U.S.C. § 706(2)(B) (courts may "hold unlawful and set aside agency action . . . contrary to constitutional right"); *see also Tex. Office of Pub. Utility Counsel*, 183 F.3d at 410 ("The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making.") (citation omitted).

[20] We reject Defendants' argument that this issue is not before us because the district court did not rule on it. To the contrary, the district court ruled on the issue of

21

## A.

In urging us to uphold ICWA, Defendants rely heavily on two propositions: that Congress's Indian affairs power goes beyond commerce with tribes and that the power is "plenary and exclusive." We therefore consider at the outset whether those propositions, of their own force, justify ICWA. They do not. Both propositions are true as far as they go, but relying on them to uphold ICWA would set virtually no limit on Congress's authority to override state sovereignty and control state government proceedings.

Defendants are correct that, under binding Supreme Court precedent, Congress's authority to legislate on Indian affairs extends beyond regulating commerce with Indian tribes. Despite their textual proximity, the Indian Commerce Clause has a "very different application[]" from the Interstate Commerce Clause. *Cotton Petroleum Corp.*, 490 U.S. at 192. "[T]he central function of the Indian Commerce Clause," the Court has explained, "is to provide Congress with plenary power to legislate in the field of Indian affairs." *Id.* (citing *Morton v. Mancari*, 417 U.S. 535, 551–52 (1974); COHEN'S at 207–08 & nn.2, 3, 9–11 (1982)). Longstanding patterns of federal legislation bear this out. For example, in addition to commercial fields like land[21] and mineral development,[22] Congress has enacted Indian-related

---

congressional authority as a necessary part of Defendants' preemption claims. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1479 (2018) (preemption requires considering, first, whether the law "represent[s] the exercise of a power conferred on Congress by the Constitution").

[21] *See, e.g.*, 25 U.S.C. § 177 (requiring federal approval of any "purchase, grant, lease, or other conveyance of lands . . . from any Indian nation or tribe of Indians"); *id.* § 81 (requiring Secretary of Interior approval for contracts leasing Indian lands); *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960) (purpose of 25 U.S.C. § 177 is to "prevent unfair, improvident or improper disposition" of Indian lands).

[22] *See, e.g.*, 25 U.S.C. §§ 2101–2108 (development of tribal mineral resources).

22

legislation in non-commercial fields like criminal law,[23] education,[24] probate,[25] health care,[26] and housing assistance.[27] Consequently, we cannot agree with Plaintiffs that ICWA is unconstitutional because it does not regulate tribal "commerce." Whatever the validity of that argument as a matter of original constitutional meaning, *cf. Adoptive Couple v. Baby Girl*, 570 U.S. 637, 659–65 (2013) (Thomas, J., concurring), it is foreclosed by Supreme Court cases interpreting the Indian Commerce Clause to extend beyond commercial interactions with tribes.

Defendants are also correct that the Supreme Court has often described Congress's Indian power as "plenary and exclusive." *See, e.g.*,

---

[23] *See, e.g.*, 18 U.S.C. § 1153 (placing certain crimes by "[a]ny Indian" within Indian country under federal criminal jurisdiction); *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2482 (2020) (state lacked jurisdiction to prosecute Indian defendant under Major Crimes Act for crime committed on reservation); *Lara*, 541 U.S. at 199–200 (upholding statute conferring on tribes criminal jurisdiction over nonmember Indians); *United States v. Antelope*, 430 U.S. 641 (1977) (upholding Major Crimes Act); *United States v. Kagama*, 118 U.S. 375, 385 (1886) (same).

[24] *See, e.g.*, 25 U.S.C. § 2000 ("It is the policy of the United States to fulfill the Federal Government's unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children . . . ."). *See also* COHEN'S § 22.03[1][a] ("Beginning with the 1794 Treaty with the Oneida, over 150 treaties between tribes and the United States have included educational provisions. For almost as long a time, Congress has legislated to provide for Indian education generally.") (footnotes omitted).

[25] *See, e.g.*, 25 U.S.C. § 2205 (authorizing tribes to adopt probate codes for distribution of trust or restricted lands located on reservations or otherwise subject to tribal jurisdiction).

[26] *See, e.g.*, 25 U.S.C. § 1601(1) ("Federal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people."). *See also* COHEN'S § 22.04 (discussing federal healthcare for Indian tribes).

[27] *See, e.g.*, 25 U.S.C. §§ 4101–4243 (establishing housing grant program for tribes).

23

*Lara*, 541 U.S. at 200 (citing *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 470–71 (1979) ("*Yakima Nation*"); *Negonsott v. Samuels*, 507 U.S. 99, 103 (1993); *United States v. Wheeler*, 435 U.S. 313, 323 (1978)). The Court has used that broad phrase in various ways—sometimes to signal "the breadth of congressional power to legislate in the area of Indian affairs," sometimes to confirm "the supremacy of federal over state law in this area," and other times "as a shorthand for general federal authority to legislate on health, safety, and morals within Indian country, similar to the states' police powers." COHEN'S § 5.02[1] (citing *inter alia Lara*, 541 U.S. at 200; *Yakima Nation*, 439 U.S. at 470; *Cotton Petroleum Corp.*, 490 U.S. at 192).[28] More recently, the Court has formulated the principle this way: "As dependents, the [Indian] tribes are subject to plenary control by Congress." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (citing *Lara*, 541 U.S. at 200).[29]

Merely describing Congress's authority as "plenary," however, does not settle ICWA's validity. "The power of Congress over Indian affairs," the Supreme Court has explained, "may be of a plenary nature; but it is not absolute." *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84 (1977) (quoting *United States v. Alcea Band of Tillamooks*, 329 U.S. 40, 54 (1946) (plurality

---

[28] *See also* Gregory Ablavsky, *Beyond the Indian Commerce Clause*, 124 YALE L.J. 1012, 1014 (2015) ) ("Ablavsky, *Indian Commerce*") ("Plenary power, as used by the Court, has two distinct meanings. Sometimes the Court uses the term interchangeably with 'exclusive,' to describe federal power over Indian affairs to the exclusion of states. But the Court also uses the term to describe the doctrine that the federal government has unchecked authority over Indian tribes, including their internal affairs.") (footnotes omitted).

[29] *Cf. McGirt*, 140 S. Ct. at 2462 ("This Court long ago held that the Legislature wields significant constitutional authority when it comes to tribal relations, possessing even the authority to breach its own promises and treaties.") (citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566–68 (1903)).

op.)); *see also* COHEN'S § 5.04[1] ("Federal power to regulate Indian affairs is 'plenary and exclusive,' but not absolute.") (footnotes omitted). In this realm, as in any, Congress's power is limited by other constitutional guarantees. *See New York v. United States*, 505 U.S. 144, 156 (1992) ("Congress exercises its conferred powers subject to the limitations contained in the Constitution.").[30] Among the most critical is the Constitution's structural guarantee of state sovereignty. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 918–19 (1997) ("Although the States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty,' [which] . . . is reflected throughout the Constitution's text") (quoting THE FEDERALIST No. 39, at 245 (J. Madison)). No Supreme Court decision even hints that Congress's Indian affairs power trumps state sovereignty. To the contrary, the Court has held that Congress's power to regulate Indian commerce—despite being "under the exclusive control of the Federal Government"—cannot "dissipate" the "background principle of state sovereign immunity." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 (1996). Similarly, the Court has recognized that states did not surrender "their immunity against Indian tribes when they adopted the Constitution." *Blatchford v. Native Vill. of*

---

[30] *See, e.g.*, *Hodel v. Irving*, 481 U.S. 704, 710, 718 (1987) (holding federal law regulating "descent and devise of Indian lands" violated the Takings Clause); *Weeks*, 430 U.S. at 83–84 ("plenary" congressional power "in matters of Indian affairs" subject to "equal protection component of the Fifth Amendment"); *Mancari*, 417 U.S. at 551–55 (same); *United States v. Creek Nation*, 295 U.S. 103, 109–10 (1935) (power over Indian lands "subject to . . . pertinent constitutional restrictions," including Takings Clause). A different question is to what extent the Constitution applies to the tribes themselves. "As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." *United States v. Bryant*, 136 S. Ct. 1954, 1962 (2016) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)). Thus, "[t]he Bill of Rights does not apply to Indian tribes." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 337 (2008).

*Noatak and Circle Vill.*, 501 U.S. 775, 781–82 (1991). Those decisions defy the radical notion that Congress may deploy its "plenary" Indian power without regard to state sovereignty or the Tenth Amendment. *See also infra* II(B) (discussing additional precedents).

To say otherwise, as Defendants do, would erase the distinction between federal and state power—namely, that "[t]he Constitution confers on Congress *not plenary legislative power* but only certain enumerated powers," with "all other legislative power . . . reserved for the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018) (emphasis added). Nor does it follow that, because the Constitution gives Congress power over Indian affairs, "the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York*, 505 U.S. at 156. That begs the question, then, whether the Indian power includes authority to *govern state child-custody proceedings*. That "question[] of great importance and delicacy," *id.* at 155 (cleaned up), has not been squarely resolved by the Supreme Court. But the Court has strongly suggested the answer: it has warned that an exercise of Congress's Indian affairs power that "interfere[s] with the power or authority of any State" would mark a "radical change[]" in tribal relations with the states. *Lara*, 541 U.S. at 205; *see also infra* II(B). And, as we explain below, no founding-era treaty, statute, or congressional practice supports ICWA's unprecedented reach. *See infra* II(C).

We therefore cannot agree with JUDGE DENNIS that ICWA's intrusion on state government proceedings fails even to implicate the Tenth Amendment. *See* DENNIS OP. at 67. According to JUDGE DENNIS, when Congress deploys its Indian power, the Tenth Amendment vanishes. A court need ask only whether Congress "may legislate on the particular subject matter at issue"—here, Indian children and families "in child custody proceedings." *Id.* Because Congress has "plenary power" over that subject,

26

raising the Tenth Amendment as a barrier would "impos[e] new restraints on [Congress's] authority." *Id.*

That is a remarkable view. Imagine its applying to hypothetical exercises of Congress's other "plenary" powers—say, its "plenary power to make rules for the admission of aliens," *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972), or its "plenary power over the Territories," *District of Columbia v. Carter*, 409 U.S. 418, 430 (1973), or its "plenary power to legislate for the District of Columbia," *Palmore v. United States*, 411 U.S. 389, 393 (1973), or its "plenary power . . . to regulate foreign commerce," *Buttfield v. Stranahan*, 192 U.S. 470, 496 (1904). Suppose Congress enacted rules in those areas that purported to govern state proceedings, as ICWA does. Imagine a federal law mandating different comparative fault rules in state tort suits involving Swedish visa holders. Or unique proof standards for Guamanians in state probate proceedings. Or laxer parol evidence rules for D.C. residents embroiled in state contract litigation. Or stricter adverse possession rules for French merchants in state property disputes. Would those federal laws, directly controlling state administrative and civil proceedings, be *immune* from the Tenth Amendment because Congress's authority in those areas is "plenary"? Of course not. Neither is ICWA.[31]

In sum, the settled proposition that "tribes are subject to plenary control by Congress," *Bay Mills*, 572 U.S. at 788, does not answer the novel question whether Congress can control state child-custody proceedings involving Indian children. We now turn to that question.

---

[31] We agree with JUDGE DENNIS that these hypotheticals are "far-fetched" and "ridiculous." DENNIS OP. at 104 n.47. That is the point of a *reductio ad absurdum.*

27

**B.**

To answer it, we consider whether any Supreme Court precedent—or, failing that, any longstanding founding-era congressional practice—justifies the use of Congress's Indian affairs power to govern state child-custody proceedings involving Indian children. *See, e.g.*, *Printz*, 521 U.S. at 905 (explaining "contemporaneous legislative exposition of the Constitution . . . , acquiesced in for a long term of years, fixes the construction to be given its provisions") (citing *Myers v. United States,* 272 U.S. 52, 175 (1926)). As we explain below (*infra* II(B)(1)–(2), II(C)), we find neither precedent nor historical evidence justifying the modern use of Congress's power here. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) ("*NFIB*") ("Sometimes the most telling indication of a severe constitutional problem is the lack of historical precedent for Congress's action.") (cleaned up).

We pause to make a point about method. Our analysis does not ask—as JUDGE DENNIS supposes—whether any "Founding-era federal law . . . applie[d] within state child welfare proceedings." DENNIS OP. at 72. JUDGE COSTA also tags us with a similarly absurd view. *See* COSTA OP. at 16 (imagining we seek a founding-era practice "explicitly bless[ing] federal intervention *in state domestic relations proceedings*" pursuant to the Indian affairs power) (emphasis added). But that approach to discerning the original extent of federal power "border[s] on the frivolous." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). No one thinks, and we do not claim, that states were adjudicating adoptions in 1787. Instead, we examine whether *comparable* founding-era uses of the Indian power justify ICWA's modern intrusion into state custody proceedings.[32] *See, e.g.*, *infra* at 38 (asking

---

[32] *See, e.g.*, *Printz*, 521 U.S. at 905–09 (examining whether founding-era federal laws requiring state courts to perform various naturalization functions justified the Brady Act's requiring state police to perform gun background checks).

whether ICWA is justified by "comparable founding-era exercises of Congress's Indian affairs power"). Testing whether the old maps onto the new is standard constitutional analysis.[33] So, we do not ask the specific (and meaningless) question whether founding-era Indian power was used to govern "state domestic relations proceedings"; we do ask the more general (and meaningful) question whether that power was used to govern "state proceedings," "state governments," "state governmental functions," or "a state's own proceedings that involve Indians." *See infra* II(C). Thus, the supposed rebuttals to our analysis—that state court "adjudication of child placements" did not exist "until the middle of the nineteenth century," DENNIS OP. at 72 , and "would not exist for another eight decades" after the founding era, COSTA OP. at 16—incinerate a straw man.

That clarification made, we proceed to our analysis.

**1.**

No Supreme Court decision supports Congress's deploying its Indian affairs power to govern state government proceedings. Indeed, the Court's precedents point in the opposite direction: such use of the Indian power marks a "radical change[] in tribal status" because it "interfere[s] with the power [and] authority of [the] State[s]." *Lara*, 541 U.S. at 205.

The logical place to begin is *Fisher v. District Court of Sixteenth Judicial District of Montana*, 424 U.S. 382 (1976), because it involves the same subject as this case: tribal authority over adoptions. Pursuant to the Indian Reorganization Act, 25 U.S.C. § 5123 (formerly cited as 25 U.S.C. § 476),

---

[33] *See, e.g.*, *Heller*, 554 U.S. at 582 ("Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.") (citing *Reno v. ACLU*, 521 U.S. 844, 849 (1997); *Kyllo v. United States*, 533 U.S. 27, 35–36 (2001)).

the Northern Cheyenne Tribe vested its tribal court with exclusive jurisdiction over adoptions among tribe members. *Fisher*, 424 at 387. The Supreme Court upheld the exclusion of state-court jurisdiction because it would "interfere with the powers of self-government conferred upon the [tribe]." *Id.* The Court emphasized, however, that the tribe's exclusive jurisdiction was limited to adoptions where the child, the birth parents, and the adoptive parents were "each and all members of the [tribe]" and "reside within the exterior boundaries of the [reservation]." *Id.* at 384 n.6. The Court therefore concluded the tribal ordinance implemented an "overriding federal policy" that ousted state-court jurisdiction "over litigation involving reservation Indians." *Id.* at 390.[34]

The law at issue in *Fisher* is the mirror opposite of ICWA. *Fisher* held Congress could keep states *out* of on-reservation adoptions among tribe members. By contrast, this case asks whether Congress can directly regulate state proceedings involving off-reservation adoptions by non-Indians. *See, e.g.*, 25 U.S.C. § 1915(a) (applying ICWA preferences to "any adoptive placement of an Indian child under State law").[35] *Fisher* involved Congress's valid attempt to promote a tribe's "right . . . to govern itself independently of state law." 424 U.S. at 386. But this case asks whether Congress can legislate standards governing a state's own child-custody proceedings. To be sure, *Fisher* does not squarely address whether Congress has power to do so.

---

[34] The Court also rejected an equal protection challenge to the ordinance, which we discuss *infra* II(A)(2).

[35] We note that one aspect of ICWA is similar to the law upheld in *Fisher*. Section 1911(a) reserves to a tribe exclusive jurisdiction "over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe." Our decision does not affect that section because it does not regulate state proceedings.

But the decision provides no support for the proposition that Congress may use its Indian affairs power to regulate state proceedings.

Speaking directly to that question is *United States v. Lara*, 541 U.S. 193 (2004), a more recent examination of the Indian affairs power. *Lara* was a double jeopardy case in which the Indian defendant, Lara, was first prosecuted by a different tribe and then prosecuted for a similar crime by the United States. 541 U.S. at 196–97. Lara's tribal prosecution was authorized by 25 U.S.C. § 1301(2), which allows tribes to prosecute other tribes' members. *Id.* at 197–98.[36] He argued his tribal prosecution was an exercise of "delegated federal authority," such that his federal prosecution constituted double jeopardy. *Id.* The Supreme Court disagreed, concluding that § 1301(2) recognized tribes' "inherent power" to prosecute nonmember Indians and that the federal prosecution did not place Lara in double jeopardy. *Id.* at 198, 210. The Court discussed several "considerations" leading it to conclude the statute validly exercised Congress's Indian affairs power. *Id.* at 200–07.

First, as noted, the Court confirmed that Congress has "broad general powers to legislate in respect to Indian tribes," powers typically described as "plenary and exclusive." *Id.* at 200 (quoting *Yakima Nation*, 439 U.S. at 470-71). Second, the Court had consistently approved adjustments of "tribal sovereign authority" similar to the expansion of criminal jurisdiction here. *Id.* at 202–03. Third, the Court found § 1301(2) did not have an "unusual legislative objective," given Congress's history of "ma[king] adjustments to the autonomous status of other such dependent entities," such as the Philippines or Puerto Rico. *Id.* at 203. Fourth, the Court found no "explicit

---

[36] The Supreme Court had previously held tribes could not prosecute members of other tribes in *Duro v. Reina*, 495 U.S. 676, 688 (1990), but Congress responded with § 1301(2).

language in the Constitution suggesting a limitation" on Congress's action. *Id.* at 204. Fifth, the Court found the jurisdictional change "limited" because the tribe already had jurisdiction over its own members as well as "authority to control events that occur upon [its] own land." *Id.* The Court cautioned, however, that it was "not now faced with a question dealing with potential constitutional limits on congressional efforts to legislate far more radical changes in tribal status. *In particular, this case involves no interference with the power or authority of any State.*" *Id.* at 205 (emphasis added).[37]

ICWA's encroachment on state child-custody proceedings cannot survive scrutiny under these *Lara* factors. To begin with, unlike in *Lara*, Defendants point us to no Supreme Court cases approving an expansion of "tribal sovereign authority" remotely like the one contemplated by ICWA. *Id.* at 202–03. Nor—as discussed *infra*—have Defendants identified any founding-era congressional history of regulating state proceedings, thus marking ICWA as having an "unusual legislative objective." *Id.* at 203. Indeed, ICWA is also "unusual" in that it intrudes into the domestic relations realm "long . . . regarded as a virtually exclusive province of the States." *Sosna v. Iowa*, 419 U.S. 393, 404 (1975). Whereas in *Lara* no "explicit [constitutional] language" barred expanding one tribe's criminal jurisdiction over other tribe members, 541 U.S. at 204, the Tenth Amendment plainly reserves to states "[t]he whole subject of the domestic relations of . . . parent and child . . . ." *Burrus*, 136 U.S. at 593–94. Unlike the "limited" jurisdictional expansion in *Lara*, ICWA forces tribes into off-reservation state proceedings involving non-Indians. 541 U.S. at 204. Finally, and most obviously, ICWA seeks the "radical change[] in tribal status"

---

[37] Additionally, the Court explained that its prior decisions implicitly recognized that Congress could relax limitations on tribes' criminal jurisdiction. *Lara*, 541 U.S. at 205–07 (citing, *inter alia*, *Oliphant v. Suquamish Tribe*, 435 U.S. 191 (1978); *Duro*, 495 U.S. 676).

foreshadowed in *Lara*: ICWA's stated purpose is to "interfere[] with the power [and] authority of [the] State[s]." *Id.* at 205.[38]

Finally, *Seminole Tribe*, 517 U.S. 44, confirms that Congress cannot deploy its Indian affairs power to override state sovereignty. In that case, the Court rejected the proposition that the Indian Gaming Regulatory Act, enacted under the Indian Commerce Clause, could validly abrogate state sovereign immunity. *Id.* at 72–73. The Court squarely held that Congress's "exclusive" authority over Indian commerce does not "dissipate" a state's immunity from federal suit: "[T]he background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government." *Id.* at 72. *Seminole Tribe*'s holding removes any basis for Defendants' core argument that, because Congress's Indian affairs authority is "plenary," Congress can *ipso facto* regulate state sovereign matters like adoption proceedings. To the contrary, "[e]ven when the Constitution vests in Congress complete law-making authority over a particular area" like Indian

---

[38] JUDGE DENNIS contends the *Lara* factors "are of no relevance" because, in ICWA, "Congress is not altering the scope of the tribes' retained sovereign power" but is instead "grant[ing] new rights, protections, and safeguards" to tribes and families. DENNIS OP. at 77. We disagree. Nowhere does *Lara* limit its analysis to federal laws that "alter[] . . . tribes' retained sovereign power," as JUDGE DENNIS claims. Rather, *Lara* deploys various "considerations" to assess whether the Constitution "authorizes" Congress's use of its Indian affairs power. *See Lara*, 541 U.S. at 200. Those considerations bear directly on ICWA's validity. To be sure, the statute in *Lara* passed muster because it merely "relax[ed]" prior statutory restrictions on "the tribes' exercise of inherent prosecutorial power." *Id.* at 200, 207. But *Lara* expressly reserved the question whether there are "potential constitutional limits on congressional efforts to legislate far more radical changes in tribal status," and "[i]n particular" for statutes that "interfere[] with the power or authority of [a] State." *Id.* at 205. The question that *Lara* reserved is the one presented by ICWA—whether by "interfer[ing] with the power or authority of [a] State," *id.*, ICWA exceeds Congress's authority to legislate for Indian tribes.

affairs, *id.*, the exercise of that power remains subject to the Constitution's guarantees of state sovereignty.[39]

**2.**

Defendants cite various Supreme Court decisions as support for ICWA, but none suffice.

Defendants cite *Lara* repeatedly, but only for the general proposition that Congress's Indian affairs power has been described as "plenary and exclusive." They do not, however, discuss *Lara* in any detail nor analyze ICWA's validity under the considerations *Lara* sets out. As already discussed, incanting the formula that Congress's power in this area is "plenary and exclusive" begs the question whether Congress may use that power to regulate state child-custody proceedings. The same can be said for other broad formulations of the Indian affairs power Defendants cite. For example, Tribal Defendants quote the seminal opinion in *Worcester v. Georgia* for the proposition that federal treaties and laws "contemplate . . . that *all*

---

[39] JUDGE DENNIS claims *Seminole Tribe* "has no bearing" on this question because it "addressed only limitations on Congress's power to override states' sovereign immunity from suit by private parties." DENNIS OP. at 75. That is incorrect. States' immunity from private suits is "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution," and which is confirmed "by the Tenth Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999); *see also Blatchford*, 501 U.S. at 781–82 (rejecting notion that state surrender of immunity against tribes was "inherent in the constitutional compact"). Thus, contrary to JUDGE DENNIS's view, *Seminole Tribe* is not cabined to the "states' sovereign immunity from suit by private parties," but bears directly on whether Congress's Indian power may *ipso facto* override state sovereignty as a general matter. JUDGE DENNIS also asserts that *Seminole Tribe* "carefully noted that its opinion in no way touched upon other aspects of the Tenth Amendment." DENNIS OP. at 75. That misreads the decision. The footnote JUDGE DENNIS cites only declined to decide whether the gaming law at issue violated the Tenth Amendment by "mandat[ing] state regulation of Indian gaming," a question "not considered below." *Seminole Tribe*, 517 U.S. at 61 n.10. Neither the cited footnote, nor anything else in the decision, creates the artificial distinction JUDGE DENNIS seeks to create here.

*intercourse* with [Indians] shall be carried on exclusively by the government of the union." 31 U.S. (6 Pet.) 515, 519 (1832) (emphasis added); *see also id.* at 561 (op. of Marshall, C.J.) (same). It is unclear what that proposition has to do with this case. *Worcester* itself has no bearing on it: the decision held that Georgia could not apply its criminal laws on Cherokee territory and in contravention of a federal treaty. *See id.* at 561 (explaining that "[t]he Cherokee nation, then, is a distinct community occupying its own territory . . . in which the laws of Georgia can have no force").[40]

Federal Defendants cite *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n* ("*Fishing Vessel*"), 443 U.S. 658 (1979), presumably because that decision required the state of Washington to accommodate the treaty rights of Indians with respect to off-reservation fishing sites. Indeed, at *en banc* argument, Federal Defendants identified *Fishing Vessel* as their best case.[41] Rec. of Oral Argument at 8:45–9:50. But the treaty-based limitation on state regulation allowed in *Fishing Vessel* is

---

[40] In a similar vein is the Supreme Court's recent decision in *McGirt*, 140 S. Ct. 2452. The Court held that certain lands in Oklahoma remained "Indian country" for purposes of the Major Crimes Act, 18 U.S.C. § 1153(a), and thus that Oklahoma state courts lacked jurisdiction to try an Indian defendant for crimes he committed on those lands. *Id.* at 2459. *McGirt* reiterates the familiar propositions that Congress has "significant constitutional authority when it comes to tribal relations," *id.* at 2462—in that case, the authority to establish an Indian reservation—and that "State courts generally have no jurisdiction to try Indians for conduct committed in 'Indian country,'" *id.* at 2459 (citing *Negonsott v. Samuels*, 507 U.S. 99, 102–03 (1993)). The decision, however, offers no support for the proposition that Congress's Indian affairs power extends to controlling state proceedings. The Court remarked only that "States have no authority to reduce federal reservations lying within their borders," *id.* at 2462, a settled proposition harkening back to Chief Justice Marshall's admonition in *Worcester*.

[41] Even so, counsel effectively admitted *Fishing Vessel* does not go far enough to support ICWA. When pressed for prior authority allowing Congress's "plenary" power to interfere with state child-custody proceedings, counsel responded that "this"—*i.e.* the instant challenge to ICWA—"is the case that presents that [issue]." Rec. of Oral Argument at 10:30–10:55.

nothing like ICWA's intrusion into state child-custody proceedings. The 1850s-era treaties in *Fishing Vessel* guaranteed tribes the "right of taking fish, at all usual and accustomed grounds and stations . . . in common with all citizens of the Territory." 443 U.S. at 674. The Court read those treaties to guarantee tribes a portion of yearly fishing runs, which could not be invalidated by state law or regulation. *Id.* at 684–85.[42] Requiring state regulatory forbearance to federal treaties, however, is worlds away from Congress's dictating separate standards for state child-custody proceedings involving Indian children. Furthermore, unlike in *Fishing Vessel*, here Defendants cannot rely on over a century of federal treaties bearing on the precise subject matter at issue. *Cf. Lara*, 514 U.S. at 203–04 (finding Indian affairs power justified by Congress's history of similar actions); *see also id.* at 201 (treaties "can authorize Congress to deal with 'matters' with which otherwise '[it] could not deal'").[43]

Tribal Defendants cite several decisions for the proposition that Congress may legislate with respect to Indian activity that does not occur "on or near the reservation." This general principle is true, of course, but again it begs the question whether ICWA validly regulates state child-custody

---

[42] *Fishing Vessel* is one in a long line of cases resolving conflicts between tribal treaty rights and non-tribal interests or state regulation. *See, e.g.*, *Herrera v. Wyoming*, 139 S. Ct. 1686 (2019); *Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392 (1968); *Seufert Bros. Co. v. United States*, 249 U.S. 194 (1919); *United States v. Winans*, 198 U.S. 371 (1905).

[43] Federal Defendants also cite *Antoine v. Washington*, 420 U.S. 194 (1975), which, similar to *Fishing Vessel*, recognized Congress may ratify agreements with Indian tribes that preclude states from applying contrary state law. In *Antoine*, a tribe ceded part of its land to the United States in exchange for preserving hunting and fishing rights. The Court held that the Supremacy Clause prevented the State of Washington from applying its hunting and fishing laws to Indians on the ceded lands. *See id.* at 203–04 (citing, *inter alia*, *Choate v. Trapp*, 224 U.S. 665 (1912); *Perrin v. United States*, 232 U.S. 478 (1914); *Dick v. United States*, 208 U.S. 340 (1908)). Neither *Antoine*, nor any decision it relied on, suggests Congress may impose Indian-specific standards on state proceedings.

proceedings. The cited cases themselves offer no guidance on that question. For example, *United States v. McGowan* held that Congress validly denominated as "Indian country" a tract of federal land occupied by an Indian colony, remarking that Congress may legislate for the "protection of the Indians wherever they may be." 302 U.S. 535, 539 (1938) (citation omitted). *Morton v. Ruiz* invalidated under the APA an agency policy excluding federal assistance for tribe members living near reservations, noting "[t]he overriding duty of our Federal Government to deal fairly with Indians wherever located." 415 U.S. 199, 236 (1974). *Perrin v. United States* upheld a federal ban on selling alcohol on lands ceded by the Yankton Sioux Tribe, based on Congress's power "to prohibit the introduction of intoxicating liquors into an Indian reservation, . . . and to prohibit traffic in such liquors with tribal Indians, whether upon or off a reservation and whether within or without the limits of a state." 232 U.S. 478, 482 (1914).[44] Finally, *United States v. Kagama* upheld Congress's power to enact a criminal code for crimes committed by Indians on Indian reservations, observing that only the federal government possessed that power and that "the theater of its exercise is within the geographical limits of the United States." 118 U.S. 375, 384–85 (1886). As this summary shows, these decisions say nothing about whether Congress may exercise its Indian affairs power to regulate a state sovereign function like child-custody proceedings.[45] And, to the extent

---

[44] Nor does *Perrin*'s modern sequel, *United States v. Mazurie*, 419 U.S. 544 (1975), support Defendants' position. Like *Perrin*, *Mazurie* only concerns Congress's Indian commerce power to regulate alcohol sales to Indians and the "introduction of alcoholic beverages into Indian country." *Mazurie*, 419 U.S. at 554 (and collecting cases). *Mazurie* upheld Congress's use of that power to ban alcohol sales by a non-Indian who owned land within a reservation. *Id.* at 546–47, 555–56.

[45] JUDGE HIGGINSON claims our view would resurrect the "governmental function" analysis rejected by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 546–47 (1985). HIGGINSON OP. at 1; *see also* DENNIS OP. at 68–74. We disagree. In deciding whether federal wage standards could apply to municipal employees,

these decisions touch on that question, they deny Congress's power to do so. *See*, *e.g.*, *Kagama*, 118 U.S. at 383 (observing the federal code "does not interfere with the process of the state courts within the reservation . . . [but] is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation").[46]

## C.

Finding no Supreme Court precedent justifying ICWA's intrusion on state sovereignty, we next examine whether ICWA is nonetheless supported by any comparable founding-era exercises of Congress's Indian affairs power. "[E]arly congressional enactments 'provid[e] contemporaneous and weighty

---

*Garcia* rejected the test in *National League of Cities v. Usery*, 426 U.S. 833, 852 (1976), which exempted from federal regulation "integral" or "traditional" state government functions. *Garcia*, 469 U.S. at 546–47. *Garcia* is inapposite for several reasons. First, *Garcia* addressed the Commerce Clause, not the Indian affairs power. As discussed, whether the latter encroaches on state authority is one key to its valid use by Congress. *See, e.g., Lara*, 541 U.S. at 205 (asking whether use of the Indian affairs power "involve[d] . . . interference with the power or authority of any State"). Second, our view does not depend, as *Usery* did, on "apprais[ing] . . . whether a particular governmental function is 'integral' or 'traditional.'" *Garcia*, 469 U.S. at 546–47. Instead, we ask whether the Indian affairs power has ever been used to regulate state government proceedings of any kind. Third, *Garcia* concerned whether "incidental application" of general federal laws "excessively interfered with the functioning of state governments." *Printz*, 521 U.S. at 932 (discussing, *inter alia*, *Usery* and *Garcia*). Here, by contrast, we address a law whose "whole *object* . . . [is] to direct the functioning of the state [administrative and judicial proceedings]" in child custody cases. *Id.*; *see also infra* III(B)(1)(b) (explaining ICWA does not "evenhandedly" regulate state and private activity).

[46] Defendants also suggest ICWA is authorized by "preconstitutional powers." But they fail to explain how that is so. As State Plaintiffs point out, the Supreme Court's reference to "preconstitutional powers" in *Lara* referred to the United States' early relationship with Indian tribes, which at that time resembled "military and foreign policy [more] than a subject of domestic or municipal law." 541 U.S. at 201. While such authority spoke to the issue in *Lara*—Congress's power to alter the scope of tribes' inherent sovereignty—it has no bearing on ICWA, a law having nothing to do with military or foreign policy and everything to do with state domestic law.

evidence of the Constitution's meaning.'" *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (alteration in original) (quoting *Printz*, 521 U.S. at 905). When assessing the constitutionality of a federal law, the Supreme Court looks to founding-era legislation for any light it may shed on the scope of Congress's authority. *See*, *e.g.*, *Printz*, 521 U.S. at 905–07 (canvassing "statutes enacted by the first Congresses" to determine whether Congress could compel state officers to implement federal law).[47] Evidence that the first Congresses used federal power over Indian tribes to regulate state proceedings would be "contemporaneous and weighty evidence" that the Constitution permits ICWA's encroachment on state child-custody proceedings. *Bowsher v. Synar*, 478 U.S. 478 U.S. 714, 723–24 (1986). "Conversely," if no such evidence exists, "we would have reason to believe that the power was thought not to exist." *Printz*, 521 U.S. at 905. *Amici* Indian law experts, as well as the Navajo Nation intervenors, have amassed considerable evidence illuminating early use of the Indian affairs power, which we have carefully considered. *See* Br. for Prof. Gregory Ablavsky as *Amicus Curiae* at 5–20 ("Ablavsky Br."); Br. for Indian Law Scholars as *Amici Curiae* at 3–8 ("Indian Law Scholars Br."); Br. for Intervenor Navajo Nation at 11–12 & nn. 5–6 ("Navajo Nation Br."). We cannot agree, however, that this evidence supports ICWA's modern-day intrusion into state child-custody proceedings.

---

[47] *See also Bowsher v. Synar*, 478 U.S. 714, 723–24 (1986) (relying on Congress's "Decision of 1789" to reject congressional role in officer removal); *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (placing particular weight on "[a]n act 'passed by the First Congress assembled under the Constitution, many of whose members had taken part in framing that instrument'" (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888))); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819) (reasoning "[t]he power [to incorporate the Bank of the United States] was exercised by the first congress elected under the present constitution").

Ample founding-era evidence shows that Congress's Indian affairs power was intended to be both broad in subject matter and exclusive of state authority. The framing generation understood Congress's power to include, for example, "making war and peace, purchasing certain tracts of [Indians'] lands, fixing the boundaries between [Indians] and our people, and preventing the latter settling on lands left in possession of the former." 33 Journals of the Continental Congress, 1774-1789, 458 (Roscoe R. Hill ed., 1936).[48] Additionally, it was understood that Congress's power would displace the prior authority of states under the Articles of Confederation to deal directly with tribes. Defending this centralization, James Madison wrote that Congress's power to regulate commerce with Indian tribes was "very properly unfettered" from "obscure and contradictory" limitations in the Articles that extended national power only to Indians "not members" of States and made it subservient to state legislation. The Federalist No. 42, at 219 (James Madison) (George W. Carey & James McClellan eds., 2001).[49] Confirming this view was Anti-Federalist Abraham Yates, Jr., who concluded, to his chagrin, that the new Constitution would "totally surrender into the hands of Congress the management and regulation of the Indian affairs." Abraham Yates, Jr. (Sydney), *To the Citizens of the State of New-York* (June 13-14, 1788), *reprinted*

[48] *See also* Joseph Story, Commentaries on the Constitution of the United States § 533, at 381 (Rotunda & Nowak ed. 1987) ("Story") (describing federal Indian power as the "right of exclusive regulation of trade and intercourse with [Indians], and the . . . authority to protect and guarantee their territorial possessions, immunities, and jurisdiction").

[49] *See also* St. George Tucker, View of the Constitution of the United States 196 (Liberty Fund 1999) (1803) (discussing Articles' "obscure" and "contradictory" limitations on national power over Indians) (citing The Federalist No. 42); Story § 533, at 380 (observing Articles attempted to "accomplish impossibilities [respecting power over Indians]; to reconcile a partial sovereignty in the Union, with complete sovereignty in the states").

*in* 20 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1153, 1156–58 (John P. Kaminski et al. eds., 2004). This view was later echoed by the Washington administration: "[T]he United States have, under the constitution, the sole regulation of Indian affairs, in all matters whatsoever." *Letter from Henry Knox to Israel Chapin* (Apr. 28, 1792), *reprinted in* 1 AMERICAN STATE PAPERS: INDIAN AFFAIRS 231–32 (Lowrie & Clarke eds., 1832).

Especially relevant is the first Congress's enactment of the Trade and Intercourse Act, *see* Act of July 22, 1790, 1 Cong. Ch. 33, 1 Stat. 137, which, with its statutory successors, was the primary federal statute governing Indian affairs until the 1830s. *See* Ablavsky, *Indian Commerce*, at 1023. The Act prohibited "any trade or intercourse with the Indian tribes" without a federal license; prohibited the sale of land by Indians or Indian tribes unless executed by federal treaty; and extended federal criminal jurisdiction to crimes committed by non-Indians against Indians. Congress later amended the Act to require federal approval to cross into Indian country and to authorize the United States military to arrest violators of the Act. *See* Act of May 19, 1796, 4 Cong. Ch. 30, § 3, 1 Stat. 469, 470; *id.* §§ 5, 16.

None of this evidence speaks to the question before us, which is whether Congress may use its Indian affairs power to regulate a state's own child-custody proceedings. As already observed, the fact that Congress's power goes beyond regulating tribal trade begs the question whether it allows Congress to regulate state governments. Also beside the point is the fact that Congress's power was intended to exclude state authority over tribes. This prevented states from, for instance, nullifying federal treaties securing Indian lands.[50] That evidence would be relevant if the issue were whether ICWA

---

[50] *See*, *e.g.*, *Worcester*, 31 U.S. at 561 (explaining that "[t]he Cherokee nation . . . is a distinct community occupying its own territory . . . in which the laws of Georgia can have

could *exclude* state courts from adoptions involving tribe members. *See Fisher*, 424 U.S. at 390 (upholding exclusion of state jurisdiction for adoptions among tribe members). But ICWA presents the opposite scenario: it seeks to force federal and tribal standards *into* state proceedings. *Amici* point us to no founding-era evidence even suggesting Congress thought its Indian affairs power extended that far.[51] The most pertinent example of Indian legislation from the first Congress—the Trade and Intercourse Act—addresses various aspects of the federal government's relationship with Indians. It says nothing about regulating a state's *own* proceedings that involve Indians.

*Amici* and the Navajo Nation also cite evidence that early Congresses used their authority to protect Indian children. But their evidence again fails to speak to the issue before us. For example, *amici* point to evidence that the federal government was "reluctantly" involved in the "widespread trade in captured children, both Indian and white," such as by "paying federal monies as ransom for children." Ablavsky Br. at 19 (citing, *inter alia*, Christina Snyder, *Slavery in Indian Country: The Changing Face of Captivity in Early America* 173–74 (2010)). They also point to federal superintendence of Indian children by "placing [them] within Anglo-American communities" and founding a "federally-run boarding school system." Ablavsky Br. at 19, 20 (citing 25 U.S.C. §§ 271-304b; Frederick E. Hoxie, A Final

---

no force"); *see also* Ablavsky, *Indian Commerce*, at 1045–50 (describing Georgia's ultimately unsuccessful efforts to assert its "territorial sovereignty" against Cherokee treaty).

[51] Judge Dennis similarly relies on evidence of early state resistance to federal Indian treaties, such as New York's undermining the Fort Stanwix Treaty with the Six Nations and Georgia's own conflicting treaties with Creek Indians. *See* Dennis Op. at 8 (citing Cohen's § 1.02[3]; Robert N. Clinton, *The Dormant Indian Commerce Clause*, 27 Conn. L. Rev. 1055, 1147 (1995)). This evidence has the same flaws as *amici*'s, however. It supports Congress's traditional power to bar states from subverting federal Indian treaties. But it does not involve, and so says nothing about, Congress's power to impose Indian-specific standards on state proceedings.

Promise: The Campaign to Assimilate the Indians, 1880-1920, 189–210 (1984)). And they cite various federal policies vis-à-vis Indian children, such as funding education, allotting lands to Indian orphans, and establishing trust funds. *See* Indian Law Scholars Br. at 3–8.[52] Finally, the Navajo Nation cites numerous federal treaties that make "repeated promises . . . for the welfare of tribal children." Navajo Nation Br. at 11–12 & nn.5–6.[53] We assume only for argument's sake that all this evidence concerns *founding-era* practices relevant to the original understanding of the Indian affairs power. *But see infra* II(D) (explaining the federal boarding-school system dates from the late nineteenth century). Even then, the evidence shows only that the federal government has long shouldered responsibility for protecting Indian children. None of it, however, speaks to whether Congress may regulate state government proceedings involving Indian children.[54]

---

[52] *See, e.g.*, Treaty with the Oneida, etc., art. III, Nov. 11, 1794, 7 Stat. 47 (providing for education of tribe's children); Treaty with the Kaskaskia art. III, Aug. 13, 1803, 7 Stat. 78 (providing funding for a Catholic priest "to instruct as many of their children as possible in the rudiments of literature"); Treaty with the Choctaw art. XIV, Sept. 27, 1830, 7 Stat. 333 (providing lands to unmarried children and orphans); Treaty with the Shawnee art. VIII, May 10, 1854, 10 Stat. 1053 (establishing trust fund for orphans); Treaty with the Cherokee, art. XXV, July 19, 1866, 14 Stat. 799 (providing for education of Cherokee orphan children in an "asylum" controlled by Cherokee government).

[53] *See, e.g.*, Treaty with the Nez Percés art. V, June 11, 1855, 12 Stat. 957 (providing two schools supplied with books, furniture, stationery, and teachers for free to the tribe's children); Treaty with the Seminoles art. III, May 9, 1832, 7 Stat. 368 (promising "a blanket and a homespun frock" to each Seminole child); Treaty with the Delawares, Supp. Art., Sept. 24, 1829, 7 Stat. 327 (requiring "thirty-six sections of the best land" be sold for "the support of schools for the education of Delaware children"); Articles of Agreement with the Creeks, Nov. 15, 1827, 7 Stat. 307 (providing $5,000 for "education and support of Creek children at the school in Kentucky").

[54] Judge Dennis relies heavily on this kind of evidence to support his argument that the "trust relationship" between the Federal Government and Indian tribes justifies ICWA. Dennis Op. at 16–17, 20–21, 59; *see, e.g.*, Cohen's § 5.04[3][a] ("One of the

## D.

Relying on much of the same historical evidence we have examined, JUDGE DENNIS mounts an elaborate originalist defense of ICWA. *See* DENNIS OP. at 5–25, 52–66. We agree with JUDGE DENNIS that ICWA's validity hinges on Congress's founding-era exercise of its Indian affairs power. *See id.* at 5 (citing *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 524 (2014); *Heller*, 554 U.S. at 605–10). But we sharply disagree with his analysis. As explained, no founding-era treaty, statute, or practice features anything like ICWA's foisting federal standards on state governments. *See supra* II(C). ICWA's goal of managing tribal-state relations may harken back to the late eighteenth century, but its methods were first born in the late 1970s. The leading Indian law treatise puts it accurately: "While reaffirming basic principles of tribal authority over tribal members, ICWA also inserts federal and tribal law into family matters long within the domain of the states." COHEN'S § 11.01[1]. By enacting rules for state officials and for state proceedings, ICWA outstrips the historical record and so cannot be supported by any original understanding of the Indian affairs power.

We offer these additional responses to JUDGE DENNIS.

First, JUDGE DENNIS invokes the *exclusivity* of Congress's Indian power to support ICWA. Because the power "is exclusive to the federal government," it "totally displaced the states from having any role in [Indian] affairs." DENNIS OP. at 58, 53; *see id.* at 53 (comparing Indian affairs power to "field preemption"); *see also* COSTA OP. at 13–14 (relying on "exclusive" and "undivided" nature of federal Indian power). JUDGE

---

basic principles of Indian law is that the federal government has a trust or special relationship with Indian tribes."). As explained below, the trust relationship fails to support the notion that Congress may impose federal standards on state child-custody proceedings. *See infra* II(D).

44

DENNIS contends that ICWA deploys this exclusive authority against states. "Just as the Constitution was meant to preclude the states from undertaking their own wars or making their own treaties with the Indian tribes," he argues, "so too does it empower the federal government to ensure states do not spoil relations with the Indian tribes" by placing Indian children with non-Indian families. *Id.* at 58 (citation omitted). We disagree.

The exclusivity of Congress's Indian power does not help justify ICWA. Quite the contrary. ICWA does the opposite of "excluding" states from Indian adoptions: it leaves many adoptions under state jurisdiction, *see* 25 U.S.C. § 1911(b), while imposing "Federal standards" on those state proceedings. *Id.* § 1902. If ICWA were akin to the founding-era practice of reserving war-making and treaty powers to the United States, then ICWA would "totally displace[] the states from having any role" in Indian adoptions. DENNIS OP. at 53.[55] As discussed, that is what Congress did in *Fisher* when it excluded tribal adoptions from state jurisdiction. *See supra* II(B)(1) (discussing *Fisher*, 424 U.S. 382). ICWA is not that. It does not bar state jurisdiction but co-opts it, thereby imposing federal yardsticks on state

---

[55] The same follows from JUDGE DENNIS's examples of "[s]tate officials . . . [who] acknowledged the federal government's plenary authority over Indian affairs under the new constitution." DENNIS OP. at 13. Those examples involved war- and treaty-making authority that the state officials conceded was entrusted to the federal government under the new Constitution. For instance, in a December 1789 letter, South Carolina Governor Charles Pinckney implored President Washington to conclude a treaty with "hostile Indian tribes" leagued with the Spanish. *See* DENNIS OP. at 13 (quoting Letter from Charles Pinckney to George Washington (Dec. 14, 1789), 4 PAPERS OF GEORGE WASHINGTON: PRESIDENTIAL SERIES 401, 404 (Dorothy Twohig ed., 1993)). The "similar acknowledgments" by the Georgia and Virginia legislatures, *id.* (citing Ablavsky, *Indian Commerce*, at 1043), also involved treaties and war: Georgia's request that the federal government negotiate a peace treaty with the Creek, and Virginia's inquiry about the propriety of supplying tribes with ammunition. *See* Ablavsky, *Indian Commerce*, at 1043.

officials and state proceedings. The exclusivity of federal Indian power argues for invalidating ICWA, not upholding it.[56]

Second, JUDGE DENNIS invokes the federal government's "trust relationship" with Indian tribes to support ICWA. DENNIS OP. at 59. This "unique" relationship creates federal obligations "to preserve tribal self-governance, promote tribal welfare, and . . . manag[e] tribal assets." *Id.* at 16–17 (citing MATTHEW L.M. FLETCHER, PRINCIPLES OF FEDERAL INDIAN LAW § 5.2 (1st ed. 2017) [hereinafter FLETCHER]); *see also* COHEN'S § 5.04[3][a]. In this relationship, JUDGE DENNIS finds "a specific obligation to protect the tribes from the states," which he claims ICWA furthers. DENNIS OP. at 59. Principally, he evokes the federal government's late-nineteenth-century policy of "Christianizing" Indian children in boarding schools, *id.* at 22–25, 59–60, arguing that ICWA remedies similarly "abusive Indian child custody practices continued at the state level." *Id.* at 59. ICWA thus fulfills the federal government's trust obligation by "protect[ing] the tribes from the states." *Id.* at 61. Again, we disagree.

Even assuming there is a federal duty to (as JUDGE DENNIS phrases it) "protect the tribes from the states," it would not authorize ICWA's imposition on state proceedings. No founding-era example shows the United States fulfilling its trust obligations that way. History tells a different story. The trust doctrine arose out of early treaties, statutes—principally, the

---

[56] We do not imply that Congress may never delegate to states authority over Indian matters. *See, e.g., Bryant*, 136 S. Ct. at 1960 (observing that, "[i]n 1953, Congress . . . g[ave] six States [criminal] 'jurisdiction over specified areas of Indian country within the States and provid[ed] for the [voluntary] assumption of jurisdiction by other States'") (first three brackets added; internal quotation marks omitted)). But no one defends ICWA on that basis, presumably because ICWA does the opposite: it imposes federal and tribal standards on proceedings within state jurisdiction. *See* 25 U.S.C. §§ 1901(5), 1903(1), 1911(b).

Trade and Intercourse Act and its successors, *supra* II(C)—and the Supreme
Court decisions in *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543 (1823),
*Cherokee Nation*, and *Worcester. See* COHEN'S § 5.04[3][a]; FLETCHER
§ 5.2; WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW IN A
NUTSHELL 16–17 (7th ed. 2020) [hereinafter CANBY].[57] Those sources do
show the federal government sometimes acted to restrain states on behalf of
tribes, but only in the sense of preventing states from unauthorized trading,
encroaching on tribal land, or subverting treaties.[58] Never did the United

---

[57] The key passages undergirding the trust doctrine are from Chief Justice
Marshall's *Cherokee Nation* opinion:

> [I]t may well be doubted whether those tribes which reside within the
> acknowledged boundaries of the United States can, with strict accuracy, be
> denominated foreign nations. They may, more correctly, perhaps, be
> denominated domestic dependent nations. They occupy a territory to which we
> assert a title independent of their will, which must take effect in point of
> possession when their right of possession ceases. Meanwhile they are in a state of
> pupilage. Their relation to the United States resembles that of a ward to his
> guardian.

> They look to our government for protection; rely upon its kindness and its power;
> appeal to it for relief to their wants; and address the president as their great father.
> They and their country are considered by foreign nations, as well as by ourselves,
> as being so completely under the sovereignty and dominion of the United States,
> that any attempt to acquire their lands, or to form a political connexion with them,
> would be considered by all as an invasion of our territory, and an act of hostility.

30 U.S. (5 Pet.) at 17–18; *see also* COHEN'S § 5.04[3][a] (explaining Marshall's *Cherokee
Nation* opinion "provided the basis for analogizing the government-to-government
relationship between tribes and the federal government as a trust relationship").

[58] *See* COHEN'S § 5.04[3][a] (explaining Trade and Intercourse Acts "imposed a
statutory restraint on alienation on all tribal land for the purpose of ensuring federal rather
than state or individual control over acquisition of Indian land"); CANBY at 17 (under the
same Acts, "[n]on-Indians were prohibited from acquiring Indian lands by purchase or
treaty . . . , or from settling on those lands or entering them for hunting or grazing"); *see
also Worcester*, 31 U.S. at 557 (the Acts "manifestly consider the several Indian nations as
distinct political communities, having territorial boundaries, within which their authority

47

States purport to "protect tribes" by enacting federal standards for state proceedings. *See also supra* II(C) (discussing absence of such evidence from founding-era sources). The same is true for early federal laws regarding crimes against Indians. *See, e.g.*, CANBY at 17 (noting "[d]epredations by non-Indians against Indians were made a federal crime"). These laws provided federal compensation for victims, *id.*, and later for prosecution under federal jurisdiction.[59] While such laws excluded state jurisdiction, they did not pretend to enact standards for state courts or officials. Indeed, in upholding a later federal law punishing on-reservation Indian crimes, the Supreme Court stressed that the law "does not interfere with the process of the state courts within the reservation, nor with the operation of state laws." *Kagama*, 118 U.S. at 383.[60]

That brings us to JUDGE DENNIS's main historical example—the era of federal "assimilation" of Indian children in boarding schools. DENNIS OP. at 22–25, 59. As we grasp his argument, JUDGE DENNIS contends that, because the federal government once engaged in this widespread removal and

---

is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied [*sic*] by the United States").

[59] *See, e.g.*, Mary Christina Wood, *Indian Land and the Promise of Native Sovereignty: The Trust Doctrine Revisited*, 1994 UTAH L. REV. 1471, 1497 n.122 (discussing so-called "bad men" clauses in, for example, the Treaty with the Northern Cheyenne and Northern Arapahoe art I, May 10, 1868, 15 Stat. 655).

[60] JUDGE DENNIS emphasizes *Kagama*'s statement that Indian tribes "owe no allegiance to the states, and receive from them no protection," and that "[b]ecause of the local ill feeling, the people of the states where they are found are often their deadliest enemies." DENNIS OP. at 67 (quoting *Kagama*, 118 U.S. at 384). That colorful dicta has no bearing on the issue before us. As discussed, *Kagama* decided only that the United States could punish as a federal crime the murder of an Indian by an Indian on a reservation, even though situated within a state. *See* 118 U.S. at 377–78; *see also id.* at 383 (noting the law was "confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation"); *see also supra* II(B)(2) (discussing *Kagama*).

re-education of Indian children, it must also have power to prevent states from engaging in similar "abusive Indian child custody practices." *Id.* at 59.[61] We reject this argument.

To begin with, JUDGE DENNIS's key evidence dates from the late nineteenth century, not the founding era. *See, e.g.*, COHEN'S § 1.04 ("In 1879, Indian education began to shift to federal boarding schools so that Indian students could be removed completely from family and tribal life.").[62] It therefore provides less insight into Congress's Indian power as conceived by the founding generation. *See Printz*, 521 U.S. at 905 (explaining that "*contemporaneous* legislative exposition of the Constitution . . . , acquiesced in for a long term of years, fixes the construction to be given its provisions" (citing *Myers*, 272 U.S. at 175) (emphasis added));[63] *cf. Heller*, 554 U.S. at 614 (observing that "discussions [that] took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources").

---

[61] The Federal Defendants similarly defend ICWA on the grounds that "Congress plainly has authority to address the massive removal of children from tribal communities."

[62] *See also* COHEN'S § 1.04 (during this period "[t]he full brunt of reeducation was directed toward Indian children, who were shipped away from the reservation or brought together at reservation schools"); Ablavsky Br. at 20 (discussing the "federally-run boarding school system, which took Indian children, often without their parents' consent, as part of its efforts to civilize them") (citing 25 U.S.C. §§ 271–304b; FREDERICK E. HOXIE, A FINAL PROMISE: THE CAMPAIGN TO ASSIMILATE THE INDIANS, 1880–1920, 189–210 (1984)).

[63] *See also Marsh*, 463 U.S. at 790 (observing that "[a]n act passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning" (citation omitted) (cleaned up)); *McCulloch*, 17 U.S. at 401 (relying on fact that the contested power "was exercised by the first congress elected under the present constitution").

But even if this evidence concerned founding-era practice, it would not prove what JUDGE DENNIS claims. As we have said again and again, none of the history shows the United States using its Indian power to legislate for state governments. The boarding-school era makes the same point from a different angle. It shows the federal government adopting a policy towards Indian children—one roundly condemned today—and then changing *its own policy* in a more enlightened direction. *See* COHEN'S § 1.05 (recounting "[a] marked change in attitude toward Indian policy [that] began in the mid-1920s . . . away from assimilation policies and toward more tolerance and respect for traditional aspects of Indian culture"). It is a mystery how an era of misguided federal policy proves Congress can dictate rules for states. None of this is to say there have been no abuses in how states have handled Indian adoptions. It is only to say that, in seeking a remedy, Congress cannot turn state governments into federal adoption agencies. The Tenth Amendment and the Constitution's structure forbid it.

One final point. According to JUDGE COSTA's separate opinion, there is nothing "novel" about ICWA's "interfer[ing] with state domestic relations proceedings" because "the federal government has been a constant, often deleterious presence in the life of the Indian family from the beginning." COSTA OP. at 15. But relying on the same evidence as JUDGE DENNIS, including the boarding-school era, *see id.* at 12–17, JUDGE COSTA also fails to identify a single example of Congress's deploying its Indian power to regulate a state's administrative or judicial machinery.[64] Thus, his

---

[64] JUDGE COSTA does dial the volume up to eleven, however. "[T]he most tragic irony" of our opinion, he claims, is that after two centuries of federal power "often used to destroy tribal life," we would "reject[] that power when it is being used to sustain tribal life." *Id.* at 12. "It would be news to Native Americans," he continues, that the same federal power used to wage war against them, steal their lands, displace them, and "'civiliz[e]'" their children "does not [also] reach the Indian family." *Id.* Where to begin? First, nothing prevents the federal government from mending its ways and using its power

denial that ICWA is a "novel" use of that power is baffling. *Id.* at 15. That view would likely surprise the leading Indian law commentator, Felix Cohen, who wrote that "ICWA . . . inserts federal and tribal law into family matters long within the domain of the states." Cohen's § 11.01[1]. It would also surprise then-Assistant Attorney General Patricia Wald, who testified to Congress about ICWA (and who would later serve as Chief Judge of the D.C. Circuit). Flagging the "serious constitutional question" raised by ICWA, Wald warned "that the federal interest in the off-reservation context is so attenuated that the 10th Amendment and general principles of federalism preclude[] the wholesale invasion of state power contemplated by [ICWA]." H.R. Rep. No. 95-1386, at 39–40 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7562–63. Of course, Wald's views—or Felix Cohen's, for that matter—do not settle ICWA's constitutionality. But at least those commentators recognized, unlike Judge Costa, that ICWA's intrusion on state power was unprecedented.

***

We sum up this part. Neither judicial nor congressional precedent supports ICWA's trespass on state child-custody proceedings. While offering evidence that Congress has deployed its Indian affairs power broadly, exclusive of state authority, and in aid of Indian children, neither Defendants nor their *amici* nor Judge Dennis offer founding-era examples

---

"to sustain tribal life." It has tried to do that for nearly a century. *See* Cohen's § 1.05 (era of "Indian Reorganization," beginning in 1928, "shift[ed] . . . toward more tolerance and respect for traditional aspects of Indian culture"). The issue before us, however, is whether the federal government's benevolence may include conscripting state governments as adoption agencies. If the Indian affairs power is a blank check, as Judges Dennis and Costa appear to think, the answer is yes. Second, no one denies that federal power "reach[es] the Indian family." Costa Op. at 12. The issue here is whether it also reaches the state administrative and judicial proceedings that ICWA purports to govern.

of Congress's using this power to intrude on state governmental functions as ICWA does. "Legislative novelty is not necessarily fatal; there is a first time for everything. But sometimes the most telling indication of a severe constitutional problem is the lack of historical precedent for Congress's action." *NFIB*, 567 U.S. at 549 (Roberts, C.J.) (cleaned up) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)). The founding generation launched the Constitution in an atmosphere of intense suspicion about federal encroachment on state sovereignty. *See Centinel Letter I* (Oct. 5, 1787) (warning power of the proposed government would "necessarily absorb the state legislatures and judicatories" and "melt[] [the United States] down into one empire"), *reprinted in* THE ESSENTIAL ANTIFEDERALIST 102 (W.B. Allen & Gordon Lloyd eds., 2002). If Congress had deployed its Indian affairs power to govern state governments, some evidence would remain. Finding none, we have "reason to believe that the power was thought not to exist." *Printz*, 521 U.S. at 905.

The Constitution gives Congress sweeping powers over Indians. But the power Congress claims in ICWA finds no support in any Supreme Court decision or founding-era practice. To permit Congress to regulate state child-custody proceedings, whenever they involve Indian children, is incompatible with "our federal system, [in which] the National Government possesses only limited powers [and] the States and the people retain the remainder." *Bond*, 572 U.S. at 854. To the extent ICWA governs child-custody proceedings under state jurisdiction, it exceeds Congress's power.

### III. Challenges to Specific ICWA Provisions

Alternatively, we address Plaintiffs' claims that parts of ICWA violate the Fifth Amendment (III(A)); the commandeering doctrine (III(B)); the

nondelegation doctrine (III(C)); and the APA (III(D)). We then consider the appropriate remedy (III(E)).

## A. Fifth Amendment Equal Protection

We first address whether ICWA violates the equal protection component of the Fifth Amendment. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 215–27, 235 (1995); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). "Fifth Amendment equal protection claims against federal actors are analyzed under the same standards as Fourteenth Amendment equal protection claims against state actors." *Butts v. Martin*, 877 F.3d 571, 590 (5th Cir. 2017) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)). Laws that classify citizens by race or ancestry trigger "the 'most rigid scrutiny.'" *Fisher v. Univ. of Tex.*, 570 U.S. 297, 309–10 (2013) (citing, *inter alia*, *Rice v. Cayetano*, 528 U.S. 495, 517 (2000); *Bolling*, 347 U.S. at 499; quoting *Loving v. Virginia*, 388 U.S. 1, 11 (1967)). Laws that do not classify in those ways, however, must still be "rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973)).

Plaintiffs claim ICWA violates equal protection: (1) by treating "Indian children" differently from non-Indian children; and (2) by preferring "Indian families" over non-Indian families. Both classifications, they argue, are racial and fail strict scrutiny. Alternatively, Plaintiffs say neither classification rationally links children with their tribes. Relying heavily on *Mancari*, Defendants counter that ICWA adopts "political" classifications subject to rational basis review. They say ICWA turns on a child's actual or potential tribal affiliation, not race, and so rationally furthers "Congress's 'unique obligation toward the Indians.'" They also defend ICWA's preference for Indian over non-Indian families because "many tribes have deep historic and cultural connections with other tribes, and . . .

many Indian children may be eligible for membership in more than one tribe."

Siding with Plaintiffs, the district court concluded ICWA classifies by race and fails strict scrutiny. The court stressed that ICWA covers children "simply *eligible* for [tribal] membership who have a biological Indian parent."[65] *Brackeen*, 338 F. Supp. 3d at 533. Surveying membership criteria, the court reasoned that ICWA applies if a child is "related to a tribal ancestor by blood." *Id.* The court also found that ICWA fails strict scrutiny because it is not narrowly tailored to maintaining tribal ties. ICWA applies to "eligible" children who may "never be members of their ancestral tribe." *Id.* at 533, 536 ICWA also "priorit[izes] a child's placement with any Indian," regardless of tribe, thus "impermissibly . . . treat[ing] 'all Indian tribes as an undifferentiated mass.'" *Id.* at 535 (cleaned up) (quoting *United States v. Bryant*, 136 S. Ct. 1954, 1968 (2016) (Thomas, J., concurring)).

### 1. Even assuming ICWA classifies by tribe, not race, it still must rationally link children to tribes.

The parties dispute whether ICWA classifies by race or tribe. Under Supreme Court precedent, which we examine below, that is a close question. Whatever the answer, though, the cases teach that the classifications still must rationally further ICWA's goal of linking children with tribes. Because we resolve the equal protection challenges on that basis (*infra* III(A)(2)–(3)), we need not decide whether ICWA classifies by race. Here we provide necessary context for our analysis by surveying the Court's Indian-classification cases from *Mancari* (1974) to *Adoptive Couple* (2013).

---

[65] *See* § 1903(4) (defining Indian child as an unmarried minor who is either a tribal member or "eligible for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe").

The seminal case is *Mancari*, which upheld a federal preference for hiring "Indians" at the Bureau of Indian Affairs ("BIA"). 417 U.S. at 551–55. "Indian" meant a tribe member with "one-fourth or more degree Indian blood." *Id.* at 553 n.24. The Court found this a "political rather than racial" preference because it excluded many "racial[]" Indians and was granted to Indians only "as members of quasi-sovereign tribal entities." *Id.* at 553 n.24, 554. Separately, the Court required the preference to be "reasonable and rationally designed to further Indian self-government." *Id.* at 555.[66] Importantly, the preference "d[id] not cover any other Government agency or activity," and so did not raise "the obviously more difficult question that would be presented by a blanket exemption for Indians from all civil service examinations." *Id.* at 554.[67]

---

[66] As the Court explained, the preference: (1) was "an employment criterion reasonably designed to further the cause of Indian self-government," *Mancari*, 417 U.S. at 554; (2) insured "participation by the governed in the governing agency," *id.*; (3) was akin to requiring officials to reside in the jurisdictions they govern, *id.*; (4) applied only to the BIA, whose "legal status [w]as truly *sui generis*" because it "governed . . . [tribal entities] in a unique fashion," *id.*

[67] Given our discussion of *Mancari*, we are puzzled by JUDGE COSTA's insistence that we harbor "the notion that the Constitution prohibits the federal government from granting preferences to tribe members." COSTA OP. at 18. JUDGE COSTA quotes nothing from our opinion to prove that claim. To the contrary, we recognize that *Mancari* permits certain federal preferences for tribe members. *See* 417 U.S. at 538, 541 (upholding BIA hiring preference for Indians and noting "[t]he federal policy of according some hiring preference to Indians in the Indian service dates at least as far back as 1834") (citations omitted). But the issue here—one *Mancari* itself recognized—is the permissible extent of those preferences. *See id.* at 554 (observing that "the BIA is truly *sui generis*," that "the preference does not cover any other Government agency or activity," and consequently that "we need not consider the obviously more difficult question that would be presented by a blanket exemption for Indians from all civil service examinations"). JUDGE COSTA pivots from this baseless claim to accuse us of "activis[m]," COSTA OP. at 20, and to propose a debate—one far afield from the issues in this case—over whether "[o]riginalism usually goes AWOL when the issue is whether the government may grant preferences to historically disadvantaged groups," *id.* at 18. We decline the invitation.

From 1974 to 1979, the Court applied *Mancari* to turn back similar equal protection challenges. It upheld laws: (1) granting a tribe sole jurisdiction over on-reservation adoptions;[68] (2) barring states from taxing on-reservation sales;[69] (3) disbursing treaty funds based on tribe membership;[70] (4) creating a criminal code for Indian lands;[71] (5) authorizing states to exercise jurisdiction over in-state Indian lands;[72] and (6) securing fishing rights to certain tribes.[73] These cases emphasized two things about permissible Indian classifications. First, they turn on tribal status, not race. Second, they reasonably further tribal interests—for instance, in self-government, economic development, and protecting Indian lands.[74]

---

[68] *Fisher*, 424 U.S. at 384 n.5, 387, 389–91.

[69] *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 475–80 (1976).

[70] *Weeks*, 430 U.S. at 79–85.

[71] *Antelope*, 430 U.S. at 646–47 & n.7.

[72] *Yakima Nation*, 439 U.S. at 471–76, 484.

[73] *Fishing Vessel*, 443 U.S. at 684–85f.

[74] *See, e.g.*, *Fisher*, 424 U.S. at 387–91 (noting the law classified not by race but by the tribe's "quasi-sovereign status," and "further[ed] . . . Indian self-government" by excluding state jurisdiction); *Moe*, 425 U.S. at 475–80 ("special [tax] treatment" turned on treaty and furthered "Congress' unique obligation toward the Indians" (quoting *Mancari*, 417 U.S. at 555) (cleaned up)); *Weeks*, 430 U.S. at 79–85 (distribution turned on whether recipients were descendants of Delawares who maintained tribal membership); *Antelope*, 430 U.S. at 646 & n.7 (criminal code applied based on whether defendants were "enrolled [tribe] members" and acted "within . . . Indian country" (citing *Mancari*, 417 U.S. at 553 n.24)); *Yakima Nation*, 439 U.S. at 471–76, 500–02 (state jurisdiction turned only on "tribal status and land tenure," and was "fairly calculated" to balance non-Indian rights with "tribal self-government"); *Fishing Vessel*, 443 U.S. at 673 & n.20 (fishing rights turned on tribal status, not race).

Moving ahead several years, two decisions have clarified how equal protection applies to Indian classifications. Those are *Rice* and *Adoptive Couple*.[75]

*Rice* asked whether the Hawaii Constitution could allow only "Hawaiians" to elect trustees of a state "Hawaiian Affairs" agency. 528 U.S. at 499. The Court held that the classification violated the Fifteenth Amendment. *Id.* The definition of "Hawaiian"—"any descendant of the aboriginal peoples" inhabiting the islands since 1778—was "a proxy for race" because it traced a person's genetic relationship to aboriginal "races." *Id.* at 514–16. Relevant here, *Rice* held the voting restriction was not justified by *Mancari*. *Id.* at 518–22.

Even assuming native Hawaiians were like Indian tribes, the Court refused to "extend the limited exception of *Mancari* to [this] new and larger dimension." *Id.* at 518, 520. *Mancari*'s hiring preference was "rationally

---

[75] Plaintiffs argue that a more radical limit on *Mancari* arises from the Supreme Court's 1995 decision in *Adarand*. That decision addressed a federal program that paid highway contractors to hire subcontractors controlled by "socially and economically disadvantaged individuals." 515 U.S. at 204. The program presumed social disadvantage if individuals were "black, Hispanic, Asian Pacific, Subcontinent Asian, [or] *Native Americans*." *Id.* at 207 (citation omitted) (emphasis added). Without discussing *Mancari*, the Court treated these as "race-based presumptions," *id.* at 208, subject to strict scrutiny. Although *Adarand* did not specifically address the Native American category, more than one federal judge has cautioned that *Adarand* may undercut *Mancari*. *See id.* at 244–45 & n.3 (Stevens, J., dissenting) (warning the majority's reasoning "would view the special preferences that the National Government has provided to Native Americans since 1834 as comparable to" race discrimination (citing *Mancari*, 417 U.S. at 541, 551–52, 553–54 & n.24)); *Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997) ("If Justice Stevens is right about the logical implications of *Adarand*, *Mancari*'s days are numbered."); *but see Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 520–23 (D.C. Cir. 2003) (rejecting argument that *Adarand* impacts scrutiny for appropriations preference "promoting the economic development of federally recognized Indian tribes"). Because we do not decide whether ICWA's classifications are race-based, however, we need not address whether *Adarand* undercuts *Mancari*.

designed to further Indian self-government" in a "*sui generis*" context. *Id.* at 520 (quoting *Mancari*, 417 U.S. at 554, 555). But the decision could not support limiting voting for state offices to "a class of tribal Indians." *Id.* This was because *Mancari* concerned only "the internal affair of a quasi sovereign" (a tribe), while the election in *Rice* concerned the entire "State of Hawaii." *Id.* "To extend *Mancari* to this context," the Court held, "would be to permit a State, by racial classification, to fence out whole classes of its citizens from decisionmaking in critical state affairs." *Id.* at 522. Thus, in deciding *Rice*, the Court clarified that *Mancari*'s "limited" hiring preference for Indians could not support preferring Indians in "critical state affairs" like an election. *Id.* at 520, 522.[76]

The second key decision is *Adoptive Couple*, which interpreted ICWA in a dispute between an Indian child's adoptive parents and her biological father. 570 U.S. at 643–46. The Court held that certain ICWA provisions—its termination standard (§ 1912(f)), active-efforts requirement (§ 1912(d)), and placement preferences (§ 1915(a))—do not apply where the child's biological father never had custody because he had abandoned the child. *Id.* at 648, 651–56.[77] Relevant here, the Court warned that certain applications of ICWA may deny a child equal protection.

---

[76] *See, e.g.*, *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004) (explaining *Rice* stands for the proposition that "Congress may not authorize special treatment for a class of tribal Indians in a state election").

[77] The Court explained that the termination standard—requiring a showing that the parent's "continued custody" may seriously harm the child, § 1912(f)—would not apply where a parent never had custody. *Adoptive Couple*, 570 U.S. at 648. Similarly, the active-efforts requirement—requiring "active efforts" to "prevent the breakup of the Indian family," § 1912(d)—would not apply where the parent had abandoned the child (there being no Indian family to "break up"). *Id.* at 651–53. Finally, the placement preferences would not apply "if no alternative party that is eligible to be preferred . . . has come forward." *Id.* at 654.

Specifically, the Court warned against applying ICWA to "put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian." *Id.* at 655. It observed that "a biological Indian father could abandon his child *in utero* and refuse any support for the birth mother . . . and could then play his ICWA trump card at the eleventh hour to override the mother's decision and the child's best interests." *Id.* at 656. If ICWA required that result, "many prospective adoptive parents would surely pause before adopting any child who might possibly qualify as an Indian under the ICWA." *Id.* "Such an interpretation," the Court stated, "would raise equal protection concerns." *Id.*

In sum, in equal protection challenges the Supreme Court has permitted Indian classifications based on tribal status (not race), if they rationally further federal obligations to tribes. This is logical, given the Constitution itself includes the category of "Indian Tribes." *See* U.S. Const. art. I, § 8, cl. 3 (vesting Congress with power to "regulate Commerce . . . with the Indian Tribes").[78] At the same time, the Court has warned that Indian classifications may raise equal protection concerns when deployed outside the tribal context. A classification may go beyond internal tribal matters and interfere with state affairs (as in *Rice*), or it may disadvantage a child with tenuous links to a tribe (as in *Adoptive Couple*).

ICWA's classifications exist in the twilight between tribe and race. As Defendants point out, ICWA links its "Indian child" definition to tribes: a child must be a tribe member or at least "eligible" for membership and the

---

[78] *See also*, *e.g.*, *United States v. Zepeda*, 792 F.3d 1103, 1117 (9th Cir. 2015) (Kozinski, J., concurring in the judgment) ("The Supreme Court has stressed time and time again that federal regulation of Indian *tribes* does not equate to federal regulation of the Indian *race*." (citing *Fisher*, 424 U.S. at 390), *Antelope*, 430 U.S. at 646, and *Mancari*, 417 U.S. at 553 n.24)).

offspring of a member. *See* § 1903(4). As Plaintiffs respond, however, whether a child is "eligible" for membership often turns on a child's quantum of Indian blood. For instance, one child in this case, Y.L.M., is eligible for membership in the Navajo Tribe because she is one-half "Navajo Indian Blood." As Plaintiffs forcefully argue, the fact that ICWA may apply depending on the degree of "Indian blood" in a child's veins comes queasily close to a racial classification.[79]

For present purposes, we need not decide whether ICWA classifies by race or tribe. Regardless, the Supreme Court still requires the law's classifications be "reasonable and rationally designed" to further federal obligations toward tribes. *Rice*, 528 U.S. at 520 (quoting *Mancari*, 417 U.S. at 555). As explained below, ICWA's separate standards for Indian children—standards which govern state proceedings, apply to children with tenuous connections to a tribe, and allow birth parents' wishes to be overridden—fail to rationally further tribal interests. That is even more evident with respect to ICWA's preference for Indian over non-Indian families, which is divorced from Congress's goal of keeping children linked to their tribe. [80]

---

[79] *See, e.g.*, *Zepeda*, 792 F.3d at 1117 (Kozinski, J., concurring in the judgment) (making applicability of Indian Major Crimes Act turn, even partially, on "proof of some quantum of Indian blood" creates an "overt racial classification"); *id.* at 1119–20 (Ikuta, J., concurring in the judgment) (use of "blood quantum test" in same law is foreclosed by *Rice*'s "opposition to 'ancestral tracing of this sort'" (cleaned up) (quoting *Rice*, 528 U.S. at 510)).

[80] JUDGE DENNIS takes issue with our tailoring analysis on two related grounds. First, he chides us for not "truly" arguing that ICWA fails rational basis review but instead only arguing that "ICWA uses *impermissible means*" to further Congress's tribal obligations. DENNIS OP. at 120. Second, he contends we "apply a far more searching standard of scrutiny" than rational basis. *Id.* at 120–21. The simple answer to both contentions is that we are faithfully following the tailoring analysis for Indian classifications laid out by *Mancari*, *Rice*, and *Adoptive Couple*. JUDGE DENNIS's analysis, by contrast,

### 2. The "Indian child" classification fails to rationally further ICWA's goal of linking children to tribes.

For three related reasons, ICWA's disparate standards for "Indian children" fail to rationally further federal obligations toward Indian tribes.

First, ICWA creates separate standards for Indian children that extend beyond internal tribal affairs and intrude into state proceedings. *Mancari* long ago cautioned that a "blanket exemption" for Indians in the civil service system would raise "obviously . . . difficult" equal protection problems. 417 U.S. at 554. *Rice* amplified this warning, holding an Indian classification could not "extend" beyond a tribe's "internal affair[s]" into an "affair of the State," like an election. 528 U.S. at 520–22. ICWA does just what *Mancari* foretold and *Rice* forbade: it creates disparate standards for Indian children in state proceedings. By exporting a blanket Indian exception into state proceedings, ICWA violates *Rice* and severs any connection to internal tribal concerns.

Compare this intrusion on state jurisdiction with the law upheld in *Fisher*. *Supra* II(B)(1). *Fisher* approved exclusive tribal jurisdiction for adoptions where the child, birth parents, and adoptive parents were "each and all members of the [tribe] and . . . reside[d] within the exterior boundaries of the [reservation]." 424 U.S. at 384 n.6. That limited measure was "justified" because it "further[ed] the congressional policy of Indian self-government." *Id.* at 391. By contrast, ICWA dictates different standards for Indian children within "the States['] . . . recognized jurisdiction." § 1901(5). By imposing "Indian child" standards on state proceedings,

---

proceeds as if those precedents had no bearing on this question at all, which is incorrect. *See infra* III(A)(2)–(3).

ICWA severs the link to tribal self-government or any other tribal interest identified by the Supreme Court.

In disagreeing with this analysis, Defendants and JUDGE DENNIS misread *Rice*. First, they claim *Rice* merely reaffirmed *Mancari* and nothing more. DENNIS OP. at 117. Not so: *Rice* specified that *Mancari*'s "limited" and "*sui generis*" Indian classification could not apply outside the tribal context to a state-wide election. 528 U.S. at 520–22. Thus, JUDGE DENNIS is wrong to argue that "the degree to which [ICWA] intrudes on state proceedings has no bearing on whether [ICWA] is rationally linked to protecting Indian tribes." DENNIS OP. at 120. To the contrary, *Rice* said this is a critical factor: an Indian classification cannot be transplanted from the "internal affair[s]" of tribes into external matters concerning all state citizens. 508 U.S. at 520; *see, e.g.*, *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004) (explaining that, after *Rice*, "Congress may not authorize special treatment for a class of tribal Indians in a state election"). Next, Defendants and JUDGE DENNIS say *Rice*, unlike this case, concerned the Fifteenth Amendment. DENNIS OP. at 121. That is true but misses the point. *Rice* said an Indian class could not be used "in critical state affairs." 528 U.S. at 522. Child-custody proceedings are no less critical to states than was the agency election in *Rice*. *See, e.g.*, *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The State . . . has a duty of the highest order to protect the interests of minor children, particularly those of tender years."). Finally, Defendants argue that, unlike in *Rice*, ICWA does not "*bar* any person . . . from participating in child-custody proceedings" (emphasis added). That is beside the point. *Rice* did not turn on whether people's rights were "barred" or only limited. Its point was that a tribal classification—which could limit participation in a tribe's "internal affair[s]"—cannot do so in "affair of the

62

[s]tate," like the state election in *Rice* or the state custody proceedings here. *Id.* at 520.[81]

Second, ICWA covers children only "eligible" for tribal membership. Enacting ICWA, Congress declared "there is no resource that is more vital to the continued existence and integrity of Indian tribes than *their* children." § 1901(3) (emphasis added). But ICWA applies not only to child tribe members, but also to a child only "*eligible* for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe." § 1903(4) (emphasis added). As Defendants tell us, "[m]embership in an Indian tribe is generally not conferred automatically upon birth," but requires "affirmative steps" by parents or guardians. *See* 81 Fed. Reg. at 38,783 (explaining "Tribal membership . . . is voluntary and typically requires an affirmative act by the enrollee or her parent"). This means ICWA applies to a child who is not, and may never become, a tribe member.

Federal Defendants respond that, because a child's "formal enrollment" in a tribe depends on parents or guardians, eligibility is a "proxy" for the child's "not-yet-formalized tribal affiliation." This is just a complicated way of saying that a child only *eligible* for membership may never become a member, and may have no other tangible connection to a tribe. The cases before us illustrate the point better than any abstract discussion could.

---

[81] JUDGE DENNIS goes so far as to say that state child-custody proceedings involving Indian children are somehow no longer purely *state* affairs. Relying on Congress's finding that Indian children are tribes' "vital" "resource[s]," 25 U.S.C. § 1901(3), he claims: "[E]ven when ICWA reaches into state court adoption proceedings, those proceedings are simultaneously affairs of states, tribes, and Congress." DENNIS OP. at 122. No authority supports that remarkable claim. ICWA's own findings recognize that "the States" have "their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies," 25 U.S.C. § 1901(5), and its provisions maintain the distinction between state and tribal jurisdiction, *id.* § 1911(a), (b).

63

Take A.L.M., whom the Brackeens eventually adopted, with his birth parents' approval, over objections by the Navajo Nation. A.L.M.'s only tie to the Navajo is that his mother is a member (his father is Cherokee). But neither A.L.M. nor his birth parents have ever lived on the Navajo reservation during A.L.M.'s life, except for the "day he was born and the next day." The Navajo never tried to participate in A.L.M.'s adoption proceedings. And the only reason A.L.M. is considered Navajo (and not Cherokee) is that "representatives of the Cherokee and Navajo Nations . . . reached an agreement in the hallway outside the hearing room that A.L.M. would become a member of the Navajo Nation because only the Navajo had identified a potential foster placement." Or take Child P., whom the Cliffords are trying to adopt over objections by the White Earth Band of Ojibwe Indians. Child P. is linked to the White Earth Band through her maternal grandmother, R.B. Before Child P. was placed with the Cliffords, the tribe wrote the state court that Child P. was ineligible for membership. After placement, however, the tribe changed its position and declared Child P. eligible. This triggered ICWA's placement preferences: Child P. was taken from the Cliffords and placed with R.B., whose foster license had been previously revoked by the state.

As these cases illustrate, ICWA permits a child's inchoate tribal membership to override her placement in state proceedings.[82] ICWA thereby

---

[82] JUDGE DENNIS waves away this (and the next) tailoring flaw in ICWA because he claims they only make the law "under- and over-inclusive." DENNIS OP. at 122–23. We disagree. First, JUDGE DENNIS again disregards what *Mancari*, *Rice*, and *Adoptive Couple* teach about tailoring: overbroad Indian classifications divorced from tribal interests create equal protection problems. *See Mancari*, 417 U.S. at 554; *Rice*, 528 U.S. at 520–22; *Adoptive Couple*, 570 U.S. at 655. Second, the "eligibility" criterion does not merely make ICWA "over-inclusive." Eligibility—one of only two ways to trigger ICWA—makes the law cover children (like the ones here) with no actual connection to a tribe. Third, as discussed below, allowing ICWA to *override* birth parents' wishes to place their children with non-Indians does not mean ICWA only has "imperfect means-ends fit[]." DENNIS

"put[s] certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian." *Adoptive Couple*, 570 U.S. at 655. This squarely raises the "equal protection concerns" forecast by the Supreme Court in *Adoptive Couple*.[83]

Third, ICWA overrides the wishes of biological parents who support their child's adoption outside the tribe. When enacting ICWA, Congress proclaimed that too many Indian families were being "broken up" when non-tribal agencies engaged in the "often unwarranted" "removal" of children and placed them with "non-Indian" families. § 1901(4). But ICWA applies even when an Indian child's parents do not oppose adoption outside the tribe. In other words, ICWA applies in circumstances entirely unlike those that gave rise to the law—situations where no Indian family is being "broken up" by state authorities and where parents themselves acquiesce in children's being placed in "non-Indian foster [or] adoptive homes." *Id.*

Again, the cases before us illustrate the point. Take Baby O., the child of Altagracia Hernandez (a non-Indian) and E.R.G. (descended from members of the Ysleta del sur Pueblo Tribe). Both parents supported Baby O.'s adoption by the non-Indian Librettis—indeed, Hernandez is a plaintiff in this case alongside the Librettis. Yet the Pueblo, asserting E.R.G. was a

---

OP. at 123 (citation omitted). Instead, it makes nonsense of ICWA's key goal of preventing the *break-up* of Indian families. *See* 25 U.S.C. § 1901(4). Finally, JUDGE DENNIS discounts ICWA's first tailoring flaw—namely, its intrusion into state proceedings in defiance of *Mancari* and *Rice*. Taken together, these three flaws show ICWA fails to rationally further its goals.

[83] Few provisions in Title 25 define "Indian" to include persons "eligible" for tribal membership. *See, e.g.*, 25 U.S.C. § 2511(3) (defining "Indian" this way for purposes of tribal school grants). None of these provisions, however, has any impact on state proceedings as ICWA does. *Cf., e.g.*, § 2502(a)(1) (authorizing federal grants to tribes that operate certain schools). Consequently, none is affected by our holding that ICWA's inclusion of "eligible" members is one factor that severs its connection to tribal interests.

member, intervened and proposed numerous Indian-family placements under ICWA. Or again take A.L.M., whose Navajo mother and Cherokee father both testified they support A.L.M.'s adoption by the non-Indian Brackeens. Nonetheless, the Navajo sought to block the Brackeens' adoption of A.L.M. in favor of placing the child with unrelated tribe members, and is now doing the same with the Brackeens' attempt to adopt A.L.M.'s half-sister, Y.R.J. *See In re Y.J.*, 2019 WL 6904728, at *3–5.

As Plaintiffs point out, allowing ICWA to override birth parents' wishes in this way again raises the "equal protection concerns" foreshadowed by *Adoptive Couple*. In that case, the Court warned ICWA was open to equal protection challenge if it allowed a tribe member "to override the mother's decision and the child's best interests" and thus "put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian." 570 U.S. at 655–56. What the Court foretold there is what has happened here to A.L.M, Y.R.J., and Baby O.: their parents' wishes were potentially or actually overridden by a non-custodial tribe member's invocation of ICWA. Applying ICWA in this way does nothing to further Congress's original aim of preventing Indian families' being "broken up" by the "unwarranted removal" of their children and placement with non-Indian families. § 1901(4).

In sum, we conclude that ICWA's "Indian child" classification violates the equal protection component of the Fifth Amendment.[84]

---

[84] As the district court found, this conclusion directly impacts the placement preferences in § 1915(a) and (b), the collateral attack provisions in §§ 1913 and 1914, and the Final Rule provisions in 25 C.F.R. §§ 23.129–132.

### 3. The "Indian family" classification fails to rationally further ICWA's goal of linking children to tribes.

We next consider Plaintiffs' claim that ICWA impermissibly discriminates against non-Indian families. While Plaintiffs challenge ICWA's placement preferences as a whole on this basis, the logical focus of the claim is on the adoptive preference for "other Indian families" in § 1915(a), as well as the preference for a licensed "Indian foster home" in § 1915(b). *See* §§ 1915(a)(3), 1915(b)(iii). In these provisions, ICWA's preference for "Indian" over "non-Indian" families is most evident. Plaintiffs argue this privileging of Indian over non-Indian families is a racial classification that fails strict scrutiny. As with the Indian child classification, however, we assume *arguendo* that "Indian family" is a tribal, not a racial, category. We do so because we agree with Plaintiffs' alternative argument that the preference fails to rationally further Congress's goal of keeping Indian children linked to their own tribe. As Plaintiffs correctly point out, "placing a tribal child with a *different* Indian tribe does not even conceivably advance the continued existence and integrity of the child's tribe."

ICWA's overriding purpose was to safeguard the continued "existence and integrity of Indian tribes" by protecting "their children" from unwarranted removal. § 1901(3). Congress invoked the United States' interest "in protecting Indian children who are members or eligible for membership in an Indian tribe." *Id.* Congress also faulted states for "often fail[ing] to recognize the essential tribal relations of Indian people." § 1901(5). Many of ICWA's provisions seek to further this tribe-focused goal. For instance, a tribe has exclusive jurisdiction of adoptions involving an Indian child domiciled "within the reservation of *such tribe*." § 1911(a) (emphasis added). Right to intervene is given to "the Indian child's tribe." § 1911(c). And some of ICWA's placement preferences are tribe-based— obviously the preference for "other members of the Indian child's tribe"

67

(§ 1915(a)(2)), but also the preference for "a member of the child's extended family" (§ 1915(a)(1), 1915(b)(i)), who is presumably of the same tribe.

ICWA, however, also has provisions broadly preferring "Indian families" over non-Indian families. A non-Indian family seeking to adopt or foster an Indian child, absent "good cause to the contrary," will fail if "other Indian families" or "Indian foster home[s]" are available. §§ 1915(a)(3), 1915(b)(iii). Nothing requires these Indian families or homes to be of a child's tribe. *See* § 1903(3) (relevantly defining "Indian" as "any person who is a member of an Indian tribe"). In fact, they are virtually assured not to be: otherwise, they would qualify as "other members of the Indian child's tribe." § 1915(a)(2).

We agree with Plaintiffs that a naked preference for Indian over non-Indian families does nothing to further ICWA's stated aim of ensuring that Indian children are linked to their tribe. This conclusion follows *a fortiori* from our conclusion that ICWA's Indian child category is insufficiently linked to federal tribal interests. The Indian child category encompassed children who were not, and may never be, members of a tribe. Even more, ICWA's preference for "Indian families" lacks any connection to a child's tribe: as explained, the Indian families preferred over non-Indian families are, by definition, not members of the child's tribe. Thus, the preference has no rational link to maintaining a child's links with his tribe. Similarly, the Indian child category ran afoul of *Mancari*, *Fisher*, and *Rice* by creating a blanket exception for Indian children in state child-custody proceedings. The Indian family category does the same: by definition, Indian families have a statutorily-conferred advantage over non-Indian families with respect to state adoptions and foster placements. Even assuming the Indian family category is tribal and not racial, ICWA extends the category far beyond *Mancari* and *Fisher*, and infiltrates the kind of "critical state affairs" that *Rice* forbade. *See Rice*, 528 U.S. at 522.

68

In response, Federal Defendants argue that this "Indian family" preference is not merely a "preference for 'generic "Indianness."'" They assert it instead "reflects the reality that many tribes have deep historic and cultural connections with other tribes, and that many Indian children may be eligible for membership in more than one tribe." We are unpersuaded. Even accepting that some tribes are interrelated, ICWA's Indian family preference is not limited in that way. Rather, the preference privileges Indian families of *any* tribe, regardless of their connection to the child's tribe, over all non-Indian families. ICWA's classification therefore does not rationally further linking children to their tribes.

In sum, we conclude ICWA's preferring Indian over non-Indian families violates the equal protection component of the Fifth Amendment.

## B. Commandeering and Preemption

The district court concluded numerous provisions of ICWA "commandeer" state agencies and courts in violation of Article I and the Tenth Amendment.[85] *See Brackeen*, 338 F. Supp. 3d at 538–41. The court also ruled that the preemption doctrine does not save these provisions because they "directly command states." *Id.* at 541. On appeal, Defendants argue ICWA does not commandeer states because it evenhandedly regulates an activity in which both states and private parties engage. They also claim the challenged provisions merely create federal rights enforceable in state courts under the Supremacy Clause.

The anti-commandeering doctrine recognizes the "fundamental structural" principal that "the Constitution . . . withhold[s] from Congress

---

[85] Specifically, the court found invalid §§ 1901–23 and 1951–52, which "include the congressional findings and declaration of policy, definitions, child custody proceedings, record keeping, information availability, and timetables."

the power to issue orders directly to the States." *Murphy*, 138 S. Ct. at 1475; *see generally Printz*, 521 U.S. 898; *New York*, 505 U.S. 144; *FERC v. Mississippi*, 456 U.S. 742 (1982); *Hodel v. Va. Surface Mining & Reclamation Ass'n., Inc.*, 452 U.S. 264 (1981). To be sure, Congress may encourage states to regulate as it wishes. For instance, Congress may "attach conditions on the receipt of federal funds" under the Spending Clause. *New York*, 505 U.S. at 167 (quoting *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)). Or it may offer states the option of regulating "private activity . . . according to federal standards or having state law pre-empted by federal regulation." *Id.* (citing *Hodel*, 452 U.S. at 288). What Congress cannot do, however, is issue "a simple command to state governments to implement legislation enacted by Congress." *Id.* at 176. Nor may it "compel the States to enact or administer a federal regulatory program." *Id.* at 188. This anti-commandeering doctrine reflects a basic principle: "[t]he Constitution confers on Congress not plenary legislative power but only certain enumerated powers," and "conspicuously absent" from those is "the power to issue direct orders to the governments of the States." *Murphy*, 138 S. Ct. at 1476.

The Supreme Court has deployed this doctrine to declare unconstitutional federal legislation commanding state legislatures, officers, and agencies. For instance, Congress could not make state legislatures "take title" to radioactive waste, nor make state executive agencies "regulat[e] [waste] according to the instructions of Congress." *New York*, 550 U.S. at 175–76; *see also Murphy*, 138 S. Ct. at 1476 (the law in *New York* "issued orders to either the legislative or executive branch of state government"). Congress also could not compel state or local officers to conduct background checks under a federal firearms law. *Printz*, 521 U.S. at 903–04, 933. Such a requirement—even if it involved only "discrete, ministerial tasks," *id.* at 929—would amount to "the forced participation of the States' executive in the actual administration of a federal program." *Id.* at 918. Finally, Congress

70

could not prohibit states from "author[izing]" sports gambling because that would "unequivocally dictate[] what a state legislature may and may not do." *Murphy*, 138 S. Ct. at 1470, 1478.

Different dynamics come into play when asking—as the district court did here—whether federal law commandeers state *courts*. This is due to the Supremacy Clause, which binds "the Judges in every State" to follow validly enacted federal law. U.S. CONST. art. VI, cl. 2; *see Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (Supremacy Clause "provides 'a rule of decision' for determining whether federal or state law applies in a particular situation" (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015))). Thus, Congress may, "in a sense, direct state judges" by enacting federal law state courts must apply. *New York*, 505 U.S. at 178–79.[86] Similarly, state judges must apply federal law that validly preempts applicable state law. *Murphy*, 138 S. Ct. at 1479. So, if federal law is enforceable in state courts or preempts state law, no "commandeering" arises from the fact that state courts must apply the federal enactment—rather, this is what the Supremacy Clause demands. *New York*, 505 U.S. at 179; *see also Printz*, 521 U.S. at 907 (state courts "have been viewed distinctively in this regard" because "unlike legislatures and executives, they applied the law of other sovereigns all the time"). The Supremacy Clause, however, assumes the same limit on Congress's power that the anti-commandeering doctrine does—that Congress may regulate only individuals, not state governments.[87] In that

---

[86] *See also id.* at 179 (explaining "this sort of federal 'direction' of state judges is mandated by the text of the Supremacy Clause"); *Printz*, 521 U.S. at 907 (suggesting "the Constitution was originally understood to permit imposition of an obligation on state *judges* to enforce federal prescriptions").

[87] *See New York*, 505 U.S. at 178 (federal laws enforceable in state courts "involve congressional regulation of individuals, not congressional requirements that States

regard, then, the operation of the Supremacy Clause overlaps with anti-commandeering.

Finally, we should not lose sight of why anti-commandeering is critical. First, the doctrine protects the division of power between federal and state governments, which "secures to citizens the liberties that derive from the diffusion of sovereign power" and "reduce[s] the risk of tyranny and abuse from either front." *New York*, 505 U.S. at 181–82 (citations omitted). Second, the doctrine "promotes political accountability" by letting voters know "who to credit or blame" for good or bad policies. *Murphy*, 138 S. Ct. at 1477.[88] Third, the doctrine "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477.[89]

With that background in mind, we proceed to our analysis. We first address Plaintiffs' anti-commandeering challenges (*infra* III(B)(1)). We next address whether the preemption doctrine saves any of the challenged provisions (*infra* III(B)(2)). As the Supreme Court has done in this area, we analyze the challenged provisions separately.[90] ICWA touches many aspects

---

regulate"); *Murphy*, 138 S. Ct. at 1481 (explaining "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States").

[88] *See also New York*, 505 U.S. at 169 ("[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.").

[89] *See also Printz*, 521 U.S. at 930 ("By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes.").

[90] *See, e.g.*, *Murphy*, 138 S. Ct. at 1470 (analyzing only the component of the Professional and Amateur Sports Protection Act, 28 U.S.C. § 3702(1), that prohibits states from "authoriz[ing] by law" sports betting); *Printz*, 521 U.S. at 902–03 (analyzing only those Brady Act sections, 18 U.S.C. § 922(s)(2), 922(s)(6)(C), 922(s)(6)(B), applicable to a "chief law enforcement officer"); *New York*, 505 U.S. at 152–54, 174–77 (analyzing

of state child-custody proceedings. It would not be implausible to find constitutionally problematic provisions alongside permissible ones.[91]

### 1. Commandeering

As discussed, the anti-commandeering doctrine typically asks whether federal law conscripts state agencies or officials. This part therefore focuses on Plaintiffs' claims that ICWA compels action by state child welfare agencies. Where Plaintiffs instead challenge provisions compelling state courts, we consider those claims under preemption analysis, *infra*.

#### a. *ICWA's active-efforts, expert-witness, placement-preference, placement-record, and notice provisions commandeer state agencies.*

No Defendant denies that ICWA requires action by state child welfare agencies. This is unsurprising. What prompted ICWA, after all, were concerns about Indian families' treatment by "State[ ] . . . *administrative* and judicial bodies." § 1901(5) (emphasis added). ICWA obviously covers matters—child-custody proceedings—lying within the purview of state agencies.[92] ICWA's regulations, moreover, describe actions that must be taken by "State agencies," "governmental organizations," and "State

---

separately the "take title" provision of the Low-Level Radioactive Waste Policy Amendments Act, 42 U.S.C. § 2021e(d)(2)(C)).

[91] *See, e.g.*, *Murphy*, 138 S. Ct. at 1481 (analyzing regulation of state legislatures in PASPA § 3702(1) separately from the "closely related provision" in § 3702(2) regulating "private conduct"); *New York*, 505 U.S. at 173–75 (two of the Act's "incentives" were valid under Spending Clause and preemption, whereas "take-title" provision commandeered states).

[92] *See, e.g.*, Tex. Hum. Res. Code § 40.002(b)(1), (2) (providing Texas Department of Family and Protective Services "shall . . . provide protective services for children" as well as "family support and family preservation services"); Tex. Fam. Code § 262.001(a) (authorizing "governmental entity with an interest in the child" to take actions to protect child).

actors."[93] For instance, ICWA's placement preferences "create[ ] an obligation on *State agencies* and courts to implement the policy outlined in the statute." 81 Fed. Reg. at 38,839 (emphasis added). Thus, the idea that ICWA compels state agencies seems incontestable. As the district court concluded, Texas "indisputably demonstrated that the ICWA requires [Texas's] executive agencies to carry out its provisions." *Brackeen*, 338 F. Supp. 3d at 540. It specifically found that the relevant agency, the DFPS,

> must, among other things[:] serve notice of suit on Indian tribes, verify a child's tribal status, make a diligent effort to find a suitable placement according to the ICWA preferences and show good cause if the preference are not followed, ensure a child is enrolled in his tribe before referring him for adoption, and keep a written record of the placement decision.

*Id.* at 540 & n.18. Defendants dispute none of this.[94]

Turning to the specific challenges before us, we conclude the following ICWA provisions commandeer state agencies.

---

[93] *See*, *e.g.*, 81 Fed. Reg. at 38,779 (ICWA sought to remedy failures by "State agencies and courts"); *id.* at 38,780 (noting "[s]everal ICWA provisions do apply, either directly or indirectly, to State and private agencies"); *id.* at 38,790 ("active efforts" require "substantial and meaningful actions by agencies," meaning "agencies of government"); *id.* at 38,791 (agreeing "active efforts" "require States to affirmatively provide Indian families with substantive services"); *id.* at 38,792 (definition of "agency" includes "governmental organizations"); *id.* at 38,814 ("active efforts" requirement "ensure[s] that State actors . . . provide necessary services to parents of Indian children"). *See also*, *e.g.*, *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 45 n.18 (1989) (observing ICWA sought to address "the failure of State officials [and] agencies" to consider "the special problems and circumstances of Indian families") (internal quotation omitted).

[94] JUDGE DENNIS's opinion does not squarely address whether ICWA commands state agencies. We understand his view to be that the point is immaterial because ICWA "evenhandedly regulates an activity in which both States and private actors engage." DENNIS OP. at 89 (quoting *Murphy*, 138 S. Ct. at 1478). We disagree and respond below.

**i. *Active efforts (§ 1912(d))*.** We begin with the "active efforts" requirement in § 1912(d). Any "party" seeking to place an Indian child in foster care, or to terminate parental rights, must "satisfy the court that active efforts have been made to provide remedial services . . . designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." *Id.* State agencies are "parties" that seek placement or termination with respect to Indian children.[95] Consequently, ICWA's active-efforts requirement demands extensive action by state and local agencies as a condition to fulfilling their obligations to Indian children.[96] For example, in *Doty-Jabbaar v. Dallas County Child Protective Services*, a state appellate court concluded a county agency failed ICWA's active-efforts requirement before terminating a birth mother's rights. 19 S.W.3d 870, 875–76 (Tex. App.— Dallas 2000, pet. denied). Although the agency had given the mother a seven-point plan including "drug treatment, parenting classes, and psychological evaluations," the court found insufficient evidence that "these remedial services and rehabilitation programs had proven unsuccessful." *Id.* at 875.[97]

---

[95] *See, e.g.*, *N.M. v. Tex. Dep't of Fam. & Prot. Servs.*, No. 03-19-00240-CV, 2019 WL 4678420, at *1 (Tex. App. —Austin Sept. 26, 2019, no pet.) (ICWA case involving Texas DFPS's efforts "to terminate the parent-child relationship of N.M. and the children's father"); Tex. Fam. Code §§ 153.371(10), 101.0133 (as child's managing conservator, DFPS has "the right to designate the [child's] primary residence," including foster placement); *see also* 81 Fed. Reg. at 38,792 ("any party" in § 1912 includes "governmental organizations").

[96] *See* 25 C.F.R. § 23.2 (defining "active efforts" to mean "affirmative, active, thorough, and timely efforts" to "maintain or reunite an Indian child with his or her family"); *see also, e.g.*, *In re D.E.D.I.*, 568 S.W.3d 261, 262–63 (Tex. App.—Eastland 2019, no pet.) (trial court "specifically found" that DFPS "made active efforts to provide remedial services and rehabilitation programs" under ICWA).

[97] *Cf., e.g.*, *In re J.L.C.*, 582 S.W.3d 421, 433–34 (Tex. App.—Amarillo 2018, pet. ref'd) (finding ICWA active-efforts burden satisfied because "the [DFPS] had appropriately engaged [the parent] with services but the Department's efforts had failed")

ICWA's regulations confirm that active-efforts demands action by state agencies. Through the "'active efforts' provision . . . Congress intended to require States to affirmatively provide Indian families with substantive services." 81 Fed. Reg. at 38,791. The "active-efforts requirement," they emphasize, "is one critical tool to ensure that *State actors* . . . provide necessary services to parents of Indian children." *Id.* at 38,814 (emphasis added).[98] The Final Rule even specifies the efforts required by § 1912(d)—including eleven categories of remedial services—"[w]here an agency is involved in the child-custody proceeding." 25 C.F.R. § 23.2.[99]

We therefore conclude that the active-efforts requirement in § 1912(d) commandeers states in violation of Article I and the Tenth Amendment. *See also Brackeen*, 937 F.3d at 443 (OWEN, J., dissenting in part) (concluding § 1912(d) "means that a State cannot place an Indian child in foster care, regardless of the exigencies of the circumstances, unless it first provides the federally specified services and programs without success").

**ii. *Expert witnesses (§ 1912(e), (f))*.** We reach the same conclusion as to the "expert witness" requirements in § 1912(e) and (f). These provisions prohibit placement or termination absent "evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical

---

[98] *See also id.* at 38,814 (active-efforts requirement sought to remedy failures by "agencies of government"); *id.* at 38,790 (the "active efforts requirement" is one of ICWA's "primary tools" to address failures by "agencies of government" and should therefore be "interpreted in a way that requires substantial and meaningful actions by agencies to reunite Indian children with their families").

[99] The term "agency" includes "governmental organizations." 81 Fed. Reg. at 38,792; *see also* 80 Fed. Reg. 10,146, 10,151 ("[a]gency" includes a "public agency and their employees, agents or officials involved in and/or seeking to place a child in a child custody proceeding").

damage to the child." § 1912(e) (foster placement); § 1912(f) (termination). ICWA thus "requires the testimony of qualified expert witnesses for foster-care placement and for adoptive placements." 81 Fed. Reg. at 38,829 (citing § 1912(e), (f); *see also* 25 C.F.R. § 23.122(a) (specifying expert qualifications). As a result, state agencies must present the testimony of expert witnesses, with specific qualifications, when they seek to place an Indian child in foster care or terminate parental rights. *See also Brackeen*, 937 F.3d at 443–44 (Owen, J., dissenting in part) (concluding § 1912(e) "places the burden on a State, not a court, to present expert witness testimony in order to effectuate foster care for Indian children").

For instance, a Texas appellate court recently found that the DFPS failed to justify terminating parental rights under ICWA because "the Department failed to produce testimony of a 'qualified expert witness' as required under the Act." *S.P. v. Tex. Dep't of Fam. & Prot. Servs.*, No. 03-17-00698-CV, 2018 WL 1220895, at *3 (Tex. App.—Austin Mar. 9, 2018, no pet.). Although DFPS offered testimony by the child's caseworker that termination was in the child's best interest, the court concluded the caseworker did not have "the requisite expertise to satisfy the federal requirement." *Id.* at *4. For instance, the caseworker was not "recognized by the Muscogee tribe," nor did she have "substantial experience in the delivery of child and family services to Indians or knowledge of [the tribe's] prevailing social and cultural standards and childrearing practices." *Id.*[100] The court therefore concluded the state agency failed to meet the "qualified

---

[100] *See* 80 Fed. Reg. at 10,157 (ICWA guidelines providing, *inter alia*, that a qualified expert "should have specific knowledge of the Indian tribe's culture and customs").

expert witness" requirement in § 1912(f) and reversed the termination of parental rights. *Id.* at *4–5.[101]

We conclude that § 1912(e) and (f) require state agencies and officials to bear the cost and burden of adducing expert testimony to justify placement of Indian children in foster care, or to terminate parental rights. The expert-witness requirements in § 1912(e) and (f) therefore commandeer states.

**iii. *Placement preferences (§ 1915(a)–(d)).*** We also conclude that the placement preferences in § 1915(a)–(d) violate the anti-commandeering doctrine to the extent they direct action by state agencies and officials. These provisions require that, absent good cause, "preference shall be given" to specific adoptive and foster placements for an Indian child.[102] Insofar as these preferences constrain state courts, we examine below whether they are valid preemption provisions. Quite apart from state courts, however, the preferences appear to independently demand efforts by state agencies and officials.

ICWA's regulations support this reading. The placement preferences, they state, "create[ ] an obligation on *State agencies* and courts to implement the policy outlined in the statute" and "require that *State agencies* and courts make efforts to identify and assist extended family and Tribal members with preferred placements." 81 Fed. Reg. at 38,839

---

[101] *See also*, *e.g.*, *In re K.S.*, 448 S.W.3d 521, 539, 544–45 (Tex. App.—Tyler 2014, pet. denied) (affirming state agency's termination of parental rights under ICWA based on testimony of a "Cherokee Nation representative" who "was qualified as an expert witness" under § 1912(f)).

[102] *See* § 1915(a) (requiring adoptive preference in favor of (1) extended family, (2) other tribe members; or (3) other Indian families); § 1915(b) (requiring different foster-care preferences); § 1915(c) (tribes may re-order preferences); § 1915(d) (preference decisions must accord with "prevailing social and cultural standards" of pertinent Indian community).

(emphases added). These "*State efforts to identify and assist preferred placements* are critical to the success of the statutory placement preferences." *Id.* at 38,839–40 (emphasis added) (collecting decisions). Further confirming this view, ICWA's guidelines, *see* 80 Fed. Reg. 10,146, specify duties that "[t]he *agency* seeking a preadoptive, adoptive or foster care placement of an Indian child *must always follow*." 80 Fed. Reg. at 10,157 (emphases added). For example, to justify deviating from the preferences, the agency must prove that "a diligent search has been conducted to seek out and identify placement options"—including detailed notices to the parents or custodian, "known, or reasonably identifiable" extended family, the child's tribe, and—for foster or preadoptive placements—ICWA-specified institutions. *Id.* And, as discussed, ICWA guidelines specify that the "agency" that must undertake these efforts includes a "public agency and their employees, agents or officials." *Id.* at 10,151.[103]

State decisions confirm that ICWA's placement preferences may result in demanding extensive actions by state child welfare agencies. For example, in *Native Village of Tununak v. State*, the Alaska Supreme Court addressed the duties of the Alaska Office of Child Services ("OCS") to implement the placement preferences. 334 P.3d 165, 177–78 (Alaska 2014). To safeguard ICWA's preferences, courts "must searchingly inquire about . . . OCS's efforts to comply with achieving[] suitable § 1915(a) placement preferences" and, in turn, OCS must "identify[] early in a [child welfare proceeding] all potential preferred adoptive placements." *Id.* at 178.[104]

---

[103] Surprisingly, Tribal Defendants contend the preferences apply "exclusively to state courts" and "are not mandates requiring that state executive branch employees enforce federal law." ICWA's regulations show the opposite is true.

[104] *See also*, *e.g.*, *Alexandra K. v. Dep't of Child Safety*, No. 1 CA-JV 19-0081, 2019 WL 5258095, at *1 (Ariz. Ct. App. Oct. 17, 2019) (observing "[t]he [Arizona Department of Child Safety] case manager testified DCS had not located any ICWA-compliant placement

In sum, to the extent the placement preferences in § 1915(a)–(d) require implementation efforts by state agencies and officials, that violates the anti-commandeering doctrine.

**iv. *Placement record (§ 1915(e); 25 C.F.R. §23.141)*.** We also conclude that the related placement-record requirements in § 1915(e) commandeer states (along with its implementing regulation in 25 C.F.R. § 23.141). This provision requires "the State" to "maintain[ ] . . . [a] record" of any Indian child placements under state law. § 1915(e). The record must "evidenc[e] the efforts to comply with the order of preference specified in [§ 1915]" and "shall be made available at any time upon the request of the Secretary or the Indian child's tribe." *Id.* In turn, the Final Rule specifies: (1) the record's minimum contents, 25 C.F.R. § 23.141(b); (2) that "[a] State agency or agencies may be designated to be the repositories for this information," *id.* § 23.141(c), and (3) that "[t]he State court or agency should notify the [Bureau of Indian Affairs] whether these records are maintained within the court system or by a State agency," *id.*

As then-JUDGE OWEN reasoned in her panel dissent, these requirements commandeer states because they are "direct orders to the States." 937 F.3d at 444, 446 (OWEN, J., dissenting in part). The statute and regulation each command "the State" to create, compile, and maintain the required record and furnish it upon request to the child's tribe or the

---

and that the Navajo Nation had not suggested any"); *People in Interest of M.D.*, 920 N.W.2d 496, 503 (S.D. 2018) (noting "[South Dakota Department of Social Services] workers also testified during the dispositional hearing to their familiarity with ICWA placement preferences, [and] their efforts to find a suitable placement for all the children"); *id.* at 504 (concluding that "because DSS explored the availability of a suitable placement for child with a diligent search, but was unsuccessful, there was good cause for departure from the placement preferences") (quoting *David S. v. State, Dep't of Health & Social Servs.,* 270 P.3d 767, 782 (Alaska 2012)) (cleaned up).

Secretary. § 1915(e); 25 C.F.R. § 23.141(a). Furthermore, the regulations explain that § 1915(e) "work[s] in concert" with the placement preferences to "require that State agencies and courts make efforts to identify and assist extended family and Tribal members with preferred placements." 81 Fed. Reg. at 38,839.[105] Consequently, as JUDGE OWEN correctly concluded, the placement-record requirements offend "the very *principle* of separate state sovereignty" because their "whole *object* . . . [is] to direct the functioning of the state executive" in service of a federal regulatory program. 937 F.3d at 445 (OWEN, J., dissenting in part) (quoting *Printz*, 521 U.S. at 932).

Tribal Defendants attempt to justify these requirements as merely making states perform administrative actions, such as "provid[ing] the federal government with information." *See also Printz*, 521 U.S. at 918 (declining to address constitutionality of laws "requir[ing] only the provision of information to the Federal Government" by state officials).[106] But the challenged provisions demand more than "provid[ing] information." The required record must not only compile documents but also "evidenc[e]" the state's "efforts to comply" with ICWA's placement preferences. § 1915(e).[107] The whole point is to help implement the placement

---

[105] *See also id.* (explaining Congress intended "reading Sections 1915(a) and 1915(e) together" to "demand[ ] documentable 'efforts to comply' with the ICWA placement preferences").

[106] JUDGE DENNIS also cites *Printz*, 521 U.S. at 905–06, for the proposition that early federal laws required state courts to record citizenship applications and transmit naturalization records. DENNIS OP. at 86. But *Printz* did not decide whether those laws set a constitutional precedent. *See* 521 U.S. at 918. And, even assuming the recordkeeping obligations in § 1915(e) may be fulfilled by state courts, those obligations go well beyond the early examples in *Printz*. *See also infra* III(B)(2)(c) (discussing similar obligations imposed on state courts by § 1951(a)).

[107] *See also* 25 C.F.R. § 23.141(a), (b) (to justify departing from preferences, record "must contain . . . detailed documentation of the efforts to comply with the placement preferences"); 81 Fed. Reg. at 38,839 ("Section 1915(e) requires that, for each placement,

preferences, which, as explained, demand action by state agencies. *See also* 81 Fed. Reg. at 38,839 (preferences "create[] an obligation on State agencies and courts"). More than an obligation to "provide information," then, § 1915(e) demands states document the "forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918.[108]

    **v.** *Notice (§ 1912(a))*. Finally, we find § 1912(a) unconstitutional because it commandeers state agencies. Under this section, any "party" seeking to place an Indian child in foster care, or to terminate parental rights, "shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." *Id.*[109] The regulations describe this as "one of ICWA's core procedural requirements in involuntary child-custody proceedings." 81 Fed. Reg. at 38,809. It applies to state agencies. *See id.* at

---

the State must maintain records evidencing the efforts to comply with the order of preference specified in section 1915.").

    [108] JUDGE DENNIS sees no commandeering because the regulation implementing § 1915(e) "permits states to designate either their courts or agencies . . . as the entities charged with complying with" the requirement. DENNIS OP. at 87; *see* 25 C.F.R. § 23.141(c) (allowing designation of "[a] State agency or agencies" as "repository for this information"); *id.* (requiring "State court or agency" to notify BIA whether records are kept "within the court system or by a State agency"). We disagree. Whatever option the state chooses, either its agencies or its courts are co-opted into administering a federal program. JUDGE DENNIS's premise seems to be that requiring state *courts* to implement § 1915(e) would not be commandeering. That is mistaken. As explained below, forcing state courts to administer a federal recordkeeping regime violates anti-commandeering just as much as forcing agencies to do it. *See infra* III(B)(2)(c) (addressing recordkeeping requirement in § 1951(a)).

    [109] If the identity or location of the parent, custodian, or tribe cannot be determined, "such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice." *Id.* The proceeding may not commence until ten days after receipt of notice by the parent, custodian, tribe, or the Secretary. *Id.*

38,792 ("any party" in § 1912(a) includes "governmental organizations").[110] The provision thereby imposes detailed[111] obligations on state agencies, which the Final Rule concedes will consume significant time and money.[112]

As explained, the anti-commandeering doctrine forbids Congress from imposing administrative duties on state agencies and officials. *See*, *e.g.*, *New York*, 550 U.S. at 176, 188 (Congress cannot issue "a simple command to state governments to implement legislation enacted by Congress," nor "compel the States to enact or administer a federal regulatory program"). Because that is what § 1912(a) does, it is unconstitutional.

### b. *ICWA does not "evenhandedly regulate" state and private activity.*

Defendants' principal response on anti-commandeering is to invoke the principle that the doctrine "does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Murphy*, 138 S. Ct. at 1478. For instance, they point out that private parties, as well as state agencies, may seek to be appointed as a child's guardian or

---

[110] *See also*, *e.g.*, *In re Morris*, 815 N.W.2d 62, 72–76, 83 (Mich. 2012) (discussing § 1912(a) notice requirement and conditionally reversing order based on failure of court to ensure that state Department of Human Services notified child's tribe); *In re Desiree F.*, 99 Cal. Rptr. 2d 668, 696 (Cal. Ct. App. 2000) (finding it was "the duty of the Fresno County Department of Social Services to notify the Tribe or the Secretary" and invalidating court orders due to "the failure of the respective county welfare agencies and juvenile courts to comply with the clear provisions of the ICWA").

[111] *See*, *e.g.*, 25 C.F.R. § 23.111(a)(1), (c) (court must ensure "party seeking placement" sends notice "by registered or certified mail with return receipt requested"); *id.* § 23.111(d)(1)–(6) (14 different statements that must appear in notice); *id.* § 23.111(e) (if parent, custodian, or tribe not ascertainable, requiring notice to BIA, including "as much information as is known regarding the child's direct lineal ancestors").

[112] 81 Fed. Reg. at 38,863 (estimating at 81,900 the "[t]otal annual burden hours" for "State court[s] and/or agenc[ies]" to provide notices); *id.* at 38,864 (estimating at $260,442 the "annual cost burden" of providing required notices).

conservator or to terminate parental rights. Similarly, JUDGE DENNIS observes that some of the challenged provisions (notice and active efforts) refer to "any party" seeking placement or termination, and thus apply "regardless of whether that party is a state agent or private individual." *See* § 1912(a), (d); DENNIS OP. at 94. In advancing this argument, both Tribal Defendants and JUDGE DENNIS rely heavily on *South Carolina v. Baker*, 485 U.S. 505 (1988), and *Reno v. Condon*, 528 U.S. 141 (2000). DENNIS OP. at 92–93. They are right to do so, because those decisions undergird the "evenhanded regulation" principle. *See Murphy*, 138 S. Ct. at 1478–79 (discussing *Baker* and *Condon*). But examining those decisions shows the principle does not apply to ICWA.

*Baker* involved a federal law denying a tax exemption to interest earned on state and local bonds issued in unregistered ("bearer") form. 485 U.S. at 510. The law treated private bonds similarly. *Id.* The Supreme Court rejected South Carolina's argument that the law commandeered states by coercing them to enact and administer a registered bond scheme. *Id.* at 513–14. At most, the law "effectively prohibit[ed]" states from issuing bearer bonds pursuant to a "'generally applicable'" law treating state and private bonds equally. *Id.* at 514 (citation omitted). The Court emphasized that the challenged law "d[id] not . . . seek to control or influence the manner in which States regulate private parties." *Id.* Relying on *Baker*, *Condon* rejected South Carolina's commandeering challenge to a federal law restricting state DMVs from disclosing drivers' personal information. 528 U.S. at 144. The law also restricted private disclosure and resale of such information. *Id.* at 146. Distinguishing its commandeering decisions in *New York* and *Printz*, the Court explained that, here, the challenged law "d[id] not require the States in their sovereign capacity to regulate their own citizens," did not require state legislatures to enact any laws, and "d[id] not require state officials to assist in the enforcement of federal statutes regulating private individuals."

*Id.* at 151. Additionally, the law regulated states only as "the owners of data bases," and as part of "the universe of entities that participate as suppliers to the market for motor vehicle information." *Id.*

For two main reasons, the "evenhanded regulation" principle from *Baker* and *Condon* has no application here. First, the laws challenged in those cases, unlike ICWA, did not compel states "to regulate their own citizens." *Condon*, 528 U.S. at 151; *see also Murphy*, 138 S. Ct. at 1479. ICWA emphatically does. As explained, ICWA requires state agencies to provide remedial services to Indian families (§ 1912(d); 25 C.F.R. § 23.2; 81 Fed. Reg. at 38,814); to adduce expert witness testimony (§ 1912(e), (f); 25 C.F.R. § 23.122(a); 81 Fed. Reg. at 38,829); to assist Indian families and tribes with preferred placements (§ 1915(a)–(d); 81 Fed. Reg. at 38,839–40); to compile records evidencing efforts to comply with placement preferences (§ 1915(e); 25 C.F.R. § 23.141); and to provide detailed notices to parents, custodians, and tribes (§ 1912(a); 25 C.F.R. § 23.111). This is especially evident as to the placement preferences: ICWA "creates an obligation on State agencies and courts to *implement*" the preferences by "mak[ing] efforts to identify and assist extended family and Tribal members." 81 Fed. Reg. at 38,839 (emphasis added). These efforts are "critical to the success of the statutory placement preferences." *Id.* at 38,839–40. The fact that ICWA imposes "critical" duties on state actors concerning private persons sets it worlds apart from the tax law in *Baker* (which, at most, effectively prohibited states from issuing bearer bonds) and the privacy law in *Condon* (which restricted agency disclosure of drivers' information). Instead, ICWA fits *Condon*'s description of laws that commandeer states by "requir[ing] state officials to assist in the enforcement of federal statutes regulating private individuals." *Condon*, 528 U.S. at 151.

Second, unlike the laws in *Baker* and *Condon*, ICWA regulates states "in their sovereign capacity." *Condon*, 528 U.S. at 151; *see also Murphy*, 138

85

S. Ct. at 1478. In *Baker* and *Condon*, Congress regulated states as participants in the bond market (*Baker*, 485 U.S. at 510) and the "market for motor vehicle information" (*Condon*, 528 U.S. at 151). Because private parties also participated in those markets, and were treated similarly, those decisions could speak of Congress "evenhandedly regulat[ing] an activity in which both States and private parties engage." *Murphy*, 138 S. Ct. at 1479. ICWA is a different animal. It regulates states, not as market participants, but as sovereigns fulfilling their "duty of the highest order to protect the interests of minor children, particularly those of tender years." *Palmore*, 466 U.S. at 433. The contrast with regulating state participation in bond or data markets could hardly be greater. As State Plaintiffs correctly observe, "child welfare is not a market regulated by Congress in which public and private actors participate," but is instead "the sovereign obligation of the States." Once again, ICWA's regulations clinch the point: they assert that ICWA balances federal interests in Indian families and tribes "with the States' *sovereign interest in child-welfare matters*." 81 Fed. Reg. at 38,789 (emphasis added).

JUDGE DENNIS responds that, because certain ICWA provisions may apply to private parties as well as state agencies, this triggers the *Baker/Condon* "evenhanded regulation" principle. DENNIS OP. at 93–101. We disagree. First, this view overlooks that *Baker* and *Condon* do not apply to a federal law that regulates states as sovereigns[113] and compels them to

---

[113] JUDGE DENNIS suggests that *Condon* addressed a law regulating states as sovereigns, and not as market participants, because "regulation of motor vehicles . . . is a quintessential state function." DENNIS OP. at 98. We disagree. Congress enacted the privacy law in *Condon* because it "found that many States . . . sell [drivers'] personal information to individuals and businesses," 528 U.S. at 143, just as "private persons" do, *id.* at 146. The law thus "regulate[d] the States as the owners of data bases," not as sovereigns. *Id.* at 151.

regulate private parties.[114] *Baker*, 485 U.S. at 514; *Condon*, 528 U.S. at 151; *see also Murphy*, 138 S. Ct. at 1479. ICWA does both. Second, JUDGE DENNIS's view mistakes the "activity" ICWA regulates. *Cf. Murphy*, 138 S. Ct. at 1478 (considering "an activity in which both States and private actors engage"). ICWA directly regulates state "child custody proceeding[s]." § 1903(1). This is not regulation of an "activity" states engage in alongside private actors, like bond issuance or data sharing. Instead, this is regulation of state administrative and judicial "proceedings" in service of a federal regulatory goal. The anti-commandeering doctrine forbids that.[115] Third, under JUDGE DENNIS's view, Congress could conscript state officials into a federal program, provided it requires private actors to participate too. The anti-commandeering cases do not support that view. The salient question, rather, is whether a federal law requires state officials to act

---

[114] We disagree with JUDGE DENNIS that the duties imposed on state employees by the federal law in *Condon* are anything like ICWA's commandeering of state agencies. *See* DENNIS OP. at 98. In *Condon*, state DMV employees had to spend "time and effort" to "learn and apply" the patchwork of federal restrictions on disclosing driver information. 528 U.S. at 144–45, 150. But the employees were "not require[d] ... to assist in the enforcement of [the] federal statute[]." *Id.* at 151. ICWA, by contrast, requires state agencies to "implement" the heart of the law—placement preferences—by "identify[ing] and assist[ing]" potential placements. 81 Fed. Reg. at 38,839–40; *see also id.* at 38,839 (stating the preferences "create[ ] an obligation on State agencies and courts to *implement the policy outlined in the statute*") (emphasis added). JUDGE DENNIS also misunderstands our point that state agencies' role here is "critical." *See* DENNIS OP. at 97 n.43. The point is not that commandeering depends on whether the state actor's forced action is "critical" or "trivial." Rather, the point is that ICWA's regulations describe state agencies as playing a "critical" role in "implement[ing]" the law, *see* 81 Fed. Reg. at 38,839–40, a telltale sign that the agencies are being "compel[led] ... to ... administer a federal regulatory program," *New York*, 505 U.S. at 188.

[115] *See New York*, 505 U.S. at 178 (explaining "Congress ... may not conscript state governments as its agents"); *Murphy*, 138 S. Ct. at 1479 (Congress cannot "regulate the States' sovereign authority to 'regulate their own citizens'") (quoting *Condon*, 528 U.S. at 151)).

"in their official capacity" to implement a federal program. *See Printz*, 521 U.S. at 932 n.17 (Brady Act did not "merely require [state officers] to report information in their private possession" but instead to do so "in their official capacity"). ICWA does so. That parts of ICWA may also compel private parties does not dilute the fact that ICWA "compel[s] the States to . . . administer a federal regulatory program." *New York*, 505 U.S. at 188.[116]

### 2. Preemption

We now consider whether the challenged ICWA provisions do not commandeer states but are, instead, valid preemption provisions. *See Murphy*, 138 S. Ct. at 1479 (considering whether PASPA § 3702(1) was "a valid preemption provision"). The district court ruled preemption could not save any of those provisions because they "directly command states" and not "'private actors.'" *Brackeen*, 338 F. Supp. 3d at 541 (quoting *Murphy*, 138 S. Ct. at 1481). On appeal, Defendants argue the challenged provisions confer federal rights on Indian children, families, and tribes that preempt conflicting state laws.

"Preemption doctrine reflects the basic concept, grounded in the Supremacy Clause, that federal law can trump contrary state law." *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 195 (5th Cir. 2019) (citing *Arizona v. United States*, 567 U.S. 387, 398–99 (2012)). This occurs when federal law

---

[116] As part of his argument that certain sections of ICWA are "evenhanded" (and therefore do not commandeer states), JUDGE DENNIS also finds that these sections are "necessarily 'best read' as pertaining to private actors." DENNIS OP. at 99. But this argument grafts onto commandeering a preemption principle—namely, that a federal law preempts only if it is "best read as one that regulates private actors." *Murphy*, 138 S. Ct. at 1479. JUDGE DENNIS cites no authority for the proposition that the two analyses may be blended into one. Moreover, the most recent Supreme Court decision addressing commandeering and preemption—*Murphy*—treats the two analyses separately. *See* 138 S. Ct. at 1478–79 (commandeering); *id.* at 1479–81 (preemption). We will therefore follow the Supreme Court and address the "best read" issue under preemption, not commandeering.

conflicts with state law, expressly preempts state law, or excludes state legislation by occupying an entire field. *See Murphy*, 138 S. Ct. at 1480 (identifying "three different types of preemption—'conflict,' 'express,' and 'field'") (citation omitted).[117] To have any kind of preemptive effect, however, a federal law must meet two conditions: it (1) "must represent the exercise of a power conferred on Congress by the Constitution," and (2) must be "best read" as a law that "regulates the conduct of private actors, not the States." *Murphy*, 138 S. Ct. at 1479, 1481.[118]

At the outset, we note that ICWA implicates "conflict" preemption only. ICWA lacks an express preemption clause and no one contends ICWA occupies the field of Indian child-custody proceedings.[119] We also note that various ICWA provisions potentially conflict with state laws.[120] For instance, ICWA grants an indigent parent the right to appointed counsel, § 1912(b), which may exceed some state guarantees. ICWA also grants a child's tribe the right to intervene, § 1911(c), a right not automatically granted by some state laws. Substantively, ICWA imposes an onerous standard for terminating parental rights—proof "beyond a reasonable doubt" that continued custody "is likely to result in serious emotional or physical damage

---

[117] *See also generally City of El Cenizo, Tex. v. Texas*, 890 F.3d 164, 176–81 (5th Cir. 2018) (field and conflict preemption); *Franks Inv. Co., LLC v. Union Pac. R. Co.*, 593 F.3d 404, 407–08 (5th Cir. 2010) (express preemption).

[118] *See also Alden*, 527 U.S. at 731 (explaining "the Supremacy Clause enshrines as 'the supreme Law of the Land' only those Federal Acts that accord with the constitutional design") (citing *Printz*, 521 U.S. at 924).

[119] *See, e.g.*, *In re A.B.*, 245 P.3d 711, 718–19 (Utah 2010) (ICWA does not implicate express or field preemption); *In re W.D.H.*, 43 S.W.3d 30, 35–36 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (ICWA implicates only conflict preemption).

[120] *See generally New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333–34 (1983) (discussing special considerations governing preemption of state law by "federal and tribal interests") (and collecting decisions).

to the child." § 1912(f). States, by contrast, generally allow termination based on "clear and convincing evidence" that a parent has committed certain offenses and that termination is in "the best interest of the child." *See, e.g.*, TEX. FAM. CODE § 161.001(b)(1), (2).[121] ICWA's placement preferences may also conflict with state standards, under which placements depend on the child's best interests.[122] Such conflicts, while not inevitable,[123] should come as no surprise. Whereas states seek only to promote a child's best interests, ICWA also seeks to "promote the stability and security of Indian tribes and families." § 1902.

With that background in mind, we proceed to the preemption analysis. We assume for purposes of this part only that ICWA is a valid exercise of Congress's power. *See Murphy*, 138 S. Ct. at 1479. We therefore focus on whether the challenged provisions are "best read" as regulating private instead of state actors. *Id.*

### a. *The provisions that regulate private actors are valid preemption provisions.*

Contrary to the district court's ruling, *see Brackeen*, 338 F. Supp. 3d at 541, we conclude that several provisions of ICWA are valid preemption provisions because they are best read as regulating private actors. For

---

[121] *See also, e.g.*, *In re W.D.H.*, 43 S.W.3d at 37, 36 (explaining Texas law "is based on the 'Anglo' standard for determining the best interest of the child," which is "'notably different'" from ICWA's termination standard) (first quoting *Doty-Jabbaar*, 19 S.W.3d at 877); and then citing *Yavapai-Apache Tribe*, 906 S.W.2d at 168).

[122] *Compare* 81 Fed. Reg. at 38,840 (explaining "[ICWA] requires that States apply a preference for the listed placement categories" in § 1915), *with* TEX. FAM. CODE § 162.016(b) (court shall grant adoption if "the adoption is in the best interest of the child"); LA. CHILD. CODE arts. 1217(B), 1255(B) (the court's "basic consideration" in adoption decree "shall be the best interests of the child").

[123] *See, e.g.*, *In re A.B.*, 245 P.3d at 720–21 (tribe's right to seek invalidation under § 1914 does not conflict with state notice-of-appeal requirements).

example, ICWA gives a child's Indian custodian and tribe the "right to intervene at any point" in a state court foster care or termination proceeding. § 1911(c). An indigent parent or Indian custodian has "the right to court-appointed counsel" in certain proceedings. § 1912(b).[124] Any party has "the right to examine all reports or other documents" filed in proceedings. § 1912(c). ICWA also confers various parental rights in voluntary termination proceedings, such as the right to have the terms of consent "fully explained in detail" and in comprehensible language (§ 1913(a)); the right to withdraw consent to a placement at any time or to a termination or adoption prior to final decree (§ 1913(b), (c)); and the right to withdraw consent based on "fraud or duress" up to two years after an adoption decree (§ 1913(d)). An Indian child, parent, custodian, or tribe may seek invalidation of a placement or termination action based on a violation of sections 1911, 1912, and 1913. § 1914. Additionally, a "biological parent" or prior Indian custodian may petition for return of custody when an adoption is set aside or the adoptive parents consent. § 1916(a). Finally, upon reaching age 18, an adopted Indian may obtain from the court information about his birth parents' "tribal affiliation," along with other information "necessary to protect any rights flowing from [his] tribal membership." § 1917.

The district court held none of the challenged provisions—including these—could validly preempt state law because they "directly command states." *Brackeen*, 338 F. Supp. 3d at 541. We disagree as to the provisions discussed above, which are best read to address private actors, not states. We therefore conclude those provisions (§§ 1911(c); 1912(b); 1913, 1914, 1916(a),

---

[124] JUDGE JONES does not agree that § 1912(b) is a valid preemption provision and so does not join this part to the extent it concludes otherwise.

and 1917[125]) are valid preemption provisions.[126] *See Haywood v. Drown*, 556 U.S. 729, 736 (2009) (explaining states "lack authority to nullify a federal right or cause of action").

### b. *The provisions that command state agency action are not valid preemption provisions.*

Conversely, we conclude that the provisions of ICWA discussed in the commandeering part are not valid preemption provisions. They are best read as regulating states, not private actors. *Murphy*, 138 S. Ct. at 1479.

In our commandeering discussion, *supra* III(B)(1), we considered ICWA's provisions requiring active efforts (§ 1912(d)), expert witnesses (§ 1912(e), (f)), placement preferences (§ 1915(a)–(d)), placement records (§ 1915(e)), and notice (§ 1912(a)). We found these provisions impose duties on state agencies to provide remedial services to Indian families (§ 1912(d); 25 C.F.R. § 23.2; 81 Fed. Reg. at 38,814); to adduce expert witness testimony

---

[125] State Plaintiffs suggest that, by requiring an adult adoptee be informed of his birth parents' tribal affiliation, § 1917 improperly imposes on courts a "non-judicial obligation[]." We disagree. The right granted by § 1917 resembles rights recognized in various state laws providing courts may unseal adoption records upon request of adoptees. *See generally* Shannon Clark Kief, Annotation, *Restricting Access to Judicial Records of Concluded Adoption Proceedings*, 103 A.L.R. 5th 255 (2002) (collecting and analyzing cases). JUDGE DENNIS argues that, if § 1917 creates a preemptive right (as we conclude), then so does the placement-record provision in § 1915(e). DENNIS OP. at 89 n.39. We disagree. Unlike § 1917, § 1915(e) imposes a detailed recordkeeping regime on states designed to implement the placement preferences. *See supra* III(B)(1)(a)(iv).

[126] *See, e.g.*, *In re J.L.T.*, 544 S.W.3d 874, 879 (Tex. App.—El Paso 2017, no pet.) (§ 1911(c) preempts state rule requiring tribe to file written pleading to intervene); *Dep't of Human Servs. v. J.G.*, 317 P.3d 936, 944 (Or. Ct. App. 2014) (§ 1914 preempts Oregon "preservation rule"); *In re K.B.*, 682 N.W.2d 81, 2004 WL 573793, at *3 (Iowa Ct. App. 2004) (table) (concluding "when a tribe has a statutory right of intervention under ICWA, state-law doctrines of estoppel may not be applied to deprive it of that right"); *State ex rel. Juvenile Dept. of Lane Cnty. v. Shuey*, 850 P.2d 378, 379–81 (Or. Ct. App. 1993) (tribe's right of intervention in § 1911(c) preempts state laws requiring tribe be represented by attorney).

(§ 1912(e), (f); 25 C.F.R. § 23.122(a); 81 Fed. Reg. at 38,829); to assist Indian families and tribes with preferred placements (§ 1915(a)–(d); 81 Fed. Reg. at 38,839–40); to compile records evidencing efforts to comply with placement preferences (§ 1915(e); 25 C.F.R. § 23.141); and to furnish notice to parents, custodians, and tribes (§ 1912(a)). We therefore concluded these provisions transgress the commandeering rule.

That also means they are not valid preemption provisions. "[E]very form of preemption is based on a federal law that regulates the conduct of private actors, not the States." *Murphy*, 138 S. Ct. at 1481. These provisions regulate, not private persons, but the conduct of state agencies and officials. They therefore cannot validly preempt conflicting state law. *See*, *e.g.*, *Printz*, 521 U.S. at 935 (explaining a federal "command [to] the States' officers . . . to administer or enforce a federal regulatory program" is "fundamentally incompatible with our constitutional system of dual sovereignty").

Federal Defendants respond that these provisions merely grant Indian children and parents "federally conferred rights," which "may constrain state child-protection agencies" but do not "directly regulate[ ] States." We disagree. As we have explained at length, these provisions do not merely "constrain" state agencies but, instead, require state agencies to undertake extensive actions. *See supra* III(A)(1). Thus, it is immaterial whether they can somehow be characterized, through verbal legerdemain, as securing "federally conferred rights."[127] The salient point is that "[t]here is no way in which th[ese] provision[s] can be understood as *a regulation of private actors*."

---

[127] For instance, Federal Defendants awkwardly re-cast § 1912(d) as securing to Indian children "the right not to be placed in foster care . . . without proof that 'active efforts have been made to provide remedial services and rehabilitative programs.'" This overlooks the key point that the provision "require[s] States to affirmatively provide Indian families with substantive services." 81 Fed. Reg. at 38,791.

*Murphy*, 138 S. Ct. at 1481 (emphasis added). They instead regulate state agencies, which means they commandeer states and cannot have valid preemptive effect. *See, e.g.*, *New York*, 505 U.S. at 178 ("Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents.").

### c. *The placement preferences, placement standards, and termination standards are valid preemption provisions for state courts. The recordkeeping requirement is not.*

The district court ruled that certain ICWA provisions were not valid preemption provisions because they require state courts to "incorporat[e] federal standards that modify *state created* causes of action." *Brackeen*, 338 F.Supp.3d at 539, 542. The court focused on ICWA's requirement that courts apply the § 1915 placement preferences, which it characterized as "a direct command from Congress to the states." *Id.* at 540. More broadly, the court concluded that whenever ICWA commands courts to apply "federal standards" in state causes of action, it commandeers states and does not validly preempt state law. *Id.* at 541. On appeal, Defendants argue that the district court's rationale failed to account for the "well established power of Congress to pass laws enforceable in state courts," which those courts must apply under the Supremacy Clause. *See, e.g.*, *New York*, 505 U.S. at 178.

To resolve this question, we first review some background principles. The Supremacy Clause binds state courts of competent jurisdiction, save in narrow circumstances, to adjudicate federal causes of action. *See, e.g.*, *Haywood*, 556 U.S. at 734–36; *Howlett v. Rose*, 496 U.S. 356, 367–75 (1990); *Testa v. Katt*, 330 U.S. 386, 394–95 (1947).[128] This obligation sometimes

---

[128] This rule does not apply "only in two narrowly defined circumstances: first when Congress expressly ousts state courts of jurisdiction; and second, when a state court

includes applying federal procedural rules connected with the federal action. *See, e.g.*, *Dice v. Akron, Canton & Youngstown R.R.*, 342 U.S. 359, 363 (1952) (state court required to apply FELA jury-trial right despite state rule requiring court to make certain findings); *Cent. Vt. Ry. Co. v. White*, 238 U.S. 507, 512 (1915) (state court required to apply FELA burden of proof despite contrary state rule). Additionally, a state procedural rule may be preempted if it interferes with a federal cause of action. *See, e.g.*, *Felder v. Casey*, 487 U.S. 131, 147-150 (1988) (state notice-of-injury prerequisite preempted in § 1983 actions); *Brown v. W. Ry. of Ala.*, 338 U.S. 294, 298–99 (1949) (state pleading rule barred because it interfered with federal rights). By contrast, however, no authority supports the proposition that Congress may prescribe procedural rules for state-law claims in state courts. *See, e.g.*, *Felder*, 487 U.S. at 138 (recognizing the "unassailable proposition . . . that States may establish the rules of procedure governing litigation in their own courts"); *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636, 651 (7th Cir. 2014) (Sykes, J., concurring) ("[I]t's doubtful that Congress has the power to prescribe procedural rules for state-law claims in state courts.") (citing, *inter alia*, Anthony Bellia, Jr., *Federal Regulation of State Court Procedures*, 110 YALE L. J. 947 (2001)).

The question we address here fits neatly into none of these categories. ICWA creates no federal cause of action state courts must enforce. Nor does ICWA enact federal procedural rules that state courts must prefer over their own procedures. Nor does ICWA impose procedural rules for state-law claims in state courts.[129] That, as noted, would likely be a bridge too far.

---

refuses jurisdiction because of a neutral state rule regarding the administration of the courts." *Haywood*, 556 U.S. at 735 (internal quotation marks and citations omitted).

[129] *Jinks v. Richland County*, 538 U.S. 456 (2003), does not support the proposition that Congress may impose procedural rules on state claims in state courts. *Jinks* upheld Congress's authority to toll state limitations periods for state-law claims while removed to

Instead, ICWA enacts substantive child-custody standards applicable in state child-custody proceedings. For instance, ICWA requires courts to place Indian children with certain persons (§ 1915), and also requires courts to make specific findings under a heightened standard of proof before an Indian child may be placed in a foster home or his parents' rights terminated (§ 1912(e) and (f)).

To the extent those substantive standards compel state *courts* (as opposed to state *agencies*), we conclude they are valid preemption provisions. As already discussed, the Supremacy Clause requires state courts to apply validly enacted federal law. *See Printz*, 521 U.S. at 907; *New York*, 505 U.S. at 178–79. The Supreme Court has ruled that federal standards may supersede state standards even in realms of traditional state authority such as family and community property law. *See, e.g.*, *Boggs v. Boggs*, 520 U.S. 833 (1997); *McCarty v. McCarty*, 453 U.S. 210 (1981); *Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979); *see also Egelhoff v. Egelhoff ex rel. Briener*, 532 U.S. 141, 151–52 (2001) (observing "we have not hesitated to find state family law pre-empted when it conflicts with ERISA") (citing *Boggs*, 520 U.S. at 833). For instance, *Egelhoff* held ERISA preempted a state probate rule and so dictated, contrary to state law, the beneficiaries of pension and insurance proceeds. 532 U.S. at 147–50. Similarly, *McCarty* held a federal military benefits law preempted state community property rules, thus altering the property division upon divorce. 453 U.S. at 223–35. And, more recently, *Hillman v. Maretta* held that a federal law setting the "order of precedence" for paying

---

federal court under supplemental jurisdiction. *Id.* at 459, 462–63; *see* 28 U.S.C. § 1367(d). The Court rejected the argument that this rule violated state sovereignty by regulating state-court "procedure," because "tolling of limitations periods falls on the 'substantive' side of the line." 538 U.S. at 464–65. The Court disclaimed any holding that "Congress has unlimited power to regulate practice and procedure in state courts." *Id.* at 465.

federal life-insurance benefits preempted a state cause of action that directed the benefits to another person. 569 U.S. 483, 491–94 (2013).

This preemption rule embraces some of the ICWA provisions challenged here. Specifically, ICWA's substantive standards requiring state courts to observe placement preferences (§ 1915) and make placement or termination findings (§ 1912(e) and (f)) are valid preemption provisions. The district court's view that these standards "modify state created causes of action," *Brackeen*, 338 F.Supp.3d at 539, is a matter of terminology not legal analysis: whenever a federal standard supersedes a state standard, the federal standard can be said to "modify a state created cause of action." In *McCarty*, for instance, the federal benefits law could be said to "modify" a state cause of action for dividing marital property. *McCarty*, 453 U.S. at 223–35. The same for *Hillman*, where the preempted state law "interfere[d]" with the federal scheme "by creating a [state] cause of action" directing proceeds to beneficiaries other than those specified by federal law. 569 U.S. at 494.

In any event, instead of casting preemption in terms of whether federal law "modifies" a state cause of action, the Supreme Court has put the analysis more straightforwardly: "[S]tate law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *see also*, *e.g.*, *Arizona*, 567 U.S. at 399 ("[S]tate laws are preempted when they conflict with federal law."). If ICWA's placement preferences apply in a state proceeding, preemption means a state court must prefer them to conflicting state standards.[130] But "this sort of federal 'direction' of state judges is mandated by the text of the

---

[130] Elsewhere in this opinion, we conclude the § 1915 placement preferences violate the equal protection component of the Fifth Amendment. *See supra* III(A)(2), (3). Our discussion in this Part of the preemptive effect of those preferences is separate from and independent of our holding that the preferences violate the Fifth Amendment.

Supremacy Clause," and so is not commandeering. *New York*, 505 U.S. at 178–79.[131]

We reach a different conclusion, however, as to § 1951(a), which requires state courts to provide the Secretary with a copy of an Indian child's final adoption decree, "together with . . . other information." The district court held this provision unconstitutional, casting it as part of ICWA's command to states to "administer" a federal regulatory program. *Brackeen*, 338 F.Supp.3d at 541-42. On appeal, Defendants argue the provision is merely an "information-sharing" requirement the Supreme Court all but approved in *Printz*. We disagree. *Printz* left open whether requiring "the provision of information to the Federal Government" amounts to commandeering. *See* 521 U.S. at 918 (noting "we . . . do not address" that issue because it is "not before us"). As State Plaintiffs point out, however, § 1951(a) makes state courts do more than share information. The provision spearheads a "recordkeeping" regime that demands state courts (1) transmit to the Secretary a variety of information, *see* 25 C.F.R. § 23.140;[132] (2) maintain a specified "record" of every Indian child placement, *see id.* § 23.141(a), (b);[133] and (3) "make the record available within 14 days of a

---

[131] State Plaintiffs worry that this principle would permit Congress "to prescribe sentences for state-law drug offenses, or to require imposition of strict liability in auto-accident cases." We think not. We cannot fathom where Congress would get the power to do those things. Here, we have assumed—for this part only—that Congress has the power to enact ICWA. *But see supra* II (separately concluding Congress lacks power to enact ICWA to extent it governs state proceedings).

[132] The information pertains to the child's tribal affiliation, the names and addresses of the child's birth and adoptive parents, and "the identity of any agency having files or information relating to such adoptive placement." § 1951(a)(1)–(4); *see also* 25 C.F.R. § 23.140(a)(1)–(6) (detailing additional requirements).

[133] "The record must contain, at a minimum, the petition or complaint, all substantive orders entered in the child-custody proceeding, the complete record of the placement determination (including, but not limited to, the findings in the court record and

request" by the tribe or Secretary, *id.* § 23.141(a). States have the option of designating either their courts or agencies as the "repository" for this information. *Id.* § 23.141(c). The regulations estimate complying with this regime will consume large amounts of state court and agency resources every year. *See* 81 Fed. Reg. at 38,863.

Unlike the other provisions discussed in this part, § 1951(a) is not a substantive child-custody standard state courts must apply under the Supremacy Clause. Rather, the provision imposes an extensive recordkeeping obligation directly on state courts and agencies. This is not a valid preemption provision because it regulates the conduct of states, not private actors. *Cf. Murphy*, 138 S. Ct. at 1481 (explaining "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States"). By conscripting state courts and agencies into administering this system, § 1951(a) violates the principle that "Congress cannot compel the States to enact or enforce a federal regulatory program." *Printz*, 521 U.S. at 935. We therefore hold that § 1951(a) violates the commandeering doctrine and is not a valid preemption provision.

***

Summing up part III, we find the following provisions unconstitutional to the extent they command state agencies (*supra* III(B)(1)(a), (B)(2)(c)):

- The active-efforts requirement in § 1912(d)

- The expert-witness requirement in § 1912(e) and (f)

---

the social worker's statement), and, if the placement departs from the placement preferences, detailed documentation of the efforts to comply with the placement preferences." *Id.* § 23.141(b).

- The placement preferences in § 1915(a) and (b)

- The placement-record requirement in § 1915(e)

- The notice requirement in § 1912(a)

- The recordkeeping requirement in § 1951(a).

We also conclude that none of these are valid preemption provisions (*supra* III(B)(2)(b)).

On the other hand, we find the following are valid preemption provisions (*supra* III(B)(2)(a), (c)):

- The right to intervene in § 1911(c)

- The right to appointed counsel in § 1912(b)

- The right to examine reports and documents in § 1912(c)

- The right to withdraw consent in § 1913(b) and (c)

- The right to collaterally attack a decree in § 1913(d)

- The right to petition to invalidate a decree in § 1914

- The right to petition for return of custody in § 1916(a)

- The right to obtain tribal affiliation information in § 1917

- Courts' obligation to apply the placement preferences in § 1915

- Courts' obligation to apply the placement and termination standards in § 1912(e) and (f).

### C. Nondelegation

We now consider whether ICWA § 1915(c) unconstitutionally delegates legislative power to Indian tribes. As discussed, ICWA establishes preferences for placements of Indian children. *See* § 1915(a), (b). Section 1915(c) empowers tribes to reorder those preferences:

> In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section.

§ 1915(c). ICWA's regulations confirm that a tribe's rewritten preferences trump the order established by Congress.[134]

The district court ruled § 1915(c) and its implementing regulations violate the nondelegation doctrine for two reasons. First, the court held that § 1915(c) invalidly attempts to delegate Congress's "inherent legislative power to create law." *Brackeen*, 338 F. Supp. 3d at 536. Second, even if § 1915(c) delegates only regulatory power, that power cannot be delegated outside the federal government to an Indian tribe. The panel reversed, reasoning that the provision merely exercised Congress's longstanding authority to "incorporate the laws of another sovereign into federal law" and that tribes have "inherent authority" to regulate their members and domestic relations. *Brackeen*, 937 F.3d at 436–37. We agree with the district court that § 1915(c) impermissibly delegates legislative power to Indian tribes.

**1.**

"The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v.*

---

[134] *See* 25 C.F.R. § 23.130(b) ("If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply."); *id.* § 23.131(c) ("If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply, so long as the placement is the least-restrictive setting appropriate to the particular needs of the Indian child, as provided in paragraph (a) of this section.").

*United States*, 488 U.S. 361, 371 (1989). Typically, a nondelegation claim challenges Congress's "transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality op.); *see also, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (a delegation challenge asks "whether the statute has delegated legislative power to [an] agency"). Such challenges are usually unsuccessful because the Supreme Court requires Congress to provide only an "intelligible principle" guiding execution of the delegated authority. *See Touby v. United States*, 500 U.S. 160, 165 (1991); *see also, e.g.*, *United States v. Whaley*, 577 F.3d 254, 263 (5th Cir. 2009) (the "modern [nondelegation] test is whether Congress has provided an 'intelligible principle' to guide the agency's regulations," which "can be broad") (citations omitted). But § 1915(c), as the district court correctly recognized, presents an atypical nondelegation issue for two main reasons: the statute delegates lawmaking—not merely regulatory—authority, and it does so to an entity outside the federal government.

"The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996) (citing U.S. CONST., art. I, § 1; *Field v. Clark*, 143 U.S. 649, 692 (1892)). That forbidden conveyance is what § 1915(c) purports to do. It does not delegate to tribes authority merely to regulate under Congress's general guidelines. *Cf., e.g.*, *Touby*, 500 U.S. at 165 (nondelegation not implicated "merely because [Congress] legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors") (citing *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Rather, it empowers tribes to change the substantive preferences Congress enacted in § 1915(a) and (b) and to bind courts, agencies, and private persons to follow them. As the district court correctly reasoned, "[t]he power to change specifically

enacted Congressional priorities and impose them on third parties can only be described as legislative." *Brackeen*, 338 F. Supp. 3d at 537; *see also INS v. Chadha*, 462 U.S. 919, 952 (1983) (explaining "action that had the purpose and effect of altering the legal rights, duties and relations of persons" is "essentially legislative in purpose and effect"). This "delegation of power to make the law," Chief Justice Marshall explained long ago, "cannot be done." *Loving*, 517 U.S. at 759 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825) (Marshall,C.J.)); *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is vested.").

If Congress wants to enact a new order of preferences, it must follow the constitutional demands of presentment and bicameralism. *See* U.S. CONST. art. I, § 1; *id.* § 7, cl. 2, 3; *see also, e.g.*, *Chadha*, 462 U.S. at 951 ("[T]he Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions."). But § 1915(c) orchestrates their evasion. Just as Congress cannot authorize laws to be amended by a single chamber, *see Chadha*, 462 U.S. at 959, or by the President, *see Clinton v. City of New York*, 524 U.S. 417, 447–48 (1998), it may not empower laws to be rewritten by an outside entity. For instance, in *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 (1991), Congress established a Board of Review, composed of nine members of Congress, that exercised veto power over a regional airport authority. The Court held the Board's authority was an unconstitutional delegation of federal power: Congress may "act with conclusive effect" only "through enactment by both Houses and presentment to the President." *Id.* at 275 n.19 (quoting *Bowsher*, 478 U.S. at 759 (Stevens, J., concurring in the judgment)). If Congress could delegate such authority to another entity, "it would be able to evade the carefully

103

crafted restraints spelled out in the Constitution." *Id.* at 275 n.20 (quoting *Bowsher*, 478 U.S. at 755 (Stevens, J., concurring in the judgment)).[135]

These principles bar the delegated authority exercised by a tribe under § 1915(c). In § 1915(a) and (b), Congress set forth a statutory order of preferences for placing Indian children, but § 1915(c) gives tribes the authority by "resolution" to overrule this order. The tribe can thereby "amend[] the standards" Congress enacted, *Chadha*, 462 U.S. at 954, sapping them of "legal force or effect," *Clinton*, 524 U.S. at 438. As a result, a state court or agency must no longer follow the priorities voted on by Congress and signed by the President in adjudicating an Indian child's placement. Instead they "shall follow" the tribe's priorities. § 1915(c). Whether Congress "intended such a result" is "of no moment." *Clinton*, 524 U.S. at 445-46. Congress cannot validly enact something called "Public Law [95-608] as modified by [an Indian child's tribe]." *Id.* at 448. The Constitution bars Congress from authorizing action that "alter[s] the legal rights, duties, and relations of persons . . . outside the Legislative Branch." *Metro. Wash. Airports*, 501 U.S. at 276 (quoting *Chadha*, 462 U.S. at 951).[136]

---

[135] JUDGE DENNIS suggests that, by discussing the Constitution's presentment and bicameralism requirements, we have *sua sponte* raised an issue not addressed by the district court or the parties. DENNIS OP. at 132. Not so. Nondelegation, presentment, and bicameralism are interrelated doctrines, as JUDGE DENNIS himself recognizes. *See id.* (stating that the nondelegation inquiry "already accounts for bicameralism and presentment") (citing, *inter alia*, John F. Manning, *The Nondelegation Doctrine as a Canon of Avoidance*, 2000 SUP. CT. REV. 223, 240 (2000)).

[136] JUDGE DENNIS tries to compare § 1915(c) to federal laws that "set a default standard that applies unless another party chooses to act." DENNIS OP. at 134. The cited laws, however, empower agencies or other government actors only to grant waivers from otherwise applicable requirements, not to re-write enacted statutes. *See id.* at 134–35 (citing, *inter alia*, 16 U.S.C. § 1536(h)(1), allowing a committee to "grant an exemption" from certain requirements of the Endangered Species Act). Indeed, one of the cases JUDGE DENNIS cites upheld a similar waiver provision against a nondelegation challenge in part because "the Secretary ha[d] no authority to *alter the text of any statute*, repeal any law, or

Finally, even assuming § 1915(c) delegates only regulatory—as opposed to legislative—authority, it is still unconstitutional because it delegates that authority outside the federal government. "By any measure, handing off regulatory power to a private entity is 'legislative delegation in its most obnoxious form.'" *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)); *see also, e.g.*, Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 351–53 (2002) (explaining that delegating executive power to non-federal actors violates Article II Appointments and Take-Care Clauses). An Indian tribe is "not part of the Government at all," which "would necessarily mean that it cannot exercise . . . governmental power." *Ass'n of Am. R.R.*, 575 U.S. at 1253 (Thomas, J., concurring). To be sure, Indian tribes are often described as "possessing attributes of sovereignty," *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (citing *Worcester*, 31 U.S. at 557), but this sovereignty has "'a unique and limited character' . . . center[ed] on the land held by the tribe and on tribal members within the reservation." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978) and citing *Mazurie*, 419 U.S. at 557). As relevant here, Indians have no sovereignty over non-Indians and no sovereignty over state proceedings. *See, e.g.*, *Plains Commerce Bank*, 554 U.S. at 330 ("[E]fforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are 'presumptively invalid.'") (quoting *Atkinson Trading Co. v. Shirley*, 532 U.S.

---

cancel any statutory provision, in whole or in part." *Def. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 124 (D.D.C. 2007) (addressing Secretary of Homeland Security's authority to waive federal environmental law under the REAL ID Act of 2005) (emphasis added). Unlike the waiver provisions Judge Dennis cites, § 1915(c) empowers tribes to "alter the text" of the placement preferences Congress enacted in § 1915(a) and (b).

645, 659 (2001)); *see also infra* (discussing this proposition in greater detail).[137]

In sum, § 1915(c) violates the nondelegation doctrine, either because it delegates Congress's lawmaking function or because it delegates authority to entities outside the federal government altogether.

**2.**

Defendants' arguments to the contrary are unavailing.

Defendants first argue that § 1915(c) is not a delegation at all but only another example of Congress's adopting the laws of another sovereign. For example, they rely on *United States v. Sharpnack*, 355 U.S. 286 (1958), which upheld the Assimilative Crimes Act ("ACA") against a nondelegation challenge. Applying to federal enclaves, the ACA criminalizes actions that "would be punishable . . . within the jurisdiction of the State, Territory, Possession, or District in which such place is situated." *Id.* at 287–88; *see* 18 U.S.C. § 13(a). "Rather than being a delegation by Congress of its legislative authority to the States," *Sharpnack* held this practice is "a deliberate

---

[137] JUDGE DENNIS counters that § 1915(c) is like "long approved" federal laws "that permit another sovereign to supply key aspects of the law"—for instance, when 42 U.S.C. § 1983 incorporates a state limitations period. DENNIS OP. at 136. We disagree. Section 1915(c) permits tribes, not merely to "supply key aspects of the law," but to *change* the order of preferences Congress enacted. Supplementing § 1983 actions with state limitations periods is a different animal. Congress "endorse[d] the borrowing of state-law limitations provisions" in § 1988, but only "where doing so is consistent with federal law." *Owens v. Okure*, 488 U.S. 235, 239 (1989). It is one thing for a state statute to supplement an otherwise-silent federal provision; it is quite another for a state (or a tribe) to alter the provisions of enacted federal law. In a similar vein, JUDGE DENNIS also cites federal laws supposedly delegating to "separate sovereign[s]" authority to change "the federal standard in matters related to the sovereign's jurisdiction." DENNIS OP. at 134–35 (emphasis omitted) (citing, *e.g.*, 20 U.S.C. § 1415(b)(6)(B), allowing state law to set time limitation for bringing an IDEA administrative claim). This again misses the point. None of these laws allows a different sovereign to alter the *text* of enacted federal law.

continuing adoption by Congress for federal enclaves" of crimes that "have been already put in effect by the respective States." 355 U.S. at 294.

Defendants contend ICWA § 1915(c) merely follows the pattern of the ACA by incorporating another sovereign's law. We disagree. The ACA's strategy is to "borrow[] state law to fill gaps in the federal criminal law on enclaves." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1891 (2019) (cleaned up). Section 1915(c) of ICWA does not "fill gaps" in federal law; it empowers tribes to *change* federal law. *Cf.*, *e.g.*, *Lewis*, 523 U.S. at 160 (explaining the ACA fills gaps only "where Congress has not defined the missing offenses") ( cleaned up). Moreover, the Supreme Court has clarified that the ACA cannot adopt state laws that "effectively rewrite an offense definition that Congress carefully considered." *Id.* at 164 (citing *Williams v. United States*, 327 U.S. 711, 718 (1946)). As a result, the ACA's "continuing adoption" of state law does not evade the Constitution's lawmaking requirements. ICWA does: § 1915(c) contemplates that tribal "resolution[s]" will supersede law already enacted in §§ 1915(a) and (b).[138]

Defendants next rely on *United States v. Mazurie*. That decision addressed whether, pursuant to a federal statute, a tribe could regulate alcohol sales on non-Indian fee lands within the boundaries of its reservation. 419 U.S. at 546–48. The Supreme Court held the tribe could do so on two grounds. First, limitations on delegating legislative power are "less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." *Id.* at 556 (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–22 (1936)). Second,

---

[138] The same may be said for the Federal Tort Claims Act ("FTCA"), on which Defendants also rely. The FTCA makes the United States liable in tort "in accordance with the [state] law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Like the ACA, the FTCA completes the federal framework by adopting state law.

"tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory," which empowers them to "regulate[] their internal and social relations." *Mazurie*, 419 U.S. at 557 (citing *Worcester*, 31 U.S. at 557; *Kagama*, 118 U.S. at 381–82; *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 173 (1973)). *Mazurie* does not apply to § 1915(c) for three reasons.

First, Indian tribes lack "independent authority" over off-reservation matters. The Supreme Court—citing *Mazurie*—has held that tribes' "unique and limited" sovereignty "centers on the land held by the tribe and on tribal members within the reservation." *Plains Commerce Bank*, 554 U.S. at 330 (citing *Mazurie*, 419 U.S. at 557). Section 1915(c), however, empowers tribes to alter placement preferences with respect to off-reservation activities. Second, tribes have only sharply limited authority over nonmembers. *See*, *e.g.*, *Montana v. United States*, 450 U.S. 544, 565 (1981) (holding a tribe's "inherent sovereign powers . . . do not extend to the activities of nonmembers of the tribe"). Section 1915(c), however, empowers tribes to affect the rights of non-Indian foster and adoptive parents. Third, and most importantly, *Mazurie* does not even hint that tribes have authority to bind *state courts and agencies*. To the contrary, the statute in *Mazurie* explicitly provided that tribal ordinances could be promulgated only "so long as state law was not violated." 419 U.S. at 547 (citing 18 U.S.C. § 1161). Thus, *Mazurie* could not support the proposition that Congress can delegate to a tribe authority to bind state courts or agencies. Defendants cite no other authority for that unheard-of proposition.[139]

---

[139] JUDGE DENNIS suggests that, regardless of a tribe's inherent sovereignty, Congress can extend a tribe's jurisdiction over state proceedings through "express authorization" in a federal statute or treaty. DENNIS OP. at 128 (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997)). No authority supports that proposition. The case JUDGE DENNIS cites addresses, like *Mazurie*, only whether Congress may authorize

**\*\*\***

For these reasons, we hold that § 1915(c) and its implementing regulations unconstitutionally delegate federal legislative power.

### D. Administrative Procedure Act

We now consider whether the Final Rule violates the APA. The district court held it did for three reasons. First, the court set aside the parts of the Final Rule that implement the statutory provisions the court found unconstitutional. *Brackeen*, 338 F.Supp.3d at 541-41. Second, in the alternative the court found the BIA exceeded its authority by issuing regulations binding on state courts. *Id.* at 542-44. *See* 81 Fed. Reg. at 38,785–86. Third, the court separately found invalid 25 C.F.R. § 23.132(b), which requires that "good cause" to depart from the placement preferences be proved by clear and convincing evidence. *Id.* at 544-46. The panel reversed. *Brackeen*, 937 F.3d at 437–41. It found ICWA constitutional, *id.* at 437, and the BIA's interpretive views entitled to *Chevron* deference, *id.* at 438–41.

We review the agency's interpretation of ICWA under the two-step framework from *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *see generally, e.g.*, *Sw. Elec. Power Co.*, 920 F.3d at 1014 (discussing *Chevron*). At step one, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. We answer that question by "exhaust[ing] all the 'traditional tools' of construction," including "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron*, 467 U.S. at 843 n.9;

---

tribes to exercise authority over nonmembers *within their reservations. See Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1223 (9th Cir. 2001) (en banc) (upholding federal statute that "ratified" tribe's governing documents giving it power to regulate reservation property, including nonmembers' property).

*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)). If that holistic reading of the statute settles the matter, *Chevron* ends: we "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. On the other hand, if the statute is "truly ambiguous" on the question, *Kisor*, 139 S. Ct. at 2414, we proceed to step two, "asking whether the agency's construction of the statute is 'permissible.'" *Sw. Elec. Power Co.*, 920 F.3d at 1014 (quoting *Chevron*, 467 U.S. at 843). A permissible construction is one that "reasonabl[y] accommodat[es] . . . conflicting policies that were committed to the agency's care by the statute." *Chevron*, 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)).

### 1.

Having found parts of ICWA unconstitutional (*supra* III(A)–(C)), we agree with the district court that the Final Rule is invalid to the extent it implements those unconstitutional statutory provisions. *See Brackeen*, 338 F.Supp.3d at 541–42; *see also* 5 U.S.C. § 706(2)(A) (authorizing courts to set aside "unlawful" agency action); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (explaining "unlawful" agency action "includes unconstitutional action"); *Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) (observing "[t]he authority of administrative agencies is constrained by the language of the statutes they administer") (citing *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007)). In the alternative, we address below the more specific grounds on which the district court concluded the Final Rule was unlawful.

### 2.

The district court found the Final Rule invalid because it purports to bind state courts' implementation of ICWA. Its ruling appears to rely on both *Chevron* step one and two. *See Brackeen*, 338 F.Supp.3d at 542–44. Defending

the ruling on appeal, Individual Plaintiffs focus on step two, arguing the BIA's "novel interpretation" of its authority in the Final Rule—which reverses BIA's position in the 1979 guidelines—does not merit *Chevron* deference. *See Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 380–81 (5th Cir. 2018) (treating this "novel interpretation" argument under *Chevron* step two). We resolve this question under step two. Therefore, we assume ICWA is "silent or ambiguous" on whether the BIA has authority to bind state courts. *Chevron*, 467 U.S. at 843. We ask only whether the BIA's 2016 stance is a "permissible construction of the statute." *Id.*

In 1979, mere months after enactment, the BIA emphatically concluded that ICWA did not authorize the agency to bind state courts' implementation of the statute. 44 Fed. Reg. at 67,584. It would be "an extraordinary step," the BIA wrote, "[f]or Congress to assign to an administrative agency such supervisory control over courts." *Id.* The agency recognized that § 1952 authorized it to issue rules "necessary to carry out [ICWA]." *Id.* But § 1952, the BIA explained, allowed it to make binding rules only for those parts of ICWA delegating interpretive responsibility to the Secretary of the Interior. *Id.*[140] "Nothing" in the section's text or history, however, suggested Congress wanted the agency to "exercise supervisory control over state or tribal courts or to legislate for them with respect to Indian child custody matters." *Id.* The agency declined to attribute to Congress "a measure so at odds with concepts of both federalism and separation of powers . . . in the absence of an express declaration of

---

[140] As an example, the agency cited § 1918, under which "the Secretary is directed to determine whether a plan for reassumption of jurisdiction is 'feasible' as that term is used in the statute." 44 Fed. Reg. at 67,584. The agency noted it had already promulgated regulations covering this section as well as "other areas where primary responsibility for implementing portions of the Act rest with this Department." *Id.* (citing 44 Fed. Reg. 45,092 (July 31, 1979)).

Congressional intent to that effect." *Id.* After operating with this understanding for 37 years, however, the agency reversed course in 2016, determining that § 1952 authorizes it to "set binding standards for Indian child-custody proceedings in State courts." 81 Fed. Reg. at 38,785.

When an agency abruptly departs from a longstanding position, its "'current interpretation . . . is entitled to considerably less deference.'" *Chamber of Commerce*, 885 F.3d at 381 (quoting *Watt v. Alaska*, 451 U.S. 259, 272–73 (1981)). Here, the agency "claims to discover in a long-extant statute an unheralded power" of binding state courts' implementation of ICWA, and so we "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("*UARG*"). Indeed, BIA's "turnaround" from its previous stance "alone gives us reason to withhold approval or at least deference for the Rule." *Chamber of Commerce*, 885 F.3d at 381 (citing *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976)). This principle is especially prescient where, as here, the agency's new position is "not a contemporaneous interpretation of [ICWA]" and "flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute." *Id.* (quoting *Gilbert*, 429 U.S. at 142); *see also Udall v. Tallman*, 380 U.S. 1, 16 (1965) (giving "particular[] . . . respect" to the "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion") (cleaned up). To be sure, an agency's changing its mind does not alone defeat *Chevron* deference. *See, e.g.*, *Gonzalez-Veliz v. Barr*, 938 F.3d 219, 234 (5th Cir. 2019) ("An agency is not permanently bound to the first reasoned decision that it makes."). But the agency must "show that there are good reasons for the new policy" by providing a "reasoned explanation" for departing from its previous position. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126

(2016) (quoting *Fox Television Stations*, 556 U.S. at 515–16).[141] The BIA has failed to do so here.

The 1979 BIA explained that empowering a federal agency to control state courts would be an "extraordinary" subversion of federalism and separation of powers. 44 Fed. Reg. at 67,584. BIA's 2016 response to this point can charitably be described as anemic. The agency now says it "reconsidered" its 1979 view because "Congress enacted ICWA to curtail State authority in some respects," including state court authority. 81 Fed. Reg. at 38,788–89. But that fails to address the serious question central to the agency's 1979 position—namely, whether Congress intended the *BIA* to control state courts. The agency also now points out that Congress can "pass laws enforceable in state courts." *Id.* at 38,789 (citing, *inter alia*, *Testa*, 330 U.S. at 394). But that settled principle long pre-dates the 1979 guidelines and, again, says nothing about whether a *federal agency* can control state courts. Moreover, as discussed, the Final Rule also purports to control state *agencies*, *supra* III(B)(1), which raises anti-commandeering problems the BIA ignores. The BIA also invokes Congress's "plenary power over Indian affairs," 81 Fed. Reg. at 38,789, but we have explained that mouthing that shibboleth is

---

[141] JUDGE DENNIS criticizes us for including the agency's reversal "as a component of *Chevron* step two." DENNIS OP. at 143. As our discussion shows, however, both our court and the Supreme Court have considered under *Chevron* step two an agency's reversal-of-position, as well as its belated discovery of novel authority in statutes it has long administered. *See Encino Motorcars*, 136 S. Ct. at 2125–26; *UARG*, 573 U.S. at 324; *Chamber of Commerce*, 885 F.3d at 380–81, 387; *see also, e.g., Environmental Integrity Project v. EPA*, 969 F.3d 529, 544 (5th Cir. 2020) (explaining "we take the agency's change of position into account" in deciding whether to apply *Skidmore* deference). JUDGE DENNIS himself concedes that, when assessing an agency's reading of a statute, "*Chevron* deference may be withheld if the agency failed to adequately explain why it shifted to its current interpretation." DENNIS OP. at 142 (citing *Encino Motorcars*, 136 S. Ct. at 2125). That is the question we confront here—whether the BIA failed to justify its discovery in § 1952 of authority whose existence it had denied for the prior forty years.

not enough to override state sovereignty. *Supra* II(A). Finally, purportedly addressing the "Federalism concerns it noted in 1979," the BIA now cites the Supreme Court's *Brand X* decision. 81 Fed. Reg. at 38,789 (citing *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005)). But *Brand X* has nothing to do with federalism; rather, it addresses when a federal court's interpretation of a statute may deny *Chevron* deference to a federal agency's later interpretation. *See id.* at 982 (holding federal court trumps if "its construction follows from the [statute's] unambiguous terms").

The 1979 BIA also concluded that neither § 1952's language or history showed Congress gave the agency supervisory power over state courts. 44 Fed. Reg. at 67,584. The agency reasoned that, by authorizing rules "necessary to carry out" ICWA, § 1952 only empowered the BIA to issue regulations "to carry out the responsibilities Congress had assigned to [the Department] under [ICWA]." *Id.* BIA's 2016 response fails to engage this reasoning. It merely says that § 1952 is a "broad and general grant of rulemaking authority" and that courts have held that similar provisions "presumptively authorize agencies to issue rules and regulations addressing matters covered by the statute." 81 Fed. Reg. at 38,786. That ducks the point entirely. No one doubts the language in § 1952 authorizes agency rulemaking. *See*, *e.g.*, *Mourning v. Family Pub. Serv.*, 411 U.S. 356, 369 (1973). The 1979 BIA asked a different question: whether § 1952 authorizes regulations that bind state courts in state proceedings. *See* 44 Fed. Reg. at 67,584 ("Nothing in the language or legislative history of § 1952 compels the conclusion that Congress intended to vest this Department with such extraordinary power."). No case cited by the 2016 BIA confronts that question.[142] Only

---

[142] *See* 81 Fed. Reg. at 38,785 (citing *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 (1999); *Am. Hosp. Ass'n v. Nat'l Labor Relations Bd.*, 499 U.S. 606, 609–10 (1991);

one—*AT&T Corp. v. Iowa Utilities Board*—even comes close, but it holds only that a federal agency can control a state commission's participation in a federal telecommunications regime. *See* 525 U.S. 366, 378 n.6 (1999) (asking whether "the state commissions' participation in the administration of the new *federal* regime is to be guided by federal-agency regulations"). Here we have the opposite question: whether a federal agency can control state courts and agencies acting under state jurisdiction. The 1979 BIA concluded ICWA did not intend that "extraordinary step," 44 Fed. Reg. at 67,584, and the 2016 BIA offers no reason whatsoever for thinking otherwise.

Finally, the BIA defends its new approach as needed to harmonize "sometimes conflicting" state court interpretations of ICWA over past decades. 81 Fed. Reg. at 38,782. Merely because state courts have sometimes disagreed about ICWA, however, says nothing about whether Congress empowered the BIA to control how state courts interpret it. *Cf.* 44 Fed. Reg. at 67,584 (stating 1979 BIA's view that state courts "are fully capable of carrying out the[ir] responsibilities [under ICWA] without being under the direct supervision of this Department"). Regardless, the BIA's 2016 examples hardly show the "necessity" for such authority. Its prime example is that some courts created an "existing Indian family" exception to ICWA.[143] But, as the agency admits, the exception was repudiated by the court that created it, is now recognized by "[o]nly a handful" of courts, and

---

*Mourning*, 411 U.S. at 369*; City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013); *Qwest Comm'ns Int'l Inc. v. FCC*, 229 F.3d 1172, 1179 (D.C. Cir. 2000)). Of these cases, JUDGE DENNIS focuses on *Mourning* because the agency-empowering language there was "nearly identical" to § 1952. DENNIS OP. at 141 & n.65. That is irrelevant, however, because *Mourning* did not address a federal agency's power over state courts or agencies; instead, it addressed the scope of the Federal Reserve Board's power to prevent merchants from evading certain Truth in Lending Act disclosure requirements. 411 U.S. at 361–62.

[143] *See* 81 Fed. Reg. 38782 (citing, *e.g.*, *Thompson v. Fairfax Cty. Dep't of Family Servs.*, 747 S.E.2d 838, 847–48 (Va. Ct. App. 2013)).

has been rejected by a "swelling chorus" of others. 81 Fed. Reg. at 38,801–02.

Also unpersuasive is the BIA's reliance on *Holyfield*. *Id.* at 38,786. *Holyfield* held that Congress did not intend state law to define the term "domicile" in ICWA § 1911, which gives tribes sole jurisdiction over on-reservation children. 490 U.S. at 44–47. The BIA claims that, in 1979, it lacked "the benefit of the *Holyfield* Court's carefully reasoned decision" showing how ICWA could be undermined by "a lack of uniformity" among state courts. 81 Fed. Reg. at 38,787. That does not hold water. *Holyfield* pitted *one* state court's errant interpretation of ICWA against correct interpretations by "several other state courts"—hardly an interpretive crisis. 490 U.S. at 41 & n.14. Moreover, the case involved ICWA's "key jurisdictional provision" dividing tribal from state authority, *id.* at 45, not any provision governing how state courts apply ICWA. *Cf.* 44 Fed. Reg. at 67,584 (1979 BIA disclaiming authority over provisions concerning "the responsibilities of state or tribal courts under the Act"). And *Holyfield* was on the books for 27 years before BIA claimed the decision inspired its 2016 policy change. 81 Fed. Reg. at 38,787. We treat that late-breaking revelation "with a measure of skepticism." *UARG*, 573 U.S. at 324.

We therefore conclude the 2016 Rule fails to provide a "reasoned explanation"[144] for reversing the agency's nearly forty-year-old

---

[144] JUDGE DENNIS disagrees, arguing the BIA needed to provide only a "minimal level of analysis" for its new position. DENNIS OP. at 146 (quoting *Encino Motorcars*, 136 S. Ct. at 2125). But that is not the standard. When agencies "change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars*, 136 S. Ct. at 2125; *see also id.* (explaining "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy") (quoting *Fox Television Stations*, 556 U.S. at 515–16). As explained, the 2016 BIA has not provided a "reasoned explanation" for its about-face. It has provided a series of *non sequiturs*.

interpretation of § 1952 and discovering novel authority to bind state courts. *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox Television Stations*, 556 U.S. at 515–16). "An arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference." *Id.* (citing *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)).

**3.**

The district court separately invalidated 25 C.F.R. § 23.132(b), part of the Final Rule that interprets the "good cause" standard in § 1915. That provision mandates specific placements for Indian children "in the absence of good cause to the contrary." *See* § 1915(a), (b). In turn, the Final Rule states: "The party seeking departure from the placement preferences should bear the burden of proving *by clear and convincing evidence* that there is 'good cause' to depart from the placement preferences." 25 C.F.R. § 23.132(b) (emphasis added); *see also* 81 Fed. Reg. at 38,844. The district court invalidated this part of the rule under *Chevron* step one, concluding it imposes a heightened burden of proof on § 1915 without statutory warrant. *Brackeen*, 338 F.Supp.3d at 545-46. We agree.

The step one inquiry is whether the statute unambiguously forecloses the agency's interpretation—here, specifying a heightened burden for proving "good cause" under § 1915. That section says nothing about a burden of proof, as the BIA admits. *See* 81 Fed. Reg. at 38,843 (noting the clear-and-convincing standard "is not articulated in section 1915"). The presumption, then, is that the section incorporates, not a heightened standard of proof, but the normal preponderance standard. *See, e.g.*, *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (statutory "silence" is "inconsistent with the view that Congress intended to require a special, heightened standard of proof"). But we need not rely solely on that presumption: at step one, we look beyond the "particular statutory provision in isolation" and read the

statute "as a symmetrical and coherent regulatory scheme." *Sw. Elec. Power Co.*, 920 F.3d at 1023 (cleaned up). Doing so, we find that Congress imposed a "clear and convincing evidence" standard in a nearby provision: § 1912(e) forbids foster placement unless "clear and convincing evidence" shows likely harm from the parent's continued custody. The next subsection, § 1912(f), demands an even higher showing—"beyond a reasonable doubt"—before terminating the parent's rights. Congress thus deliberately included heightened standards for proving certain matters in § 1912(e) and (f), but *not* for proving "good cause" in § 1915.[145] We thus conclude Congress elected not to impose a heightened standard in § 1915, foreclosing the agency's interpretation at *Chevron* step one. *See Chamber of Commerce*, 885 F.3d at 369 (when statute "unambiguously forecloses" agency interpretation, "that is the end of the matter") (quoting *Chevron*, 467 U.S. at 842–43) (cleaned up).

JUDGE DENNIS suggests this "negative-implication" canon of statutory construction does not apply when assessing the permissible scope of agency action. DENNIS OP. at 148–49. *See generally Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (discussing negative-implication or *expressio unius est exclusio alterius* canon) (citing SCALIA & GARNER, READING LAW 107 (2012)). We disagree. Courts are to use "all the 'traditional tools' of construction" at *Chevron* step one. *Kisor*, 139 S. Ct. at 2415 (quoting *Chevron*, 467 U.S. at 843 n.9). And both the Supreme Court and our court have deployed the negative-implication canon in the step one analysis.[146] The

---

[145] *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("'[W]here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[146] *See, e.g., Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002); *Brown v. Gardner*, 513 U.S. 115, 120 (1994); *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 732

*Chevron* cases JUDGE DENNIS cites—which in any event are all out-of-circuit—merely show that the canon sometimes does not resolve step one. For instance, by including an agency mandate in one section but not another, Congress "may simply not have been focusing on the point in the second context" and so left "the choice . . . up to the agency." *Clinchfield Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 895 F.2d 773, 779 (D.C. Cir. 1990); *see also*, *e.g.*, *Catawba County v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009). There is no evidence of that here, however. To the contrary, Congress explicitly mandated heightened standards-of-proof in sections addressing foster and adoptive placements (§ 1912(e) and (f)), but *not* in a nearby section (§ 1915) addressing departures from placement preferences. Far from suggesting Congress left the standard-of-proof up to the agency, this pattern "signals the intentional omission" of a heightened standard from § 1915, a decision the agency cannot second-guess. *Chamber of Commerce*, 885 F.3d at 373 (citing *Russello*, 464 U.S. at 23).

Sitting this debate out, the Federal Defendants' sole response is that the Final Rule *suggests* but does not *require* the clear-and-convincing-evidence standard. They argue that § 23.132(b) says only that courts "should" impose that standard, and also point out that the regulations state the rule "does not categorically require [it]" and "declines to establish a uniform standard of proof." 81 Fed. Reg. 38,843. We are unsure what to make of this strange argument. The Final Rule's whole purpose was to impose "uniformity" on state courts, *id.* at 38,779, and the term "should" often "create[s] mandatory standards." *Should*, GARNER'S DICTIONARY OF LEGAL USAGE (3d ed. 2011). Moreover, the state courts hearing Plaintiffs' cases have not read the

_____

(5th Cir. 2018); *Chamber of Commerce*, 885 F.3d at 373; *Luminant Generation Co., LLC v. EPA*, 675 F.3d 917, 929 (5th Cir. 2012); *Miss. Poultry Ass'n, Inc. v. Madigan*, 992 F.2d 1359, 1363–64 & n.29 (5th Cir. 1993).

rule as a mere suggestion. Thus, whatever credence we might give to the Federal Defendants' view, we would still find the rule invalid at step one because it seeks to create (and has in fact created) a heightened standard-of-proof in contravention of § 1915.

Alternatively, we would find this part of the rule invalid at *Chevron* step two. As discussed above, we view with "skepticism" an agency's departure from longstanding practices, especially those adopted contemporaneously with the statute's enactment. *Chamber of Commerce*, 885 F.3d at 381 (quoting *UARG*, 573 U.S. at 324); *supra* III(D)(1). The BIA's 2016 treatment of the § 1915 "good cause" determination is strikingly at odds with its 1979 position. In 1979, the BIA wrote that ICWA's "use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." 44 Fed. Reg. at 67,484. This supported BIA's position that "[p]rimary responsibility for interpreting" ICWA's language "rests with the courts that decide Indian child custody cases." *Id.* In 2016, BIA did a 180-degree reversal—seeking to impose a one-size-fits-all standard on what it previously stated was a "flexible" inquiry—without giving the "reasoned explanation" needed to justify discarding a longstanding agency view. *Gonzalez-Veliz*, 938 F.3d at 234 (quoting *Encino Motorcars*, 136 S. Ct. at 2126). The agency's sole justification was that state courts have "almost universally" adopted this standard. 81 Fed. Reg. at 38,843. But that undermines the agency's position. A near-consensus by state courts in applying the statute—one they have "primary responsibility" for administering, 44 Fed. Reg. at 67,487—hardly justifies the BIA's newfound view that it must impose uniformity on those same courts.

## E. Remedy

We now address the question of remedy. Plaintiffs' second amended complaint, the one operative here, sought a declaration that specific sections of ICWA are unconstitutional and an injunction prohibiting the Federal Defendants from implementing or administering those sections. It also sought vacatur of the Final Rule. The district court, however, granted only declaratory relief as to specific provisions of ICWA and the Final Rule, and Plaintiffs have not cross-appealed seeking to modify the district court's judgment. *See, e.g., Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 876 F.3d 119, 127 (5th Cir. 2017) (explaining that "even a prevailing party must file a cross-appeal to seek a modification of a judgment") (citing *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 604 (5th Cir. 2004)). Having found discrete parts of ICWA and the Final Rule unconstitutional and unlawful, we would therefore affirm the district court's judgment to that extent. Specifically: (1) we would declare that the noted sections of ICWA are unconstitutional;[147] and (2) we would declare that the noted provisions of the Final Rule are unlawful under § 706 of the APA.[148]

Finally, a word about severability. The modern Supreme Court applies a "severability doctrine" to determine whether invalid parts of a statute may be excised from the rest. *See, e.g., Free Enter. Fund*, 561 U.S. at 508 ("'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any

---

[147] Those are: **(1)** 25 U.S.C. §§ 1915(a), 1915(b), 1913(d), 1914 (equal protection); **(2)** 25 U.S.C. §§ 1912(a), 1912(d), 1912(e), 1912(f), 1915(a), 1915(b), 1915(e), 1951(a) (anti-commandeering); and **(3)** 25 U.S.C. § 1915(c) (nondelegation).

[148] Those are: **(1)** all parts of the Final Rule that implement the ICWA provisions declared unconstitutional; **(2)** all parts of the Final Rule that purport to bind state courts; and **(3)** the requirement in 25 C.F.R. § 23.132(b) that good cause to depart from the placement preferences be proved "by clear and convincing evidence."

'problematic portions while leaving the remainder intact.'") (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–29 (2006)). For at least two reasons, however, we need not perform that analysis here.

First, Plaintiffs do not challenge all of ICWA but only particular provisions. We can therefore grant Plaintiffs appropriate relief without delving into severability.[149] In that way, this case differs from cases where deciding severability was necessary to fashion appropriate relief. *Cf., e.g., Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2349 (2020) (plaintiffs invoked "ordinary severability principles" to argue for complete relief on their First Amendment claim); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2208 (2020) (observing "[t]here is a live controversy between the parties on th[e] question [of severability], and resolving it is a necessary step in determining petitioner's entitlement to its requested relief"). Second, the parties' briefing contains little substantive analysis on this point. We decline to perform a severability analysis of a complex statute like ICWA when the parties have not deeply engaged with the issue.[150]

---

[149] *See, e.g.*, 28 U.S.C. § 2201(a) (authorizing courts to "declare the rights and other legal relations of any interested party" in "a case of actual controversy within its jurisdiction"); 5 U.S.C. § 706(2) (authorizing courts to "hold unlawful and set aside agency action, findings, and conclusions" under various circumstances).

[150] Even were we so inclined, we note that ICWA contains a severability clause. *See* 25 U.S.C. § 1963. In that event, "[a]t least absent extraordinary circumstances, the Court should adhere to the text of the severability or nonseverability clause" because the clause "leaves no doubt about what the enacting Congress wanted if one provision of the law were later declared unconstitutional." *American Ass'n*, 140 S. Ct. at 2349.

No. 18-11479

Priscilla R. Owen, *Chief Judge*, concurring in part, dissenting in part.

# I

## A

I first consider whether the States have standing. For the reasons articulated in Judge Dennis's and Judge Costa's opinions,[1] the States do not have standing to assert in this suit that the Indian Child Welfare Act of 1978 (ICWA)[2] violates the Equal Protection Clause of the Fifth Amendment. As to all other claims, I conclude that the States do have standing.

The States have asserted various, often overlapping, claims in Counts I through IV and Count VII of the live complaint in the district court—the Second Amended Complaint. Briefly summarized, the States seek a determination that Congress did not have the authority to supplant state law in child-welfare and adoption cases with certain directives in ICWA, and that Congress cannot require state courts to follow ICWA. The States also contend that the Bureau of Indian Affairs (BIA) violated the Administrative Procedure Act (APA) and the federal Constitution when it promulgated the Final Rule (Count I). The States contend that the Indian Commerce Clause did not empower Congress to enact certain provisions of ICWA (Count II); that adoption, foster care, and pre-adoptive placement of "Indian children" are not permissible subjects of regulation under the Tenth Amendment (Count III); that ICWA and the Final Rule violate anti-commandeering principles under the Tenth Amendment (Count III); that ICWA and the Final Rule violate the Equal Protection Clause of the Fifth Amendment

---

[1] *See* Dennis, J., concurring and dissenting, part I(A)(1), p. 39 n.13; Costa, J., concurring and dissenting, part I, p. 3 n.2.

[2] 25 U.S.C. §§ 1901-1923, 1951-1952.

No. 18-11479

(Count IV); and that ICWA and the Final Rule violate the non-delegation doctrine of Article I, Section 1 because they "delegate to Indian tribes the legislative and regulatory power to pass resolutions in each Indian child custody proceeding that alter the placement preferences state courts must follow" (Count VII).

The States complain about the costs of complying with ICWA and the Final Rule, including the hours and resources that child-welfare agencies expend, costs borne by the States to employ experts, and the time consumed in state-court proceedings resolving ICWA issues. The States further contend they "are directly and substantially injured by the delegation of power over placement preferences because it violates the Constitution's separation of powers through abdication of Congress's legislative responsibility and requires State Plaintiffs to honor the legislation and regulation passed by tribes in each child custody matter, which can vary widely from one child to the next and one tribe to another."

The States have adequately alleged that they are injured by ICWA and the Final Rule for standing purposes.[3] The determinative question is whether those injuries could be redressed if a federal court were to grant the relief the States seek in this case.

The States seek a declaration that parts of ICWA are unconstitutional and therefore that state rather than federal law governs. To the extent the States are seeking to supplant ICWA with state substantive and procedural law in child-welfare proceedings, such a declaration would not redress the

---

[3] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." (citations, footnote, and internal quotation marks omitted)).

No. 18-11479

States' injuries because no state court would be bound by such a declaration.[4] Every state court would, of course, be free to decide the constitutionality of ICWA de novo because the rulings of the federal district court and of this court would not bind state courts and would not bind private litigants in state court proceedings. For this reason, the assertion in JUDGE DUNCAN's opinion that a decision of this court "would also remove state child welfare officials' obligations to implement [ICWA's] preferences"[5] is, with great respect, incorrect.

The States contended in the district court that because various provisions of ICWA are unconstitutional, the federal government cannot require the States to comply with those provisions and therefore could not withhold federal funding for child welfare as a consequence of non-compliance with ICWA. Specifically, the States requested the district court to hold that certain statutes authorizing the Secretary to withhold federal child welfare funds from states that do not comply with ICWA, including 42 U.S.C. §§ 622(b)(9) and 677(b)(3)(G), are unconstitutional. The States sought an injunction prohibiting the federal defendants from implementing or enforcing those statutes in their initial pleadings.

However, the States did not thereafter pursue any relief in the district court regarding the withholding of funds by the federal defendants. The States moved for summary judgment, but they did not seek summary judgment or request injunctive relief in their motion with regard to federal funding of child welfare. They did not cross-appeal in this court seeking such relief, nor could they since they did not pursue it in the district court. The

---

[4] *See Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) (per curiam) ("Redressability requires 'a likelihood that the requested relief will redress the alleged injury.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998))).

[5] *See* DUNCAN, J., concurring and dissenting, part I(B), p. 21.

3

No. 18-11479

question then arises as to whether there is redressability at this point in the proceedings, since standing must be present at each stage of litigation.[6]

A determination in this case that certain provisions of ICWA, the Final Rule, or both were unconstitutional would be a binding determination (res judicata) as between those States and the federal government. This would mean that the States could categorically direct their child-welfare agencies to cease compliance with the provisions of ICWA if it were held unconstitutional. Such relief would address injuries asserted by the States and establishes the States' Article III standing to raise the constitutional challenges to ICWA, other than equal protection. The States would no longer be burdened with ICWA's requirements and would not incur the costs and expenses associated with compliance unless and until, in a state-court proceeding, individual plaintiffs asserted rights under ICWA and a final state-court judgment were to hold, contrary to a judgment of this court or the district court, that ICWA is constitutional and the State is bound by its requirements in that state-court proceeding. The potential for such a collision between state and federal courts as to ICWA's constitutionality does not mean that federal courts cannot redress the States' injuries in the present case. A federal-court judgment in the States' favor in this case could conceivably redress their injuries, though in the longer term, a state court's view of the constitutionality of ICWA might ultimately carry the day were a conflict between state-court holdings and federal-court holdings to arise.

---

[6] *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990) ("[The] case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. To sustain our jurisdiction in the present case, it is not enough that a dispute was very much alive when suit was filed . . . ." (first citing *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988); and then citing *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974))).

No. 18-11479

A judgment in the present case holding that the States prevail against the federal defendants on their claims that ICWA is unconstitutional could also potentially be the basis for precluding the federal government from withdrawing funding for a State's failure to comply with unconstitutional statutory or regulatory provisions. Does that mean that the federal government is prohibited from using a "carrot/stick" approach to persuade a State to comply with ICWA or else withdraw funding? That issue was not raised or briefed in the district court or this court. It has not been decided. But the point is, it is not improbable that the relief that the States do continue to seek in the present case would, in future litigation between the States and the federal government, preclude the federal government from withholding child welfare funds under ICWA as a consequence of the States' failure to comply with ICWA. The constitutionality of ICWA would be off the table in any such future litigation between a State who is a party to this case and the federal government.

Not all the States' claims are grounded in the federal Constitution. The States challenge 24 C.F.R. § 23.132(b) on the basis that the clear-and-convincing-evidence standard is contrary to 25 U.S.C. § 1915, and on the basis that in promulgating the Final Rule, the Bureau of Indian Affairs (BIA) did not provide a reasoned explanation for reversing its prior, long-held interpretation of ICWA. The relief sought by the States in this regard would redress their complaint that the Final Rule imposes too high a standard on state agencies seeking to place a child other than in accordance with ICWA's preferences. The Final Rule's offending provisions would be abrogated and therefore would not be a factor or at issue in state-court adoption or placement proceedings. This would redress the injuries identified by the States.

Accordingly, I concur in parts I(C) and (D) of JUDGE DENNIS's opinion, with the exception of the last sentence in part I(D).

No. 18-11479

**B**

As to the standing of the individual plaintiffs, I concur in part I(A)(1) of JUDGE DENNIS's opinion, and parts I and II(A) and the final paragraph of part II(B) of JUDGE COSTA's opinion.

I add these observations. None of the individual plaintiffs have standing to press any of their claims, other than those with regard to the APA and the Final Rule, because nothing this court has to say about ICWA binds any state court in adoption or foster care placement cases when a private party asserts that ICWA's provisions are constitutional and must be applied or that they are unconstitutional and cannot be applied. Private parties in child-welfare and adoption proceedings would not be bound by a judgment issued by a federal district court or this court declaring rights as between the Brackeens, for instance, and the federal defendants, or as between the States and the federal government.

The assertion in JUDGE DUNCAN's opinion that the individual plaintiffs' claims are redressable because the "Federal Defendants would be barred from inducing state officials to implement ICWA, including the preferences, by withholding funding,"[7] is, with great respect, erroneous. None of the individual plaintiffs have standing to argue that the federal government is precluded from withholding child welfare funds from a State. They do not argue that they have a right or interest that would permit them to insert themselves into disputes as to funding between the federal government and the States under ICWA. The individual plaintiffs cite no statute or constitutional provision that would confer such a right. Any relief granted to the States regarding child-welfare funding under ICWA would redress the individual plaintiffs' claims, if at all, only incidentally and

---

[7] DUNCAN, J., concurring and dissenting, part I(B), p. 21.

tangentially. In any event, as discussed above, the States did not pursue in the district court their request for a declaration that the federal defendants are barred from withholding child-welfare funding under ICWA. Such relief was not granted by the district court, and the States do not seek such relief in this court. No judgment of this court could now grant the relief that JUDGE DUNCAN's opinion says would redress the individual plaintiffs' claims regarding ICWA's preferences.

The individual plaintiffs do have standing to challenge the Final Rule. However, even were the Final Rule abrogated in its entirety, ICWA's statutory preferences and other requirements would remain intact. The individual plaintiffs do not have standing to challenge ICWA's provisions directly or in the abstract in the present case. A judgment of this court would not resolve any actual case or controversy as between the individual plaintiffs and the federal defendants, other than challenges to the Final Rule, for the reasons considered above and in JUDGE DENNIS's and JUDGE COSTA's opinions.

## II

I agree with the conclusion in JUDGE DENNIS's opinion,[8] as a general proposition, that Congress had the authority under the Indian Commerce Clause[9] to enact ICWA. However, I do not join JUDGE DENNIS's analysis fully. I join part II(A) of JUDGE COSTA's opinion as to this issue.

---

[8] DENNIS, J., concurring and dissenting, part II(A)(1).

[9] U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.").

No. 18-11479

## III

## A

Because I conclude that neither the States nor the individual plaintiffs have standing to bring direct equal protection challenges to ICWA's statutory provisions, I would not and do not reach the merits of any of those claims. To the extent that equal protection claims have been asserted by the individual plaintiffs in challenging the Final Rule, I join the final paragraph in part II(B) of JUDGE COSTA's opinion. The individual plaintiffs have standing to assert equal protection challenges to ICWA in this context. I agree with the conclusion in JUDGE DENNIS's opinion that ICWA's preferences are political not racial. Those preferences withstand rational-basis scrutiny. I therefore conclude that the Final Rule did not violate the Equal Protection Clause in implementing ICWA's statutory preferences, including the preference for "Indian Families."

## B

Regarding the commandeering and preemption claims, I join part II(A)(2)(a)(i) of JUDGE DENNIS's opinion and part III(B) of JUDGE DUNCAN's opinion.

To clarify, with regard to part III(B)(1)(a)(iii) of JUDGE DUNCAN's opinion, I agree that 25 U.S.C. §§ 1915(a)-(b), and implementing regulations, in large measure violate the anti-commandeering doctrine. However, the placement preferences set forth in that statute and its implementing regulations, standing alone, do not commandeer, as JUDGE DUNCAN's opinion explains.[10]   Those federal laws preempt contrary state-law preferences. The commandeering occurs because state agencies are directed

---

[10] DUNCAN, J., concurring and dissenting, part III(B)(1)(a)(iii), p. 83.

to undertake action to identify and assist individuals who might be entitled to preference over others seeking to adopt or to provide foster care. To the extent the state courts and state agencies become aware of individuals who seek to have ICWA's preferences applied, ICWA's preferences should be followed.

## C

Only the State plaintiffs asserted claims that Congress impermissibly delegated legislative power to Indian tribes in ICWA. With regard to the non-delegation issues, I join part II(C) of JUDGE DENNIS's opinion.

## D

Regarding the APA claims, I join part III(D)(3) of JUDGE DUNCAN's opinion. I do not join part III(D)(2) of that opinion because the discussion as to whether regulations bind state courts is abstract. It is unclear from the discussion which regulations purport to bind state courts separate and apart from statutory provisions which do bind state courts to the extent the statutory provisions are constitutional.

## E

I would grant declaratory relief consistent with the conclusions in this opinion.

No. 18-11479

JACQUES L. WIENER, JR., *Circuit Judge*, dissenting in part:

I concur with JUDGE DENNIS's Opinion, except for its holding on standing to challenge 25 U.S.C. § 1915(a) and (b) on equal protection grounds. I also concur with JUDGE COSTA in his partial dissent on standing. For the reasons more explicitly stated below, I write separately because the Plaintiffs' second amended complaint is deficient and should be dismissed for lack of standing.

JUDGES DUNCAN and DENNIS each conclude that the Individual Plaintiffs, through the Brackeens and Cliffords, have Article III standing to challenge § 1915(a) and (b) of ICWA on equal protection grounds.[1] This conveniently allows the Opinions to proceed to the merits of the Plaintiffs' equal protection arguments. Like JUDGE COSTA, I disagree with JUDGES DUNCAN's and DENNIS's conclusions that the Plaintiffs have Article III standing to challenge § 1915(a) and (b), so I would not reach the merits of the Plaintiffs' equal protection claim. In addition to the redressability problems cited in JUDGE COSTA's dissent, JUDGES DUNCAN and DENNIS choose to ignore three important facts: (1) the date that the most recent complaint was filed, (2) the Brackeens' delayed supplementation of the record, and (3) the fact that the Cliffords could have appealed their case to the Minnesota Supreme Court but did not do so. Those facts are dispositive of the Plaintiffs' ability to show standing: The Brackeens and Cliffords (and, by extension, all of the Individual Plaintiffs) do not have standing to challenge § 1915(a) and (b), so we do not have jurisdiction to decide whether these parts of ICWA pass constitutional muster.

---

[1] JUDGE DENNIS concludes that the Plaintiffs do not have standing to challenge § 1913(d) and 1914, and I concur for the reasons provided in that opinion.

1

No. 18-11479

## I. Background

The Plaintiffs filed their initial complaint in October 2017, seeking declaratory and injunctive relief, claiming that ICWA and the Final Rule are unconstitutional and violate the Administrative Procedure Act.[2] At that time, the Brackeens were attempting to adopt A.L.M., who qualified as an "Indian child" under ICWA. A.L.M.'s biological parents voluntarily terminated their parental rights in May 2017, and the Brackeens completed their adoption of A.L.M. in January 2018. The Plaintiffs filed a second amended complaint two months later. Presumably because they knew that standing would be an issue, the Brackeens stated that they "also intend to provide foster care for, and possibly adopt, additional children in need. Because of their experience with the Final Rule and ICWA, however, [they] are reluctant to provide a foster home for other Indian children in the future." Despite their reluctance, however, the Brackeens attempted to adopt A.L.M.'s sister, Y.R.J., who was born in June 2018—three months *after* the second amended complaint was filed. The Plaintiffs supplemented the district court record in October 2018 (after it had entered final judgment), notifying the court that the Brackeens were attempting to adopt Y.R.J. The Brackeens intervened in a state court adoption proceeding in November 2018, seeking to terminate the parental rights of Y.R.J.'s mother—eight months after the second amended complaint was filed.[3]

The Plaintiffs also stated in their second amended complaint that the Cliffords wished to adopt Child P., a six-year-old girl whom the Cliffords had fostered since July 2016. With the support of Child P.'s guardian ad litem,

---

[2] *See Brackeen v. Zinke*, 338 F. Supp. 3d 514, 526–46 (N.D. Tex. 2018), *rev'd sub nom.* 937 F.3d 406 (5th Cir. 2019), *reh'g en banc granted*, 942 F.3d 287 (5th Cir. 2019).

[3] *See In re Y.J.*, 2019 WL 6904728, at *3 (Tex. App. Dec. 19, 2019).

No. 18-11479

the Cliffords moved to adopt Child P. The Minnesota court denied their petition in January 2019 because Child P.'s tribe intervened in her case and invoked ICWA's placement preferences.[4] The Cliffords appealed the Minnesota court's order, but the Minnesota court of appeals affirmed.[5] It does not appear that the Cliffords timely appealed that court's judgment.

## II. Article III Standing

Under Article III of the United States Constitution, federal courts only have jurisdiction over a "case" or "controversy."[6] "To establish a 'case or controversy,' a plaintiff must establish that it has standing."[7] Standing requires that a plaintiff show (1) "an injury in fact" that is (2) fairly traceable to the challenged action of the defendant, and that is (3) likely to be "redressed by a favorable decision."[8] JUDGES DUNCAN and DENNIS only analyze standing to challenge § 1915(a) and (b) on equal protection grounds as to the Brackeens and the Cliffords. No other Individual or State Plaintiff can show standing to challenge these provisions of ICWA.

Fatal to the Brackeens' assertion of standing are the facts that (1) they had already adopted A.L.M. prior to the Plaintiffs' filing of the second amended complaint, and (2) their stated desires to adopt or provide foster care for other Indian children were too vague to constitute an injury in fact. The Brackeens must show Article III standing both at the time of the filing of

---

[4] *See In re Welfare of the Child in the Custody of: Comm'r of Human Servs.*, No. 27-JV-15-483 (4th Dist. Minn. Jan. 17, 2019).

[5] *In re S.B.*, No. A19-0225, 2019 WL 6698079, at *6 (Minn. Ct. App. Dec. 9, 2019).

[6] *See* U.S. CONST. art. III, § 2, cl. 1.

[7] *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[8] *Lujan*, 504 U.S. at 560–61.

the complaint and throughout the lawsuit.[9] The court must analyze standing at the time that the latest complaint is filed.[10]

The first requirement of standing is that a plaintiff must have suffered an "injury in fact."[11] An injury in fact must be (1) concrete and particularized and (2) actual or imminent, not conjectural or hypothetical.[12] Some courts have held that when "plaintiffs seek declaratory and injunctive relief only, there is a further requirement that they show a very significant possibility of future harm; it is insufficient for them to demonstrate only a past injury."[13] "A request for injunctive relief remains live only so long as there is some present harm left to enjoin."[14] "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."[15]

The Brackeens could not show an actual injury in fact at the time the Plaintiffs filed the second amended complaint because the Brackeens had already adopted A.L.M. Actual injury requires the Plaintiffs to show that they

---

[9] *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007) (noting that standing is assessed at the time the complaint is filed); *Arizonans for Off. Eng. v. Ariz.*, 520 U.S. 43, 45 (1997) ("[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.").

[10] *See Rockwell*, 549 U.S. at 473–74 ("[W]hen a plaintiff . . . voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (analyzing standing at the time the second amended complaint was filed).

[11] *Lujan*, 504 U.S. at 560–61.

[12] *Id.* at 560.

[13] *San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).

[14] *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995).

[15] *O'Neal v. City of Seattle*, 66 F.3d 1064, 1066 (9th Cir. 1995) (omission in original) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983)).

are *presently* affected by ICWA and the Final Rule.[16] The Brackeens' injury was a "past injury," which "is insufficient for them to demonstrate" the injury in fact necessary to obtain injunctive or declaratory relief.[17]

Neither could the Brackeens show an imminent injury in fact.[18] Their stated desire to adopt or provide foster care for other Indian children was too vague because they had not specified a date or time that they would attempt to adopt Y.R.J. or other Indian children.[19] The Brackeens did not attempt to show that they planned to adopt another Indian child until October 2018—seven months after the second amended complaint had been filed and after final judgment had been entered. At the time that the second amended complaint was filed, the Brackeens' "intent" to provide foster care for Indian children, or the "possibility" that they would adopt any, was insufficient to show injury in fact. As the Supreme Court has explicitly held, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even

---

[16] *See N.J. Physicians, Inc. v. Obama*, 653 F.3d 234, 239 (3d Cir. 2011) (noting that a plaintiff must be "presently impacted" by the defendant's actions).

[17] *Reno*, 98 F.3d at 1126.

[18] JUDGE DUNCAN notes that he would reach the same conclusion as to the Brackeens' adoption of A.L.M. because it fits within the "capable of repetition, yet evading review" exception to mootness. This exception is inapposite, so the case would be moot were it not lacking an injury in fact, because (1) the adoption proceedings were not too short in duration to be fully litigated, and (2) there is no reasonable expectation that the Brackeens would be subject to the same injury again. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008). As to the first prong, the Brackeens could have litigated their ICWA challenges in state court during A.L.M.'s July 2017 adoption proceedings, long before October 2018 when the district court entered judgment against the Defendants. As to the second prong, the Brackeens' stated reluctance to adopt more Indian children was too vague, as discussed above. *See Lujan*, 504 U.S. at 564 (holding that a sufficient specification of when the injury in fact will occur is necessary).

[19] *See Reno*, 98 F.3d at 1127 (holding that plaintiffs could not show injury in fact, because "[t]he complaint does not specify any particular time or date on which plaintiffs intend to violate the Act").

No. 18-11479

any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."[20]

The Brackeens' standing issue in this case is similar to those found in cases—some of which are cited in JUDGE DENNIS's Opinion—wherein the Supreme Court has held that plaintiffs lack standing because their injuries were not "imminent." For example, in *O'Shea v. Littleton*, the Court held that the plaintiffs lacked standing because, even though they had suffered past unconstitutional practices they could not prove a present or future impact as a result of those practices.[21] The Court noted that the alleged imminent threat was not "sufficiently real and immediate to show an existing controversy simply because [the plaintiffs] anticipate violating lawful criminal statutes and being tried for their offenses."[22] Similarly, in *City of Los Angeles v. Lyons*, the Court rejected the plaintiff's standing argument, noting that the complaint "depended on whether [the plaintiff] was likely to suffer future injury from the use of the chokeholds by police officers."[23]

Further, JUDGES DUNCAN and DENNIS err by considering Y.R.J.'s proceedings for purposes of standing because the Plaintiffs did not move to supplement the record with information relating to the Brackeens' attempted adoption of Y.R.J. until October 10, 2018. Final judgment had been entered,

---

[20] *Lujan*, 504 U.S. at 564.

[21] 414 U.S. 488, 493, 495–96 (1974).

[22] *Id.* at 496.

[23] 461 U.S. at 105. Although these cases arose in the context of unconstitutional police practices, which are unlike allegedly unconstitutional adoptive proceedings, they are instructive. Here, like the plaintiffs in *O'Shea* and *Lyons*, the Plaintiffs are seeking future remedies based on past exposures to harm, which JUDGES DUNCAN and DENNIS incorrectly classify as a regulatory burden. On the contrary, there can be no regulatory burden in a completed adoption proceeding, *viz.*, the completed adoption of A.L.M.

No. 18-11479

however, on October 4, 2018. The Supreme Court has explicitly held that a lack of standing cannot be cured by evidence entered into the record after final judgment.[24] Unlike *Mathews v. Diaz*, in which the Supreme Court held that a supplemental pleading cured the jurisdictional defect, the Brackeens' supplementation of the district court record occurred *after* judgment had been entered.[25]

---

[24] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 495 n.* (2009) ("After the District Court had entered judgment, and after the Government had filed its notice of appeal, respondents submitted additional affidavits to the District Court. We do not consider these. If respondents had not met the challenge to their standing at the time of judgment, they could not remedy the defect retroactively.").

[25] *Cf.* 426 U.S. 67, 75 (1976). In *Mathews*, cited by JUDGE DENNIS, the Court noted that "[a] supplemental *complaint* would have eliminated this jurisdictional issue; since the record discloses, both by affidavit and stipulation, that the jurisdictional condition was satisfied, it is not too late, even now, to supplement the complaint to allege this fact." *Id.* (emphasis added). *Mathews* involved Federal Rule of Civil Procedure 15(d), which allows a party to file a supplemental *pleading. See id.* at 75 n.8; *accord Northstar Fin. Advisors Inc. v. Schwab Inv.*, 779 F.3d 1036, 1044 (9th Cir. 2015). The Brackeens did not file a supplemental pleading. Instead, they filed a supplement to the record. Further, *Mathews* involved the issue of exhaustion, not standing. *See* 426 U.S. at 75-76. Finally, *Mathews*' language that "even now," filing a supplemental pleading would not be "too late," is dictum. In *Mathews*, the plaintiffs filed a supplemental pleading after the complaint had been filed but *before* final judgment had been entered. *Id.* at 75 (noting that the pleading was supplemented "while the case was pending in the District Court"). There was no issue of filing a supplemental pleading at the Supreme Court level; thus, this language is dictum. Here, as stated, the Brackeens did not supplement the record until *after* final judgment was entered, and this cannot cure the defective complaint. *See Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008) (noting that "while 'later events may not create jurisdiction where none existed at the time of filing, the proper focus in determining jurisdiction are the facts at the time the complaint under consideration was filed'" (brackets and emphasis omitted) (quoting *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 483 (Fed. Cir. 1996)).

No. 18-11479

Finally, the Cliffords do not have standing to challenge § 1915(b) because their claim is not redressable.[26] They could have appealed their challenges to ICWA in Minnesota state court but likely missed the deadline to appeal.[27] The state of Minnesota is also not a party to this lawsuit, so any ruling we make on the constitutionality of ICWA would have no effect on the Cliffords' adoption proceedings.[28]

## III. Conclusion

It would be convenient if we could ignore facts that are dispositive of Article III standing—as do JUDGES DUNCAN and DENNIS—and proceed to the merits in important constitutional cases such as this. We are, however, governed by the rule of law. And a federal court cannot weigh in on an issue over which it lacks jurisdiction, however appealing doing so might be. I concur with JUDGE COSTA that the Plaintiffs lack standing because their case is not redressable. And even though I join JUDGES DENNIS's well-reasoned and thorough Opinion on the merits, I would reverse the district court's order that the Plaintiffs have Article III standing to challenge 25 U.S.C. § 1915(a) and (b) on equal protection grounds.

---

[26] *See Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014) (noting that redressability is a requirement for standing)

[27] *See In re S.B.*, No. A19-0225, 2019 WL 6698079, at *1 (Minn. Ct. App. Dec. 9, 2019) (showing no notice of appeal to the January 2020 judgment); *see also* Minn. R. Civ. App. P. 117 subd 1 (requiring filing of notice of appeal within 30 days of the filing of the Court of Appeals' decision).

[28] *See Okpalobi v. Foster*, 244 F.3d 405, 426–27 (5th Cir. 2001) (en banc) (concluding that the plaintiffs' claim was not redressable because the defendants were "powerless to enforce [the Act] against the plaintiffs (or to prevent any threatened injury from its enforcement")).

No. 18-11479

Haynes, *Circuit Judge*, concurring:

I concur with portions of both Judge Dennis's and Judge Duncan's Opinions (respectively, the "Dennis Opinion" and the "Duncan Opinion").[1] On standing, I concur with the conclusions of Part I of the Duncan Opinion that Plaintiffs have standing to bring all their claims.[2]

On the equal protection issues, I concur in part with Part II(B)(2) of the Dennis Opinion that the definition of "Indian child" does not violate the Equal Protection Clause. As to the placement preferences, I conclude that the first two prongs of ICWA § 1915(a)—concerning the members of the child's extended family and tribe—withstand even strict scrutiny, so I concur with Part II(B)(2) of the Dennis Opinion that they are constitutional; but I concur with Part III(A)(3) of the Duncan Opinion that the "other Indian families" prong of ICWA § 1915(a) violates the Equal Protection Clause because it fails to be rationally tied to fulfilling Congress's goals of protecting Indian tribes.

On the anti-commandeering/preemption issues, I concur with the conclusion in Part II(A)(1) of the Dennis Opinion that Congress had plenary authority under the Indian Commerce Clause to enact ICWA, but I concur with Parts III(B)(1)(a)(i) and III(B)(1)(a)(iv) and in part with Parts III(B)(1)(a)(ii), III(B)(1)(b), and III(B)(2)(b) of the Duncan Opinion that ICWA §§ 1912(d), (e) and 1915(e) violate the anti-commandeering doctrine and are invalid preemption provisions. With respect to the remaining

---

[1] All references to the Dennis Opinion and Duncan Opinion are to the enumerated sections under the "Discussion" portion of each opinion.

[2] In that regard, I also agree with the conclusions of Parts I(A)(2)–(D) of the Dennis Opinion.

statutory provisions at issue, I concur with the Dennis Opinion that they do not violate the anti-commandeering doctrine and validly preempt state law.

On the nondelegation doctrine issue, I concur with Part II(C) of the Dennis Opinion that ICWA § 1915(c) does not violate that doctrine.

Lastly, on the Administrative Procedure Act issues, I concur with Part III(D)(1) of the Duncan Opinion that the Final Rule is invalid to the extent that it implements the unconstitutional statutory provisions identified above: ICWA §§ 1912 (d), (e), and 1915(e) and the "other Indian families" prong of ICWA § 1915(a). However, to the extent that the Final Rule implements constitutional ICWA provisions, I concur with Part II(D)(1) of the Dennis Opinion that those portions of the Final Rule are valid. I also concur with Part II(D)(2) of the Dennis Opinion that BIA did not exceed its authority in making the Final Rule binding. But I concur with Part III(D)(3) of the Duncan Opinion that the "good cause" standard in 25 C.F.R. § 23.132(b) fails at *Chevron* step one.

STEPHEN A. HIGGINSON, *Circuit Judge*, concurring in part, with whom JUDGE COSTA joins:

I concur in Judge Dennis's comprehensive opinion except for Discussion § I.A.2 and write separately to highlight lessons I draw from two Supreme Court cases.

"Any rule of state immunity that looks to the 'traditional,' 'integral,' or 'necessary' nature of governmental functions inevitably invites an unelected federal judiciary to make decisions about which state policies it favors and which ones it dislikes." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985). Engaging in this type of policy weighing, the dissent would strike a statute that has garnered support from Congressional members on both sides of the aisle, a large number of states, and at least 325 federally recognized Indian tribes and has been the law of the land for over four decades.

Specifically, the dissent would hold that the "structural guarantee of state sovereignty" limits Congress's authority to regulate state child custody proceedings involving Indian children. It bases this on two observations: "[n]o Supreme Court decision supports Congress deploying its Indian affairs power to govern state government proceedings," and there is no "comparable founding-era exercise[ ] of Congress's Indian affairs power."

Yet, in *Garcia*, the Court explained why it rejected, "as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional'": (1) "it prevents a court from accommodating changes in the historical functions of States, changes that have resulted in a number of once-private functions like education being assumed by the States and their subdivisions"; (2) it "results in line-drawing of the most arbitrary sort; the genesis of state governmental functions stretches over a historical continuum from before the Revolution to the present, and courts would have to decide by fiat precisely how longstanding a pattern of state involvement had to be for federal regulatory authority to be defeated"; (3) it is "unworkable," in part "because of the elusiveness of

1

objective criteria for 'fundamental' elements of state sovereignty"; and (4) "[s]tate sovereign interests . . . are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." 469 U.S. at 543–52. Contrary to this Supreme Court instruction, the dissent risks resuscitating a misunderstanding of state sovereignty that entangles judges with the problematic policy task of deciding what issues are so inherent in the concept and history of state sovereignty that they fall beyond the reach of Congress.

"[T]he fact that the States remain sovereign as to all powers not vested in Congress or denied them by the Constitution offers no guidance about where the frontier between state and federal power lies." *Id.* at 550. Instead, it is the nature of our federalist system that states retain sovereign authority "only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *Id.* at 549. As Judge Dennis comprehensively explains, the Indian Commerce Clause has done exactly that with respect to Indian Affairs.

But it is not only the dissent's test that diverges from Supreme Court authority—it would also be its result. The Supreme Court has repeatedly recognized that Congress *can* preempt state law that applies in state domestic relations proceedings. *See, e.g.*, *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 146 (2001) (holding that ERISA preempted application of Washington statute in state probate proceedings); *Boggs v. Boggs*, 520 U.S. 833, 841 (1997) (holding that ERISA preempted application of Louisiana community property law in state probate proceedings); *McCarty v. McCarty*, 453 U.S. 210, 232–33 (1981) (holding that federal law preempted application of California community property law in state divorce proceedings); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 590 (1979) (holding that the Railroad Retirement Act preempted application of California community property law in state divorce proceedings); *Free v. Bland*, 369 U.S. 663, 670 (1962) (holding that federal law preempted application of Texas community property law in state probate proceedings); *Wissner v. Wissner*, 338 U.S. 655, 658–59 (1950) (holding that the National Service Life Insurance Act preempted application

2

of California community property law in state probate proceedings); *McCune v. Essig*, 199 U.S. 382, 389–90 (1905) (holding that the Homestead Act preempted application of Washington community property law in state probate proceedings); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("Congress may legislate in areas traditionally regulated by the States."). That is exactly what Congress did here. *See* 25 U.S.C. § 1902 (declaring Congress's intent to establish "minimum Federal standards" to be applied in state child custody proceedings involving Indian children).

The dissent relies primarily on *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), to support a contrary result. But even Chief Justice Rehnquist—the author of *Seminole Tribe* and perhaps the most faithful proponent of state's rights—explicitly recognized that Congress *may* preempt state domestic relations law. *See McCarty*, 453 U.S. at 237 (Rehnquist, J., dissenting) ("[T]he authority of the States should not be displaced *except pursuant to the clearest direction from Congress*." (emphasis added)); *see also Bond v. United States*, 572 U.S. 844, 858 (2014) ("'[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" (quoting *Gregory*, 501 U.S. at 460)). Although Chief Justice Rehnquist's position was narrower than the dissent's here, *see McCarty*, 453 U.S. at 232 (finding state community property law preempted where (1) there was a conflict between the federal and state laws and (2) the consequences of the state law sufficiently injured the objectives of the federal program), I highlight it to demonstrate how consequential the dissent's retort to clearly stated congressional authority actually is. Even applying Chief Justice Rehnquist's dissenting position, the Indian Child Welfare Act ("ICWA") stands. The ICWA establishes "minimum Federal standards" to be applied in state child custody proceedings involving Indian children—it is hard to image a clearer indication of Congress's intent to preempt state law. 25 U.S.C. § 1902.

Just as "[n]one can dispute the central role community property laws play in . . . community property States," *Boggs*, 520 U.S. at 839–40, it is irrefutable that states have a compelling interest in their child custody

3

proceedings. Nevertheless, important, longstanding, and binding Supreme Court precedent recognizes both the United States' unique and compelling obligation to Indians, *see United States v. Lara*, 541 U.S. 193, 200 (2004) ("[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'" (citations omitted)); *see also McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) ("This Court long ago held that the Legislature wields significant constitutional authority when it comes to tribal relations."), and dictates that "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail," *Free*, 369 U.S. at 666.

GREGG COSTA, *Circuit Judge*, concurring in part and dissenting in part, with whom CHIEF JUDGE OWEN joins as to Parts I and II(A) and the final paragraph of Part II(B), with whom JUDGES WIENER and HIGGINSON join, with whom JUDGE DENNIS joins as to Part II, and with whom JUDGE SOUTHWICK joins as to part I:

Congress passed the Indian Child Welfare Act of 1978 on voice votes, a procedure typically reserved for noncontroversial legislation. The law continues to enjoy bipartisan support. *See* Brief of Members of Congress as Amici Curiae in Support of Defendants-Appellants and Reversal. Leading child welfare organizations believe the law "embodies and has served as a model for the child welfare policies that are [the] best practices generally" and reflects "the gold standard for child welfare policies and practices in the United States." Brief of Casey Family Programs and 30 Other Organizations Working with Children, Families, and Courts to Support Children's Welfare as Amici Curiae in Support of Appellants at 2; Letter from Child Welfare Advocates to Elizabeth Appel, Off. of Regul. Aff. & Collaborative Action, U.S. Dep't of Interior (May 19, 2015), http://www.nativeamericanbar.org/wp-content/uploads/2014/01/CFP-et-al-Support-Letter-Re-Proposed-ICWA-Regulations.pdf.

Yet more than four decades into its existence, a federal district court held key parts of the law unconstitutional. That facial invalidation is contrary to the longstanding views of state courts, where adoption proceedings of course take place.[1] It is ironic that a federal court saw infringements on state sovereignty that the state courts themselves have not seen.

---

[1] *See, e.g., In re K.M.O.*, 280 P.3d 1203, 1214–15 (Wyo. 2012); *In re Phoenix L.*, 708 N.W.2d 786, 795–98 (Neb. 2006); *In re Baby Boy L.*, 103 P.3d 1099, 1106–07 (Okla. 2004); *In re A.B.*, 663 N.W.2d 625, 634–37 (N.D. 2003), *cert. denied*, 541 U.S. 972 (2004); *Ruby A. v. State, Dep't of Health & Soc. Servs.*, 2003 WL 23018276, at *4–5 (Alaska Dec. 29, 2003); *In re Marcus S.*, 638 A.2d 1158, 1158–59 (Me. 1994); *In re Armell*, 550 N.E.2d 1061, 1067–68 (Ill. App. Ct. 1990), *cert. denied*, 498 U.S. 940 (1990); *In re Miller*, 451 N.W.2d 576, 578–79 (Mich. Ct. App. 1990) (per curiam); *In re Application of Angus*, 655 P.2d 208, 213 (Or. Ct. App. 1982), *cert. denied*, 464 U.S. 830 (1983); *In re Appeal in Pima Cty. Juvenile Action No. S-903*, 635 P.2d 187, 193 (Ariz. Ct. App. 1981), *cert. denied*, 455 U.S. 1007 (1982); *In re Guardianship of D.L.L.*, 291 N.W.2d 278, 281 (S.D. 1980). *But see In re Santos Y.*, 92 Cal. App. 4th 1274 (Cal. Ct. App. 2001) (upholding "as applied" constitutional challenges to ICWA when the child had never been part of an Indian home).

I.

Such ironies abound in this case. The most astonishing irony results from this being a federal court challenge to laws that apply in state adoption proceedings. It will no doubt shock the reader who has slogged through today's lengthy opinions that, at least when it comes to the far-reaching claims challenging the Indian Child Welfare Act's preferences for tribe members, this case will not have binding effect in a single adoption. That's right, whether our court upholds the law in its entirety or says that the whole thing exceeds congressional power, no state family court is required to follow what we say. *See, e.g., Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (per curiam) (noting that Texas state courts are "obligated to follow only higher Texas courts and the United States Supreme Court"); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) (recognizing that state courts "render binding judicial decisions that rest on their own interpretations of federal law").

There is a term for a judicial decision that does nothing more than opine on what the law should be: an advisory opinion. That is what the roughly 300 pages you just read amount to.

The rule that federal courts cannot issue advisory opinions is as old as Article III. *See Hayburn's Case*, 2 Dall. 409, 410 n.* (1792); 3 The Correspondence and Public Papers of John Jay 486–89 (Johnston ed. 1891) (August 8, 1793, letter from Chief Justice Jay refusing to give the Washington Administration advice on legal questions relating to war between Great Britain and France); *see also Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[I]t is quite clear that 'the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.'" (quoting Charles Alan Wright, Federal Courts 34 (1963))). Early courts could just call such a case what it was—a request for an advisory opinion, *see, e.g.*, *Muskrat v. United States*, 219 U.S. 346, 361–63 (1911); *United States v. Ferreira*, 54 U.S. 40, 51–52 (1851); *Hayburn's Case*, 2 Dall. at 410 n.*. The modern rise of public law litigation resulted in the development of doctrines likes standing, ripeness, and mootness to enforce

the "case or controversy" requirement. *See* Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 169 (1992) (noting that the Supreme Court did not use the word "standing" until 1944 (citing *Stark v. Wickard*, 321 U.S. 288 (1944))). This compartmentalization of justiciability law risks losing the forest for the trees. Justiciability doctrines, with their various elements and exceptions, have one underlying aim: ensuring federal courts only hear cases that actually decide concrete disputes. Decide is the key word here. When a judicial opinion does not actually resolve a dispute, it has no more legal force than a law review article.

The modern doctrinal box most concerned with weeding out advisory opinions is the redressability element of standing. "Satisfaction of this requirement ensures that the lawsuit does not entail the issuance of an advisory opinion without the possibility of any judicial relief, and that the exercise of a court's remedial powers will actually redress the alleged injury." *Los Angeles v. Lyons*, 461 U.S. 95, 129 (1983) (Marshall, J., dissenting).

The redressability requirement proves fatal to at least the equal protection claim (which is really a claim under the Fifth Amendment's Due Process Clause because ICWA is a federal law). Nothing we say about equal protection will redress the Brackeens' alleged injury of potentially being subject to preferences that would favor tribe members in the adoption of Y.R.J.[2] Their argument for redressability is that the family court judge may, or even says he will, follow our constitutional ruling. In other words, our opinion may *advise* him on how to decide the adoption case before him. This description of the plaintiffs' argument reveals why it doesn't work. Maybe the opinion will convince the family court judge, maybe it won't. The same is true for law review articles or legal briefs. But what is supposed to separate

---

[2] The States do not have standing to pursue the equal protection claim because they are not "persons" entitled to the protection of the Fifth Amendment. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966). They thus cannot suffer an equal protection injury of their own. Indeed, neither the opinion from the three-judge panel nor the en banc majority opinion relies on the States for equal protection standing.

court decisions from other legal writings is that they actually resolve a dispute.

Yet Judge Dennis's Opinion signs off on plaintiffs' redressability theory,[3] finding it sufficient that it is "'substantially likely that [a state court] would abide by an authoritative interpretation' of ICWA."[4] Dennis Op. at 45 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992)); *see also id.* at 43 (stating that "the Texas trial court has indicated that it will refrain from ruling on the Brackeens' federal constitutional claims pending a ruling from this court"). Finding redressability based on the possibility that another court will consider the opinion persuasive would allow the requirements of standing to be satisfied by advisory opinions—the very thing that the doctrine was designed to prevent. Justice Scalia nailed the problem with this reasoning:

> If courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will *always* exist. Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power.

---

[3] On their own, neither Judge Dennis's Opinion nor Judge Duncan's Opinion garners a majority of the court to find standing for the equal protection claim. Combining the two opinions, however, a majority concludes there is standing. I thus address both opinions.

[4] Don't overlook the ellipsis—it obscures something critical. The replaced language was not referring to a "state court" that might follow the federal decision, but to "the President and other executive and congressional officials." *Franklin*, 505 U.S. at 803. That lawsuit challenging a decennial reapportionment of congressional seats was brought against the Secretary of Commerce, who was certainly bound by the judgment, and the question was whether a ruling against that Cabinet member who oversaw the census could influence the reapportionment even though the President had ultimate policymaking authority in the executive branch. Holding that the head of the relevant cabinet agency could be sued was hardly extraordinary. What is extraordinary—in fact unprecedented—is to find standing based on the chance that another court might follow the federal decision not because it has to but because it might want to.

*Franklin*, 505 U.S. at 825 (Scalia, J., concurring in part and in the judgment). It therefore is not enough that the family court judge has indicated he might, or even will, follow what the federal court decides.

This court has no authority to resolve whether the ICWA-mandated burden of proof will apply in the Y.R.J. adoption. The binding effect of a legal decision—in standing lingo, its ability to redress an injury—must flow from the judgment itself. *Id*; *see also United States v. Juvenile Male*, 564 U.S. 932, 937 (2011) (per curiam) (rejecting the notion that a case could be justiciable because "a favorable decision in this case might serve as useful precedent for respondent in a hypothetical [future] lawsuit"). But the Brackeens would come up short even if a decision's precedential effect could establish redressability. Texas courts do not have to follow the decisions of lower federal courts on questions of federal law.[5] *Penrod Drilling Corp.*, 868 S.W.2d at 296; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 58 n.11 (1997) (rejecting as "remarkable" the idea that a state court must follow the precedent of lower federal courts); *Lockhart v. Fretwell*, 506 U.S. 364, 375–76 (1993) (Thomas, J., concurring) (explaining that "neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation").

The bottom line is that both before and after the district court held ICWA unconstitutional, the Texas judge in the Y.R.J. adoption case (or any

---

[5] Apparently recognizing this problem, the Brackeens argue that "if the Supreme Court affirmed, all courts would be bound by that decision." En Banc Brief of Individual Plaintiffs 63. The argument ignores the principle explained above that redressability must come from the judgment itself as opposed to the precedential force an opinion may have.

And there is another problem with this argument, one again recognized by Justice Scalia. Standing is determined at the outset of a lawsuit, and no one then knows whether the case will be one of the rare ones that makes it to the Supreme Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992) (explaining that "standing is to be determined as of the commencement of suit" and "at that point it could certainly not be known that the suit would reach this Court"). If standing depended on whether the Supreme Court granted cert, then a cert denial would wipe away the years of litigation in the lower federal courts.

other) could come out either way on an equal protection claim. Indeed, the state court judge has already ruled on some of the constitutional claims presented here. *See In re Y.J.*, 2019 WL 6904728, at *1 (Tex. App.—Fort Worth, Dec. 19, 2019) (noting family court's holding that ICWA violated the anticommandeering doctrine). A petition challenging that ruling is pending with the Supreme Court of Texas. *See In re Y.J.*, Tex. S. Ct. No. 20-0081 (petition available at 2020 WL 750104). Some of the issues the petition asks the state high court to resolve will sound familiar: whether ICWA was "lawfully enacted by Congress" and whether it "discriminate[s] on the basis of race." *Id.* at 9, 13. What we think about those same issues will have no binding effect on the state courts that get to resolve the adoption, whether that be the state supreme court or the family court judge. That irrefutable point means our ruling on the lawfulness of ICWA preferences cannot redress the plaintiffs' injury.

One might wonder if the advisory nature of this case doesn't always characterize declaratory judgments. After all, "ordinarily a case or judicial controversy results in a judgment requiring award of process of execution to carry it into effect." *Fidelity Nat'l Bank & Tr. Co. v. Swope*, 274 U.S. 123, 132 (1927). To be sure, there is an advisory flavor to all declaratory actions: they resolve rights in a future suit that has not yet fully materialized. Concerns that declaratory judgments were advisory led the Supreme Court to refuse to hear some claims for declaratory relief before the enactment of the Declaratory Judgment Act of 1934. *Willing v. Chi. Auditorium Ass'n*, 277 U.S. 274, 286–89 (1928) (Brandeis, J.) (explaining that deciding whether a lessee would have violated a lease by demolishing a building before the demolition occurred would be a "declaratory judgment[, which] relief is beyond the power conferred upon the federal judiciary"); *Liberty Warehouse Co. v. Grannis*, 273 U.S. 70, 76 (1927) (holding there was no jurisdiction over claim under Kentucky's declaratory-judgment law). *But see Nashville, Cent. & St. Louis Ry. v. Wallace*, 288 U.S. 249, 258, 264–65 (1933) (holding that federal courts had jurisdiction over claim brought under state declaratory-judgment law).

What saves proper declaratory judgments from a redressability problem—but is lacking here—is that they have preclusive effect on a traditional lawsuit that is imminent.[6]  *See* 10B WRIGHT ET AL., *supra*, § 2771 ("A declaratory judgment is binding on the parties before the court and is claim preclusive in subsequent proceedings as to the matters declared . . . ."); *accord* RESTATEMENT (SECOND) OF JUDGMENTS § 33. Take an insurance coverage dispute, which was the nature of the case upholding the federal Declaratory Judgment Act and remains the prototypical declaratory action today. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937). A federal court's declaration, in a case between the insurer and insured, of whether there is coverage will bind those parties in a subsequent lawsuit seeking to recover on the policy. *See id.* at 239, 243–44. That "definitive determination of the legal rights of the parties" is what allows declaratory judgments in federal court. *Id.* at 241. To be justiciable, a declaratory judgment must seek "specific relief through a decree of a conclusive character." *Id.*; *accord MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). In contrast, our resolution of the equal protection question will conclude nothing.

A leading federal procedure treatise recognizes that preclusive effect is what separates a permissible declaratory judgment from an impermissible advisory opinion:

> The federal Declaratory Judgment Act provides that a declaratory judgment shall have the force and effect of a final judgment or decree. The very purpose of this remedy is to establish a binding adjudication that enables the parties to enjoy the benefits of reliance and repose secured by res judicata. Denial of any preclusive effect, indeed, would leave a

---

[6] The more common standing problem for declaratory judgments is whether the second lawsuit "is of sufficient immediacy and reality." *See* 10B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2757 (4th ed. 2020). That is part of standing's injury requirement, which requires an "actual or imminent" harm. *Lujan*, 504 U.S. at 560 (1992) (quotations omitted). The redressability problem this request for declaratory relief poses is less common but no less fundamental.

procedure difficult to distinguish from the mere advisory opinions prohibited by Article III.

18A WRIGHT ET AL., *supra,* § 4446. This requirement explains why you will not find a declaratory judgment that lacks preclusive effect.

This case will be the first. There is no mutuality of parties, nor is the state court judge who will decide Y.R.J.'s case a party. The Brackeens have suggested that a ruling in this federal case would bind the Navajo Nation in state court. That is not true for multiple reasons. For starters, the Navajo Nation was not a party in the district court (it intervened on appeal), so standing on that basis would not have existed when the suit was filed or even when judgment was entered. *See Lujan*, 504 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit.").[7] Relatedly, it is doubtful that issue preclusion applies to a party that does not litigate in the trial court. Apart from these defects relating to the timing of Navajo Nation's entering this lawsuit, issue preclusion does not usually apply to pure questions of law like whether ICWA's preferences violate the Fifth Amendment. *John G. & Marie Stella Kenedy Mem. Found. v. Dewhurst*, 90 S.W.3d 268, 288 (Tex. 2002) (explaining that "[d]eterminations of law are not generally given preclusive effect" in refusing to give effect to federal court ruling interpreting old land grant under Mexican civil law); *see also In re Westmoreland Coal Co.*, 968 F.3d 526, 532 (5th Cir. 2020); RESTATEMENT (SECOND) OF JUDGMENTS § 29(7) (1982); 18 WRIGHT ET AL., *supra*, § 4425, at 697-701 (all recognizing same principle). This ordinary reluctance to give preclusive effect to questions of law becomes even stronger when, as here, the two cases are in different forums and neither

---

[7]*Lujan* is right on point. The plaintiff sought to establish redressability by arguing that "by later participating in the suit" two federal agencies "created a redressability (and hence a jurisdiction) that did not exist at the outset." *Id*. at 569 n.4. That argument did not work because "[t]he existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." *Id*. (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)). Any claim of postfiling redressability is even weaker here because Navajo Nation did not intervene until the appeal.

jurisdiction's highest court has resolved the issue. RESTATEMENT (SECOND) OF JUDGMENTS § 29(7) cmt. i.

JUDGE DUNCAN'S Opinion states the plaintiffs need only show that the "practical consequences" of a ruling by this court would "significantly increase the likelihood of relief." Duncan Op. at 20. Note the opinion does not say—and can't say because no case does—that redressability can be met when the "practical consequence" is convincing a state court judge to follow our lead. That distinction is critical. As I have recounted, state courts have no obligation to follow a lower federal court's ruling on federal law.   In contrast, the executive branch officials sued in cases like *Franklin* would be bound in later litigation by the federal court's declaratory judgment. 505 U.S. at 803 (recognizing that the Commerce Secretary's role in "litigating [the] accuracy" of the census meant that declaratory relief against her would redress plaintiff's injuries). The *Franklin* redressability dispute was about whether the Cabinet member being sued had sufficient influence over the challenged policy even though the President had the ultimate say (as is always the case). On that question, a substantial likelihood that the Commerce Secretary could influence the census conducted by the department she headed established redressability. 505 U.S. at 803 (recognizing that it was the Commerce Secretary's "policy determination concerning the census" that was being challenged); *see also supra* note 4. *Franklin*'s unremarkable reasoning is why there is redressability for the APA claims—a declaratory judgment against the Interior Secretary would bind her when it comes to enforcing the department's challenged regulations.

But contrary to JUDGE DUNCAN'S Opinion, the Plaintiffs' standing to challenge regulations cannot bootstrap the claims challenging ICWA's *statutory* preferences into federal court. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press."). Even without a regulation requiring "clear and convincing" evidence to justify departing from the preferences, the statutory preferences remain and must be applied by state court judges unless they hold them unconstitutional. The benefit the

9

individual Plaintiffs would receive from a declaration that the "clear and convincing evidence" regulation is invalid establishes redressability for the APA claim challenging that regulation; it does not show how a declaration that the underlying statutory preferences are unconstitutional would redress plaintiffs' injuries. *But see* Duncan Op. at 21–22.

Judge Duncan's second stab at redressability also improperly cross-pollinates standing among different claims. Redressability arising from a declaration that any obligations the placement preferences impose on child welfare officials violate anti-commandeering principles at most establishes standing for that "particular claim[]," *Allen v. Wright*, 468 U.S. 737, 752 (1984), not the equal protection claim that seeks to declare unlawful the preferences as they apply in state court proceedings. *But see* Duncan Op. at 21–22. And the statutory preferences remain on the books regardless of federal funding based on ICWA compliance.[8] *But see id.* at 21.

The final redressability theory in Judge Duncan's Opinion is that the "requested relief would make the adoptions less vulnerable to being overturned" because it "would declare unenforceable the collateral attack provisions themselves and the underlying grounds for invalidity." Duncan Op. at 21 (citing 25 U.S.C. §§ 1911-1914). This again mixes and matches claims against different provisions instead of requiring the plaintiffs to "demonstrate standing separately" for each claim. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000). More fundamentally, it brings us back to where I started: no state court judge has to follow what we say about ICWA. Consequently, even if standing to challenge the collateral review provisions somehow transfers to support standing for challenging the separate provisions establishing the preferences in the first place, no state court has to follow a "ruling" we make about the collateral review provisions.

---

[8] Chief Judge Owen also correctly notes that the funding issue "was not raised or briefed in the district court or this court." Owen Op. at 5. Nor is it clear how the individual plaintiffs, as opposed to the States which cannot assert a Fifth Amendment claim, are injured by the funding issue.

To a state court judge, our "ruling" is nothing more than pontifications about the law. Perhaps our view persuades the state court, perhaps not.

So both of the opinions that find standing for the equal protection claim end up basing that view, at least in part, on the possibility that a Texas judge might decide to follow our view of the law. Think about the consequences of this unprecedented view of standing. A plaintiff need only find a state court judge who says she would defer to a federal court ruling on the difficult constitutional issue she is facing. Presto! A plaintiff could manufacture standing for a federal lawsuit even when a declaratory judgment would not have preclusive effect on any parties to the federal suit. Talk about upsetting the state/federal balance.

This license to allow outsourcing of traditional state court matters to federal court brings me back to the opening point. To supposedly vindicate federalism, we offend it by deciding questions that state court judges are equipped to decide and have for decades—with the Supreme Court having a chance to review those rulings. *See, e.g., Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013) (case arising in South Carolina courts); *cf. Moore v. Sims*, 442 U.S. 415, 418, 434–35 (1979) (holding that *Younger* abstention applies to family law cases). That we disregard the limits of federal jurisdiction to reach out and decide issues that are raised directly in adoption cases makes our lack of faith in our state court colleagues even more troubling. Why aren't they capable of deciding these issues that are squarely before them? Any historical and institutional concerns about state courts' willingness to vindicate federal constitutional rights are lessened when a federal statute is being challenged. If anything, state court judges would be more receptive to concerns, like the allegations plaintiffs raise here, that a federal law is interfering with constitutional protections for States and individuals.

If the case-or-controversy requirement means anything, it prevents a federal court from opining on a constitutional issue on the mere hope that some judge somewhere may someday listen to what we say. No limitation on Article III is more fundamental than our inability to issue such an advisory opinion.

11

II.

A.

That brings us to the most tragic irony of today's opinions. After more than two centuries of courts' recognizing sweeping federal power over Indian affairs when that power was often used to destroy tribal life, our court comes within a whisker of rejecting that power when it is being used to sustain tribal life. It would be news to Native Americans that federal authority to wage war against Indian nations, to ratify treaties laying claim to more than a billion acres of Indian land, to remove Indian communities to reservations, and to establish schools aimed at "civilizing" Indian pupils does not reach the Indian family. *See United States v. Lara*, 541 U.S. 193, 201–04 (2004); 1 Cohen's Handbook of Federal Indian Law §§ 1.01–03. Contrary to what a near-majority of our court concludes, the same power Congress once relied on to tear Indian children from Indian homes authorizes Congress to enlist state courts in the project of returning them.

Two centuries of federal domination over Indian affairs are enough to sustain ICWA's provisions regulating state domestic relations proceedings. Congress has "plenary and exclusive" authority "to legislate in respect to Indian tribes." *Lara*, 541 U.S. at 200. This "broad power," *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980), is found in Article I, which authorizes Congress to "regulate commerce . . . with the Indian tribes." U.S. Const. art. I, § 8. The Indian Commerce Clause "accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 62 (1996).

Judge Dennis well articulates how federal supremacy in the field of Indian affairs grew out of the Founding generation's understanding of the relationship between the new nation and tribes. From the outset, the Continental Congress dealt with Indian tribes just as it did foreign nations, wielding an indivisible bundle of powers that encompassed war, diplomacy, and trade. En Banc Brief for Professor Gregory Ablavsky in Support of Defendants-Appellants and Reversal at 5–6. But under the Articles of

12

Confederation, some states claimed much of the same authority, leaving the state and federal governments jostling for control over Indian relations. Gregory Ablavsky, *Beyond the Indian Commerce Clause*, 124 YALE L.J. 1012, 1021–22 (2015) (discussing ARTICLES OF CONFEDERATION OF 1781, art. IX, para. 4). The Constitution solved this predicament by making federal authority over Indian commerce, treatymaking, and territorial administration exclusive. *Id.* The national government soon claimed, with the apparent assent of state leaders, undivided power over Indian affairs. *Id.* at 1041–44. Dennis Op. at 7–13.

The Framers grounded federal power over Indian affairs in both the explicit constitutional text and in implicit preconstitutional understandings of sovereignty.[9] Brief of Indian Law Scholars as Amici Curiae in Support of Defendants-Appellants at 1. They viewed relations between the United States and Indian tribes as governed by the law of nations. Ablavsky, *supra*, at 1059–67. Many early treaties embraced the idea that the United States, as the more powerful sovereign, owed a duty of protection to tribes. Brief of Indian Law Scholars, at 1–2 (collecting examples). And the Supreme Court emphasized that this responsibility for Indian welfare imbued the federal government with immense power at the expense of the states. *See, e.g.*, *Worcester v. Georgia*, 31 U.S. 515, 560–61 (1832); *United States v. Kagama*, 118 U.S. 375, 384 (1886); *United States v. Rickert*, 188 U.S. 432, 437–38 (1903).

How far does this power extend? The Supreme Court has upheld federal authority to enact special criminal laws, in the name of "continued guardianship," affecting U.S. citizens who are Indian tribe members. *United States v. Nice*, 241 U.S. 591, 595–99 (1916) (construing the General Allotment

---

[9] Just as the Supreme Court has stressed that background principles of state sovereign immunity inform interpretation of the Eleventh Amendment, *Seminole Tribe*, 517 U.S. at 72, the Court has recognized the relevance of the historical context from which the plenary federal Indian power emerged. *See Lara*, 541 U.S. at 201 (tracing federal authority over Indian affairs to "the Constitution's adoption of preconstitutional powers necessarily inherent in any Federal Government"); *Morton v. Mancari*, 417 U.S. 535, 551–53 (1974) ("The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself.").

Act of 1887). Congress may violate treaty obligations in its disposal of tribal property, *Lone Wolf v. Hitchcock*, 187 U.S. 553, 564, 567–68 (1903) (validating congressional allotment in conflict with treaty between the United States and Kiowa and Comanche Tribes); unilaterally determine tribal membership for the purposes of administering tribal assets, *Del. Tribal Bus. Cmte. v. Weeks*, 430 U.S. 73, 84–86 (1977) (upholding statute appropriating award made by Indian Claims Commission); exercise eminent domain over tribal lands, *Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 656–67 (1890) (upholding legislation granting railroad right of way through Indian land); and single out Indian applicants for preferred hiring in federal jobs, *Mancari*, 417 U.S. at 551–55 (sustaining constitutionality of Indian Reorganization Act of 1934).[10]

Where do the states stand in relation to the "plenary and exclusive" federal power over Indian affairs? They are "divested of virtually all authority over Indian commerce and Indian tribes." *Seminole Tribe*, 517 U.S. at 62. The states, in ratifying the Constitution, ceded to Congress "the exclusive right to regulate . . . intercourse with the Indians," *Worcester*, 31 U.S. at 590, as clearly as the states gave Congress sole power to "coin money, establish post offices, and declare war," *id.* at 580–81. Even when federal policy favoring state control over Indian affairs reached its height, Congress

---

[10] The Supreme Court has recognized the extraordinary breadth of federal power in another area where Congress wields plenary authority: immigration. *See* Michael Doran, *The Equal-Protection Challenge to Federal Indian Law*, 6 U. PA. J. L. & PUB. AFF. 1, 34–42 (2020). The foundational cases recognizing plenary federal authority over immigration and Indian affairs were decided just three years apart and rely on similar reasoning. *Compare Chae Chan Ping v. United States*, 130 U.S. 581 (1889), *with Kagama*, 118 U.S. at 375 (1886); *see also* Doran, *supra*, at 34–36 (noting similarities in the reasoning of the cases).

There is also symmetry in the scope of federal power over these two subjects. Just as limited rational-basis review governs classifications involving tribes, the immigration power allows the federal government to discriminate among noncitizens in a way that states may not. *Compare Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976) (Congress may withhold Medicare eligibility from certain noncitizens), *with Graham v. Richardson*, 403 U.S. 365, 376 (1971) (states may not constitutionally deny welfare benefits to certain noncitizens); *see also* Doran, *supra*, at 36–39 & n.193 (drawing this comparison). And because "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government," "[a]ny concurrent state power that may exist is restricted to the narrowest of limits." *Hines v. Davidowitz*, 312 U.S. 52, 66–68 (1941).

withheld from the states "general civil regulatory powers . . . over reservation Indians." *Bryan v. Itasca Cty.*, 426 U.S. 373, 390 (1976) (interpreting Pub. L. 280); Cohen's § 1.06 & n.32.

Some examples illustrate the limits of state authority to regulate Indian affairs even in core areas of state power like criminal law and taxation. Without Congress's blessing, states cannot exercise criminal jurisdiction over Indian country. *See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 470–71 (1979) (discussing federal authorization of state jurisdiction under Pub. L. 280); *United States v. John*, 437 U.S. 634, 649–54 (1978) (holding state criminal jurisdiction precluded by Major Crimes Act of 1885); *Kagama*, 118 U.S. at 379–80. Congress can exempt Indians from state property taxes. *Bd. of Comm'rs of Creek Cty. v. Seber*, 318 U.S. 705, 715–18 (1943). Even when Congress has not legislated, exclusive federal authority in the domain of Indian affairs may preempt state regulation. *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 165 (1973) (invalidating state tax on tribe member's income earned on reservation); *Bracker*, 448 U.S. at 150–52 (striking down state tax on commercial activities of non-Indians on Indian land).

Judge Duncan's Opinion proclaims ICWA a novel exercise of congressional power because it interferes with state domestic relations proceedings. But as Judge Dennis recounts, the federal government has been a constant, often deleterious presence in the life of the Indian family from the beginning. And, as will be discussed, ICWA is hardly the only statute to impose federal standards on state courts.

Congress's interest in the destiny of Indian children is older than the Republic itself. The Continental Congress viewed Indian education as a wartime strategy, authorizing a grant to Dartmouth College with the hope that bringing Indian students to the school would deter any possible attack by British-allied tribes. Matthew L.M. Fletcher & Wenona T. Singel, *Indian Children and the Federal-Tribal Trust Relationship*, 95 Neb. L. Rev. 885, 911 (2017). Following Independence, more than one hundred treaties provided for Indian education. Brief of Indian Law Scholars, at 4. But early federal

efforts to offer voluntary education programs morphed into a "coercive and destructive" system of boarding schools designed to assimilate Indian children. Matthew L.M. Fletcher, Principles of Federal Indian Law § 3.6 (1st ed. 2017); Brief of Ablavsky, at 20. The federal government instituted its "civilization" policy by force, punishing Indian families that resisted turning over their children and hunting down the pupils who escaped. Fletcher, Federal Indian Law § 3.6. At these schools, students were beaten for speaking their native languages. Cohen's § 1.04; Dennis Op. at 21–24. While these practices have abated, federal involvement in Indian schooling has not. Under today's federal policy of Indian self-determination, Congress provides substantial funding for Indian education and continues to operate some schools with "tribal input and . . . tribal control." Fletcher & Singel, *supra*, at 964; *see also* Brief of Indian Law Scholars, at 4.

In the view of Judge Duncan's Opinion, this narrative sheds little light on whether Congress can set standards for state adoptions involving Indian children because no Supreme Court decision or "founding-era congressional practice" explicitly blesses federal intervention in state domestic relations proceedings. Duncan Op. at 2, 29. But adoption as we know it today did not exist at common law and did not become the subject of state legislation until the mid-nineteenth century. Stephen B. Presser, *The Historical Background of American Adoption Law*, 11 J. Fam. L. 443, 443 (1971). It would have been "anachronistic . . . and bizarre," in the words of one amicus, for the founding-era Congress to attempt legislative interference with state proceedings that would not exist for another eight decades. Brief of Ablavsky, at 16; *see also Brown v. Bd. of Educ.*, 347 U.S. 483, 489–90 (noting that the history of the Fourteenth Amendment was "inconclusive" on the issue of school segregation because "[i]n the South, the movement toward free common schools, supported by general taxation, had not yet taken hold" at the time of enactment). Given that "at least during the first century of America's national existence . . . Indian affairs were more an aspect of military and foreign policy than a subject of domestic or municipal law," it should come as no surprise that the focus of the broad federal power over

Indian affairs has shifted over time. *Lara*, 541 U.S. at 200 (internal citation omitted).

Still, JUDGE DUNCAN's Opinion declares ICWA—as a "federal Indian law [that] governs states' own administrative and judicial proceedings" for domestic relations—to be highly "unusual," and finds no historical analogue for this (highly specific) category of legislation. Duncan Op. at 2, 34. But while family court proceedings typically are governed by state law, they are not a "no fly zone" for federal interests. *See* Brief of Casey Family Programs, at 24–26 (discussing federal laws that apply in domestic relations cases). Take the Servicemember's Civil Relief Act. 50 U.S.C. §§ 3901–4043. The law sets rules governing child custody proceedings in state courts by, among other things, limiting the court's consideration of a servicemember's deployment when determining custody. *See id.* §§ 3931, 3938. In asserting a federal interest in family court proceedings, the Servicemember's Civil Relief Act is not unique. To further the federal government's treatymaking and foreign relations powers, the International Child Abduction Remedies Act charges state courts with administering the Hague Convention on the Civil Aspects of International Child Abduction to ensure "prompt return" of abducted children. *See* 28 U.S.C. §§ 9001–03. And JUDGE HIGGINSON cites several examples of federal laws that preempt state domestic relations law. Higginson Op. at 2-3 (citing cases involving ERISA, the Railroad Retirement Act, the National Service Life Insurance Act, and Homestead Act). If these statutes permissibly "govern[] states' own administrative and judicial proceedings," Duncan Op. at 2, why would Congress lack authority to do the same through its "plenary and exclusive" power over Indian affairs?

When Congress enacted ICWA, it declared the removal of Indian children from their homes by state officials "the most tragic and destructive aspect of American Indian life today." *See* H.R. Rep. No. 95-1386, at 9 (1978). Family-separation policies had "contributed to a number of problems, including the erosion of generations of Indians from Tribal communities, loss of Indian traditions and culture, and long-term emotional

17

effects on Indian children caused by the loss of their Indian identity." Indian Child Welfare Act Proceedings, Final Rule, 81 Fed. Reg. 38,864, 38, 780 (June 14, 2016) (citing *Hearing Before the Subcommittee on Indian Affairs of the Senate Comm. on Interior & Insular Affairs on Problems that Am. Indian Families Face in Raising Their Children & How These Problems Are Affected by Fed. Action or Inaction,* 93 Cong., 2d Sess., at 1–2, 45–51 (1974)). Although ICWA can never heal these wounds, it sought to stanch their bleeding. As the culmination of extensive federal involvement in the education and welfare of Indian children, the law falls well within the broad congressional power over Indian affairs.

## B.

This leads to today's final irony. JUDGE DUNCAN's Opinion overrides the plenary federal power over Indian affairs, with its deep textual and historical roots, based on a principle that finds support in neither text nor history: the notion that the Constitution prohibits the federal government from granting preferences to tribe members. Rather than credit copious originalist evidence of the sweeping federal power over Indian affairs, JUDGE DUNCAN's Opinion adopts the atextual and ahistorical argument that the Fifth Amendment's implicit equal protection guarantee strips Congress of the power to enact tribal preferences. Duncan Op. at 71; *see Bolling v. Sharpe*, 347 U.S. 497, 499 (1955) (recognizing that the Fourteenth Amendment's guarantee of "'equal protection of the laws' is a more explicit safeguard of prohibited unfairness" than the Fifth Amendment's Due Process Clause). That is nothing new. Originalism usually goes AWOL when the issue is whether the government may grant preferences to historically disadvantaged groups. *See, e.g.,* ERIC J. SEGALL, ORIGINALISM AS FAITH 127–30 (2018); CASS R. SUNSTEIN, RADICALS IN ROBES 131–42 (2005); Steven G. Calabresi & Gary Lawson, *The Rule of Law as a Law of Law*, 90 NOTRE DAME L. REV. 483, 490–91 (2014); Michael B. Rappaport, *Originalism and the Colorblind Constitution*, 89 NOTRE DAME L. REV. 71, 76 (2013); Stephen M. Griffin, *Rebooting Originalism*, 2008 U. ILL. L. REV. 1185, 1202–03; Jed Rubenfeld, *Affirmative Action*, 107 YALE L.J. 427, 430–

32 (1997); Eric Schnapper, *Affirmative Action and the Legislative History of the Fourteenth Amendment*, 71 VA. L. REV. 753, 754 (1985).[11]

Ignoring the lack of historical support for a constitutional ban on federal preferences to historically-disadvantaged groups is especially flagrant in light of 200-plus years of jurisprudence recognizing vast federal power over Indian affairs. As that authority flows in part from the federal government's plenary power over foreign relations, there is nothing unusual or unconstitutional about exercising it to grant preferences. Preferring some nations over others—through alliances, aid, and treaties, among other things—is the essence of foreign policy. That's why a preference for tribe members "does not constitute racial discrimination." *Mancari*, 417 U.S. 553; *see* Bethany R. Berger, *Savage Equalities*, 94 WASH. L. REV. 583, 627 (2019) ("ICWA's definition of 'Indian children,' which requires either tribal citizenship or that the child has a tribal citizen parent and is eligible for citizenship, rests squarely on the kind of 'political rather than racial' belonging of which *Mancari* approved."). When Congress "single[s] out [Indians] for special treatment," it draws upon its expansive authority to structure relations between the United States and another sovereign. *Mancari*, 417 U.S. at 554–55 (describing Indians as "members of quasi-sovereign tribal entities"); *accord Fisher v. Dist. Court*, 424 U.S. 382, 390 (1976) (explaining that the jurisdiction of a tribal court "does not derive from [] race . . . but rather from the quasi-sovereign status of [tribes] under federal law"). These preferences further centuries-old interests animating the federal government's "special relationship" with tribes. *Mancari*, 417 U.S. at 541–42, 552.

---

[11] Although Professor Rappaport recognizes that some court decisions rejecting the constitutionality of affirmative action programs "engage[] in little discussion of the constitutional text and almost no discussion of the history of the Fourteenth Amendment," he tries to push back on the prevailing scholarly view that the original understanding allows *states* to pursue such policies. Rappaport, *supra*, at 76. But even he recognizes that the historical case is much different when it comes to claims that the federal government cannot adopt policies that prefer disadvantaged groups. *Id.* at 71 n.2, 73.

## C.

Why bother with these objections to the substantive aspects of today's opinions if, as I have explained, they will have all the binding effect of a law review article?[12] Because the procedural and substantive problems with this case are two peas in the same activist pod.

Judicial restraint is a double victim of today's tome. The court ignores standing requirements that enforce "the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). And a willingness, even eagerness, to strike down a 43-year-old federal law that continues to enjoy bipartisan support scorns the notion that "declar[ing] an Act of Congress unconstitutional . . . is the gravest and most delicate duty" that federal judges are "called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 147–48 (1927) (Holmes, J., concurring).

Whither the passive virtues? Alexander Bickel, *The Supreme Court 1960 Term Foreword: The Passive Virtues*, 75 HARV. L. REV. 40 (1961).

Whither the "conviction that it is an awesome thing to strike down an act of the legislature approved by the Chief Executive"? ROBERT H. JACKSON, THE STRUGGLE FOR JUDICIAL SUPREMACY: A STUDY OF A CRISIS IN AMERICAN POWER POLITICS 323 (Legal Classics ed. 2000).

Heaped, one must conclude, on the pile of broken promises that this country has made to its Native peoples.

---

[12] In addition to a federal court's inability to create precedent for state courts, the two equal protection challenges our court upholds will not even be precedential within our circuit because we are affirming the district court's ruling by an equally divided vote.